## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| TAMAR SHIRINIAN | ) | |
| | ) | |
| *Plaintiff,* | ) | **Civil Action No. 3:25-cv-528** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Crytzer** |
| **THE UNIVERSITY OF TENNESSEE** | ) | **Magistrate Judge McCook** |
| **KNOXVILLE,** | ) | |
| | ) | **JURY DEMAND** |
| **DONDE PLOWMAN,** | ) | |
| **RANDY BOYD and CHARLES NOBLE,** | ) | |
| **In their personal and official capacities.** | ) | |
| | ) | |
| *Defendants.* | ) | |

---

### MEMORDANUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED HEARING

---

Plaintiff moves this Court for a temporary restraining order to restrain Defendants from retaliating against her in any way based on her Facebook comment. Among other things, this would require Defendants to remove Plaintiff from being on administrative leave, allow her to return to teaching in the classroom and mentoring students, afford her the opportunity to publish as a UTK professor, halt any termination proceedings, and allow her tenure track to continue without any interference or retaliation.

The First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). Speech about "public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to

Case 3:25-cv-00528-KAC-JEM    Document 12    Filed 11/05/25    Page 1 of 9    PageID #: 105

special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

## I.  LEGAL STANDARD

In determining whether to grant a TRO and/or preliminary injunction, the Court must weigh four factors: (1) the movant's chances of succeeding on the merits; (2) if the movant would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest. *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). The Sixth Circuit has held that "[n]one of these factors is a prerequisite to injunctive relief," rather, "It's a balance of four factors, not a mandate that all four factors exist. While the absence of one factor—say harm to a moving party—may weigh heavily in the balance, it does not dictate the balance." *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017). However, particularly in the context of TRO requests, courts should generally emphasize the "irreparable injury" factor above the others. *Bobay v. Wright State Univ.*, 2023 U.S. LEXIS 14825, *6 – 7 (6th Cir. 2023).

Based on the law and facts, the scales tip heavily in favor of the Plaintiff.  Further, while not dispositive, it is notable that the United States District Court for the District of South Dakota granted a similar motion for a TRO in a case involving a professor who spoke out against Mr. Kirk.  See *Hook v. Rave*, Case No. 4:25-cv-04188-KES, Sept. 24, 2025 (attached as <u>Exhibit 5</u>).

## II.  Dr. Shirinian's private Facebook comment is core protected political speech that is protected by the First Amendment

The First Amendment protects us all—those who are unpopular today, as well as those who may be unpopular tomorrow.  *Healy v. James*, 408 U.S. 169, 188 (1972), quoting *Community Party v. SACB*, 367 U.S. 1, 137 (dissenting opinion) (1961) ("I do not believe that it can be too often

repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish."). This protection is at the core of the American experiment and extends to all viewpoints, without discrimination.

On the night of September 12, 2025, while Dr. Shirinian was in her home, off work, and on personal time, she wrote a comment to a private Facebook post that her friend had posted. See Shirinian Declaration. The private Facebook Post of Dr. Shirinian's friend stated as follows:

> "I've unfriended four people since Kirk's assassination. I get it, they're mourning him because of his message but the content of his message was full of hate, genocide apologia and bigotry yet they're treating him like the next best thing since Jesus. So my secular sensibilities find that to be blasphemous and a lil delulu. I guess we "grew" apart.

Dr. Shirinian responded to her friend's private Facebook post with a comment:

> The world is better off without him in it. Even those who are claiming8 to be sad for his wife and kids….like, his kids are better off living in a world without a disgusting psychopath like him and his wife, well, she's a sick fuck for marrying him so I don't care about her feelings.

Now, Dr. Shirinian is about to be fired. See id.

Dr. Shirinian exercised her First Amendment rights as a private citizen on a matter of great and immediate public concern. While her words offended political leaders who sought to punish her for this speech, that does not negate the fact that it is fully protected by the First Amendment. Were it otherwise, political speech that causes hurt feelings or political disagreements would allow the government to retaliate against any of us---something that Mr. Kirk himself often noted.

Dr. Shirinian's speech deals with profound and timely public issues: Who was Charlie Kirk? What is his legacy? Do we agree or disagree with what he promoted? How should we react to his murder? Does it bother you that President Trump supported him, and vice-versa?

3

Were some of his messages full of hate, genocide apologia, and bigotry?  Were his messages like the messages of Jesus or where they opposite to the messages of Jesus?  Is treating him like Jesus blasphemous?  The questions and opinions set a foundation for who we want to be as a country.

Speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community" involves matters of public concern.  *Connick v. Myers*, *supra*, 461 U.S. at 146.  Whether speech is —in the view of some— "inappropriate" or "controversial" is "irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).  In fact, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."  *Snyder v. Phelps*, *id.*, quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

Even something as appalling and disgusting as advocating for the assassination of the President—nothing close to anything Dr. Shirinian said or ever would say—is protected.  On March 30, 1981, a clerical employee in a Texas county Constable's office, upon hearing of the attempt to assassinate President Ronald Reagan, said "If they go for him again, I hope they get him."  She was fired.  The Supreme Court held that her First Amendment right to speak outweighed her law-enforcement employer's interest in terminating her.  It ruled that her firing violated her First Amendment right to speak.  *Rankin v.McPherson*, 483 U.S. 378, 392 (1987).

This framework is in place because the state may not punish speech it dislikes. "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *NRA of America v. Vullo*, 602 U.S. 175, 180 (2024).  This is not a novel idea.  "Six decades ago, this Court held that a government entity's threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of

4

disfavored speech violates the First Amendment." *NRA of America v. Vullo*, *id.*, quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

In understanding rights given to college professors when dealing with extramural speech, *Jorjani v. N.J. Inst. of Tech*, 151 F.4d 135 (3rd Cir. 2025), is helpful. Jorjani, a philosophy professor, formed the "Alt Right Corporation," founded the website "AltRight.com" and spoke favorably of Adolph Hilter. In reversing the District Court, the Court of Appeals, citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987), recognized that Jorjani's speech cannot "be considered in a vacuum" as the "manner, time, and place of the employee's expression are relevant." The Court recognized the importance of the fact that his speech occurred entirely outside of the college's academic environs and found that, "it matters not that his opinions do not enjoy majoritarian support, since 'the proudest boast of our free speech precedence is that we protect freedom to express 'the thought that we hate.'" *See* Jorjani at 147, citing *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

### B. Dr. Shirinian is suffering irreparable injury

"'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, ___ U.S. ___, 145 S. Ct. 2332, 2364 (2025), quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). "This Court has long held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Doe v. Mills*, ___ U.S. ___, 142 S.Ct. 17, 22 (2021), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

Moreover, in the context of an ongoing First Amendment injury, there is substantially less onus on a plaintiff to demonstrate actual irreparable injury to satisfy Rule 65. *In re King World*

*Productions, Inc*., 898 F.2d 56, 59 (6th Cir. 1990) (recognizing that "even minimal interference with first amendment freedoms causes an irreparable injury.").

Dr. Shirinian has been punished for exerting her freedom under the First Amendment, effectively quelling the speech of all public university professors if the government does not like it. As a result, she is not allowed to teach or publish in her capacity as a UTK professor. She cannot work with graduate students she has helped for years to finish their dissertations. See Shirinian Declaration. And, she has been wrongly accused of promoting school shootings--- something she did not do and would never do. See id.

**C.     The TRO/Preliminary Injunction will not cause substantial harm to third parties**

Granting a temporary restraining order enforcing Dr. Shirinian's First Amendment rights will not inflict any substantial harm on third parties. To the contrary, defendants and students at UTK will benefit by returning Dr. Shirinian to the classroom so she can resume teaching and mentoring her students as they finish their dissertations, exactly what they sought when UTK hired her. It will also "unchill" the speech of many who may now be afraid to speak out in fear of retribution---even if such retribution would violate the First Amendment.

**D.     The TRO and injunction will serve the public interest**

The public interest is always served when the Constitution is upheld. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). Therefore, the TRO and injunction will serve the public interest.

**II.      Dr. Shirinian should be excused from posting bond**

"The court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." F.R.Civ.P. 65(c). But no bond should be

required here. Defendants will sustain no costs or damages from a temporary restraining order. Even if defendants could show potential costs or damages, this litigation seeks to vindicate the public interest in enforcing the First Amendment, so a bond should be waived.

**III.        Plaintiff has provided proper notice to defendants**

Plaintiff has already provided a copy of this Motion to counsel for UTK, so the provisions of F.R.Civ.P. 65 concerning temporary restraining orders granted without notice do not apply.

**IV.        Conclusion**

Overbroad regulation of speech harms public speech far beyond its effect on any person retaliated against. Everyone—university professors, students, citizens—who sees or hears what has happened to Dr. Shirinian is deterred from saying anything that could put them in MAGA's crosshairs. No one wants to be next. Professors have families and obligations. They do not want to be fired, must try to find a lawyer, then engage in time-consuming, anxiety-provoking, expensive litigation to try to get their job back. Almost any rational teachers will take a big step back from expressing any opinion on any of the most controversial subjects of the day: Mr. Kirk, the reaction to Mr. Kirk's murder, President Trump and his attempts to remake American society and culture, etc. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.") The outcome of this litigation will significantly affect whether university professors will speak on matters of public debate, especially in times of political challenges when their voices are needed more than ever.

"Professors may say things in public that are mistaken, offensive, or even repugnant and vile—or they may simply say things that threaten the interest of powerful groups and individuals or run contrary to prevailing sentiment—but general principles of free speech protect their right

to say such things and university employers should refrain from penalizing them for such speech. When universities claim that firing professors who say controversial things is justified, courts should stand ready to closely interrogate such claims. [Even] [w]hen the extramural speech of professors is weighed in a *Pickering* balance, the university's legitimate interest should not include an interest in suppressing speech because it is unpopular or uncivil or gives rise to the commotions that unpopular or uncivil speech can trigger." Keith E. Whittington, *What Can Professors Say in Public? Extramural Speech and the First Amendment*, 73 Case W. Rsrv. L. Rev. 1121, 1174-75 (2023).

Debating Dr. Shirinian's comment is for the marketplace of ideas and, ideally, for faculty and students at universities such as the University of Tennessee. The First Amendment guarantees the marketplace stays open in public universities and colleges and that speakers, even the very speakers UTK has previously allowed on campus and the UTK professor who undoubtedly promoted violence, not be punished when the government does not like it.

Respectfully Submitted,

 /s/ Robert C. Bigelow, Esq.
Robert C. Bigelow, Esq. #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
(615) 829-8986
rbigelow@bigelowlegal.com

8

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 5, 2025, a copy of the foregoing is being sent via email to all counsel listed below:

Rachel K. Powell, Esq.
Deputy General Counsel
The University of Tennessee
400 W. Summit Dr. – UT Tower #1117
Knoxville, TN 37902
(865) 974-0525
Attorney for Defendants

<u>/s/ Robert C. Bigelow</u>
Robert C. Bigelow #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
rbigelow@bigelowlegal.com
(615) 829-8986

*Attorney for Plaintiff*

9