UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| PHILLIP MICHAEL HOOK,<br><br>Plaintiff,<br><br>vs.<br><br>TIM RAVE, in his official capacity as President of the South Dakota Board of Regents; SHEILA K. GESTRING, in her official capacity as President of the University of South Dakota; and BRUCE KELLEY, in his official capacity as Dean of the University of South Dakota College of Fine Arts,<br><br>Defendants. | 4:25-CV-04188-KES<br><br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

On September 23, 2025, plaintiff, Phillip Michael Hook, sued Tim Rave, the President of the South Dakota Board of Regents; Sheila K. Gestring, the President of the University of South Dakota; and Bruce Kelley, the Dean of the University of South Dakota College of Fine Arts. *See generally* Docket 1. In his complaint, Hook alleges that the South Dakota Board of Regents' (SDBOR) notice of intent to fire Hook from his job as a professor at the University of South Dakota amounted to unconstitutional retaliation in violation of the First Amendment. *Id.* ¶¶ 16-17, 22. Hook filed a motion for a temporary restraining order, requesting a TRO to restrain defendants from (1) retaliating against him in any way based on his Facebook posts, (2) continuing his administrative leave, and (3) holding a personal conference with Hook on September 29, 2025. Docket 3. On September 24, 2025, the court held a motion hearing on the

TRO. Docket 10. For the following reasons, the court grants Hook's motion for a TRO.

## BACKGROUND

Hook is a tenured Professor of Art at the University of South Dakota. Docket 4 ¶ 1. He has taught at the University since 2006. *Id.*

In the late afternoon on September 10, 2025, while at home and off work, Hook posted the following message concerning the recent shooting and killing of Charlie Kirk to his private Facebook account:

> Okay. I don't give a flying f*** about this Kirk person. Apparently he was a hate spreading Nazi. I wasn't paying close enough attention to the idiotic right fringe to even know who he was. I'm sorry for his family that he was a hate spreading Nazi and got killed. I'm sure they deserved better. Maybe good people could now enter their lives. But geez, where was all this concern when the politicians in Minnesota were shot? And the school shootings? And Capitol Police? I have no thoughts or prayers for this hate spreading Nazi. A shrug, maybe.

Docket 4-2. Approximately three hours later, while still at home and off work, Hook removed the above message and made a second post. Docket 4 ¶ 3. The second post stated:

> Apparently my frustration with the sudden onslaught of coverage concerning a guy shot today led to a post I mow [sic] regret posting. I'm sure many folks fully understood my premise but the simple fact that some were offended, led me to remove the post. I extend this public apology to those who were offended. Om Shanti.

Docket 4-3.

Around noon on September 12, 2025, South Dakota Speaker of the House Jon Hansen[1] shared a screenshot of Hook's first post and included the following message:

> Yesterday, I was made aware of these hateful and vile comments made by a University of South Dakota professor regarding the death of Charlie Kirk and Charlie's family. I am disgusted by his remarks, and think they are unbecoming of someone who works for and represents our University. Yesterday, after seeing the post, I immediately reached out to USD President Sheila Gestring and called on the professor to be fired. I understand that the professor is likely to be terminated from his position. I will keep you posted on the final decision. That kind of disgusting rhetoric from an employee and representative of our university directed toward a good man's family who was recently assassinated will not be tolerated.

Docket 4-4. A few hours later, South Dakota Governor Larry Rhoden also shared a screenshot of Hook's first post and included the following message:

> When I read this post, I was shaking mad. The Board of Regents intends to FIRE this University of South Dakota professor, and I'm glad.
>
> This individual stands in front of South Dakota students to educate them. We must not send the message to our kids that this is acceptable public discourse.
>
> We need more Charlie Kirks on campus and less hatred like this.

Docket 4-6.

Around the same time, Hook received a letter from Kelley notifying Hook of Kelley's "intent to terminate [Hook's] contract as Professor with The University of South Dakota." Docket 4-7 at 1. The letter explained that the reason for Hook's termination was due to violations of SDBOR Policies 4.4.8 and 1.6.1.

---

[1] Jon Hansen is also a 2026 candidate for South Dakota Governor. Docket 4-4.

3

*Id.* SDBOR Policy 4.4.8 provides:

> Neglect of duty, misconduct, incompetence, abuse of power or other actions that manifest an unfitness to discharge the trust reposed in public university faculty members or to perform assigned duties.

*Id.* (quoting SDBOR 4.4.8 § 5.1). SDBOR Policy 1.6.1 provides:

> Faculty members are members of a learned profession. When they speak or write as private citizens on matters of public concern, they must be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As learned people and as educators, they should remember that the public may judge their profession and their institution by their utterances. Hence, they should at all times be accurate, show respect for the opinions of others and make every effort to indicate when they are not speaking for the institution.

*Id.* (quoting SDBOR 1.6.1 § C.1.3).

The letter further specified that evidence of the violation of SDBOR 4.4.8 "includes a social media post from [Hook's] personal account that we have attached as an addendum for reference." *Id.* The letter notified Hook that a personal conference to "discuss this matter and intended disciplinary action" would take place on September 29, 2025. *Id.* The letter also informed Hook that he would be placed on administrative leave until a final decision on the intent to terminate his position was determined. *Id.*

On September 23, 2025, Hook filed the present action, seeking injunctive relief based on a single claim of unconstitutional retaliation against core political speech in violation of the First Amendment. *See generally* Docket 1.

## LEGAL STANDARD

When ruling on a motion for a temporary restraining order or preliminary injunction, the court must consider (1) the likelihood of success on the merits;

(2) the threat of irreparable harm to the moving party; (3) the balance of irreparable harm against any injury an injunction would inflict on other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981); *see also Tumey v. Mycroft AI, Inc.,* 27 F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for preliminary injunction."). When weighing these factors, "no single factor is in itself dispositive," but the court must consider all the factors to determine whether to grant the temporary restraining order. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir. 1987).

## DISCUSSION

### I.    Likelihood of Success on the Merits

"Success on the merits has been referred to as the most important of the four factors." *Roudachevski v. All-Am. Care Ctrs., Inc.,* 648 F.3d 701, 706 (8th Cir. 2011). To demonstrate that he is likely to succeed on the merits, Hook need only show that he has a "fair chance of prevailing" on the merits. *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC,* 953 F.3d 1041, 1045 (8th Cir. 2020) (internal quotation marks omitted). A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. *Id.* at 1044-45.

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett,* 587 U.S. 391, 398 (2019) (quoting

*Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To prevail on his First Amendment retaliation claim, Hook must show that "(1) [he] engaged in protected activity, (2) [defendants] took an adverse employment action against [him], and (3) the protected speech was a 'substantial or motivating factor' in that decision to take the adverse employment action." *Noon v. City of Platte Woods*, 94 F.4th 759, 764 (8th Cir. 2024) (quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020)).

To determine whether Hook's speech is entitled to First Amendment protection, the court must first determine whether Hook "spoke as a citizen on a matter of public concern." *Mayfield v. Mo. House of Reps.*, 122 F.4th 1046, 1053 (8th Cir. 2024) (quoting *Henry*, 950 F.3d at 1011). "A public employee's speech is not protected by the First Amendment if it 'owes its existence' to [the employee's] professional responsibilities," *McGee v. Pub. Water Supply Dist. No. 2*, 471 F.3d 918, 921 (8th Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006)), because "a public employee does not speak as a citizen if he speaks pursuant to his job duties," *Lindsey v. City of Orrick*, 491 F.3d 892, 898 (8th Cir. 2007). Additionally, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citations omitted). In determining whether speech is protected, the court must examine the "content, form, and context of the speech." *Lindsey*, 491 F.3d at 898. "The arguably 'inappropriate

6

or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

The court concludes that Hook spoke as a citizen and his speech was on a matter of public concern. While at home and off work, Hook made the first post on his private Facebook page. Docket 4 ¶ 2; *see* Docket 4-2. Defendants note that Hook's Facebook page identified himself as a professor at the University of South Dakota, Docket 9 at 2-3, but this alone does not show that a post made on his personal Facebook account is speech that arises from Hook's duties as a professor. *See McGee*, 471 F.3d at 921. Hook's first post also constitutes speech on a matter of public concern. Hook's first post discussed the murder of a public figure—Charlie Kirk—and went on to question the difference in reactions between the murder of Kirk and other recent public murders and shootings. *See* Docket 4-2 (comparing the public reaction to Kirk's murder to the public reactions to the murders of Minnesota House Speaker Melissa Hortman and her husband Mark Hortman, the attempted murders of Minnesota State Senator John Hoffman and his wife Yvette Hoffman, and the shootings at Evergreen High School in Colorado). This is speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Lane*, 573 U.S. at 241. At the TRO hearing, defendants did not dispute Hook's assertion that his Facebook post constituted speech on a matter of public concern. Based on the above, the court concludes that Hook's speech is entitled to First Amendment protection.

Because Hook spoke as a citizen and on a matter of public concern, the court must then determine whether defendants have "produced evidence to indicate the speech had an adverse impact on the efficiency of the [University's] operations." *Mayfield*, 122 F.4th at 1053 (quoting *Henry*, 950 F.3d at 1011). If the court determines there is an adverse impact, then the court applies the balancing test laid out in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See id.* But "[w]here there is no evidence of disruption, resort to the *Pickering* factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests." *Henry*, 950 F.3d at 1011 (internal quotation marks omitted).

At this stage, defendants have failed to put on evidence that Hook's "speech had an adverse impact on the efficiency of the [University's] operations." *Mayfield*, 122 F.4th at 1053. Defendants allege that in the days following Hook's post, "hundreds of calls and message were made to the Board of Regents and/or the University of South Dakota commenting negatively regarding the comment or calling for the removal of Professor Hook." Docket 9 at 4. But "[m]ere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." *Lindsey*, 491 F.3d at 899; *see also Melton v. City of Forrest City, Ark.*, 147 F.4th 896, 903 (8th Cir. 2025) (finding insufficient evidence of disruption where defendants only alleged that " 'several' police officers and city-council members were upset and 'phone lines [were] jammed' with calls from concerned citizens"). Defendants have not demonstrated that there was any disruption to on-campus activities,

8

Hook's teaching lessons, or the University's operations. And without more, "such 'vague and conclusory' concerns . . . runs the risk of constitutionalizing a heckler's veto." *Melton*, 147 F.4th at 903 (quoting *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000)). Thus, because defendants have failed to demonstrate any evidence of disruption, the court need not consider the *Pickering* factors at this stage. *See id.* at 903; *Mayfield*, 122 F.4th at 1055.

The court last concludes that defendants took an adverse employment action against Hook and that Hook's speech was the "substantial or motivating factor" in defendants' decision to place Hook on administrative leave and notify him of their intention to fire him. *Henry*, 950 F.3d at 1011. To establish an "adverse employment action," Hook must show that he suffered "a material change in the terms or conditions" of his employment and that the change would "chill a person of ordinary firmness" from continuing to engage in activity protected by the First Amendment. *Grooms v. Privette*, 127 F.4th 730, 734 (8th Cir. 2025) (internal quotation marks omitted). At this stage, the court concludes that Hook has a "fair chance of prevailing" in showing that defendants' intention to terminate his position as a professor materially changed the terms and conditions of his employment and that the change to his employment status would "chill a person of ordinary firmness" from continuing to engage in First Amendment protected activity.[2] *Id.*

---

[2] Defendants argue that a TRO is inappropriate at this time because the case could become moot if SDBOR decides not to terminate Hook at the personal conference hearing scheduled for September 29, 2025. Docket 9 at 7. But as Hook notes, the possibility that the conference may end favorably for him does

Further, within two days of his first post, Hook was notified that the SDBOR intended to terminate his tenured position as a professor at the University of South Dakota. *See* Docket 4-2; Docket 4-7. The September 12, 2025, letter itself identifies Hook's social media post as the single piece of evidence it used to support its decision to terminate Hook's position. *See* Docket 4-7 at 1. Defendants also identify a phone call from South Dakota Speaker of the House Hansen as one of the "hundreds of calls and messages" it received seeking Hook's removal as a professor from the University of South Dakota. Docket 9 at 4. Defendants also indicated at the TRO hearing that generally, a letter indicating the SDBOR's intent to terminate a professor would include all the reasons for the termination. At this stage, due to the short proximity in time between Hook's post and the September 12, 2025, letter, the singular reference to Hook's social media post in the intent to terminate letter, and the communications from South Dakota politicians to the SDBOR calling for Hook's removal, the court concludes that Hook has demonstrated a fair chance of prevailing on the issue of whether his first Facebook post was the "substantial or motivating factor" in defendants' decision to place Hook on

---

not necessarily make the case unripe for the court's review. *See Ohio Civil Rts. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625 n.1 (1986) (noting that a case is still ripe for a court's review even where a prosecution or administrative action may end favorably for the plaintiff). Instead, the court concludes that the case is ripe because Hook "has sustained or is immediately in danger of sustaining some direct injury" because of SDBOR's notice of its intent to terminate his position as a professor. *Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 573 (2003); *see also Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (holding that injunctive relief would have been appropriate where employees were "only threatened with discharge").

10

administrative leave and notify him of their intention to fire him. *Henry*, 950 F.3d at 1011.

Thus, because the court concludes that Hook has demonstrated a "fair chance of prevailing" on the merits of his First Amendment retaliation claim, *Jet Midwest Int'l Co*, 953 F.3d at 1045, the court concludes that the first *Dataphase* factor favors granting the requested TRO.

## II.    Threat of Irreparable Harm

Under the second *Dataphase* factor, Hook must show that he is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). But in cases implicating the First Amendment, courts normally assume irreparable injury because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (internal quotation marks omitted); *see also Iowa Right to Life Comm., Ins. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). As noted above, Hook has demonstrated that he is likely to succeed on the merits of his First Amendment claim. Thus, the court concludes that the second factor favors granting the requested TRO because Hook faces irreparable harm in the absence of temporary relief.

## III.    Balance of the Hardships

The third *Dataphase* factor for obtaining a temporary restraining order requires a plaintiff to establish that his irreparable harm is greater than the hardship that a temporary restraining order would cause defendants. *See Sturgis Area Chamber of Com. v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000). Defendants argue that issuing a TRO would harm them by preventing the SDBOR from holding the personal conference on September 29, 2025, to decide on Hook's termination and causing ongoing disruption within the University system. Docket 9 at 7. But at this stage, the court finds that granting a TRO to enforce Hook's First Amendment rights outweighs any potential harm to defendants. And "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011)).

## IV.    Public Interest

The court also concludes that the fourth *Dataphase* factor weighs in favor of granting a TRO. The public has a compelling interest in protecting its First Amendment rights. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."). Thus, the court finds that this factor weighs in favor of granting the temporary restraining order.

## V.    Bond

After considering the relevant factors, the court exercises its discretion to waive the bond requirement embedded in Federal Rule of Civil Procedure 65(c). *See Rickland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

## CONCLUSION

Based on the above, it is ORDERED:

1. Hook's motion for temporary restraining order (Docket 3) is granted. Defendants are required to temporarily set aside their determination to place Hook on administrative leave. Defendants shall reinstate Hook's position as a Professor of Art at the University of South Dakota, retroactive to September 12, 2025, to remain effective until the preliminary injunction hearing on Wednesday, October 8, 2025, at 9:00 a.m. in Sioux Falls Courtroom 2.

2. Defendants are not restrained from holding a personal conference with Hook on September 29, 2025.

3. This temporary restraining order shall remain in effect until October 8, 2025.

    Dated September 24, 2025.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

13