UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| TAMAR SHIRINIAN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 3:25-cv-528-KAC-JEM |
| ) | JURY DEMAND |
| THE UNIVERSITY OF TENNESSEE ) | |
| KNOXVILLE, DONDE PLOWMAN, ) | |
| RANDY BOYD, and CHARLES NOBLE,) | |
| in their personal and official capacities, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND EXPEDITED HEARING

Defendants Donde Plowman, Randy Boyd, and Charles Noble, in their individual and official capacities, by and through the University of Tennessee's Office of the General Counsel and pursuant to Fed. R. Civ. P. 65, hereby submit this Response in Opposition to Plaintiff's Motion for Temporary Restraining Order ("Plaintiff's Motion"), [Docs. 11, 12]. As will be explained in further detail below, Plaintiff is not entitled to such an extraordinary and drastic remedy as a TRO because she cannot show a strong likelihood of success on the merits because the University's efficiency interests under *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968), outweigh Plaintiff's First Amendment interests. In further opposition, Defendants would show the Court as follows:

### BACKGROUND

Plaintiff requests that the Court issue a temporary restraining order requiring Defendants to, among other things, (1) return Plaintiff to her employment status prior to her placement on administrative leave and (2) halt the pending termination proceedings against her. [Doc. 11, p. 1].

Pursuant to Fed. R. Civ. P. 65(b), temporary restraining orders are limited to specific facts in an affidavit or verified complaint submitted by the moving party. In this case, Plaintiff has submitted a four-page Declaration in support of her motion. [Doc. 11-1]. Based on that limited universe of facts, Plaintiff's verified allegations do not meet the standard required for this Court to grant a TRO, which is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco*, LLC, 958 F.3d 532, 539 (6th Cir. 2020) (citations omitted). This burden of proof is "more stringent than the proof required to survive a summary judgment motion." *Id*. (quoting *Leary v. Daeschner*, 228 F.3d 72, 739 (6th Cir. 2020)).

On September 10, 2025, Charlie Kirk was killed at a public Turning Point USA event on the campus of Utah Valley State University. His assassination immediately and nearly completely dominated national discourse and the media. In this turbulent environment, on September 12, 2025, Plaintiff, a tenure-track professor in the Anthropology Department at the University of Tennessee, Knoxville ("UTK"), commented on a friend's Facebook post with reference to Charlie Kirk's assassination, the following:



[Doc. 11-1, ¶ 8; Doc. 1-2].[1] The outcry from current UTK students, alumni, donors, and the public was sharp and swift.

On September 15, 2025, UTK's Chancellor Donde Plowman ("Chancellor Plowman") placed Plaintiff "on administrative leave (with pay) pending termination proceedings." [Doc. 11-2]. Chancellor Plowman articulated to Plaintiff her reason for this action, including that Plaintiff's "decision to post incendiary comments publicly at a time of heightened anxiety reveals that [she

---

[1] The substance of Plaintiff's Facebook post/comment is not included in Plaintiff's Declaration [Doc. 11-1] or its attachments. However, the Facebook post at issue was attached to Plaintiff's unverified Complaint [Doc. 1-2], and Defendants do not dispute the authenticity of the Facebook post.

3

does] not have the competencies necessary to be an effective instructor." [Doc. 11-2]. Further, "[t]eaching and shaping the lives of young people is core to the mission of the University of Tennessee, Knoxville," and "[f]aculty have a great responsibility as educators of American's future leaders to make sure students have a healthy educational environment in which to learn, wrestle with difficult issues, and express themselves seriously." [*Id.*] Civil discourse is fundamental to the mission of the university. Chancellor Plowman's letter stated that Plaintiff's comments were "negatively impact[ing] the academic environment and increas[ing] the risk of violence on our campus." [*Id.*] Chancellor Plowman's initial swift action was clearly in response to substantial disruption to the University community caused by Plaintiff's social media post and its impact and because Chancellor Plowman perceived that Plaintiff would be unable to carry out her teaching responsibilities.

Shortly thereafter, on September 16, 2025, Chancellor Plowman provided Plaintiff notice of the grounds of termination of her tenure-track appointment with the University. [Doc. 11-3]. Consistent with her prior letter, Chancellor Plowman advised that Plaintiff's "social media post creates grave concerns about [her] judgment as a faculty member," and that Plaintiff's "egregious misconduct" provided her adequate cause to terminate Plaintiff's tenure-track appointment under University policy. [Doc. 11-3]. This lawsuit soon followed, and shortly thereafter, Plaintiff filed the instant Motion for Temporary Restraining Order. [Docs. 11, 12].

**TEMPORARY RESTRAINING ORDER STANDARD**

A temporary restraining order is "an extraordinary remedy" only granted in exceptional circumstances. *Bruce v. Great Britain*, No. 3:17-CV-285, 2017 WL 11666483, at *1 (E.D. Tenn. Nov. 6, 2017) (citing *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008)). This "extraordinary remedy" is reserved only for cases where it is necessary

4

to preserve the status quo until trial." *Enchant*, 958 F.3d at 535-36 (quoting *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017)). An injunction is never awarded "as of right," and the moving party carries a heavy burden and must clearly show the need for a temporary restraining order. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Kendall*, 630 F. Supp. 2d at 860. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

In the First Amendment context, courts have *generally* considered success on the merits to be dispositive because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Defendants reserve the right to challenge each element of the test for injunctive relief as the case progresses, but at this time, and on this limited record, Plaintiff's motion should be denied because she cannot establish a strong likelihood of success on the merits.

It should be further noted that Plaintiff's own actions undermine her argument that such extraordinary relief as a TRO is necessary in this case. Indeed, although Plaintiff was put on leave on September 15, 2025, and filed the instant lawsuit on October 29, 2025, she did not file her motion for a TRO until November 5, which was *51 days after she was put on leave*. Plaintiff's failure to act with at least some appearance of urgency in seeking this extraordinary remedy demonstrates that such a remedy is unnecessary.

## LAW & ARGUMENT

To prevail on her claim for First Amendment retaliation, Plaintiff must show that (1) she "engaged in protected speech"; (2) each of the Defendants "took an adverse action against her"; and (3) "there was a causal connection between the protected speech and the adverse action." *Sullivan v. Ohio State Univ.*, 764 F. Supp. 3d 652, 661 (S.D. Ohio 2025) (citing *Josephson v. Ganzel*, 115 F.4th 771 (6th Cir. 2024)). Although Defendants reserve the right to challenge each element as the case progresses, the dispositive issue for this motion is whether Plaintiff "engaged in protected speech." *Id.* And it is clear in this case that Plaintiff did not.

Courts make this determination using "a three-prong test." *Noble v. Cincinnati & Hamilton Cnty. Pub. Library*, 112 F.4th 373, 381 (6th Cir. 2025) (quoting *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022)). First, Plaintiff "must have spoken as a private citizen, not pursuant to h[er] official capacities." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Second, her speech must address "a matter of public concern," which includes "any matter of political, social, or other concern to the community." *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994). Third, and finally, the Court must decide whether Plaintiff's "free speech interests outweigh the efficiency interests of the government as an employer." *Noble*, 112 F.4th at 382 (quoting *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017)).

For purposes of ruling on Plaintiff's Motion only, and although Defendants reserve the right to later challenge Plaintiff's proof on all prongs, Defendants submit that Plaintiff's entitlement to injunctive relief clearly fails under the third prong.

### I. Plaintiff's speech should be afforded little Constitutional weight.

As the Sixth Circuit has recognized, "[I]t is appropriate to begin [the third prong] analysis by determining the degree of protection the speech warrants – i.e., the level of importance the

speech has in the community." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 538 (6th Cir. 2020). "Central to the concept of protecting the speech of government employees is the idea that public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is 'of substantial concern to the public.'" *Id.* (quoting *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007)). To that end, "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Id.* (quoting *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986)). Thus, the Constitutional weight afforded a public employee's speech necessarily requires courts to consider "the public's interest – or lack thereof – in receiving the information shared" and whether the employee's speech reflects some "special insight" into government operations. *Id.*

Here, Plaintiff's Facebook comment offers no "special insight" into government operations, nor does it "expos[e] inner workings of government organizations to the public." *Id.* (quoting *Garcetti*, 547 U.S. at 419; *City of Elyria*, 512 F.3d at 492). Instead, Plaintiff's speech merely celebrated Mr. Kirk's violent death and interposed a series of incendiary comments about his surviving spouse and children. *See* Doc. 1-2 (stating that Mr. Kirk's children "are better off living in a world without a disgusting psychopath like him" and describing Mr. Kirk's widow as "a sick fuck for marrying him . . . ."). These statements fall seriously short of the "well-informed view[] of [a] government employee" that First Amendment jurisprudence so strenuously protects. *Id.* (quoting *Garcetti*, 547 U.S. at 419). Consequently, Plaintiff's speech deserves little Constitutional weight.

**II.     The University's efficiency interests outweigh Plaintiff's First Amendment rights.**

After assigning the appropriate weight to Plaintiff's speech, the Court must then weigh the University's "efficiency interests" by considering whether Plaintiff's speech:

7

> (a) impaired discipline by superiors or harmony among coworkers;
> (b) had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary;
> (c) impeded the performance of the speaker's duties or interfered with the regular operation of the enterprise; or
> (d) undermines the mission of the employer.

*Bennett*, 977 F.3d at 539-40 (citations omitted). "Together, these factors center on [the employer's] effective functioning as a public agency." *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *3 (6th Cir. Jan. 25, 2023) (citing *Bennett*, 977 F.3d at 540 (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987))). Although further factual development may implicate other factors, this factor is determinative even at this stage because Plaintiff's speech impeded her ability to perform her duties, disrupted the University's "regular operations," and "undermine[d] the [University's] mission," as discussed separately below. *Id.*

### A. Plaintiff's speech resulted in reasonably predictable disruption to the University's operations and impeded her ability to perform her duties.

First, Plaintiff's speech posed reasonably predictable disruption to the University's ongoing operations and impeded her ability to effectively carry out her responsibilities as a faculty member, which justified Chancellor Plowman's decision to place Plaintiff on administrative leave and initiate steps to terminate Plaintiff's employment on an expedited basis.

As Chancellor Plowman stressed in her letter placing Plaintiff on leave, the speech of faculty members has a "broader impact" on the university community, and it is a faculty member's responsibility to ensure a healthy educational environment and model civil discourse. [Doc. 11-1]. In the context of Plaintiff's role as an educator, Plaintiff's public post impeded her ability to perform her job and created grave concerns about her judgment as a teacher, a mentor to young students, and a public-facing representative of the University.

8

As the Supreme Court has explained, "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Waters v. Churchill*, 511 U.S. 661, 675 (1994). To that end, public employers are not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Gillis v. Miller*, 845 F.3d 677, 687 (2017) (quoting *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-34 (8th Cir. 2015)). Rather, courts must "give[] substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Id.* (quoting *Waters*, 511 U.S. at 673-74). When evaluating the "reasonableness" of a public employer's prediction, courts should consider "the manner, time and place the speech was uttered [and] the context in which the dispute arose." *Id.* (quotations and citations omitted).

In *Marquardt*, for example, the Sixth Circuit affirmed the termination of a public employee who created and shared a series of incendiary social media posts about the officer-involved death of 12-year-old Tamar Rice, including:

> Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around and acting bad. I am upset I did not get the chance to kill the little criminal fucker.

2023 WL 395027, at *1.

Although Mr. Rice's death had occurred some fourteen months before the employee's offending social media posts, they were posted less than two days after renewed public interest in Mr. Rice's case because the municipality involved in Mr. Rice's death had issued his family a bill for the emergency medical services he received after the officer-involved shooting. *Id.* Central to the Sixth Circuit's conclusion that the municipality's interests in terminating the employee

9

outweighed the employee's First Amendment interests was the timing of his posts and the fact that they were made "in the wake of a gripping national media storm" and "in an environment where public reaction to the shooting had been explosive." *Id.* at *4.

As in *Marquardt*, Plaintiff's social media post occurred in the immediate aftermath of Mr. Kirk's assassination—an assassination that occurred on the campus of another public university—and came at a time when Mr. Kirk's death dominated national discourse. Colleges and universities across the country, including the University of Tennessee, were reeling from the fallout of yet another campus shooting, and political leaders were debating what action, if any, should be taken in response to his death. Ignoring the "explosive environment" that existed at the time of her post, Plaintiff's comments, at least tacitly, endorsed campus violence. *Marquardt*, 2023 WL 395027 at *4. Considering the content and timing of Plaintiff's remarks, Chancellor Plowman had no choice but to take swift and decisive action to avoid the patent and predictable threat to University operations that Plaintiff's speech posed. For these reasons, the anticipated disruption to the University outweighs Plaintiff's First Amendment interests.

### B. *Plaintiff's speech seriously undermined the University's mission.*

In addition to its potential impact on operations, Plaintiff's speech also seriously undermined the University's "mission." *Bennett*, 977 F.3d at 539-40 (citations omitted). When evaluating the "mission" factor, courts "consider the role and responsibilities of the employee and, when the role is public-facing, whether the danger to successful functioning of the office may increase." *Id.* (citing *Rankin*, 483 U.S. at 390). Indeed, "[s]tate-run employers generally have more discretion to sanction an employee in a confidential, policymaking, or public contact role than one who performs ministerial functions." *Josephson*, 115 F.4th at 785 (quoting *Rankin*, 483 U.S. at 390-91).

In *Bennett*, the Sixth Circuit noted that "public perception is central to the [employer's] mission" and found that Bennett was in a "public-facing role." 977 F.3d at 542. "In weighing Metro's interest in fulfilling the mission of the office, we consider the role and responsibilities of the employee and, when the role is public-facing, whether the danger to successful functioning of the office may increase." *Id*.

Here, as the State of Tennessee's land grant public institution of higher education, the University's overall mission, of which this Court may take judicial notice, is to "[s]erv[e] all Tennesseans and beyond through education, discovery and outreach that enables strong economic, social, and environmental well-being."[2] Plaintiff, as a tenure-track faculty member, no doubt served in a "public-facing role." *Bennett*, 977 F.3d at 542. Her post undermined the University's mission, discredited the University's commitment to campus safety, and made it impossible for her to continue teaching and outreaching in a way that upheld the University's reputation. This is especially true given the environment in which campus violence is a serious concern, and Plaintiff's post celebrated a campus shooting. Chancellor Plowman's termination letter cited these very issues as forming the basis for seeking Plaintiff's termination, stating that Plaintiff's speech "negatively impacted the academic environment and increased the risk of violence on our campus." [Doc. 11-2].

Plaintiff relies primarily on *Rankin v. McPherson*, 483 U.S. 378 (1987), a Supreme Court decision that found in favor of an employee's First Amendment rights. However, the speech in *Rankin*, unlike this case, in no way "interfered with the effective functioning of the office." *Id.* at 389. That was so because the offensive speech "took place in an area to which there was ordinarily no public access; [the plaintiff's] remark was evidently made in a private conversation with another

---

[2] *See* https://tennessee.edu/about/mission/ (last accessed Nov. 19, 2025).

11

employee[], and [t]here is no suggestion that any member of the general public was present or heard [the plaintiff's] statement." *Id*.

Plaintiff also cites *Jorjani v. New Jersey Institute of Technology*, 151 F.4th 135 (3d Cir. 2025), a decision from the Third Circuit Court of Appeals. Unlike the present case, where the disruption caused by Plaintiff's speech was substantial, the disruption caused by the speech in *Jorjani* was "minimal" and "differ[ed] little from the ordinary operation of a public university." *Id*. at 142. The circumstances in *Jorjani* are completely distinguishable from the kind of "explosive" situation or "national media" storm over a violent act that this case involves: the violent assassination on a college campus of a controversial public figure who had spoken with students on the University's own campus just a few months earlier.[3] *See Marquardt*, 2023 WL 395027, at *4.

This case presents vastly different circumstances than those in *Rankin* or *Jorjani*. Plaintiff is a public-facing university professor who made an incendiary post that caused significant on-campus disruption, contravened the University's mission, and undermined the University's commitment to maintaining a safe campus in an explosive and charged environment. Accordingly, *Pickering*'s "mission" factor favors the University, and the Plaintiff's Motion should be denied.

## CONCLUSION

In sum, granting the University the "wide degree of deference" to which it is entitled under existing law, *Connick v. Myers*, 461 U.S. 138, 151-52 (1983), Plaintiff cannot show a likelihood of success on the merits because Plaintiff's First Amendment rights are clearly outweighed by the reasonably predicted disruption to the University's operations and the extent to which Plaintiff's

---

[3] *See* Allie Feinberg, *Charlie Kirk's Visit Shows the MAGA Movement is Loud and Proud at the Univ. of Tenn.*, KNOXVILLE NEWS SENTINEL, Mar. 14, 2025, https://www.knoxnews.com/story/news/politics/2025/03/14/charlie-kirk-turned-out-thousands-of-conservative-ut-students/82363421007/ (last accessed Nov. 19, 2025).

speech undermined the University's mission, impeded her ability to do her job, and compromised campus safety. Forcing the University to return Plaintiff to the classroom will only heighten and prolong the substantial disruption to the University and discredit the University's commitment to campus safety. A TRO under these circumstances is unnecessary and, therefore, Plaintiff's motion should be denied.

If, however, the Court decides to grant temporary injunctive relief, Defendants request that any such relief be narrowly tailored to maintain the status quo – i.e., maintaining Plaintiff on paid administrative leave and out of the classroom – to avoid the immense disruption and threat of operational harm posed to the University if Plaintiff is permitted to return to her teaching responsibilities.

Respectfully submitted this 19th day of November, 2025.

*/s/ Michael D. Fitzgerald*
Michael D. Fitzgerald (BPR #20079)
T. Mitchell Panter (BPR #031744)
The University of Tennessee
Office of General Counsel
505 Summer Place – UT Tower 1107
Knoxville, TN 37902
(865) 974-3245
mike.fitzgerald@tennessee.edu
mitchell.panter@tennessee.edu

*Attorneys for Defendants*