# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### NORTHERN DIVISION

| | | |
|---|---|---|
| TAMAR SHIRINIAN | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 3:25-cv-528 |
| | ) | |
| v. | ) | |
| | ) | Judge Crytzer |
| THE UNIVERSITY OF TENNESSEE | ) | Magistrate Judge McCook |
| KNOXVILLE, | ) | |
| | ) | JURY DEMAND |
| DONDE PLOWMAN, | ) | |
| RANDY BOYD and CHARLES NOBLE, | ) | |
| In their personal and official capacities. | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S REPLY IN OPPOSITION TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED HEARING

---

Defendants' Response ignores the fact that, after a UTK professor posted a tweet encouraging motorists to run down protestors, *UTK openly recognized that his speech was protected by the First Amendment* and allowed him to continue to teach. See Shirinian Declaration, Doc 11-1; September 22, 2025, letter to Chancellor Plowman, Doc. 11-4; Knox News article "No UT penalty for Tenn. Prof who tweeted 'Run 'em down.'"[1] They also ignore that their own former law school Dean publicly admitted that the UTK professor's "Run 'em down" tweet was an exercise of his First Amendment rights despite offending many members of the UTK community and beyond. See id. Finally, Defendants ignore a compelling order from the United States District Court for the District of South Dakota that granted a similar TRO request in an almost identical case involving a professor's comments and Charlie Kirk. See *Hook v. Rave* (Doc. 12, Ex. 1)

---

[1] https://www.knoxnews.com/story/news/nation-now/2016/09/27/glenn-reynolds-columnist-twitter/91174840/

## I. Defendants claim regarding timing fails to tell the full story

Defendants first argue that this court should not grant the TRO because of the 51-day period between when Plaintiff was placed on leave and the date of the filing of the TRO. However, undersigned counsel reached out to counsel for UT the latter half of the week of September 15, 2025. On September 22, 2025, after being invited by the Chancellor to provide a written response, Dr. Shirinian send Chancellor Plowman a response to the Chancellor's Notice of Grounds for Termination. Over the course of the following five weeks, counsel for both parties engaged in numerous discussions. The lawsuit was ultimately filed when it was clear that a resolution prior to filing a lawsuit was not possible.

As evidenced by the footnote in Plaintiff's current Motion (Doc. 11, p. 1), counsel for both parties were hopeful for an expedited hearing---hence the filing of a TRO as opposed to a Motion for a Preliminary Injunction. In an Order entered November 11, 2025 (Doc. 13), the Court ordered parties to fully brief the issues and noted that, if necessary, it will set an in-person hearing after the matter is fully briefed.

More importantly, under Rule 65 of the Federal Rules of Civil Procedure, this Court may issue a preliminary injunction only on notice to the adverse party, while a temporary restraining order may be issued without such notice. As both parties have now fully briefed the issue of temporary injunctive relief (see Defendants' Response at p.13, "[i]f, however, this Court decides to grant temporary injunctive relief…"), the current motion is effectively now a Motion for Temporary Injunctive Relief and not a Motion for Temporary Restraining Order.

## II. Plaintiff's Speech Deserves Significant Constitutional Weight

While Defendants rely on *Bennett v. Metro Gov't of Nashville & Davidon Cnty*., 977 F.3d 530 (6th Cir. 2020), the facts and holding in *Bennett* support Plaintiff's positions. In *Bennett*,

the plaintiff was terminated from her position at the Emergency Communications Center (ECC) for a Facebook comment she made after President Trump won the 2016 election. Specifically, the comment was, "Thank god we have more America loving rednecks. Red spread across all America. Even niggaz and latinos voted for trump too!" See id. at 533.

Holding that the District Court erred in finding Bennett's speech to be in the highest rungs of protected speech, the Sixth Circuit focused on Bennett's use of the term "niggaz." See id. at 539. In stark contrast, Dr. Shirinian's comment was in direct response to a private Facebook post specifically addressing Mr. Kirk's messages of "hate, genocide apologia and bigotry" while people treat him "like the next best thing since Jesus." Contrary to Defendants' claim that "Plaintiff's speech merely celebrated Mr. Kirk's violent death and interposed a series of incendiary comments about his surviving spouse and children" (Doc. 17, at p. 7), Dr. Shirinian's comment was not about *how* Mr. Kirk's life was taken, but Mr. Kirk's messages that were heard by millions. This is clear based on a plain reading of the initial Facebook post and Plaintiff's responsive comment. In her September 22, 2025, letter to the Chancellor (Doc. 11-4), Plaintiff correctly noted that, "…in no way did the words I used endorse, incite, or suggest that anyone should resort to violence. While I despise his bigoted, often hateful rhetoric, Mr. Kirk did not deserve to be killed for his words. No one does."

First Amendment values are paramount in restraining the state from silencing speech for political reasons, which is exactly what the government has done in this matter. The First Amendment has its most urgent application for speech on public issues, like the rhetoric of Mr. Kirk and the millions of people both for and against it. As a slew of decisions symbolize, while many in our society might even find some speech dangerously wrong, public opinion does not allow it to be cancelled or censored by the government. See *Am. Booksellers Assn't v. Hudnut*,

3

771 F.2d 323, 328 (7th Cir. 1985)(Nazi party marching through a city with a large Jewish population); *Snyder v. Phelps*, 563 U.S. 443, 460-61 (2011) (allowing Westboro Baptist Church to shout "Thank God for Dead Soldiers" outside the funeral of a soldier killed in the line of duty); *Rankin v. McPherson*, 483 U.S. 378 (1987) (a deputy county constable, after hearing of an attempt on the life of the President, said while working on the job, "if they go for him again, I hope they get him"); *Texas v. Johnson*, 491 US. 397, 421 (1989) (Kennedy, J., concurring) (noting that a protester may burn the American flag, no matter "how repellent his statement must be to the Republic itself.")

The right to speak freely on public issues falls on the "highest rung of hierarchy of First Amendment values." See *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). As such, Dr. Shirinian's comment must be afforded the highest rung of protected speech.

### III. Plaintiff's First Amendment Rights Outweigh UTK's Efficiency Interests

Based on UTK's failure to act after one of its professors *actually encouraged* motorists to run down protesters, coupled with UTK allowing neo-Nazis and white supremacists to speak on campus, it is fair to assume Defendants knew or had reason to know that their decisions with regards to Plaintiff violated the First Amendment. Defendants have chosen to recklessly ignore the very First Amendment tenets for which the University once stood and now must double-down in a forum where debate was once (and must still be) encouraged: public higher education.

As was noted in *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708, 710 (9th Cir. 2010):

> The right to provoke, offend and shock likes at the core of the First Amendment.

This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular. Colleges and universities---sheltered from the currents of popular opinion by tradition, geography, tenue and monetary endowments—have historically fostered that exchange. But that role in our society will not survive if certain points of view may be declared beyond the pale.

Plaintiff and many others viewed *significant amounts* Mr. Kirk's rhetoric as beyond the pale. See Doc. 11-4, Plaintiff's September 22, 2025, letter of the Chancelor). UTK previously welcomed him to campus but now punishes Plaintiff due to a ***single Facebook comment Plaintiff made as a citizen and not as an employee*** that pales in comparison to the voluminous, often hateful and discriminatory rhetoric of Mr. Kirk that Defendants have never spoken out against.

All four factors provided in *Bennett v. Metro Gov't of Nashville & Davidon Cnty.*, 977 F.3d 530 (6th Cir. 2020) weigh in favor of Plaintiff.

### A. Harmony Amongst Coworkers Factor Strongly Favors Dr. Shirinian

People associated with the University, including students who Dr. Shirinian was helping, have reached out to Plaintiff in support of her return to UTK. See Shirinian Declaration. In addition, in a faculty meeting with the Chancellor, numerous faculty members spoke up against the Chancellor's decision to terminate Dr. Shirinian. No one, other than the Chancellor and the Provost (John Zomchik), supported her decision at the meeting. See id. Finally, Dr. Shirinian's Department Chair wrote a letter to the Chancellor supporting her return. See id. As such, the first factor strongly supports Dr. Shirinian.

### B. There is No Detrimental Effect on Close Working Relationships for which Personal Loyalty and Confidence are Necessary

As was previously established, Dr. Shirinian's close working relationships, including students who she was working with and her own Department Chair, support her. See id. As such, the second factor strongly supports Dr. Shirinian.

**C. Defendants' argument that Plaintiff's speech resulted in reasonably predictable disruption to operations and impeded her ability to perform her duties strikes against caselaw and UTK's own prior actions/inactions**

Defendants first cite *Waters v. Churchill*, 511 U.S. 611, 675 (1994). *Waters* involved a nurse in an obstetrics department in a public hospital who, while on the job, was asked her opinion of her department by another nurse who was considering transferring. The employee allegedly said that things were bad in obstetrics and complained about her supervisor. Defendants then cite *Gillis v. Miller*, 845 F.3d 677. 687 (2017), a case involving former correctional officers who posted a memorandum notifying fellow officers of their right to union representation during an investigation into prescription drug trafficking at the jail. Finally, Defendants rely on *Marquardt v. Carlton*, 2023 WL 395027 (6th Cir. Jan. 25, 2023). *Marquardt* involved a captain in the Cleveland Emergency Medical Services whose Facebook page stated, in part, "I am upset I did not get the chance to kill the criminal fucker" when discussing the shooting death of Tamir Rice, a twelve-year-old who was shot and killed by Cleveland police while possessing a toy gun. Notably, while Defendants attempt to use *Marquardt* to support the government's efficiency interests, such reliance is misplaced, as the Court in *Marquardt* specifically stated that "[o]ther than resolving the 'public concern' question, our decision today is narrow."

The facts in *Waters, Gillis,* and *Marquardt* have essentially nothing to do with the case at hand. And, despite Defendants initial claims that Plaintiff "endorsed violence", Defendants have apparently changed their position and now claim that such endorsement was given "tacitly." See Defendants' Response, Doc. 17, at p. 10. In doing so, Defendants now recognize the obvious: Plaintiff did not directly endorse violence. In fact, as evidenced by her letter to the Chancellor, her Declaration, and the actual words in the Facebook Post and Plaintiff's comment, Plaintiff did not even tacitly endorse violence. (Regardless, since a UTK professor openly and obviously

6

endorsed violence and kept his job, Defendants know that even such an endorsement would not make a difference under First Amendment principles.)

It is disingenuous for Defendants to claim that Plaintiff's speech disrupted UTK operations when it: 1) turned a blind eye under First Amendment grounds to a UTK professor encouraging people to run over protestors with their cars, 2) allowed a neo-Nazi, white nationalist group to plan a lecture series on UTK's campus, and 3) allowed a white nationalist known for his "Make America White Again" billboards to give a talk in UTK's Alumni Memorial Building for an event entitled "White Nationalism: Fact or Fiction." This Court must not allow Defendants to cherry pick what speech they deem to be acceptable or choose for which side of the political aisle they are willing to ignore the First Amendment.

### D.     UTK's Mission was not undermined

On November 17, 2025, the UT Faculty Senate overwhelmingly passed a resolution requesting the University to "publicly reaffirm its commitment to free speech" by providing a written statement to the school community.[2] The resolution passed 59-11-9. The resolution calls for the statement to include "specific directives" for academic leaders and to affirm private speech by professors is "unequivocally protected by University policy and existing law." It also recognizes that the actions of the University "have created a chilling effect on faculty, staff, and student speech and damaged trust in University governance." Such a resolution is a wonderful example of how UTK's mission was not hurt by Dr. Shirinian's comment, but by the actions that Defendants took to punish Plaintiff and how it is Defendants that have effectively chilled free speech on campus.

---

[2] https://www.yahoo.com/news/articles/faculty-presses-university-tennessee-publicly-141305417.html.

How does that same mission align with UTK allowing a white nationalist known for his "Make America White Again" billboard to give a talk in UTK's Alumni Memorial Building for an event entitled "White Nationalism: Fact or Fiction?" The only answer must be that UTK, as a prestigious institution of higher education, recognizes that the various viewpoints held by people should be debated and not suppressed, even if they are despicable and discriminatory. As Defendants know, while vile and disgusting, even the viewpoints of neo-Nazis on campus and professors openly calling for living, breathing protestors to be run over by people driving cars, are protected under the First Amendment.

Hopefully, after debate, viewpoints will either be supported with facts and reason or set aside because they lack factual backing and proper reasoning. However, it is the undergraduates, graduate students, professors and administration at public colleges and universities who must each individually determine who and what they will follow---not the government determining what they must.

Defendants claim that Dr. Shirinian had a similar "public-facing" role like the plaintiff in *Bennett* and that this case and *Bennett* are somehow similar. However, this argument is incorrect:

1. Bennett worked in a position where she constantly interacted with the public at-large. Dr. Shirinian works in a role that has little interaction with the public at large.

2. Bennett made a discriminatory public Facebook comment to a man she did not know. Dr. Shirinian made a private Facebook comment to a friend about an important public topic.

3. Bennett identified herself as a Metro employee, ECC employee and Metro Police Department employee in her Facebook profile. Dr. Shirinian did not identify herself as a UTK employee in her Facebook profile or comment.

4. Bennett used an offensive racial slur. Dr. Shirinian's comment, while not kind, was not discriminatory.

5. Bennett received numerous complaints from colleagues who worked in her own office. Dr. Shirinian has the support of a significant amount of UTK professors, the overwhelming majority of Faculty Senate, as well as the Head of her own Department. Defendants have not provided complaints from any professors in (or even outside) of her department.

6. Bennett claimed that her fellow employees were "playing the victim" and were not really offended. Dr. Shirinian wrote a lengthy apology, acknowledging that her comments were offensive.

7. Communications between Bennett and her fellow telecommunicators was found to be essential to the work they did. Dr. Shirinian's job as a professor does not rely heavily on inner-department communications.

8. Bennett's Facebook profile disclosed that she was a Metro employee but not that her views were hers alone and do not reflect the views of the Metro Government. Dr. Shirinian had no need for such a disclaimer, as she did not even mention UTK on Facebook or in her comment. Additionally, her Facebook page as well the page of the friend to whom she commented are private and only accessible to "Friends" and not the public.

9. Bennett failed to show any remorse or accountability. Dr. Shirinian showed remorse and took accountability.

See Shirinian Declaration. This fourth factor also weighs in favor of Plaintiff.

## CONCLUSION

In *Connick v. Myers*, 461 U.S. 138, 151-52 (1983), the Court found:

Although today the balance is struck for the government, this is no defeat for the First Amendment. For it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussion concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here.

See id. at 154.

Allowing Defendants to mandate what people must and must not say on their own time as citizens would defeat the First Amendment. Based on UTK's past, Plaintiff contends that Defendants already know this but feel they must nonetheless fight in court. Plaintiff has shown that her chance of succeeding on the merits is likely and that she is permanently harmed absent an

9

injunction. Further, an injunction would not cause substantial harm to third parties. Finally, the requested injunction would serve the public interest. As such, this Court must grant Plaintiff's motion.

Respectfully Submitted,

/s/ Robert C. Bigelow, Esq.
Robert C. Bigelow, Esq. #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
(615) 829-8986
rbigelow@bigelowlegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2025, a copy of the foregoing is being sent to opposing counsel:

Rachel K. Powell, Esq.
Michael D. Fitzerald, Esq.
T. Mitchell Panter, Esq.
The University of Tennessee
400 W. Summit Dr. – UT Tower #1117
Knoxville, TN 37902
(865) 974-0525
Attorney for Defendants

/s/ Robert C. Bigelow
Robert C. Bigelow #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
rbigelow@bigelowlegal.com
(615) 829-8986

*Attorney for Plaintiff*
