# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **TAMAR SHIRINIAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:25-cv-528** |
| | ) | |
| **v.** | ) | **Judge Crytzer** |
| | ) | **Magistrate Judge McCook** |
| **DONDE PLOWMAN, et al.;** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## AMENDED COMPLAINT

---

1.     Plaintiff brings the Amended Complaint alleging that Defendants violated and continue to violate Plaintiff's First Amendment constitutional rights by retaliating against her as a professor in a public university for expressing political speech in a purely personal capacity and also based on First Amendment viewpoint discrimination.  Plaintiff seeks injunctive relief and damages.

## **PARTIES**

2.     Plaintiff Tamar Shirinian ("Dr. Shirinian") is a resident of Knox County, TN.

3.     Defendant University of Tennessee, Knoxville ("UTK") is Tennessee's flagship land-grant, state university, located in Knox County.

4.     Defendant Donde Plowman ("Chancellor Plowman") is the Chancellor of UTK.

5.     Defendant Randy Boyd ("President Boyd") is the President of the University of Tennessee System.

6.     Defendant Charles Noble ("Dr. Noble") is UTK's Faculty Senate President.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL ALLEGATIONS

### A.      Dr. Tamar Shirinian

8.      Plaintiff Tamar Shirinian, M.A., Ph.D, is an Anthropology professor at UTK.

9.      Dr. Shirinian received her Ph.D. from Duke University and has been a UTK professor for five years.

10.     Dr. Shirinian dedicated thousands of hours to academic study, including undergraduate and graduate work, original research, the writing of a dissertation, the writing of a book, the chairmanship of a professional organization, and holding editorial positions in academic journals.

11.     Dr. Shirinian is an exceptional, award-winning scholar with numerous publications.

12.     Dr. Shirinian had excellent reviews and was on an early tenure track at UTK, having submitted her tenure file for consideration on August 25, 2025.

13.     Dr. Shirinian's professional goal was to become a professor at a major research institution.  She was extremely proud to become a professor at UTK, a university where her husband also works, and loves teaching college students.

### B.      Conservative Activist Charlie Kirk

14.     Charlie Kirk was a well-known conservative activist who founded the political organization "Turning Point USA" (which became a multimillion-dollar organization) for the purpose of furthering his political, social, moral and religious ideological beliefs.

2

15.     Mr. Kirk was a public figure of political importance who discussed and debated matters of public and political interest on various publicly broadcasted platforms.

16.     Mr. Kirk and Donald Trump became friends and political allies, with Mr. Kirk supporting Mr. Trump and working very hard to enhance his appeal to younger voters.

17.     After January 6, 2021, when many Republicans thought Mr. Trump's political career was over, Mr. Kirk embraced the "Stop the Steal" movement claiming the 2020 election was stolen by Democrats as a result of widespread election fraud.

18.     The 2020 election was not stolen by Democrats as a result of widespread election fraud.

19.     Mr. Kirk played a significant role in helping Trump win the 2024 election, by boosting the appeal of Trump, the MAGA movement, and conservatism generally, especially with younger voters.

20.     Mr. Kirk espoused many conservative political views considered by many to be radical.

21.     Mr. Kirk dismissed affirmative action and diversity, equality and inclusion programs, as well as people he perceived as benefitting from them.

22.      Mr. Kirk called the country's passing of the Civil Rights Act of 1964 "a huge mistake."

23.     Mr. Kirk often debated college students on campuses in public exhibitions designed to defeat and humiliate young adults whose views differed from his own.

24.     On March 25, 2025, Mr. Krik hosted an event on the campus of UTK, during which he stated that UTK should be defunded and to fire liberal professors.

3

25.     Some of Mr. Kirk's political viewpoints, viewpoints adopted by millions, terrified many Americans – particularly women, black people, people of color, members of the LGBTQ community, and immigrants.

26.     Sadly, Mr. Kirk was shot and killed on September 10, 2025, at the age of 31.

### C.     Charlie Kirk's position on the role of women in society

27.     Mr. Kirk often spoke publicly regarding his beliefs about the roles of men and women in society, taking the explicit position that women's proper role is to get married, submit to their husbands, have children, and raise children rather than to pursue careers.

28.     Speaking before an audience of high schoolers, Mr. Kirk advocated that high school girls should attend college primarily to seek an "MRS" degree.

29.     Mr. Kirk claimed that women should treat "learning some stuff" as essentially an afterthought.

30.     Mr. Kirk stated that a woman's "purpose for being, every single day" is to find an "amazing husband."

31.     Mr. Kirk claimed that women should not pursue higher education.

32.     Mr. Kirk publicly urged women to "submit to a Godly man when [they] meet one."

33.     Mr. Kirk also publicly stated that young men need "strong men" as teachers, because young men do not like taking orders from women and can only respect "strong men."

34.     In August 2025, Kirk commented on his Charlie Kirk Show podcast about the news that singer Taylor Swift, a self-made billionaire and music superstar who leads an entertainment business empire, had gotten engaged to Travis Kelce, one of the NFL's best players at the tight end position, who plays for the Kansas City Chiefs.

4

35. During his podcast, Kirk ordered Swift to "Submit to your husband, Taylor" and told her, "You're not in charge."

36. Kirk then laughed and declared that "most importantly" Swift had to change her last name to Kelce, or she didn't "really mean it."

37. Upon information and belief, Mr. Kirk would have likely ignored Chancellor Plowman's incredible credentials that made her more than worthy of her leadership position at UTK, and would have claimed that Chancellor Plowman, because she is a woman, should not have a role in higher education and/or was a "DEI hire" and somehow not worthy of her position.

### D. Charlie Kirk's expressed beliefs on Black people

38. On May 19, 2023, on The Charlie Kirk Show, Mr. Kirk stated, "Happening all the time in America, prowling Blacks go around for fun to go target white people, that's a fact. It's happening more and more."

39. On January 3, 2024, during his Show, Mr. Kirk stated, "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder if she's there because of her excellence, or is she there because of affirmative action?"

40. On May 25, 2020, George Floyd, a 46-year-old Black man, was murdered by Derek Chauvin, a 44-year-old white police officer, after a store clerk reported Mr. Floyd made a purchase with a counterfeit $20 bill and he was placed under arrest.

41. The City of Minneapolis agreed to pay $27 million dollars to settle a wrongful death claim brought my Mr. Floyd's family, and Mr. Chauvin was convicted by a jury and sentenced to 22.5 years in prison.

42. The death of Mr. Floyd sparked outrage by millions of Americans and led to some of the largest Civil Rights protests since the Civil Rights movement of the 1960s.

5

43. In 2021, Mr. Kirk referred to George Floyd as a "scumbag" who wasn't worthy of the attention he was receiving.

44. In July 2023, Kirk publicly denigrated several prominent black female leaders – including Supreme Court Justice Ketanji Brown Jackson, former First Lady and attorney Michelle Obama, U.S Congressperson and attorney Sheila Jackson Lee, and author and TV host Joy Reid.

45. Broadcasting from the comfort of his podcast, Kirk told these esteemed members of society, all of whom have accomplished far more academically than Kirk himself ever did:

> You do not have the brain processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously.

46. In January 2024, Kirk publicly stated on the Charlie Kirk Show that if he saw a black airline pilot "I'm going to be like boy, I hope he's qualified."

47. Charlie Kirk's comments regarding race were often divisive, disparaging and discriminatory.

**E.    Charlie Kirk's position on Martin Luther King, Jr.**

48. Dr. Martin Luther King, Jr. ("MLK") was a racial and economic justice advocate who served as one of the primary leaders during the Civil Rights Movement of the 1960's. Drawing on his Christian faith and the teaching of Mahatma Gandhi, Dr. King's nonviolent legacy is a foundational aspect of the modern Civil Rights Movement.

49. In 1968, Martin Luther King, Jr. was assassinated.

50. The assassin, a white man named James Earl Ray, shot and killed Martin Luther King, Jr. with a gun.

6

51. While Martin Luther King, Jr. was a very controversial figure during his life, in the years after his death he was widely credited with having served a major role in the Civil Rights Movement and improving racial justice in America.

52. In 1983, then-President Ronald Reagan – a conservative Republican – signed into law a bill establishing the third Monday in January each year as "Martin Luther King Day," a federal holiday.

53. In December 2023, at a Turning Point USA convention entitled "America Fest," Mr. Kirk publicly declared, "MLK was awful. He's not a good person."

54. In January 2024, during the week before Martin Luther King Day, Mr. Kirk declared on his podcast that, "We'll be hitting [MLK] next week."

55. As promised, on January 15, 2024 – which was both the Martin Luther King federal holiday, and the anniversary of Martin Luther King, Jr.'s birthday – Mr. Kirk published several social media statements deriding Martin Luther King Jr. and his legacy.

### F. Charlie Kirk's Positions on Immigrants and Gaza

56. Mr. Kirk proclaimed that it was "time to ban third world immigrants, legal or illegal."

57. Mr. Kirk claimed that "the Great Replacement Strategy" was a strategy to replace white rural America with "something different" and was well under way every day on America's southern border.

58. Mr. Kirk stated that "Zero people from Gaza should be allowed to come to America."

59. In July of 2025, Mr. Kirk rejected allegations that Israel was starving people in Gaza.

7

## G.     Charlie Kirk's Positions on the LGBTQ Community

60.     During his show in 2022, Mr. Kirk argued that gay couples "are not happy just having marriage.  Instead, they now want to corrupt your children."

61.     During a speech posted in 2023 by Right Wing Watch, Mr. Kirk said that the "transgender thing" is a "throbbing middle finger to God."

62.     In the same speech, Mr. Kirk cited a Bible verse saying that a woman who puts on men's clothes or a man who puts on a women's garment is an "abomination."

63.     Mr. Kirk opposed transgender rights, and his organization sponsored rallies against transgender medical care.

64.     In April of 2024, Mr. Kirk likened doctors who perform gender-affirming care to Nazis committing atrocities.

65.     Mr. Kirk claimed that there should not be a Transgender Day of Visibility and that it should be banned.

66.     On the Alex Stein Show, aired on December 14, 2023, Mr. Kirk stated:

> You know, I used to say hey, if you as a gay person were to go to Gaza they would throw you off tall buildings, right?  Now they don't have any tall buildings left, so I don't…wait, is that too soon?  Maybe you shouldn't kill Jews, you stupid Muslims!

## H.     Mr. Kirk's Alleged Antisemitism

67.     Erick Erickson, a commentator who has been in the mainstream of American conservatism, wrote in a post that Turning Post USA was "looking like not just a grifting operation, but an anti-Semitic grifting operation."

8

68. Ben Domenech, a co-founder of The Federalist, wrote, "If Charlie Kirk remains the head of TPUSA, the right has an anti-Semite problem that will follow them into the coming elections."

69. Mr. Kirk was a proponent of "replacement theory," a once-fringe conspiracy theory positing that Jews are trying to replace white Americans with nonwhite immigrants. This ideology motivated the gunman who killed 11 worshipers in a Pittsburgh synagogue in 2018.

70. Mr. Kirk also accused Jewish philanthropists of fomenting anti-whiteness by supporting liberal antiracism causes like the Black Lives Matter movement.

71. "The philosophical foundation of anti-whiteness has been largely financed by Jewish donors in this country," Mr. Kirk said on his show in 2023.

72. Allies of Mr. Kirk often sought to defend him against accusations of antisemitism by citing his support for Israel.

### I. Charlie Kirk's positions on Islam

73. In a September 8, 2025, social media post, Mr. Kirk claimed that "Islam is the sword the left is using to slit the throat of America."

74. Mr. Kirk called Islam a danger to the United States.

75. Leading up to the mayoral primary in New York City, he paired a mention of Zohran Mamdani, who is Muslim and won the Democratic nomination, with references to Al Quada and 9/11, seeking to paint Mr. Mamdani to be a terrorist.

76. Mr. Mamdani was a child growing up in New York City at the time of the 9/11 terrorist attack and was profiled as "other" because of his religion. Mr. Mamdani said that it was important to honor the memories of those who were killed and noted his deep sorrow for all those who were killed.

9

77.     Nevertheless, in a post on X, Mr. Kirk said of Mr. Mamdani, "America's largest city was attacked by radical Islam 24 years ago, and not a [dis]similar form of that pernicious force is poised to capture city hall."

## J.     Charlie Kirk's position on the First Amendment

78.     An avowed constitutionalist, Mr. Kirk consistently expressed his strong belief in and support for the right to freedom of speech, protected by the First Amendment.

79.     In 2024, Kirk posted on the social media platform the following quote: "Hate speech does not exist legally in America. There's ugly speech. There's gross speech. There's evil speech. And all of it is protected by the First Amendment."

80.     In June 2025, while participating in a debate at Oxford University, Kirk denounced the arrest of British citizen Lucy Connelly for a post she had made on "X."

81.     Connelly's X post had called for, "Mass deportations now, set fire to all the f^#*ing hotels full of the bastards for all I care… if that makes me racist, so be it."

82.     Kirk asserted that Connelly's arrest was an affront to civil liberties, declaring, "That is not a free speech value at all. You should be allowed to say outrageous things. You should be allowed to say contrarian things. Free speech is a birthright…."

83.     Kirk continued with a sweeping declaration that citizens have a moral obligation to advocate for a "value neutral free speech policy," and that such a policy is the "bedrock of a liberal democracy."

## K.     The Shooting of Charlie Kirk

84.     On September 10, 2025, Charlie Kirk was shot and murdered while speaking at a college campus in Utah.

10

85.     Charlie Kirk's shooting and death immediately became a topic of great political relevance.

86.     President Trump ordered flags flown at half-staff in recognition of Mr. Kirk's death.

87.     The news of the killing, theories about the suspect and his motives, reactions to the killing and discussion of Mr. Kirk's views dominated the news and social media.

88.     Mr. Kirk's murder triggered expressions of outrage and condemnation from millions of MAGA-aligned Americans, including a long line of politicians who support the MAGA agenda, as well as others, including politicians on the other end of the political spectrum such as former Presidents Barack Obama and Bill Clinton.

89.     Numerous MAGA-aligned public officials and politicians have sanctimoniously grandstanded their judgment and condemnation of any `one who dares to make negative comments regarding Charlie Kirk.

90.     Some MAGA-aligned public officials have moved to erect statues of Mr. Kirk in public squares, while others have moved for a "National Day of Remembrance for Charlie Kirk."

91.     In contrast, many with more progressive and moderate political views, have expressed negative views of Charlie Kirk's values and rhetoric, particularly with regards to Mr. Kirk's perceived racism, perceived bigotry, and his perceived sexism.

92.     Discourse regarding Mr. Kirk and his public political views have been a topic of public and political interest and has been widely and publicly discussed by politicians, broadcasters, journalists and the public.

**L.      GOP/MAGA Targets Those with Harsh Words About Charlie Kirk**

93.     Many GOP/MAGA Republicans have openly targeted individuals, including some university professors, who spoke out against Mr. Kirk after he was assassinated.

11

94. Some politicians openly endorsed using the power of the government to punish speech.

95. President Trump's administration itself endorsed using the power of the government to punish speech.

96. This has caused many Americans, including educators and those who work outside of education, to be afraid to speak out.

97. It has also caused some Republican lawmakers to fear speaking out.

**M. MAGA and Representative Tim Burchett's Threat to Higher Education**

98. U.S. Representative Tim Burchett ("Representative Burchett") is the U.S. Representative for Tennessee's 2nd Congressional District, which includes Knoxville.

99. Representative Burchett is often a featured guest on Fox News, a conservative media outlet.

100. Representative Burchett was a Tennessee State Senator from 1998-2010.

101. Representative Burchett was the Mayor of Knox County, home to UTK, from 2010-2018.

102. Representative Burchett claimed to be a friend of Mr. Kirk.

103. Representative Burchett claimed that Mr. Kirk called him to lobby for Mr. Trump's "Big Beautiful Bill" to make sure that he was "on board" with it---and that that discussion was the last time he and Mr. Kirk spoke.

104. Representative Burchett falsely claimed that "Democrats are willing to shut the government down for "TRANSGENDER surgery and healthcare for ILLEGALS."

12

Case 3:25-cv-00528-KAC-JEM    Document 25    Filed 12/11/25    Page 12 of 48
PageID #: 178

105. In May of 2025, the UT System provided Knox News with a list of 61 grants that been terminated or were at risk of being terminated by President Trump's administration.

106. Ultimately, that month, the UT System lost over $37 million in federal funds due to the termination of 42 grants, with 25 impacting UTK.

107. The UTK Institute of Agriculture was the most affected program, with over $31 million in funding that was taken away.

108. The grants also supported research into things such as vaccines, school shootings, Alzheimer's and mental health.

109. UT Vice President of Communications and Marketing, Tiffany Carpenter, said the direct impact of its cuts is on students and staff on the various projects.

110. There were over 150 research projects that were under consideration for termination, including "Secondary Analyses of Child Care and Early Education Data."

111. Over the course of the summer of 2025 and into September, the UT System and its leaders worked to stabilize research efforts and try to restore some of the federal grants cancelled by the Trump Administration.

112. In September of 2025, funding freezes and proposed cuts put UT System programs for veterans at risk.

113. The freezes and proposed cuts also put UT System programs for first-generation students at risk.

114. In 2025, or at all times relevant to this cause of action, Defendants were extremely worried about GOP/MAGA federal grant cancellations and the cuts serious detrimental effects to its students, faculty and staff.

13

## N.    Dr. Shirinian's Private Facebook Comment

115.    Over the years, Dr. Shirinian followed Mr. Kirk's activist career and found his public political comments terrifying, infuriating and factually incorrect on a wide array of issues – particularly Kirk's comments on race, diversity, higher education, immigrants, women, Gaza, and the LGBTQ community.

116.    Dr. Shirinian also did not like that Mr. Kirk's Turning Point USA hosted an on-line "Professor Watchlist" that targeted professors who possessed viewpoints it did not like and asked like-minded conservatives to "report" them.

117.    Stacey Patton, a research associate at Morgan State University who also teaches multimedia journalism at Howard University, describes her appearance on the "Professor Watchlist" in the following way:

> For weeks my inbox and voicemail were deluged. Mostly white men spat venom through the phone: "bitch," "c*nt," "n****r." They threatened all manner of violence.
>
> They overwhelmed the university's PR lines and the president's office with calls demanding that I be fired. The flood was so relentless that the head of campus security reached out to offer me an escort, because they feared one of these keyboard soldiers might step out of his basement and come do me harm.
>
> And I am not unique.
>
> Kirk's Watchlist has terrorized legions of professors across this country. Women, Black faculty, queer scholars, basically anyone who challenged white supremacy, gun culture, or Christian nationalism suddenly found themselves targets of coordinated abuse.
>
> Some received death threats. Some had their jobs threatened. Some left academia entirely. Kirk sent the loud message to us: speak the truth and we will unleash the mob!

14

118.     Dr. Shirinian also closely followed the public comments of President Trump, a man admired and praised by Mr. Kirk.

119.     On the night of September 12, 2025, while Dr. Shirinian was in her home, off work, and on her personal time, she saw a private Facebook post that her friend had posted.

120.     The private Facebook post of Dr. Shirinian's friend stated as follows:

> I've unfriended four people since Kirk's assassination. I get it, they're mourning him because of his message but the content of his message was full of hate, genocide apologia and bigotry yet they're treating him like the next best thing since Jesus. So my secular sensibilities find that to be blasphemous and a lil delulu. I guess we "grew" apart.

121.     In response to her friend's post, which gave a negative assessment of Mr. Kirk's ideology, Dr. Shirinian wrote a comment: a

> The world is better off without him in it. Even those who are claiming to be sad for his wife and kids….like, his kids are better off living in a world without a disgusting psychopath like him and his wife, well, she's a sick f*#k for marrying him so I don't care about her feelings.

122.     Dr. Shirinian did not refer to herself as a UTK professor in any part of her private Facebook profile.

123.     Dr. Shirinian did not refer to UTK in her comment.

**O.     A Threat from Knoxville's U.S. Representative, Tim Burchett**

124.     On September 13, 2025, only days after the murder of Charlie Kirk, and the day after Dr. Shirinian made her Facebook comment, United States Representative Tim Burchett made a Facebook post that, as of October 26, 2025, has been "liked" by over 27,000 people.

15

125.    In his Facebook post, Representative Burchett was adamant that all of the people who worked in higher education and made "classless, almost demonic attacks of Mr. Kirk…need to be gone, absolutely, 100%."

126.    In doing so, Representative Burchett was calling for the termination of employment of anyone who said mean or cruel things about Mr. Kirk.

127.    In his Facebook post, Representative Burchett claimed that anyone who spoke out against Mr. Kirk and his rhetoric should "never had been hired."

128.    In his Facebook post, Representative Burchett targeted individuals in management and administration in higher education.

129.    The three named Defendants in this matter involving Dr. Shirinian are in management and administration in higher education.

130.    He incredulously asked, "Who the heck hired all these dad-gummed people?!?" and continued, "That's who we need to look at.  That's the problem.  The institutional problem that we have in our colleges and universities across the country."

131.    Representative Burchett claimed that "people in charge" at colleges and universities in higher education are "the real problem" and that the individuals under them are only "foot soldiers."

132.    Defendants are some of the "people in charge" at UTK.

133.    Representative Burchett then claimed in his Facebook post that the leaders in higher education were going to "cover their ass."

134.    On September 14, 2025, after Representative Burchett received a message on "X" from someone with the alias/handle "CA Escapee" that forwarded Dr. Shirinian's Facebook comment to Representative Burchett, he publicly responded, "On it."

16

## P.      MAGA "Outrage"

135.     On information and belief, someone saw Dr. Shirinian's private Facebook comment and forwarded a screenshot of it to third parties who did not have access to the post or comment.

136.     In addition to Representative Burchett, others who were forwarded screenshots of the comment include Tennessee Representative Jack Zachary and UT System President Randy Boyd.

137.     President Trump has endorsed and promoted violence on numerous occasions.

138.     At a November 23, 2015, rally in Birmingham, Alabama, President Trump suggested that a heckler maybe "should have been roughed up."

139.     At a February 1, 2016, rally in Iowa, President Trump stated "If you see somebody getting ready to throw a tomato, knock the crap out of them, would you?'

140.     In an August 2016 rally, President Trump suggested that "Second Amendment people" might be able to stop Hillary Clinton from appointing justices to the Supreme Court if she became President.

141.     On October 18, 2018, after then-Representative Greg Gianforte pled guilty to a misdemeanor charge for physically assaulting a reporter, President Trump said, "Any guy that can do a body slam, he is my guy!"

142.     In May of 2020, President Trump retweeted a video of a supporter in New Mexico saying that, "the only good Democrat is a dead Democrat" and added a comment, "Thank you Cowboys.  See you in New Mexico!"

143.     In a January 6, 2021, tweet before the election certification took place, President Trump tweeted, "Get smart Republicans. FIGHT!" That same day, in a video message to violent insurrectionists at the Capitol, he stated, "We love you.  You're very special."

17

144.    When talking about Representative Liz Cheney, President Trump said, "Let's put her with a rifle standing there, with nine barrels shooting at her, OK?  Let's see how she feels about it when the guns are trained on her face."

145.    In 2025, Trump pardoned or commuted the sentences of more than 1,500 people convicted or charged in connection with the January 6th U.S. Capitol riot, some of whom attacked police officers with weapons including metal batons, wooden planks, a flagpole, fire extinguishers and/or pepper spray.

146.    In 2025, President Trump pardoned individuals who, while at the U.S. Capitol, screamed for the January 6th mob to "Hang Mike Pence."

147.    In 2025, President Trump pardoned January 6th participants who were convicted of felonies involving violence towards police officers, calling the convicted felons "hostages."

148.    In 2025, President Trump pardoned individuals convicted of seditious conspiracy as a result of their actions on January 6th.

149.    In 2025, President Trump pardoned an individual who stood in front of gallows and spoke of his desire to hang Democratic politicians before assaulting police officers.

150.    Representative Burchett has never made a public statement condemning President Trump for promoting or endorsing violence.

151.    Representative Burchett has never made a public statement condemning any comment made by Mr. Kirk.

152.    Mr. Zachary has never made a public statement condemning President Trump for promoting or endorsing violence.

153.    Mr. Zachary has never made a public statement condemning any comment made by Mr. Kirk.

18

154.     Despite remaining quiet about all of President Trump's comments that endorsed violence and pardoned individuals who attacked police officers on January 6th, Representative Burchett felt called to action due to a comment on a private Facebook page.

### Q.    Chancellor Donde Plowman

155.     Chancellor Plowman has served as UTK's Chancellor since 2019 and oversees a campus budget of $2.3 billion as well as more than 40,000 students, 8,300 staff, and 2,500 fulltime faculty.

156.     Chancellor Plowman has access to the lawyers who work in UTK's Office of General Counsel.

157.     Chancellor Plowman has access to counsel in UT's offices in Memphis, Chattanooga, Martin and Nashville.

158.     Chancellor Plowman has access to the many attorneys who work in a full time capacity at UTK's College of Law.

159.     Chancellor Plowman led an increase in UTK's research expenditures to a record $380 million.

160.     Chancellor Plowman was previously the Executive Vice Chancellor at the University of Nebraska-Lincoln.

161.     Chancellor Plowman is a globally recognized organizational scientist whose scholarship includes the topics of leadership, change management, and strategic decision making.

162.     In 2015, Chancellor Plowman became the first recipient of the Lincoln Woman of the Year Award.

19

163.    Chancellor Plowman's current community activities include involvement with the Knoxville Executive Women's Association and the International Women's Association, Knoxville Chapter.

164.    In the summer of 2020, Chancellor Plowman and her leadership council, including her cabinet and certain UTK students, took part in a two-day retreat to reflect on issues of racism and discuss how to make meaningful change on UTK's campus.

165.    One of the books read in preparation for that retreat was "How to Be an Antiracist", written by Ibram X. Kendi.

166.    In the fall of 2020, Chancellor Plowman and UTK's Student Government Association President, Karmen Jones, sat down to discuss various topics, including diversity and inclusion on campus.

167.    The conversation can be found on https://torchbearer.utk.edu/2020/10/aconversation/.

168.    During that conversation, Chancellor Plowman noted that she was taken aback by how much everyone poured out from their heart and that "we've got to get comfortable being uncomfortable."

169.    During that conversation, Ms. Jones noted that topics of race, diversity and intersectionality are not comfortable topics.

170.    During that conversation, Chancellor Plowman stated that UTK recruited Black faculty but struggled to keep them, but that she was working to retain faculty that looks like UTK's population.

171.    Chancellor Plowman also stated that she wanted UTK to be a place where "everyone matters and everyone belongs."

20

172.    In addition to a discussion about diversity and antiracism, Chancellor Plowman and Ms. Jones discussed Women in Leadership.

173.    Chancellor Plowman proudly referred to Ms. Jones as the first Black woman who was ever elected Student Body President at UTK.

174.    Chancellor Plowman, who is admired by many throughout America, once wrote, "It is critical that we do not let this moment pass us by but instead do the hard work addressing our own shortcomings as individuals and a university."

175.    Chancellor Plowman previously helped UTK develop a Diversity Action Plan to address the "systemic racism and injustice prevalent throughout our society."

176.    Upon information and belief, Chancellor Plowman generally agrees with the principles in the book "How to Be an Antiracist" in which Kendi argues that the opposite of racist is anti-racist rather than simply non-racist.

177.    Upon information and belief, Chancellor Plowman generally supports principles that uphold Diversity, Equity and Inclusion---principles that are often under attack by many MAGA conservatives.

178.    Upon information and belief, Chancellor Plowman believes that diversity is a good and positive thing.

179.    Upon information and belief, Chancellor Plowman believes that equity is a good and positive thing.

180.    Upon information and belief, Chancellor Plowman believes that inclusion is a good and positive thing.

21

181. Upon information and belief, Chancellor Plowman is well-aware of the tremendous sacrifices required of individuals to achieve academic success worthy of becoming a university professor.

182. Upon information and belief, Chancellor Plowman is well-aware that it is more difficult for women to rise through the ranks of academia.

183. Upon information and belief, Chancellor Plowman knows that a majority of university Presidents or Chancellors are men.

184. Upon information and belief, Chancellor Plowman believes that some of the positions taken by Mr. Kirk are detrimental to women.

185. Upon information and belief, Chancellor Plowman believes that some of the positions taken by Mr. Kirk are detrimental to minorities.

186. Upon information and belief, Chancellor Plowman believes that some of the positions taken by Mr. Kirk are detrimental to members of the LGBTQ community.

187. Upon information and belief, Chancellor Plowman believes that some of the positions taken by Mr. Kirk are discriminatory and cruel.

### R. President Boyd and Dr. Noble

185. Randy Boyd is the President and Chief Executive Officer of the entire University of Tennessee System.

186. President Boyd has access to the lawyers who work in UTK's Office of General Counsel.

187. President Boyd has access to legal counsel in UT's offices in Memphis, Chattanooga, Martin and Nashville.

22

188.     President Boyd has access to the many attorneys who work in a full-time capacity at UTK's College of Law.

189.     President Boyd helped create UT Promise, opening the door for college to almost two-third of all Tennessee households by providing scholarships to attend colleges in the UT system.

190.     President Boyd, a self-made multimillionaire, recruited Chancellor Plowman to become UTK's Chancellor and even flew on his private plane to pick Chancellor Plowman up for her interview.

191.     Chancellor Plowman reports to President Boyd.

192.     President Boyd's mentor is former Tennessee Governor Bill Haslam, a Republican. Mr. Haslam co-hosts a podcast with former Tennessee Governor Phil Bredesen, a Democrat, called "You Might Be Right."

193.     President Boyd is considered by many Republicans and Democrats to be a goodhearted, moderate Republican who cares about issues such as diversity, equity and inclusion.

194.     Upon information and belief, President Boyd believes that diversity is a good and positive thing.

195.     Upon information and belief, President Boyd believes that equity is a good and positive thing.

196.     Upon information and belief, President Boyd believes that inclusion is a good and positive thing.

197.     Upon information and belief, in the MAGA-controlled state of Tennessee, President Boyd must hide his true feelings and toe the MAGA party line.

23

198.    Dr. Charles Noble is the Jerry and Kay Henry Professor of Business and the Roy and Audrey Fanceher Faculty Research Fellow at UTK's Haslam College of Business.

199.    Dr. Noble is also the President of the UTK Faculty Senate.

200.    Upon information and belief, however, in the MAGA-controlled state of Tennessee, Dr. Noble believes that he too must toe the MAGA party line.

**S.    Chancellor Plowman, President Boyd and Dr. Noble Discuss What to Do**

198.    UTK's principal mission is "the discovery and dissemination of truth through teaching, research and expression."

199.    UTK has never issued a public statement condemning President Trump for promoting or endorsing violence.

200.    Chancellor Plowman has never issued a public statement condemning President Trump for promoting or endorsing violence.

201.    President Boyd has never issued a public statement condemning President Trump for promoting or endorsing violence.

202.    Dr. Noble has never issued a public statement condemning President Trump for promoting or endorsing violence.

203.    UTK has never issued a public statement condemning any comment made by Mr. Kirk.

204.    Chancellor Plowman has never issued a public statement condemning any comment made by Mr. Kirk.

205.    President Boyd has never issued a public statement condemning any comment made by Mr. Kirk.

24

206. Dr. Noble has never issued a public statement condemning any comment made by Mr. Kirk.

207. Defendants know that a significant portion of the residents of Knox County, Tennessee, back both Mr. Kirk and President Trump.

208. Upon information and belief, Republican politicians and lawmakers put pressure on UTK and Chancellor Plowman to retaliate and punish anyone speaking negatively about Mr. Kirk.

209. Upon information and belief, Republican politicians and lawmakers put pressure on UTK and Chancellor Plowman to retaliate and punish Dr. Shirinian for speaking negatively about Mr. Kirk.

210. Upon information and belief, Chancellor Plowman felt political pressure to punish Plaintiff for speaking negatively about Mr. Kirk.

211. Upon information and belief, President Boyd felt political pressure to punish Plaintiff for speaking negatively about Mr. Kirk.

212. Despite UTK remaining silent as to President Trump's comments that clearly endorsed violence, President Trump pardoning individuals who attacked police officers on January 6th, and Mr. Kirk's rhetoric, President Boyd decided to speak up against Dr. Shirinian's private Facebook comment.

213. In his private capacity, President Boyd posted on social media that Dr. Shirinian's comment "advocated violence."

214. Separately, in his public capacity, as the President of the University of Tennessee system, President Boyd posted on social media that Dr. Shirinian's comment "advocated violence."

25

215.    Upon information and belief, President Boyd made both social media posts without first discussing whether Dr. Shirinian's posts were protected under the First Amendment.

216.    Upon information and belief, prior to making his posts on social media, President Boyd knew that Dr. Shirinian's comment did not actually advocate violence.

**T.    Defendants Punish Dr. Shirinian**

217.    The First Amendment generally does not apply to private colleges and universities.

218.    The University of Tennessee, Knoxville, however, is a public university.

219.    Prior to making any decision regarding Dr. Shirinian, Defendants knew that her Facebook comment involved issues regarding the First Amendment.

220.    UTK has a well-regarded law school, the Winston College of Law.

221.    The Winston College of Law employs numerous legal scholars, some of whom have previously provided UTK with advice on how to handle First Amendment issues.

222.    The UT System has a Division of General Counsel that provides legal guidance to support the University.

223.    The General Counsel's office in Knoxville is approximately the size of a medium-sized Knoxville law firm.

224.    The UT System also has four additional offices full of lawyers upon which it can ask for legal advice: in Memphis, Martin, Chattanooga and Nashville.

225.    Chancellor Plowman informed Dr. Shirinian that she consulted with and relied upon the advice of President Boyd and Dr. Noble before making her ultimate decision regarding what, if anything, she should do regarding Dr. Shirinian's private Facebook comment.

226.    Chancellor Plowman did not claim to rely upon the advice of any of the many lawyers available to her.

26

227.     Upon information and belief, Chancellor Plowman did not rely upon the advice of the many lawyers available to her.

228.     Defendants President Boyd and Chancellor Plowman internally acknowledged uncertainty about constitutionality of their actions but acted anyway.

229.     Prior to making any decision, upon information and belief, Chancellor Plowman believed that Dr. Shirinian's Facebook comment was protected under the First Amendment.

230.     Prior to making any decision, upon information and belief, President Boyd knew or had reason to know that Dr. Shirinian's Facebook comment was protected under the First Amendment and that Dr. Shirinian should not be punished by a public university.

231.     Prior to making any decision, upon information and belief, Mr. Noble believed that Dr. Shirinian's Facebook comment was protected under the First Amendment.

232.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, Chancellor Plowman did not ask campus police if they saw any increased threat level on campus due to Dr. Shirinian's comment.

233.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, President Boyd did not ask campus police if they saw any increased threat level on campus due to Dr. Shirinian's comment.

234.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, Chancellor Plowman did not speak with student organizations on campus about Dr. Shirinian's comment.

235.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, President Boyd did not speak with student organizations on campus about Dr. Shirinian's comment.

236.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, Chancellor Plowman did not speak with any of Dr. Shirinian's colleagues in her department.

237.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, President Boyd did not speak with any of Dr. Shirinian's colleagues in her department.

238.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, no student reported any safety worries due to Defendants because of Dr. Shirinian's comment.

239.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, no student reported any worries due to Defendants about Dr. Shirinian's teaching, research or mentoring duties.

240.     Upon information and belief, prior to making any decisions regarding the employment of Dr. Shirinian, no member of Dr. Shirinian's teaching department reported any worries due to Defendants about Dr. Shirinian's teaching, research or mentoring duties.

241.     Upon information and belief, Chancellor Plowman acted in a manner of self-preservation, worried that, if she did not terminate Dr. Shirinian because of her views, she herself could be punished, disciplined or terminated.

242.     Upon information and belief, President Boyd acted in a manner of self-preservation, worried that, if she did not terminate Dr. Shirinian because of her views, she herself could be punished, disciplined or terminated.

243.     Upon information and belief, Chancellor Plowman acted, in part, based on fear that UTK might face financial repercussions from a MAGA Republican Governor and MAGA

28

Republican federal and state legislature if she did not terminate Dr. Shirinian.

244. Upon information and belief, President Boyd acted, in part, based on fear that UTK might face financial repercussions.

245. Chancellor Plowman acted based in part on fear that UTK might face financial repercussions from donors if she did not terminate Dr. Shirinian.

246. Upon information and belief, Chancellor Plowman considered statements made by Representative Burchett to be a threat to UTK.

247. Upon information and belief, Chancellor Plowman discussed these fears with President Boyd and/or Dr. Noble.

248. Chancellor Plowman knew or should have known that Dr. Shirinian's Facebook comment was made in her private capacity as a citizen.

249. President Boyd knew or should have known that Dr. Shirinian's Facebook comment was made in her private capacity as a citizen.

250. Dr. Noble knew or should have known that Dr. Shirinian's Facebook comment was made in her private capacity as a citizen.

251. Chancellor Plowman either knew that Dr. Shirinian's private Facebook comment did not reference UTK or recklessly failed to investigate.

252. President Boyd knew that Dr. Shirinian's private Facebook comment did not reference UTK in any form or fashion or recklessly failed to investigate.

253. Dr. Noble knew that Dr. Shirinian's private Facebook comment did not reference UTK or recklessly failed to investigate.

254. Upon information and belief, Chancellor Plowman recognized that Dr. Shirinian was protected under the First Amendment and should not face consequences from UTK but punished Dr. Shirinian anyway.

255. Upon information and belief, President Boyd, despite recognizing that Dr. Shirinian was protected under the First Amendment and should not face consequences from UTK, aided in the decision to punished Dr. Shirinian anyway.

256. Upon information and belief, Dr. Noble, despite recognizing that Dr. Shirinian was protected under the First Amendment and should not face consequences from UTK, aided in the decision to punished Dr. Shirinian anyway.

257. Upon information and belief, Chancellor Plowman believes that Dr. Shirinian's comment is protected under the First Amendment.

258. Upon information and belief, Mr. Boyd believes that Dr. Shirinian's comment is protected under the First Amendment.

259. Upon information and belief, Dr. Noble believes that Dr. Shirinian's comment is protected under the First Amendment.

260. Nevertheless, in a letter dated September 15, 2025 (attached as Exhibit 1), Chancellor Plowman notified Dr. Shirinian that, due to her Facebook post, she was being placed on administrative leave with pay pending termination proceedings.

261. In the letter, Chancellor Plowman instructed Dr. Shirinian to discontinue any university-related business.

262. In the letter, Chancellor Plowman informed Dr. Shirinian that UTK was initiating both termination proceedings and an expedited termination of her tenure track appointment.

263. UTK removed Dr. Shirinian from the classroom.

30

264.    Placing Dr. Shirinian on administrative leave has resulted in her inability to provide mentorship to graduate students who came to UTK to work with Dr. Shirinian and, in one case, who came to the U.S. to work with Dr. Shirinian.

265.    Placing Dr. Shirinian on administrative leave has resulted in her inability to continue working with graduate students as they finish their dissertations, in some cases with students with whom Dr. Shirinian has worked closely for seven years (as a member of their doctoral committees) and put in over a hundred hours of mentorship.

266.    In the letter, Chancellor Plowman contended that Dr. Shirinian endorsed a campus shooting.

267.    Upon information and belief, Chancellor Plowman does not actually believe that Dr. Shirinian endorsed campus shootings.

268.    Dr. Shirinian did not and has never endorsed a campus shooting.

269.    If Mr. Kirk had been struck and killed by a drunk driver and Dr. Shirinian commented that the world was "better off without Mr. Kirk," Chancellor Plowman would not have claimed that Dr. Shirinian endorsed people driving under the influence.

270.    If Mr. Kirk had been struck and killed by a drunk driver and Dr. Shirinian commented that the world was "better off without Mr. Kirk," Chancellor Plowman would not have claimed that Dr. Shirinian was endorsing people driving drunk and killing others.

271.    On September 16, 2025, Chancellor Plowman sent Dr. Shirinian a separate letter (attached as Exhibit 2).

272.    In her September 16, 2025 letter, Chancellor Plowman claimed that Dr. Shirinian endorsed, even celebrated, violence and murder on a college campus.

273.    In her September 16, 2025 letter, Chancellor Plowman refers to Dr. Shirinian as

31

"seriously derelict" in her responsibilities as a member of the academic community.

274. Dr. Shirinian was not "seriously derelict" in her responsibilities as a member of the academic community and her comment was made as a private citizen.

275. In the September 16, 2025 letter, Chancellor Plowman writes, "In my view your reckless use of incendiary language demonstrates that you lack the fitness to engage in teaching, research, or service as a member of this faculty."

276. Dr. Shirinian is fit to engage in teaching, research and service as a member of the faculty.

277. Dr. Shirinian's private Facebook comment had no relationship to her teaching, research, or professional service.

278. Chancellor Plowman contended that Dr. Shirinian's social media comment equated to "gross misconduct."

279. In the letter, Chancellor Plowman recognizes that, before deciding to initiate termination proceedings, she consulted with President Boyd and Dr. Noble.

280. As part of a wbir.com/Channel 10 news report, Dr. Noble stated, in part:

> The faculty senate at the University of Tennessee Knoxville supports the freedom of expression for our faculty in their classroom duties and other professional activities. We also acknowledge that faculty have personal lives and interactions where they may fairly express themselves in ways that would not always be appropriate in a professional setting. That said, the faculty senate strongly opposes so-called "hate speech" in any form or setting. In an era of divisive politics and seemingly diminishing human kindness, the senate is saddened by many recent events and reactions to those events. We want to use our limited influence to encourage greater harmony across our campus and our nation.

281.    Dr. Noble's statement, published by 10 News on September 15, 2025, made it appear that the UTK Faculty Senate considered Dr. Shirinian's comment to be "hate speech."

282.    Upon information and belief, Dr. Noble knows that Dr. Shirinian's comment did not constitute hate speech.

283.    Upon information and belief, Dr. Noble knows or has reason to know that hate speech (even if offensive, hateful or disgusting) is generally protected under the First Amendment.

284.    Upon information and belief, Dr. Noble's response was crafted to make the reader, most of who have received no formal education regarding First Amendment issues, believe the fallacy that Dr. Shirinian's comment was not protected under the First Amendment because her comment might be deemed by some to be "hateful."

285.    Upon information and belief, Dr. Noble responded to News Channel 10 knowing that Dr. Shirinian's comment was protected under the First Amendment.

286.    Upon information and belief, Dr. Noble knows or should know that both Mr. Kirk and President Trump have used rhetoric that does not encourage greater harmony.

287.    Upon information and belief, Dr. Noble has never spoken out publicly against anything said by Mr. Kirk or President Trump.

288.    Chancellor Plowman offered an opportunity for Dr. Shirinian to respond in writing by September 22, 2025, which she did (attached as Exhibit 3).

289.    Dr. Shirinian informed Chancellor Plowman that she deleted her comment and apologized for it being ineloquent, insensitive and heartless.

290.    Dr. Shirinian recognized that Mr. Kirk did not deserve to be killed for his bigoted, often hateful rhetoric, and that she was a long-time advocate for peace.

33

291.     Dr. Shirinian noted that, as a member of the LGBQ+ community, she was disgusted by things Mr. Kirk said and encouraged and influenced his followers to believe.

292.     Dr. Shirinian noted that she felt a personal connection to the genocide in Gaza due to her Armenian heritage and as a "descendant of genocide survivors."

293.     Dr. Shirinian also noted that, as a stepmother to three Black children, she was terrified of the anti-Black rhetoric that Mr. Kirk fomented regularly.

**U. Viewpoint Discrimination and the Hypocrisy and Inconsistency of UTK**

294.     Defendants ignored, allowed or excused offensive, bigoted and often hateful things said by conservatives such as Mr. Kirk and President Trump that were protected under the First Amendment.

295.     Chancellor Plowman targeted the opinion or stance expressed by Dr. Shirinian in her Facebook comment.

296.     President Boyd targeted the opinion or stance expressed by Dr. Shirinian in her Facebook comment.

297.     Mr. Noble targeted the opinion or stance expressed by Dr. Shirinian in her Facebook comment.

298.     Although Chancellor Plowman claimed that Dr. Shirinian's comment promoted violence, Dr. Shirinian's comment had nothing to do with how Mr. Kirk died.

299.     Dr. Shirinian's comment did not mention violence or the manner of Mr. Kirk's death.

300.     Defendants would not have made the same claim as to Dr. Shirinian's comment if Mr. Kirk had died in an accident.

34

301. Chancellor Plowman regulated how Dr. Shirinian should feel about the views of Mr. Kirk.

302. President Boyd regulated how Dr. Shirinian should feel about the views of Mr. Kirk.

303. Mr. Noble regulated how Dr. Shirinian should feel about the views of Mr. Kirk.

304. The opinions of Mr. Kirk were public issues and were often discussed in the media.

305. Mr. Kirk was welcomed at UTK in 2025 as part of Turning Point USA's "American Comeback Tour."

306. Chancellor Plowman allowed Mr. Kirk to speak on the UTK campus despite knowing about his divisive rhetoric.

307. President Boyd allowed Mr. Kirk to speak on UTK campus despite knowing about his divisive rhetoric.

308. Defendants knew that many individuals did not like or support the opinions of Mr. Kirk.

309. By punishing Plaintiff, Chancellor Plowman was declaring which opinions of public matters were acceptable.

310. By punishing Plaintiff, President Boyd was declaring which opinions of public matters were acceptable.

311. By punishing Plaintiff, Mr. Noble was declaring which opinions of public matters were acceptable.

312. By punishing Plaintiff, Chancellor Plowman was claiming that Dr. Shirinian's viewpoints were unacceptable.

35

313. By punishing Plaintiff, President Boyd was claiming that Dr. Shirinian's viewpoints were unacceptable.

314. By punishing Plaintiff, Mr. Noble was claiming that Dr. Shirinian's viewpoints were unacceptable.

315. Chancellor Plowman knew that a public employer cannot legally punish a professor for being critical of a political figure.

316. President Boyd knew that a public employer cannot legally punish a professor for being critical of a political figure.

317. Mr. Noble knew that a public employer cannot legally punish a professor for being critical of a political figure.

318. In the Chancellor Plowman's letters to the Plaintiff, she acknowledges that she was upset at Plaintiff viewpoint.

319. Chancellor Plowman knows that public school educators have been punished for speaking out against Mr. Kirk after his death.

320. Chancellor Plowman knows that some of these public-school educators have sought relief in the court system and that courts have ordered public schools and universities to return them to work.

321. Chancellor Plowman has chosen to ignore such court rulings.

322. President Boyd knows that public school educators have been punished for speaking out against Mr. Kirk after his death.

323.    President Boyd knows that some of these public-school educators have sought relief in the court system and that courts have ordered public schools and universities to return them to work.

324.    President Boyd has chosen to ignore these court rulings.

**Neo-Nazis Allowed on UTK Campus**

325.    The Traditionalist Workers Party ("TWP") was a neo-Nazi, white nationalist group that advocated for racially pure nations and communities and blamed Jewish people for many of the world's problems.

326.    TWP helped organize the August 2017 protest in Charlottesville, Virginia, that erupted into a deadly riot.

327.    In 2018, UTK allowed TWP to plan a lecture series on campus, despite wide condemnation of the group by UTK students, faculty and administration.

328.    A local TWP affiliate claimed responsibility for painting racist messages on UTK's "Rock" to advertise the event.

329.    UTK's Faculty Senate passed a resolution condemning white supremacists and affirming UTK's commitment to diversity and inclusion.

**White Supremacist/ "Make America White Again" Event on UTK Campus**

330.    In 2019, UTK allowed white nationalist Rick Tyler to rent space on campus and give a talk in UTK's Alumni Memorial Building for an event entitled "White Nationalism: Fact or Fiction."

331.    Mr. Tyler had previously drawn national attention for his slogan "Make America White Again" billboards.

332.    Mr. Tyler considered himself a White Christian Nationalist.

333.     Ironically, Jesus Christ was not white, but a brown skinned immigrant who preached unconditional love and non-violence.

334.     Mr. Tyler's presence on UTK's campus was met with significant demonstrations and increased police presence.

**UTK Professor Encouraging Drivers to "Run Down" Protesters Not Punished**

335.     In 2016, after police shot Keith Lamont Scott, a 43-year-old African-American man, in Charlotte, North Carolina, people protested and blocked traffic on Interstate 277.

336.     In response to a tweet from a TV news station showing the protestors, a UTK Professor responded, "Run them down."

337.     The UTK Professor is a well-known conservative.

338.     By stating "Run them down," the UTK Professor urged motorists to run over demonstrators on the interstate who were blocking traffic.

339.     The words "run them down" advocated for drivers to run over protesters with their vehicles.

340.     The UTK Professor's "Run them down" tweet promoted violence.

341.     The UTK Professor's "Run them down" tweet promoted violence against people who were alive and protesting.

342.     The then-Dean of the UTK Law School, Melanie D. Wilson, stated that, after an examination of the facts, policies in the university's Faculty Handbook and the law" no disciplinary action would be taken by UTK.

343.     Despite recognizing that the tweet "offended many members of our community and beyond," UTK found that the Professor's tweet to be an "exercise of his First Amendment rights."

38

**Faculty Use of a Racial Slur**

344. While Chancellor Plowman was the Chancellor, a white UTK professor was seen in a tweet standing in front of a white board on which she had written a racial slur as an acronym.

345. Over 10 campus organizations signed a letter calling for the professor's dismissal.

346. The letter also noted that some students reported objections to a lesson from the same professor where she "instructed students in her class to recreate the experience of enslaved African Americans who endure the Middle Passage."

347. UTK students organized a sit-in protest.

348. Chancellor Plowman met with many UTK students and told them that she would also involve President Boyd in the discussion, which she did.

349. The professor who used the racial slur was not terminated, but sent to training at UTK's Office of Teaching and Learning.

350. Chancellor Plowman recognized that many students of color were hurting and not being heard, but that "firing a faculty member will not fix that."

351. Chancellor Plowman treated the in-classroom speech of this professor more favorably than the private, out of classroom speech of Dr. Shirinian.

**V.     UT's Free Speech Policy, Faculty Handbook and Reactions from UTK Faculty**

352. The University of Tennessee System's "Policy Affirming Principles of Free Speech for Students and Faculty" states, in part, that the University, "must be committed to maintaining a campus as a marketplace of ideas for all students and all faculty in which the free exchange of ideas is not to be suppressed because the ideas put forth are thought by some or even by most members of the University's community to be offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical, or wrongheaded."

39

353. Terminating Plaintiff does not show a commitment to a marketplace of ideas and strikes against this policy.

354. The "Policy Affirming Principles of Free Speech for Students and Faculty" also states, in part, that "although the University greatly values civility and mutual respect, concerns about civility and mutual respect must not be used by the University as a justification for closing off the discussion of ideas, however offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical, or wrongheaded those ideas may be to some students or faculty."

355. By acting to terminate Plaintiff, Chancellor Plowman used concerns about civility and mutual respect as a justification for closing off the discussion of ideas.

356. Section 2.1.3 of UTK's Faculty Handbook, entitled "Freedom as a Citizen" states, in part, that "When faculty members communicate as citizens on matters of public concern, they operate independently of the university. In this situation, faculty members have rights common to all citizens, including the right to…voice their opinions."

357. Defendants have punished Plaintiff for voicing her opinion as a citizen on a matter of public concern.

358. Dr. Shirinian's Facebook comment was not a threat.

359. Section 2.1.3 continues, "When exercising their rights as citizens, faculty members must also respect the university by not claiming to represent the positions or views of the university and by not using institutional resources."

360. Plaintiff posted her Facebook comment as a citizen.

361. In posting her Facebook comment as a citizen, Dr. Shirinian did not claim to represent the positions or views of UTK.

40

362.    In posting her Facebook comment as a citizen, Dr. Shirinian did not use any of UTK's institutional resources.

363.    UTK hosted a Faculty Senate meeting in September of 2025.

364.    At the meeting, not one UTK faculty member openly supported Chancellor Plowman's decision regarding Dr. Shirinian.

365.    In October of 2025, UTK Provost John Zomchick was questioned about Dr. Shirinian's punishment.

366.    Dr. Zomchick claimed that he was the individual who had the authority to initiate termination proceedings but that he did not.

367.    Dr. Zomchick admitted that could not cite a policy justifying Chancellor Plowman's termination action against Dr. Shirinian.

368.    There is no policy in UTK's handbook that allows Chancellor Plowman to initiate termination proceedings.

369.    In November of 2025, the Faculty Senate passed a resolution (59 in favor, 11 against and 9 abstentions) aiming to restore confidence in UT governance following the termination of Dr. Shirinian.

370.    The resolution that was passed recognized that UTK violated principles of free speech in terminating Dr. Shirinian.

371.    The resolution notes the chilling effect of free speech.

372.    Chancellor Plowman recognizes that a majority of the faculty believe that she violated the First Amendment by terminating Dr. Shirinian.

373.     President Boyd recognizes that a majority of the faculty believe that he violated the First Amendment by terminating Dr. Shirinian.

## W.     Hate Mail

374.     UTK's decision to terminate Dr. Shirinian has made national news.

375.     In addition to being suspended and not allowed to teach at UTK, Dr. Shirinian has received a significant amount of hate mail, including but not limited to the following:

    a    "Take a toaster bath you n*#&er loving c*_+
    b    I hope someone buries u so deep that it would take an eternity to find ur filthy tongue
    c    BURN ALIVE IN HELL FOREVER
    d    You are the sick piece of shit who deserves a big d*#^ in your a*@ • Please go back to your country of origin

376.     Following President Boyd's and Chancellor Plowman's public statements regarding Dr. Shirinian "advocating violence" and the university's termination proceedings against her, the volume of hate mail sent to Dr. Shirinian increased.

377.     News coverage of UTK's actions against Dr. Shirinian further increased the volume of hate mail received by Dr. Shirinian, both online, via email, and to her home address.

## CLAIMS FOR RELIEF

### COUNT ONE:  Retaliation for Private Political Speech (42 U.S.C § 1983)
### INJUNCTIVE RELIEF FROM DEFENDANTS IN THEIR OFFICIAL CAPACITIES

378.     Plaintiff hereby reincorporates foregoing paragraphs by reference.

379.     Defendants retaliated against Dr. Shirinian for her private social media comment about Mr. Kirk.

380. Dr. Shirinian's social media comment was made on her personal time, on her personal device, using her personal account, without any reference to UTK, and in her private capacity as a citizen.

381. Dr. Shirinian's comment involved matters of great public concern---the controversial political figure Mr. Charlie Kirk and his messages of hate, genocide apologia, sexism and bigotry.

382. Whatever governmental needs UTK may have as a public employer, they are insufficient to justify gagging Dr. Shirinian's private right to speak on these matters of great public concern.

383. Defendants' actions against Dr. Shirinian would deter a person of ordinary firmness from engaging in political speech.

384. Dr. Shirinian suffered adverse actions as a result of her political speech.

385. Defendants acted under color of law in punishing Dr. Shirinian for her speech.

386. As the ACLU recently put it, in response to the nationwide push to terminate and discipline teachers for daring to criticize Mr. Kirk's political views:

> Government officials calling for people who expressed their political views to lose their jobs or face other punishment is unconstitutional. As the Supreme Court ruled just last year in *NRA v. Vullo* – a case where a Democratic government official was pressuring businesses to not work with the NRA – government officials can't use their power to pressure third parties into silencing or punishing speech they dislike. Full stop. Employers, media companies, and even state and local officials facing such pressure should remember that the First Amendment protects them from having to give in.

387. Defendants violated the First Amendment and must be ordered to both reinstate Plaintiff and allow her to continue towards tenure without interference or retaliation.

43

**COUNT TWO: Retaliation for Private Political Speech (42 U.S.C § 1983)
COMPENSATORY AND PUNITIVE DAMAGES AGAINST DEFENDANTS IN THEIR
INDIVIDUAL CAPACTIES**

388.    Plaintiff hereby reincorporates the foregoing paragraphs by reference.

389.    Defendants retaliated against Dr. Shirinian for her private social media comment about Mr. Kirk.

390.    Dr. Shirinian's social media comment was made on her personal time, on her personal device, using her personal account, without any reference to UTK, and in her private capacity as a citizen.

391.    Dr. Shirinian's comment involved matters of great public concern---the controversial political figure Mr. Charlie Kirk and his messages of hate, genocide apologia, sexism and bigotry.

392.    Whatever governmental needs UTK may have as a public employer, they are insufficient to justify gagging Dr. Shirinian's private right to speak on these matters of great public concern.

393.    Defendants' actions against Dr. Shirinian would deter a person of ordinary firmness from engaging in political speech.

394.    Dr. Shirinian suffered adverse actions as a result of her political speech in violation of the First Amendment.

395.    Defendants acted under color of law in punishing Dr. Shirinian for her speech.

396.    Defendants have each retaliated against Dr. Shirinian for her political speech in reckless and/or intentional disregard of her First Amendment rights.

## COUNT THREE:  VIEWPOINT DISCRIMINATION (42 U.S.C § 1983)
## INJUNCTIVE RELIEF FROM DEFENDANTS IN THEIR OFFICIAL CAPACITIES

397.    Plaintiff hereby reincorporates foregoing paragraphs by reference.

398.    Dr. Shirinian engaged in speech or expressive activity.

399.    Dr. Shirinian's social media comment was made on her personal time, on her personal device, using her personal account, without any reference to UTK, and in her private capacity as a citizen.

400.    Dr. Shirinian's comment involved matters of great public concern---the controversial political figure Mr. Charlie Kirk and his messages of hate, genocide apologia, sexism and bigotry.

401.    Defendants punished Plaintiff because of her viewpoint.

402.    Even in nonpublic forums, viewpoint discrimination is categorically forbidden.

403.    Defendants did not act in good faith.

404.    Viewpoint discrimination by a public university is *per se* unconstitutional.

405.    No reasonable public official could believe viewpoint discrimination is lawful.


## COUNT FOUR: VIEWPOINT DISCRIMINATION (42 U.S.C § 1983)
## COMPENSATORY AND PUNITIVE DAMAGES AGAINST DEFENDANTS IN THEIR
## INDIVIDUAL CAPACITIES

406.    Plaintiff hereby reincorporates the foregoing paragraphs by reference.

407.    Dr. Shirinian engaged in speech or expressive activity.

408.    Dr. Shirinian's social media comment was made on her personal time, on her personal device, using her personal account, without any reference to UTK, and in her private capacity as a citizen.

45

409. Dr. Shirinian's comment involved matters of great public concern---the controversial political figure Mr. Charlie Kirk and his messages of hate, genocide apologia, sexism and bigotry.

410. Defendants punished Plaintiff because of her viewpoint.

411. Even in nonpublic forums, viewpoint discrimination is categorically forbidden.

412. Defendants did not act in good faith.

413. Viewpoint discrimination by a public university is per se unconstitutional.

414. Defendants have discriminated against Plaintiff with reckless and/or intentional disregard of her clearly established First Amendment rights.

415. Defendants continue to discriminate against Plaintiff was reckless and/or intentional disregard of her clearly established First Amendment rights.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays that:

1. Defendants Answer this Amended Complaint within the time provided by law.

2. This Court grant the outstanding Motion for Temporary Restraining Order and order Defendants to restrain from retaliating against Plaintiff in any way based on her Facebook comment. Among other things, this would require Defendants to take Plaintiff off administrative leave, allow her to return to teaching in the classroom, mentoring students, publishing, halting any termination proceedings, and allowing Plaintiff's tenure track to continue without any interference or retaliation.

3. Any and all possible injunctive relief including reinstatement.

4. That this Court find that Defendants actions for any and all claims are unconstitutional.

46

5.     This cause be tried by a jury.

6.     The Court enter judgment for Plaintiff against the Defendants.

7.     Plaintiff be awarded damages, including but not limited to back pay, front pay, emotional distress, loss of enjoyment of life, compensatory and punitive damages against Defendants.

8.     Plaintiff be awarded reasonable attorney's fees and litigation expenses, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

7.     Court costs be taxed to Defendants.

8.     Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.


                                        Respectfully Submitted,

                                         /s/ Robert C. Bigelow, Esq.
                                        Robert C. Bigelow, Esq. #022022
                                        Bigelow Legal, PLLC
                                        4235 Hillsboro Pike, Suite 301
                                        Nashville, TN 37215 (615)
                                        829-8986
                                        rbigelow@bigelowlegal.com

47

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 11, 2025, a copy of this Amended Complaint was sent

via the Court's CM/ECF system to all counsel listed below:


      Michael D. Fitzherald, Esq.
      T. Mitchell Panter, Esq.
      The University of Tennessee
      400 W. Summit Dr. – UT Tower #1117
      Knoxville, TN 37902
      (865) 974-0525
      Attorneys for Defendants

                                        <u>/s/ Robert C. Bigelow, Esq.</u>