UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| TAMAR SHIRINIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 3:25-cv-528-KAC-JEM |
| | ) |
| DONDE PLOWMAN, et al.; | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Plaintiff Tamar Shirinian's "Motion for a Temporary Restraining Order and Expedited Hearing" [Doc. 11]. Because Plaintiff has not shown that Defendants likely violated her First Amendment rights when she was placed on administrative leave, the Court denies her Motion.

**I.     Background and Findings of Fact[1]**

Defendant the University of Tennessee is "Tennessee's flagship land-grant university and premier public research institution." *See About*, The University of Tennessee, Knoxville, https://www.utk.edu/about (last visited Dec. 18, 2025). Its stated mission is to "[s]erve[] all Tennesseans and beyond through education, discovery and outreach that enables strong economic, social and environmental well-being" [*See* Doc. 17 at 11 (citation omitted)]. Defendant Donde Plowman is the Chancellor of the University of Tennessee, Knoxville [*See* Doc. 1 at 2]. Defendant Randy Boyd is the President of the University of Tennessee System [*Id.*]. Defendant Charles Noble is the University of Tennessee, Knoxville's Faculty Senate President [*Id.*]. Plaintiff is an

---

[1] The record before the Court is limited [*See* Doc. 17 at 2]. Plaintiff's Complaint [Doc. 1] is not verified and therefore does not serve as evidence in support of Plaintiff's request for a temporary restraining order [*See* Doc. 1]. *See* Fed. R. Civ. P. 65(b)(1)(A).

"Anthropology professor" at the University of Tennessee, Knoxville [*See* Docs. 11-1 at 1, 11-3 at 1]. At the relevant time, she was "on an early tenure track" [*See* Doc. 11-1 at 1].

On September 10, 2025, political activist Charlie Kirk was assassinated on a college campus. "On the night of September 12," while Plaintiff was "off work" and at home, Plaintiff "wrote a comment to a private Facebook post" [*See* Doc. 11-1 at 1]. The post and comment read:



[Doc. 17 at 3]². Plaintiff "did not refer to" herself "as a UTK professor in" her "private Facebook profile" [Doc. 11-1 at 2]. Robby Starbuck, a political "activist," "discovered" the post and "shared" it publicly "with his hundreds of thousands of followers" [*See* Doc. 11-4 at 4]. Starbuck

---

² Plaintiff's Declaration does not contain the post and comment, but Defendants' Response does [*See* Doc. 17 at 3]. Plaintiff admits that she made the comment, [*see* Doc. 11-1 at 2], and "Defendants do not dispute the authenticity," [Doc. 17 at 3 n.1].

also questioned why Plaintiff's research specialty existed "at [the] University of Tennessee" [*Id.*]. "[A]t least two (2) elected representatives, U.S. Rep. Tim Burchett" and "Tennessee Rep. Jack Zachary . . . reached out to the University" to express concern about Plaintiff's comment [*Id.* at 5].

On September 15, Plaintiff received a letter from Defendant Plowman giving her "notice of [Defendant Plowman's] decision to place [Plaintiff] on administrative leave (with pay) pending termination proceedings" [*See* Doc. 11-2 at 1]. Defendant Plowman assessed that Plaintiff's "decision to post incendiary comments" that "celebrat[e] violence and murder" "at a time of heightened anxiety" "violated the university's expectations for the people teaching our students" and "reveals that you do not have the competencies necessary to be an effective instructor" [*Id.*]. Further, Defendant Plowman stated that Plaintiff's failure to "model[] civil discourse, even when expressing personal opinions" "negatively impacted the academic environment and increase[d] the risk of violence on our campus" [*Id.*].

On September 16, Defendant Plowman sent another letter [*See* Doc. 11-3]. It notified Plaintiff that Defendant Plowman had "initiated an expedited termination of" Plaintiff's "tenure track appointment" and gave Plaintiff an opportunity to respond [*See id.* at 1]. This letter stated that Plaintiff's "social media post creates grave concerns about your judgment as a faculty member" and constitutes "egregious misconduct" [*Id.*]. And it remarked that Plaintiff's behavior also "br[ought] the University into disrepute" and "adversely affect[ed] the University" such that the University believed that Plaintiff "lacked the fitness to engage in teaching, research, or service as a member of this faculty" [*See* Docs. 11-3 at 2-3]. The University believed that Plaintiff's "reckless use of incendiary language" "constitute[d] a serious dereliction of [Plaintiff's] obligations as a member of this academic community . . . [and] fail[ed] to meet the [University's] expectations for professional engagement" [*Id.* at 3].

3

On September 22, Plaintiff responded in her own letter [*See* Doc. 11-4 at 1]. Plaintiff "admitted[]" that her comment was "ineloquent," "heartless," "insensitive," "crude," "cold," "unfeeling," and "far from humane" [*Id.* at 1-3]. Plaintiff assessed that she was "confident that Mr. Starbuck, Mr. Burchett or Mr. Zachary would have asked for" Defendant Plowman's "resignation" or "[p]erhaps they would have even threatened to pull funding from the University" if Plowman "had done nothing or failed to act" [*Id.* at 5]. Plaintiff maintained, however, that she did not "endorse, incite, or suggest that anyone should resort to violence" [*Id.* at 1].

Once Plaintiff was placed on administrative leave, "numerous people associated with the University, including students I [she] was helping, reached out" "in support of" her return [*See* Doc. 11-1 at 3]. "[I]n a faculty meeting with the Chancellor, numerous faculty members spoke up against her decision to terminate my employment and . . . no one, other than the Chancellor supported my termination" [*Id.* at 4]. Plaintiff "received hate mail from numerous" others [*See* Docs. 11-1 at 4, 11-4 at 4].

On October 29, Plaintiff filed a Complaint against Defendants Plowman, Boyd, Noble and the University of Tennessee, Knoxville [Doc. 1]. The Complaint alleges a First Amendment retaliation claim against Defendants and seeks injunctive relief and compensatory and punitive damages [*See* Docs. 1 at 36-38, 24]. Plaintiff then filed the instant Motion [Doc. 11]. Defendants responded [Doc. 17]. And Plaintiff replied [Doc. 18]. The Court held a conference at which Plaintiff confirmed that her Complaint included only a First Amendment retaliation claim and that Plaintiff wished for the Court to assess her Motion on the record then before the Court [Doc. 24][3].

---

[3] Plaintiff has since filed an amended complaint [*See* Doc. 25].

4

## II.     Analysis

A temporary restraining order "is an extraordinary remedy never awarded as of right." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). A plaintiff seeking a temporary restraining order has the burden of meeting an exacting standard. *Id.* at 22. The Court considers "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *See Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365-66 (6th Cir. 2022) (quotation omitted) (en banc) (per curiam); *see also See Bobay v. Wright State Univ.*, No. 22-4007, 2023 WL 3963847, *3 (6th Cir. June 13, 2023). Defendant only challenges whether Plaintiff has a "strong likelihood of success on the merits" [*See* Doc. 17 at 5]. Plaintiff is "not required to prove [her] case in full" at this preliminary stage. *See Certified Restoration Dry Cleaning Network, LLC, v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quotation omitted). But she must generally make a "clear showing" that she is likely to succeed on the merits. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024).

To succeed on a First Amendment retaliation claim, Plaintiff must show that she "(1) engaged in constitutionally protected speech, (2) [each of the Defendants] took adverse actions against [her] that caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) [the] actions [of each Defendant] were motivated, at least in part, by the exercise of [Plaintiff's] constitutional rights." *See McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023) (citation omitted); *see also Bennett v. Metro. Gov't of Nashville*, 977 F.3d 530, 537 (6th Cir. 2020).

Only the first element is at issue here [*See* Doc. 17 at 5]. To prove that Plaintiff's speech is protected by the First Amendment, she must show:

> (1) that [her] speech was made as a private citizen, rather than pursuant to [her] official duties; (2) that [her] speech involved a matter of public concern; and (3) that [her] interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in "promoting the efficiency of the public services it performs through its employees."

*Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006)). For the purposes of this Motion, the only dispute is whether Plaintiff's interest in speaking outweighs the University's "interest, as an employer, in promoting the efficiency of the public services it performs through its employees" [*See* Docs. 11-1 at 1-2, 17 at 7]. *See also Handy-Clay*, 695 F.3d at 540 (cleaned up); *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020).

To assess this dispute, the Court applies the balancing test set forth by the Supreme Court in *Pickering v Board of Education of Township High School*[4]. Courts are to weigh relevant factors "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Pickering*, 391 U.S. at 568. *Pickering*'s balancing test "stands out from the Supreme Court's free-speech jurisprudence." *See Bennett*, 977 F.3d at 553 (Murphy, J., concurring). But *Pickering* is binding, and it applies here.

On one side of the scale is "the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community." *See id.* at 538. "[T]he manner, time, and place of the employee's" speech all bear on the calculus. *See Rankin*, 483 U.S. at 388. Speech that "more substantially involve[d] matters of public concern" may warrant greater protection. *Connick*, 461

---

[4] 391 U.S. 563, 568 (1968).

U.S. at 152. *Id.* Speech made on an employee's own time receives greater protection than speech made at work. *See Garcetti*, 547 U.S. at 426. And political speech is entitled to the greatest protection under the First Amendment. *Connick*, 461 at 145.

Here, Plaintiff's speech made outside of work involves "a matter of public concern," *see Noble v. Cincinnati*, 112 F.4th 373, 382 (6th Cir. 2024), but it falls outside of the First Amendment's core because it is not political speech, *see Bennett*, 977 F.3d at 538. The "context" of Plaintiff's speech is political because it "referenced a high-profile public event," *see Noble*, 112 F.4th at 382 (quoting *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *3 (6th Cir. 2023)) (cleaned up), that "gripp[ed] national media . . . just days earlier," *see Marquardt*, 2023 WL 395027, at *4. The "general content" of Plaintiff's speech, however, is not political. *See id.* at *3. Plaintiff's comment did not specifically engage with Charlie Kirk's politics or his political message [*See* Doc. 17 at 3]. Because the content of Plaintiff's speech was not core political speech, her speech does not occupy "the 'highest rung of the hierarchy of First Amendment'" protection [*See* Doc. 18 at 4 (quoting *Connick*, 461 U.S. at 145 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)))].

On the other side of the scale is "the effective functioning of the public employer's enterprise" as articulated through "pertinent considerations." *See Rankin*, 483 U.S. at 388; *see also Bennett*, 977 F.3d at 539. Pertinent considerations include "whether the statement [1] impairs discipline by superiors or harmony among co-workers, [2] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, [3] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise," or (4) "undermines the mission of the public employer." *Rankin*, 483 U.S. at 388. "[A] public employer need not show actual disruption." *Gillis*, 845 F.3d at 687. Instead, a showing that it

7

"could reasonably predict that the employee speech would cause disruption" is enough. *Id.* If, as here, "an employee's speech 'substantially involve[s] matters of public concern,' an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning." *See Leary v. Daeschner*, 228 F.3d 729, 737-38 (6th Cir. 2000) (quoting *Connick*, 461 U.S. at 150-52).

Here, the reaction to Plaintiff's comment was swift and substantial. Plaintiff's comment "w[as] not kept private and eventually captured" the public's "attention" [*See* Doc. 11-4 at 4-5]. *See Marquardt*, 2023 WL 395027, at *5; *see also Bennett*, 977 F.3d at 541. The comment was shared broadly on social media [*See* Doc. 11-4 at 4]. And "at least two (2) elected representatives" contacted the University to express concerns about the post [*Id.* at 5]. Plaintiff "received a significant amount of hate mail," [*see* Docs.11-4 at 4, 11-1 at 4], and the propriety of her work at the University was called into question, [s*ee* Doc. 11-4 at 4]. Others associated with the University, including students and "numerous faculty members" supported Plaintiff's return [*See* Doc. 11-1 at 4]. But the comment and the context in which it was made caused Defendant Plowman to assess that Plaintiff did "not have the competencies necessary to be an effective instructor" [*see* Doc. 11-2 at 1]. The University believed that Plaintiff "lacked the fitness to engage in teaching, research, or service as a member of this faculty" [*See* Docs. 11-3 at 2-3].

There is also evidence that Plaintiff's speech "undermine[d] the mission" of the University. *See Rankin*, 483 U.S. at 388. According to the University, the comment "violated the university's expectations for the people teaching our students" [*See* Doc. 11-2 at 1]. Further, Defendant Plowman assessed that Plaintiff's comment "negatively impacted the academic environment and increase[d] the risk of violence on our campus" [*Id.*]. Plaintiff's comment purportedly "br[ought] the University into disrepute" and "adversely affect[ed] the University" [*See* Docs. 11-3 at 2-3].

8

Case 3:25-cv-00528-KAC-JEM    Document 26    Filed 12/18/25    Page 8 of 9    PageID #: 232

On this record, the Court cannot determine that these assessments lack reasonableness. At bottom, the University believed that Plaintiff's "reckless use of incendiary language" "constitute[d] a serious dereliction of [Plaintiff's] obligations as a member of this academic community . . . [and] fail[ed] to meet the [University's] expectations for professional engagement" [*Id.* at 3].

Balancing these factors, Plaintiff has not shown that they weigh in her favor at this early stage in the litigation. Therefore, she has not shown that her speech was likely constitutionally protected and that she is likely to succeeded on the merits of her retaliation claim. *See Ryan*, 979 F.3d at 526 (quoting *Bennett*, 977 F.3d at 537); *see also Pickering*, 391 U.S. at 568. Without a showing that Defendants have likely violated Plaintiff's First Amendment rights, the other relevant factors do not support the issuance of a temporary restraining order.

### III. Conclusion

For the above reasons, the Court **DENIES** Plaintiff Tamar Shirinian's "Motion for a Temporary Restraining Order and Expedited Hearing" [Doc. 11].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge