IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | | |
|---|---|---|
| TAMAR SHIRINIAN | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 3:25-cv-528-KAC-JEM |
| | ) | |
| v. | ) | |
| | ) | Judge Crytzer |
| DONDE PLOWMAN, et al. | ) | Magistrate Judge McCook |
| in their personal and official capacities | ) | |
| | ) | JURY DEMAND |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT OF MOTION**

## INTRODUCTION

This case returns to the Court on a materially different record and in a different procedural posture. The question now presented is narrow and familiar at the preliminary-injunction stage: whether Defendants may continue to enforce severe, career-altering discipline against a tenure-track professor for off-duty speech made as a private citizen, where the developed evidentiary record no longer supports Defendants' asserted justification for that discipline.

The First Amendment does not permit that result.

This case is not about civility, tone, or whether Plaintiff's private speech was agreeable. It is about whether the State may punish a public-university professor for private, off-duty expression based on officials who, *under oath*, admit to focusing on moral condemnation of the viewpoint expressed and marketing and communications analysis of public and political reaction—rather than on evidence of actual or reasonably predicted disruption to university operations. The Constitution draws a firm line against that power.

1

In denying Plaintiff's request for emergency relief, the Court acted on a necessarily limited record and under an extraordinary-relief standard applicable to temporary restraining orders. The Preliminary Injunction record now before the Court is materially different in ways that directly address the considerations that controlled the TRO ruling.[1]

The undisputed evidence now establishes that Defendants removed a professor on the verge of tenure from the classroom and initiated expedited termination proceedings without identifying a single disrupted class, a single student complaint, any meaningful police involvement, any emergency response, or any concrete operational impairment traceable to Plaintiff's speech. No investigation preceded the discipline. No contemporaneous findings of disruption were made. No particularized threat assessment was conducted. Defendants failed to even check if the initial post and comment in question was authentic versus edited/altered, AI-driven, created by bots, or simply fake. Instead, sworn testimony demonstrates that Defendants' decision-making centered on public backlash and being "viral", "temperature", reputational concern, public relations and political pressure—considerations that reflect listener reaction rather than institutional necessity. That distinction is constitutionally dispositive.

Even under Defendants' preferred *Pickering/Rankin* framework, government employers may not elevate public outrage, political pressure, or reputational anxiety over protected speech. A "reasonable prediction" of disruption must be grounded in evidence and institutional judgment—not in backlash metrics or external demands. As the record demonstrates, the State imposed discipline because officials condemned the viewpoint expressed and reacted to public outrage. The State officials' analysis did not turn on balancing at all: viewpoint discrimination is

---

[1] The record now contains over 700 pages of sworn deposition testimony. After ordering expedited processing, thanks to the hard work of the Court Reporter, Plaintiff received the transcripts on Friday, January 16, 2026. Due to the Court being closed on Monday, January 19, 2026, Martin Luther King, Jr. Day, Plaintiff submits this Motion and Memorandum today, Tuesday, January 20, 2026.

categorically forbidden by the First Amendment and cannot be justified by predictions of disruption, reputational concern, or institutional discomfort.

Plaintiff spoke as a private citizen, on her own time, in a private forum. She did not invoke her employer, her position, or the University. She did not threaten violence, incite unlawful action, or interfere with her teaching duties. The severe sanctions imposed against her—removal from teaching, loss of faculty status, and initiation of termination proceedings (not to mention an illusory due process design that even the Chancellor admits is lacking and did not follow Board of Trustee policies)—were not tailored to any demonstrated operational need. On the present record, they reflect punishment for viewpoint and reaction, not regulation of workplace efficiency.

Plaintiff does not ask the Court to resolve the ultimate merits of this case at the preliminary stage. Nor does she ask the Court to supervise university policy or second-guess academic judgment. She seeks a narrow, status-quo-restoring injunction designed to halt ongoing constitutional injury while this case proceeds on the merits.

Specifically, Plaintiff requests interim relief that (1) stays termination proceedings and any further disciplinary action arising from the same protected speech; (2) restores her faculty status, access, and tenure-track protections pending adjudication; and (3) prohibits any prejudice to her tenure clock, dossier, or review attributable to the challenged discipline. Even if the Court concludes that immediate classroom reinstatement is not warranted at this stage, the Constitution requires—at minimum—that Plaintiff's faculty status and tenure-track protections be restored and that any continued exclusion from teaching be justified by a particularized, evidence-based showing of actual disruption or a credible threat supported by admissible evidence.

This request is carefully calibrated to the Court's prior ruling and to the evidentiary record now before it. The Court is not asked to revisit the TRO decision; it is asked to apply the familiar

3

preliminary-injunction standard to a materially developed record that cures the factual deficiencies previously identified. Because the record now demonstrates that Defendants' asserted justification for discipline rests on listener reaction rather than institutional necessity, Plaintiff has shown a strong likelihood of success on the merits of her First Amendment claim.

Importantly, the rule Defendants advance would not apply only to Plaintiff. It would authorize public universities to discipline faculty whenever private, off-duty speech strikes against the moral views of those in charge or the political climate *du jour*—allowing constitutional protection to rise or fall with public outrage, donor pressure, or elected-official demands. Courts around the United States have recognized in similar contexts, the First Amendment does not permit such a regime, particularly in the public-university context, where the State's power is at its weakest and academic freedom is at its apex.

The remaining preliminary-injunction factors reinforce this conclusion. Each day the challenged discipline remains in place Plaintiff suffers ongoing and irreparable harm to her First Amendment rights and her academic career—harms that cannot be fully remedied later by damages. Defendants have no legitimate interest in continuing to enforce an unconstitutional penalty. Third parties have no cognizable interest in a system where constitutional rights depend on political outrage. The public interest is served—especially at a public university—when government officials are required to adhere to the Constitution's core requirement of viewpoint neutrality.

On the materially developed record now before the Court, Plaintiff respectfully requests that the Court grant her Motion for a Preliminary Injunction and restore the constitutional status quo pending final adjudication.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, the Court must weigh four factors: (1) the movant's chances of succeeding on the merits; (2) if the movant would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest. *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). The Sixth Circuit has held that "[n]one of these factors is a prerequisite to injunctive relief," rather, "It's a balance of four factors, not a mandate that all four factors exist. While the absence of one factor—say harm to a moving party—may weigh heavily in the balance, it does not dictate the balance." *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017).

The current record before the Court cures the Plaintiff's factual defects that controlled the TRO ruling. The Court denied Plaintiff's TRO on a limited record and under an extraordinary-relief posture, crediting Defendants asserted "reasonable prediction" of disruption and giving reduced weight to Plaintiff's speech because the Court viewed the "general content" as non-political. The preliminary-injunction record is materially different. The previously filed Declaration of Dr. Tamar Shirinian is attached as <u>Exhibit A</u>, sworn deposition testimony of Charles Noble, the President of the Faculty Senate, as <u>Exhibit B</u>, Chancellor Donde Plowman as <u>Exhibit C</u>, and President Randy Boyd as <u>Exhibit D</u>. Some of the 100+ exhibits, referenced via previously marked exhibit numbers, will follow. This sworn testimony now establishes that Defendants imposed severe employment sanctions on a professor on the verge of receiving tenure—because of decision-making centered on moral viewpoints, public backlash, political pressure, virality, email volume, "temperature," brand management, and elected-official demands.

Plaintiff's claim of viewpoint discrimination, which was not before the Court at the time of the TRO, completely changes the framework. That evidentiary shift also matters for each *Pickering/Rankin* factor and independently confirms that Defendants' "prediction" of disruption was not a reasoned operational judgment—it was a listener-reaction rationale, i.e., a heckler's veto, which the First Amendment forbids.

## **RELIEF REQUESTED**

Plaintiff seeks a narrow, status-quo-restoring injunction that prevents further unconstitutional retaliation while this case is adjudicated on the merits. Specifically, Plaintiff requests that the Court order Defendants, their officers, agents, employees, and all persons acting in concert with them to:

1. Stay or suspend termination proceedings and any further disciplinary proceedings arising from Plaintiff's September 12, 2025 off-duty speech;
2. Restore Plaintiff's faculty status and access (including email, systems access, library access, research access, and other ordinary privileges of appointment), and restore her tenure-track protections pending adjudication;
3. Prohibit retaliation or further discipline based on the same protected speech;
4. Prohibit any prejudice to the tenure clock, dossier, or tenure review attributable to the challenged discipline or related controversy; and
5. Permit Plaintiff to teach absent a particularized, evidence-based showing of actual disruption or credible threat supported by admissible evidence.

If the Court is not inclined to order immediate classroom reinstatement as a mandatory form of relief, Plaintiff requests—at minimum—an order granting items (1)–(4) above and providing that any continued exclusion from teaching must be justified by a particularized evidentiary showing rather than generalized predictions based on public outrage.

This relief is administratively straightforward and restorative. It does not compel policy changes, restructure operations, or impose ongoing judicial management. It simply prevents Defendants from continuing to enforce an unconstitutional penalty while the merits are adjudicated.

# FACTUAL SUMMARY

### A. Dr. Tamar Shirinian and the Tenure Track

Dr. Tamar Shirinian is an accomplished anthropology professor at the University of Tennessee, Knoxville ("UTK"), with extensive scholarship and a record of strong teaching performance. Shirinian Decl., Ex. 1. She held a tenure-track appointment and submitted her tenure dossier one year early, on August 25, 2025. Id. Dr. Noble testified that tenure is described by some as "a job for life" and while one may lose tenure, it provides significant job security. Noble Dep. 13. Dr. Noble explained the significant length and rigor of the tenure process and the Board's ultimate authority. Nobel Dep. 23:1–24:6; 28:3–12.

### B. The National Context and Plaintiff's Private Speech

Charlie Kirk, a nationally prominent political figure, was assassinated on September 10, 2025. Plowman Dep. 127:6–7. The assassination and its public meaning became a subject of national debate. Boyd Dep. 37; Ex. 22; Ex. 24.

On September 12, 2025, while off duty, at home, and speaking as a private citizen, Plaintiff made a comment in a private Facebook setting. Shirinian Decl.; Plowman Dep. 249–50. Plaintiff did not identify herself as a UTK employee and did not reference the University. Plowman Dep. 249–50. A screenshot of the post and comment was later amplified publicly by a political influencer, and political officials demanded action. Plowman Dep. 113–14, 30-31.

### C. Defendants' Response: No Investigation, No Evidence of Disruption, Heavy Reliance on Public Relations and Brand Marketing

Chancellor Plowman learned of the post on September 14, 2025, but did not verify its authenticity through IT or investigate operational impacts before acting. Plowman Dep. 41–44; 107:13–18; 108:7. She has conceded the speech did not call for violence nor instruct anyone to commit violence. Plowman Dep. 250–51.

Before imposing severe discipline, Chancellor Plowman did not conduct a formal investigation; did not consult campus police; did not identify disrupted classes; did not identify a specific threat; did not contact Plaintiff; did not contact Plaintiff's head/dean; did not contact colleagues or students; and did not consult UTK law faculty. Plowman Dep. 48-49; 61–62; 251–53.

President Boyd made public statements early, framing the matter as "reprehensible," while the University simultaneously represented it was "investigating." Boyd Dep. 115–16; 126:5–10; 135:16–24; 139:3–17. President Boyd testified UT monitored social-media sentiment to protect the "brand." Boyd Dep. 240. Marketing and communications personnel tracked email volume and reaction. Ex. 38.

### D. Deviation from Board of Trustees Policy and Unwritten Rules

Chancellor Plowman cited an expedited termination policy associated with acts or credible threats of harm, though Plaintiff was not suspended without pay and Defendants lacked evidence of threats or harm traceable to Plaintiff. Plowman Dep. 160-162. Plowman admitted she "skipped" ordinary steps and ignored Board policy "with the counsel from General Counsel." Exhibit 67; Plowman Dep. 176; 185:2–6; 266–69.

President Boyd testified that administrators may override written speech-protective policies from the Board of Trustees based on "timing and circumstance," and asserted an unwritten rule that all private social-media speech should be treated as public because it *might* become public. President Boyd admitted under oath that faculty at the University of Tennessee have no way to know that this unwritten rule even existed. Boyd Dep. 83–86; 142–50; 166–68; 96.

### E. No Actual Disruption; Documented Chilling Effect

Dr. Noble testified he was not aware of threats, disruption, teaching deficiencies, or refusal by colleagues to work with Plaintiff. Noble Dep. 99–102. The Faculty Senate later passed a resolution finding a chilling effect and damage to governance. Noble Dep. 90–92; Ex. 7.

### F. Board of Trustees Authority and Knowledge

The record confirms the Board's ultimate authority and knowledge. Noble Dep. 23:1–24:6; 28:3–12; Boyd Dep. 168:2–169:6; 225-2297; Plowman Dep. 168:14–169:9. President Boyd testified he spoke with Board Chair John Compton about Plaintiff's case and believed the Chair was included in relevant emails. Boyd Dep. 40:11–22; 229:4–230:2. Board members were briefed on actions taken. Noble Dep. 41:6–47:18; Boyd Dep. 225:18–229:4; Plowman Dep. 267-68.

## ARGUMENT

### I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

This Court need not approve of Plaintiff's speech to protect it. The question is not whether the speech is admirable or even moral. The question is whether the government may punish a citizen-employee for off-duty speech based on viewpoint and public outrage, without evidence of actual disruption. On this record, Plaintiff is likely to succeed.

#### A. The Discipline Bears the Hallmarks of Viewpoint Discrimination and Listener-Reaction Punishment

Viewpoint discrimination is an "egregious form of content discrimination" and presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The First Amendment does not permit government to punish speech because it expresses a disfavored moral or political judgment. *Matal v. Tam*, 582 U.S. 218, 243 (2017) ("[G]iving offense is a viewpoint."). And a public university, in particular, may not use its power

9

as an employer to impose orthodoxy. *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)("[I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or at their faith therein."); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

The developed record supports a strong inference that Plaintiff was punished because Defendants condemned the viewpoint expressed and because of the backlash it produced:

- President Boyd described the speech as morally "reprehensible," treated his moral judgment as the University's position, and acted amid intense public reaction. Boyd Dep. 135:16–24; 139:3–17; 214; 240.
- Chancellor Plowman acknowledged the statement reflected Plaintiff's opinion, conceded it did not call for violence, and nonetheless focused on what was "going viral," email volume, and "temperature." Plowman Dep. 180:3–5; 250–51; 109:2–5.
- Marketing, communications and government relations rapidly engaged; metrics were tracked; legislators commended "swift action." Ex. 38; Ex. 45; Exs. 47–48.
- No operational facts were identified first—no investigation, no student interviews, no disrupted classes, no police consultation, no identified threat. Plowman Dep. 48; 61–62; 251–53.

That is the constitutional problem in its simplest form: government may not convert public outrage into a license to punish protected speech. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). The Sixth Circuit has repeatedly rejected "heckler's veto" rationales—where the State burdens a speaker because listeners react angrily. *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 252–53 (6th Cir. 2015) (en banc) (recognizing that "the Supreme Court, in *Cantwell*, *Terminiello*, *Edwards*, *Cox*, and *Gregor*, has repeatedly affirmed the principle that 'constitutional rights may not be denied simply because of hostility to their assertion or exercise'"). On this record, Defendants' proffered interests collapse into listener-reaction punishment: a prediction of disruption drawn from outrage rather than evidence.

### B. Plaintiff Spoke as a Private Citizen on a Matter of Public Concern

Plaintiff spoke off duty, at home, in a private forum, and not pursuant to any of her official duties. Shirinian Decl.; Plowman Dep. 249–50. Speech made as a citizen on matters of public concern lies at the core of First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 146 (1983). The assassination of a nationally prominent political figure and the public reaction to it are matters of obvious public concern. Boyd Dep. 37; Ex. 22; Ex. 24.

Nor does the First Amendment require that speech be polite, civil, or universally regarded as "political." The Constitution protects speech on public issues even when it is offensive. *Snyder v. Phelps*, 562 U.S. 443, 451–52, 458 (2011); *Papish v. Bd. of Curators*, 410 U.S. 667, 670 (1973) (per curiam); *Rankin v. McPherson*, 483 U.S. 378, 387–88 (1987).

### C. Even Under *Pickering/Rankin*, Defendants Cannot Carry Their Burden on The Record Now Before the Court

Defendants are likely to argue this case is governed by *Pickering* and that the University may act on a "reasonable prediction" of disruption. But even under that framework, Defendants bear the burden of showing a legitimate efficiency interest that outweighs the employee's and the public's interest in the speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Rankin*, 483 U.S. at 388.

Offense, controversy, reputational anxiety, and anticipated backlash from outsiders are--–critically---not cognizable "disruption" interests that can justify punishing protected speech. *Rankin*, 483 U.S. at 388; *Forsyth Cnty.*, 505 U.S. at 134–35; *Bible Believers*, 805 F.3d at 252–53. Here, the record is stark:

- No disrupted classes identified. Plowman Dep. 251–53.
- No student complaints identified. Noble Dep. 99–102; Plowman Dep. 251–53.
- No police involvement or emergency measures. Plowman Dep. 251–53.
- No investigation or interviews before discipline. Plowman Dep. 48; 61–62; 251–53.
- No documented impairment of teaching or workplace functioning. Noble Dep. 99–102.

11

Case 3:25-cv-00528-KAC-JEM    Document 42    Filed 01/20/26    Page 11 of 17
PageID #: 423

By contrast, there is affirmative evidence Defendants acted because of backlash metrics, "temperature," and political pressure. Plowman Dep. 109:2–5; Boyd Dep. 214; 240; Ex. 38; Ex. 45; Exs. 47–48. That is not a constitutionally valid substitute for evidence of disruption.

Even if Defendants invoke "safety" as a legitimate interest, the record reflects they did not act like officials responding to a safety threat: no police consultation, no evidence-based threat assessment, no operational findings, and—now, over 4 months later—no identified incident traceable to Plaintiff. Plowman Dep. 251–53; Noble Dep. 99–102. A generalized fear based on public anger is precisely the kind of listener-reaction rationale the First Amendment forbids government to elevate over speech rights.

Accordingly, Plaintiff is likely to succeed even under Defendants' preferred test—and even more so under the Constitution's categorical prohibition on viewpoint discrimination and heckler's veto punishments. Notably, now that the record has developed considerably, Plaintiff would likely succeed based her initial claims of retaliation.

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

The ongoing deprivation of First Amendment rights constitutes irreparable injury as a matter of law. *Elrod*, 427 U.S. at 373; *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). Here, Defendants continue to enforce a severe penalty for protected speech: removal from teaching, exclusion from ordinary faculty functions, and the continuation of termination proceedings.

This harm is not cured by paid administrative leave. The tenure track is a narrow and time-limited professional trajectory. Removal from teaching, mentoring, seeking funding for research, scholarship access, and ordinary faculty status irreparably damages Plaintiff's professional standing and tenure prospects. Shirinian Decl.; Noble Dep. 11-28. Courts recognize that loss of unique career opportunities and professional standing can constitute irreparable harm. *EEOC v.*

12

Case 3:25-cv-00528-KAC-JEM   Document 42   Filed 01/20/26   Page 12 of 17
PageID #: 424

*Chrysler Corp.,* 733 F.2d 1183, 1186 (6th Cir. 1984). Due to a Facebook comment that took only a "moment," Dr. Noble, the President of the Faculty Senate, contends that Dr. Shirinian's career (which she worked all of her adult life to establish), is now "devastated." Noble Dep. 42. Granting this injunction will, at least temporarily, provide a reasonable band-aid to the devastation until the matter can fully be decided.

The record also supports broader chilling effects—recognized by faculty governance bodies—flowing from Defendants' decision to punish off-duty speech based on outrage and moral disapproval. Noble Dep. 90–92; Ex. 7. A chilling effect on protected speech is itself irreparable harm. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

### III. THE REQUESTED INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO THIRD PARTIES---ALTHOUGH NOT ISSUING AN INJUNCTION WILL

An injunction that restores the status quo ante and halts ongoing constitutional violations does not harm third parties; it prevents constitutional injury. *See Obama for Am. v. Husted*, 697 F.3d 423, 436-37. Defendants have identified no evidence that Plaintiff's presence in a faculty role (or her teaching) caused disruption, threatened safety, or impaired university operations. Plowman Dep. 251–53; Noble Dep. 99–102. Political backlash and donor or outsider displeasure are not cognizable third-party harms that can justify suppressing speech rights. *Forsyth Cnty.*, 505 U.S. at 134–35; *Bible Believers*, 805 F.3d at 252–53.

Moreover, Plaintiff's requested relief is structured to avoid burden on the University: if the Court is concerned about immediate classroom assignment, the order can restore faculty status and stay termination while allowing teaching to resume absent a particularized, evidence-based showing of actual disruption or credible threat. Notably, this matter is about significantly more than Dr. Shirinian. It is about all of the employees who work at University of Tennessee, including

13

but not limited to faculty. That structure protects all of them, including faculty, who are extremely concerned about their First Amendment and Due Process rights being violated. *See* Exs. 7, 10, 12, 14, 15, 16. Currently, the snap decisions of a few administrators and the acquiescence of the Board of Trustees control the Constitutional viewpoints of many and have created an atmosphere of fear, uncertainly, and, for many, protest.

## IV. THE INJUNCTION SERVES THE PUBLIC INTEREST

It is always in the public interest to prevent constitutional violations. *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979). That principle carries special force where the State uses employment power to punish off-duty speech based on outrage and viewpoint condemnation. The public interest is not served when constitutional protections depend on the popularity of the viewpoint or the volume of angry emails.

Public universities exist to educate citizens in a free society. The Supreme Court has repeatedly described them as a "marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180–81 (1972); *Keyishian*, 385 U.S. at 603. Allowing public officials to impose career-ending sanctions for private speech based on moral disapproval and political backlash undermines that mission and chills lawful expression. The Faculty Senate's resolution confirms that chilling effect in concrete institutional terms. Noble Dep. 90–92; Ex. 7.

A narrow injunction here vindicates the public's interest in constitutional limits, viewpoint neutrality, and principled governance without requiring the Court to manage university operations.

## V. THE RELIEF IS NARROW, RESTORATIVE, AND WELL WITHIN THE COURT'S EQUITABLE POWERS

Finally, courts routinely grant the requested relief at this stage: preservation of the status quo ante and prevention of continuing constitutional harm. *Obama for Am.*, 697 F.3d at 436–37.

14

Plaintiff does not ask the Court to compel new policies, supervise academic decisions, or micromanage campus affairs. Plaintiff asks the Court to stop Defendants from continuing to enforce a penalty imposed on a constitutionally impermissible basis and to restore the basic tenure-track protections and faculty status that existed before the challenged discipline.

The record confirms Defendants and the Board have authority to implement this relief immediately. Noble Dep. 23:1–24:6; 28:3–17; Boyd Dep. 168:2–169:6; 225-229; Plowman Dep. 168:14–169:9.

## CONCLUSION

The record presents a straightforward First Amendment violation. Dr. Shirinian spoke as a private citizen, off duty, in a private forum, without invoking the University, threatening violence, or causing any disruption. Shirinian Decl.; Plowman Dep. 249–53; Noble Dep. 99–108. Defendants nevertheless removed her from teaching and initiated termination proceedings because they found her viewpoint "offensive," "abhorrent," and "morally reprehensible," and because of the backlash the speech generated. Boyd Dep. 69–70, 135; Plowman Dep. 67–69, 105–06, 250–51. The First Amendment does not permit a public university to punish speech on that basis. *Rosenberger*, 515 U.S. at 828–31; *Matal*, 582 U.S. at 243; *Bible Believers*, 805 F.3d at 252–53.

The Court's TRO ruling rested on a sharply limited record and on Defendants asserted "reasonable prediction" of disruption. The record now before the Court is materially different. Sworn testimony confirms Defendants imposed severe employment sanctions against a professor on the cusp of tenure—removal from the classroom and initiation of termination proceedings—without identifying any disrupted class, any student complaint, any threatened harm traceable to Plaintiff, or any emergency measure requiring police involvement. Instead, Defendants' decision-

15

Case 3:25-cv-00528-KAC-JEM   Document 42   Filed 01/20/26   Page 15 of 17
PageID #: 427

making centered on political and public-relations backlash: virality, volume of emails, social-media reaction, and elected-official pressure. This is precisely the kind of listener-reaction punishment the First Amendment forbids.

Plaintiff has therefore shown a strong likelihood of success on the merits. She has also shown irreparable harm as a matter of law because the ongoing deprivation of First Amendment rights cannot be remedied after the fact, and because removal from the classroom and the tenure track inflicts career harm that cannot be reconstructed through later damages.

The balance of equities and the public interest likewise favor an injunction, because there is no legitimate interest—by Defendants or any third party—in the continuation of unconstitutional conduct, and the public interest is served by preventing constitutional violations and preserving academic freedom at a public university. *Connection Distrib.*, 154 F.3d at 288; *Keyishian*, 385 U.S. at 603.

Plaintiff's requested relief is calibrated to what courts most readily grant at the Preliminary Injunction stage: preservation of the status quo ante and prevention of continuing constitutional harm. *See Obama for Am. v. Husted*, 697 F.3d 423, 436–37 (6th Cir. 2012). Plaintiff does not ask the Court to supervise university operations or dictate academic policy. Plaintiff asks the Court to stop Defendants from continuing to enforce an unconstitutional penalty while the merits are adjudicated and to restore Plaintiff's faculty status, access, and tenure-track protections.

The requested relief is narrow and restorative. It allows Dr. Shirinian to teach, stays termination proceedings, restores full faculty status and access, does not allow retaliation or further discipline based on the speech, and does not allow tenure-clock or dossier prejudice. To the extent the Court views immediate classroom reinstatement as mandatory in form, Plaintiff requests, at minimum, an order restoring all faculty privileges so that she can continue publications she was

16

working on publications she was previously involved in at UTK, staying any termination proceedings, and further ordering that Plaintiff may resume teaching absent a particularized showing of actual disruption or credible threat supported by evidence.

For these reasons, the Court should grant Plaintiff's Motion for a Preliminary Injunction.

Respectfully Submitted,

/s/ Robert C. Bigelow, Esq.
Robert C. Bigelow, Esq. #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
(615) 829-8986
rbigelow@bigelowlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, a copy of the foregoing will be sent via the Court filing system to all counsel of record for the Defendants.

/s/ Robert C. Bigelow
Robert C. Bigelow #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
rbigelow@bigelowlegal.com
(615) 829-8986

*Attorney for Plaintiff*