1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF TENNESSEE

3                  AT KNOXVILLE

4    _____

5    TAMAR SHIRINIAN,

6           Plaintiff,

7       v.                      Case No.

8    THE UNIVERSITY OF TENNESSEE      3:25-cv-528-KAC-JEM

9    KNOXVILLE, DONDE PLOWMAN, RANDY

10   BOYD, and CHARLES NOBLE, in

11   Their Personal and Official

12   Capacities,

13           Defendants.

14   _____

15        VIDEOTAPED DEPOSITION OF CHARLES NOBLE

16   DATE:          Wednesday, January 7, 2026

17   TIME:          9:05 a.m.

18   LOCATION:      UT Tower

19                  400 West Summit Hill Drive

20                  Knoxville, TN 37902

21   REPORTED BY:   Joni C. Bolden

22   JOB NO.:       7824638

23

24

                                          Page 1

Case 3:25-cv-00528-KAC-JEM     Document 44     Filed 01/21/26     Page 1 of 146
                              PageID #: 434

```
 1                    A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF TAMAR SHIRINIAN:
 3         ROBERT BIGELOW, ESQUIRE
 4         Bigelow Legal, PLLC
 5         4235 Hillsboro Pike
 6         Nashville, TN 37215
 7         rbigelow@bigelowlegal.com
 8         (865) 804-6272
 9
10   ON BEHALF OF DEFENDANTS THE UNIVERSITY OF TENNESSEE
11   KNOXVILLE, DONDE PLOWMAN, RANDY BOYD, AND CHARLES
12   NOBLE:
13         MICHAEL D. FITZGERALD, ESQUIRE
14         University of Tennessee
15         400 West Summit Hill Drive - UT Tower Suite 1155
16         Knoxville, TN 37902
17         mike.fitzgerald@tennessee.edu
18         (865) 974-9321
19
20   ALSO PRESENT:
21         Tamar Shirinian, Plaintiff
22         Tina Caiazza, Litigation Paralegal for Mike
23         Fitzgerald
24         Stephen Pendleton, Videographer
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1                        I N D E X
2    EXAMINATION:                                    PAGE
3         By Mr. Bigelow                               7
4
5                      E X H I B I T S
6    NO.            DESCRIPTION                       PAGE
7    Exhibit 1      UT Faculty Senate Information and
8                   Accomplishments                    60
9    Exhibit 2      Bylaws - Faculty Senate            65
10   Exhibit 3      Printout of Facebook Post Hasmik
11                  Geghamyan                          73
12   Exhibit 4      Printout of "X" Post by Randy Boyd  73
13   Exhibit 5      Randy Boyd Printed "X" Profile Bio  74
14   Exhibit 6      Faculty Senate Webpage Printout     74
15   Exhibit 7      Memorandum October 3, 2025 to
16                  Charlie Noble                       77
17   Exhibit 8      AAUP Document                       82
18   Exhibit 9      GE0004 Philosophy on Institutional
19                  and Leadership Statements           85
20   Exhibit 10     Article, The Daily Beacon
21                  11/13/2025                          89
22   Exhibit 11     Faculty Senate Meeting Agenda
23                  11/17/2025                          89
24
```

Page 3

```
 1              E X H I B I T S (Cont'd)
 2   NO.           DESCRIPTION                      PAGE
 3   Exhibit 12    Article, Knoxville News Sentinel
 4                 11/18/2025                        92
 5   Exhibit 13    Faculty Senate Meeting Agenda
 6                 10/20/2025                        93
 7   Exhibit 14    United Campus Workers Petition to
 8                 Reinstate Dr. Tamar Shirinian     93
 9   Exhibit 15    Policy Affirming Principles of
10                 Free Speech for Students and
11                 Faculty Effective 11/03/2017      95
12   Exhibit 16    Article, Knoxville News Sentinel
13                 No UT Penalty for Tenn. Prof
14                 09/27/2016                        97
15   Exhibit 17    NPR Article 12/15/2025            97
```
16
17
18
19
20
21
22
23
24

Page  4

```
 1              P R O C E E D I N G S
 2                  THE REPORTER:  Good morning.  My name
 3    is Joni Bolden.  I am the reporter assigned by
 4    Veritext to take the record of this proceeding.  We
 5    are now on the record at 9:05 a.m.
 6                  This is the deposition of -- could you
 7    please state your name, sir?
 8                  DR. NOBLE:  Sure.  Charles Noble.
 9                  THE REPORTER:  Taken in the matter of
10    Tamar Shirinian vs. the University of Tennessee
11    Knoxville -- is it -- Donde Plowman, Randy Boyd, and
12    Charles Noble, in their personal and official
13    capacities, on January 7, 2026, at the UT Building in
14    downtown Knoxville, Tennessee.
15                  I am authorized to take
16    acknowledgements and administer oaths in Tennessee.
17                  Additionally, absent an objection on
18    the record before the witness is sworn, all parties
19    and the witness understand and agree that any
20    certified transcript produced from the recording of
21    this proceeding:
22                      - is intended for all uses permitted
23                        under applicable procedural and
24                        evidentiary rules and laws in the
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    same manner as a deposition recorded
 2                    by stenographic means; and
 3              - shall constitute written stipulation
 4                    of such.
 5              At this time, will everyone in
 6     attendance please identify yourself for the record.
 7     We'll begin with my right, and go around this way.
 8                    MR. FITZGERALD:  My name is Michael
 9     Fitzgerald.  I am with the Office of the General
10     Counsel for the University of Tennessee, and I am
11     counsel for all the defendants, including Dr. Noble.
12                    MS. CAIAZZA:  Tina Caiazza, paralegal
13     for the University of Tennessee.
14                    THE VIDEOGRAPHER:  Stephen Pendleton,
15     the videographer.
16                    MS. SHIRINIAN:  Tamar Shirinian, the
17     plaintiff.
18                    MR. BIGELOW:  Rob Bigelow, and I am the
19     attorney for Dr. Shirinian.
20                    DR. NOBLE:  Charles Noble.
21                    THE REPORTER:  Thank you.  Thank you.
22                    Hearing no objection, I will now swear
23     the witness.
24                    Please raise your right hand.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1   WHEREUPON,
 2                      CHARLES NOBLE,
 3   called as a witness and having been first duly sworn
 4   to tell the truth, the whole truth, and nothing but
 5   the truth, was examined and testified as follows:
 6                    THE REPORTER:  Thank you.
 7                    You may proceed.
 8                      EXAMINATION
 9   BY MR. BIGELOW:
10        Q    Good morning, Dr. Noble.
11        A    Good morning.
12        Q    How are you this morning?
13        A    Good.  Thanks.
14        Q    Good.  Again, my name is Rob Bigelow.  As
15   you know, I represent Dr. Shirinian.
16             Have you ever given a deposition before?
17        A    Once before.
18        Q    Okay.  And what was that?  Tell me about
19   that.
20        A    It was a real estate dispute several years
21   ago.
22        Q    Okay.  Fair enough.  Were you a party in
23   that dispute?
24        A    Yes.  I was the -- I had to sue a contractor
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   over a real estate issue.
 2         Q    Okay.  Well, I just have -- I don't -- the
 3   lawyer who was involved with that may have different
 4   rules than I do.  I have some pretty simple rules.
 5              One, as you already testified to, is to tell
 6   the truth.
 7              The second is, if you don't understand a
 8   question that I'm asking, just tell me.
 9         A    Okay.
10         Q    I am from the north, originally, I'm from
11   Michigan, and, sometimes, I have a tendency to speak a
12   little quick.
13              If I do just be like, "Hey, Bigelow, slow
14   down.  I didn't understand what you asked."
15              Also, if you need to use the restroom or
16   take a break at any time, just let me know.
17         A    Okay.
18         Q    Not a big deal.  We'll take a break.  Or, if
19   you get a call that you need to take, or whatever you
20   need to do, that's fine.
21              This is not a trick, or a test of endurance,
22   or anything like that.  I'm just asking you a bunch of
23   questions.
24         A    Okay.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        Q    Fair enough?

 2        A    Yeah.

 3        Q    Finally, I -- the -- a lot of people have a

 4   tendency to say, "uh-huh," or, "uh-uh," things like

 5   that when answering a question.

 6             I ask that you not do that because it makes

 7   the court reporter's life really, really difficult

 8   because the, "uh-huh," or, "uh-uh," isn't a easy

 9   answer to decipher.

10        A    Sure.

11        Q    Where do you currently work, sir?

12        A    The University of Tennessee Knoxville.

13        Q    And what is your position at UTK?

14        A    My title is Henry Distinguished Professor of

15   Business.  I have a tenured position in the Department

16   of Marketing and Haslam College of Business.  And I'm

17   also serving a one-year term as the president of the

18   faculty senate.

19        Q    Which I'm sure you're not exactly happy that

20   you got to do, but that's beside the point.

21             How did you become the president of the

22   faculty senate?

23        A    I was in typical kind of path.  The -- the

24   senate requires representation from various
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    departments across campus, and there's some degree of
 2    arm-twisting, typically, that goes on from department
 3    heads and deans to get people to serve.  Some -- some
 4    are more anxious.
 5              I was happy to serve, but we had a need in
 6    the Haslam College.  So I just served as a regular
 7    senator, and then, as typically happens, you pretty
 8    quickly end up chairing committees and things like
 9    that, and so I did a little bit of that.
10              And then, two springs ago, the -- the
11    leadership team, for whatever reason, thought that I
12    might be a decent person for this role.  And so they
13    reached out and just inquired as to whether I'd have
14    interest in doing that.
15         Q    And I read over your CV and your background
16    and some of your publications.
17              Is it fair to say that one of your interests
18    is marketing with like new products, that's a big
19    thing that you're involved with?
20         A    Yes.
21         Q    Okay.  Are you involved with any social,
22    political, or religious groups in -- like, just
23    generally, in Knoxville?
24         A    I'm really not.  No.  I don't go to church
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1   regularly.  I don't belong to any social groups of any

2   sort, really.

3       Q    Okay.  How did you ultimately get -- explain

4   what tenure is, to those who might not know what

5   tenure is.

6       A    Oh, wow.  That's -- could take up our hour.

7   Well, tenure is a process.

8       Q    Just remember, we might have more than an

9   hour, so, if you talk about tenure for an hour, I --

10      A    I'll -- I'll try to keep it very brief, but

11  let me know if you'd like me to elaborate --

12      Q    Sure.  Please.  I will.

13      A    So, roughly speaking, there are basically

14  two kinds of faculty on a campus.  There are what we

15  call tenure track faculty and non-tenure track

16  faculty.

17          The non-tenure track faculty are focused on

18  teaching.  They typically teach seven or eight courses

19  a year or something like that, and that's kind of

20  their mission.

21          Tenure track faculty have more of a balance

22  between research and teaching, typically.  So, when

23  you're hired as a tenure track faculty member, you

24  typically have to have a terminal degree of some sort,

www.veritext.com              Veritext Legal Solutions              800-556-8974

```
 1   most cases, that's a PhD or a doctorate, and you go
 2   into a process.
 3           Basically, it is a probationary period, we
 4   call it that sometimes, of five -- get this right --
 5   five years, basically, and, where every year you're
 6   evaluated, looking at your research and teaching.
 7           Try -- depending on the department, you
 8   know, the needs can -- can vary quite a bit.  I mean,
 9   we have tenured professors in dance, for example, and
10   they would do very different things that I would do
11   for my professional development.
12           But so, after that probationary period, five
13   years, then you -- there's an expression of "going up
14   for tenure" or "submitting your package for tenure."
15           And you don't have a choice, and so tenure
16   is kind of an up or out decision, so it's fairly
17   dramatic.
18           So, in that sixth year, after the first
19   five, the sixth year, you go through this process of
20   evaluation that starts at the department level to
21   the -- the college level, to the provost level, and so
22   on, and people are voting whether you should be
23   retained.
24           And so, if you're not retained, you're --
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1   you're given a terminal contract, typically for the
2   following year.  So, at the end of your seventh year,
3   you would have to leave.
4           If you are retained, then, you have a lot.
5   People sometimes colloquially call it "job for life."
6   That's not really true.  You can lose -- lose tenure,
7   but -- but you have a lot more job security at that
8   point, when you're granted tenure, going forward.
9       Q    So you said a couple things.  First, you
10  said, usually, you have to have a terminal degree.
11  And when you say that, you mean like a doctorate;
12  correct?
13      A    Correct.
14      Q    And how do you get a doctorate degree?
15      A    Well, you enter a doctoral program, you
16  know, and the requirements vary.  Some programs will
17  take people straight from an undergraduate degree.
18  Probably more common is to have some sort of master's
19  degree, then, to go into a PhD program.
20          You know, the length of those programs can
21  vary anywhere from three to seven years, depending on
22  the discipline.
23          And then, when you graduate, you would have
24  a PhD.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        Q    So you go to undergrad first, obviously,
 2   four years, normally, some -- for some more, for some
 3   less, for four years, and then, to graduate school?
 4        A    Correct.  Most -- and again, it's -- it's
 5   hard to generalize across all fields, again, getting
 6   into arts and -- and different areas are -- are fairly
 7   different.
 8             But, in most cases, I think, you would --
 9   you would -- people will have a master's degree, which
10   typically takes one or two years, and then, they would
11   go on and get a PhD after that.
12        Q    And you said, for a PhD, it's anywhere from
13   three or four to seven years?
14        A    Correct.  Yeah.
15        Q    So, when you're talking about higher
16   education to get a PhD, would it be fair to say that
17   it's the 4 years of undergrad, 1 or 2 years of
18   masters, so that's 5 or 6, and then, 3 to 7, so you're
19   talking anywhere from 9 to 13, 14 years, based on the
20   math, roundabout?
21        A    Yeah.  I think that captures most cases.
22        Q    Okay.
23        A    That model.  Yeah.
24        Q    Is it difficult to get a PhD?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        A     Sure.

 2        Q     And you have to do a dissertation?

 3        A     Correct.

 4        Q     And what is a "dissertation"?

 5        A     Again, that can look very different.  You

 6   know, if I was an artist getting a PhD, it would be a

 7   portfolio of artwork and things like that.

 8              But, in most -- well, I'll just speak to

 9   more of the social sciences, which is really what I'm

10   in, you know, in most cases, you find a research topic

11   that interests you, that you've been studying through

12   your PhD program.

13              And then, you work with an advisor, you

14   know, you have a dissertation chair, and then other

15   faculty who are also on the committee.  And you kind

16   of negotiate what a -- what a valid research project

17   will look like.

18              Typically, you would end up gathering some

19   data of some sort, could be all kinds of different

20   things, depending on what you're studying.

21              So you do that research, you -- you write up

22   a giant document.  I believe my dissertation was 350

23   pages long, something like that.  And it needs to get

24   approved by your committee.
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

```
 1              And then, you present.  It's called a
 2    "defense."  You -- you ultimately present that work,
 3    not just to your committee, but to the department and
 4    even your whole college.
 5              And then, there's, you know, kind of a
 6    voting process at that point, to say whether you pass
 7    or not.
 8        Q    There's something called "ABD"; correct?
 9        A    Yes.
10        Q    Could you explain that?
11        A    Yeah.  ABD is when you have begun your
12    dissertation.  And that's what -- I -- I left my PhD
13    program, ABD.  So it stands for "all but
14    dissertation."
15              So that means that you are kind of working
16    on your dissertation midstream somewhere.  Maybe you
17    have data, you haven't fully analyzed it yet.  Maybe
18    you have -- you're writing things up and so on.
19              But some job opportunity comes along that
20    you want to take advantage of, and so, you -- you
21    leave your PhD school to take a faculty position as
22    ABD.
23              Typically, it doesn't last more than a year.
24    If you take more than a year as an ABD, the school
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1  will probably cut you loose because you're not on a
 2  tenured track at that point.  You're kind of a
 3  temporary employee.
 4       Q    So, for you, you wrote, you said, it was
 5  like 350 pages --
 6       A    Uh-huh.
 7       Q    -- for your dissertation?
 8       A    Correct.
 9       Q    You did, "uh-huh," by the way.
10       A    Oh, sorry.
11       Q    That's okay.  That's okay.  But yes?
12       A    Yes.
13       Q    Yours was 350 pages, roundabouts?
14       A    I believe so.  Yeah.
15       Q    And did you -- you did not defend it,
16  though, or you did?
17       A    Ultimately, I defended it.  Sure.
18       Q    Okay.
19       A    I wouldn't have a PhD if I hadn't defended
20  it.
21       Q    Right.  Right.  But did you do that after
22  you left the university?
23       A    So, if I -- just to -- if this helps -- so I
24  did my PhD at Arizona State University.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1      Q    Okay.

2      A    I left there, I believe, in 1995, ABD, and

3   took a job at Mississippi State University.

4           So I was considered a -- I think,

5   technically, they might have called me a "visiting

6   professor" or something like that.  So not a tenure

7   track professor, but I was there.

8           And so I -- for that year, I taught at

9   Mississippi State University.  I did service.  I did

10  all the things a faculty member would do.  But, you

11  know, at night, so to speak, on the side, I was

12  working on this 350-page dissertation.

13          And so around about a -- the following

14  summer, so 10 or 11 months later, after I started

15  there, I, you know, physically went back to Arizona to

16  defend my dissertation.

17          I had been working with my -- my committee

18  the whole year, you know, passing things back and

19  forth and so on.

20     Q    How many years did it take you to write your

21  dissertation?

22     A    The whole program for me was -- I guess,

23  until defense, was five years.  So I was on campus for

24  four years at Arizona State, and then, one year ABD,

```
 1   and then, went back to defend.
 2        Q    And you take some classes first before you
 3   start writing your dissertation normally; is that
 4   true?
 5        A    Yeah.  And that varies a lot by program,
 6   what -- you know, what your focus is.
 7             In business, typically, it's something like
 8   two and a half years' worth of coursework at the
 9   beginning of the program.  And then, after that,
10   you're really focused on research almost exclusively
11   and -- and some teaching as a student.
12        Q    Is it fair to say that it's a tremendous
13   amount of work?
14        A    It's, yes, very fair to say that.
15        Q    Okay.  And, once you get your terminal
16   degree, your PhD, and kind of what we were talking
17   about before, ultimately, if you're fortunate enough,
18   you get a job in academia, if you want; correct?
19        A    Correct.
20        Q    And, as you said, kind of going back a
21   little bit, one track in academia is the tenure track?
22        A    Yes.
23        Q    And is getting tenure stressful?
24        A    Extremely.  It's extremely stressful.  If
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

1   you -- as I mentioned, it's not just a -- a nice to
2   have.  You know, if you are denied tenure, you're
3   fired, effectively, in -- in almost every case.
4           So, you know, if you have a spouse, you have
5   a family, you have to, you know, go home and tell them
6   that we're going to have to pack up and -- and find
7   another place to go probably.
8           So, yeah, it's very stressful.
9       Q    And you -- and, earlier, you talked about
10  the determination of getting tenure, and it starts at
11  your department chair; is that correct?
12      A    Actually, a notch below.  There's typically
13  a committee at the department level of senior faculty
14  who get together.  It depends on the department.
15          Sometimes, they provide feedback every year.
16  Sometimes, they just get together when someone is
17  being considered for tenure.
18          And they -- they -- sometimes, it's called a
19  vote.  Sometimes, it's called kind of an advisory
20  comment, something like that.  So it's -- it's kind of
21  a non-binding referendum, you might say.
22      Q    Sure.
23      A    But we'll call it a vote.  So the -- so
24  department senior faculty would get together and vote.

```
 1   So I'm a full professor now, and so, anytime anyone is
 2   coming up for tenure in my department, I would have
 3   input on that.
 4           So those folks have input, have a vote,
 5   write a letter of commentary in addition, saying
 6   either -- you know, it could be anything from we
 7   strongly support this person, they're a superstar, we
 8   need to give them tenure ASAP, or it could be that we
 9   don't think that they've met the standards in
10   research, teaching both, whatever.
11           But all of that is non-binding.  It's
12   informational.  It goes to the department head, in --
13   in every situation that I know of on campus, goes to
14   the department head.
15           The department head typically repeats the
16   process.  They evaluate the faculty member, they add
17   their own commentary.  They may or may not comment
18   specifically on what the department, senior faculty,
19   had said.
20           The department head input is also, as I
21   understand it, non-binding, in terms of the decision.
22   In other words, if the department head says no, that
23   it's not over yet, like the process continues.  Right?
24           From there, it goes to the -- the campus
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    level. And, in some cases there is a campus level

2    committee that assesses people as well, at kind of a

3    high level, and then, again, providing input,

4    feedback, and so on, non-binding.

5          And then it ultimately goes to the chief

6    academic officer, or the provost, who, as I understand

7    the process, is really the only vote that counts, the

8    only one that really makes a hard decision on yay or

9    nay, in terms of tenure.

10      Q    You said the chief academic officer or the

11    provost. Is that the same person?

12      A    I.e., Provost. Yes. Yes. Yes.

13      Q    Okay. I just wanted to be clear for the

14    record.

15      A    Sorry. Yep. Same person.

16      Q    So, ultimately, there's one, two, three --

17    four levels?

18      A    Something like that. Yes.

19      Q    Okay. And I would imagine that, like,

20    getting your PhD is also very stressful?

21      A    Yes.

22      Q    Okay. Is that fair to say?

23      A    Getting the PhD?

24      Q    No. Getting your tenure?

www.veritext.com      Veritext Legal Solutions      800-556-8974

1        A    Getting tenure, yes.  It's a long process.
2    You know, you submit your -- a dossier, which is a --
3    I don't -- now, it's digital.  It used to be these
4    huge three ring binders, and you'd have two or three
5    giant ones, and it would have every paper you've ever
6    written, teaching evaluations, any kind of annual
7    reviews you've received, all this stuff.
8            And -- and you would submit that in -- I
9    think, now, it's -- it's something like -- well, the
10   process starts in June, before -- in June, where
11   you're soliciting outside letters from people.
12           It also involves getting outside
13   recommendations from scholars in the field, to say
14   whether you deserve tenure or not.  That would
15   probably start in June.
16           Around August/September, you put together
17   this giant dossier I'm talking about.  I believe the
18   deadline now is sometime in October, early October,
19   when you would submit these things.
20           And the final step in the process is
21   actually even after the provost votes.  This is more
22   of a formality, but the board of trustees technically
23   votes to accept the provost recommendations, and I
24   believe that typically happens in May or June.

www.veritext.com          Veritext Legal Solutions          800-556-8974

1          So it's, you know, nine, ten months.  And
2     along the way, you may -- or a faculty member may or
3     may not know how it's going.
4          Different schools vary and how they handle
5     that.  Sometimes, it's a dark process.  You'll get
6     little like winks from colleagues, maybe, if you're
7     lucky.
8     Q    Like you're doing good?
9     A    Yeah.  Yeah.
10    Q    I think you got this.  Okay.
11    A    -- sometimes, it's -- you know, you might
12    not.
13         So, yeah.  So it's a long -- it's a grind,
14    and it's a stressful process to go through.
15    Q    You said that there were standards of
16    research and teaching.  Could you tell me about that?
17    A    You know, and those -- particularly on the
18    research side, those are going to vary dramatically.
19         I can speak to business, which, I think, is
20    typical for most of the social sciences and the -- the
21    harder sciences.  But a lot of it is based on journal
22    publications and academic journals.
23         So that dissertation, that -- my 350-page
24    dissertation, just as an example, the first step for a

```
 1   good student would typically be, once they've defended
 2   that dissertation, to then take that 350-page thing,
 3   and, in our case, boil it down to about a 50-page
 4   paper, research paper.  And you would send that to an
 5   academic journal for consideration.
 6           And then, that's -- it's a whole other
 7   stressful grind of a process.  It can take years to go
 8   through the review process at a journal.
 9           You know, I'm editor now of one of the top
10   journals in marketing, and I've been editor of another
11   top journal, innovation.  So I'm pretty, you know,
12   experienced in --
13       Q    Sure.
14       A    -- the editor side of things.  And, you
15   know, the rejection rate, in our field, is about 95
16   percent.  So 95 percent of the papers you submit get
17   turned down, you know, maybe a little bit lower,
18   but -- so that's stressful.
19           And so -- but if you don't get turned down,
20   then, you go through an iterative process, where
21   they'll say, we're not rejecting your paper, but here
22   are three reviewers, three or four reviewers, picking
23   out 80 things that are wrong with your paper that we
24   don't like.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1          And then, you have to go through and address
2     those comments, resubmit the paper, they review it
3     again.  Goes back and forth, in our field, anywhere
4     from three to five rounds, typically, before a paper,
5     if you're lucky, gets accepted.
6          So that can take years for a paper.  I just
7     had a paper accepted recently that I think was seven
8     years in process, which is crazy.
9          And, if you go back to the math of tenure,
10    that means that, if I was counting on that for tenure,
11    it wouldn't have helped me at all because it actually
12    took too long to get through that -- the pipeline.
13         So it's a -- it's a stressful process.
14    Yeah.  Sorry if that's too much.
15    Q    No.  It's perfect.  I appreciate you
16    explaining all of that.
17         Do you know when the board of trust or the
18    highest -- when they vote, if they explain their vote
19    or they just say like, thumbs up, thumbs down, or do
20    you know the answer to that?
21    A    As I understand it's a -- it's a consent
22    agenda, so it's just a sweeping one vote for -- they
23    don't vote individually on -- on faculty.  They don't
24    consider case by case.

1        I believe, as -- again, as I understand it,
2   the times they do consider it case by case would be
3   unusual situations where, for example, we're hiring a
4   prestigious person from another school who already has
5   tenure somewhere, and we want to bring them in
6   straightaway with tenure.
7        That's a little bit of a different process,
8   and I believe they give that a little more specific
9   attention.
10       Q    Is anything, outside of research and
11  teaching, looked at?
12       A    You know, technically, yes.  I mean,
13  service, collegiality, those are probably the -- the
14  two biggest things.
15       Service would be serving on -- there's
16  usually an expectation, for -- for tenured faculty
17  even, to -- to serve on some committees, to -- to work
18  with student groups, to do different things, to serve
19  their discipline, to review papers for journals in
20  their discipline, be associate editors, things like
21  that.
22       But that is, especially in -- during the
23  tenure decision, that's less significant, less
24  important, typically, than -- than later on in your

www.veritext.com          Veritext Legal Solutions          800-556-8974

1  career.

2      Q    What -- the reason I ask, I mean, could

3  someone meet all of the research and teaching

4  standards, and then, the provost just say, "Well, I

5  just don't like that person, and thumbs down"?

6      A    I suppose, technically, they could.  I mean,

7  to answer your question, yes, they could say that.

8          Would it hold up, if there was an appeal and

9  there was process there?  I -- I don't know.

10         But they have the -- the provost has the

11 power to -- there's no scoring system that says you

12 had 72 points and you need 70 to make tenure, so good,

13 you're in.  You know, it -- it's -- yeah.

14     Q    If someone has the teaching and research

15 standards, usually, do they get in if they meet those

16 standards, in your experience?

17     A    Yes.

18     Q    Okay.  Are you familiar with Dr. Shirinian

19 at all, prior to this?

20     A    No.

21     Q    Okay.  Are you familiar with her research

22 and teaching, as we sit here?

23     A    Just her general research area, I've heard

24 but --

1       Q    Tell me about that.

2       A    As I understand it, apologies if I

3  misrepresent, but, you know, that she -- she's an

4  anthropologist who studies, I believe, a particular

5  focus on -- on queer studies and -- and related areas

6  there.  And that's about all I know, I'm afraid.

7       Q    What's your understanding of her teaching

8  qualifications?

9       A    I have no understanding, no information on

10  that.

11       Q    You haven't looked into it at all?

12       A    No.

13       Q    Okay.

14       A    I'm not privy to that information.

15       Q    Okay.  What about her research?

16       A    I don't -- you know, and, frankly, I

17  wouldn't -- even if I saw her CV, these things are so

18  field-specific, and -- and a lot of it depends on the

19  quality of journals that someone is publishing in.

20           So, even if I saw a nice list of articles, I

21  really wouldn't have any ability, without a ton of

22  extra research, to understand the -- the quality level

23  of that.

24       Q    Could you call her chair and ask her chair,

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    if you wanted to?
2         A     That would not be appropriate.  That's not
3    something that -- there's no reason for me to do
4    that -- that, so that wouldn't be appropriate for me
5    to do that.
6         Q     In a circumstance where we find ourselves,
7    in a lawsuit, do you find that, as the chair of the
8    faculty senate, that would be something that would be
9    appropriate for you to do?
10        A     No.
11        Q     Okay.  Why not?
12        A     As I understand it, there's nothing that --
13   that I've been asked to speak to or comment on that is
14   anything that has to do with evaluating her academic
15   credentials, so that -- exploring her research, the
16   quality and quantity of it, would -- would relate to
17   that, and so, I -- I don't think it's relevant here.
18        Q     This past year.  What emails, like what
19   email addresses, have you used, if any, with regards
20   to discussing Dr. Shirinian?
21        A     I just use cnoble@utk.edu.  We'd have to get
22   an IT person involved, but, as I understand it, there
23   are -- I forget the phrase they use, but -- in IT, but
24   there are -- we all have like multiple kind of

```
1    synonymous email address -- in other words, like
2    cnoble@tennessee.edu, I think, works just as well, but
3    I don't give that out.  I don't use that.  So I use
4    cnoble@utk.edu.
5         Q    Are there any other emails that you've used
6    with regards --
7         A    Well, it's the same address.  It's, again,
8    synonymous.  My official username is cnoble6, so,
9    occasionally, I would have to use cnoble6@utk.edu, and
10   that's it.
11        Q    Have you used any personal emails?
12        A    No.
13        Q    Okay.  What about kind of non-email
14   communication?  What phones have you used to discuss
15   Dr. Shirinian?
16        A    I don't recall using my phone to discuss
17   this case at all.
18        Q    Okay.  So you've never spoken with anyone on
19   the phone to discuss this case?
20        A    I've never texted anyone in that sense.
21   Yeah.
22        Q    No.  My question, though, was, have you
23   spoken with anyone on the phone?
24        A    I've -- in a -- in a very superficial way to
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1  say, you know, I have to go to court or I have to go
2  to give a deposition, that kind of thing.
3          You know, I am the faculty senate president,
4  as you know, and so, I meet with my leadership team.
5  And so, you know, we have touched on -- on this case
6  from time to time over the fall, as we've gone through
7  different proceedings, like that resolution that
8  you're familiar with.
9      Q    Who have you spoken with on the phone with
10  regards to Dr. Shirinian?
11      A    Well, our leadership team is -- is -- it's a
12  three-year term, when you're elected senate -- you're
13  actually elected president elect.  So it's president
14  elect year, president year, and a past president,
15  immediate past president, year.
16          And so, it's always a three-person team.  So
17  our president elect is -- his name is Jud Laughter.
18  He's in education.  Derek Alderman is the past
19  president.  He's a geographer.
20          And so, we have discussed this, but I have
21  intentionally not discussed details with them.  I
22  mean, I -- I don't -- I haven't discussed anything in
23  any kind of detail that's transpired.  You know, I
24  haven't wanted to get them involved in it.

www.veritext.com            Veritext Legal Solutions            800-556-8974

1      Q     So is it fair to say, based on what you're
2    just saying, the only people you've spoken with about
3    this matter or Dr. Shirinian, frankly, is Mr. Laughter
4    and Mr. Alderman?
5      A     Yes.  Other than my counsel and other
6    people.
7      Q     What counsel have you spoken with?  You
8    don't have to tell me what they've said to you or what
9    you said to them, but just what counsel have you
10   spoken with?
11     A     Mike and the team here.
12     Q     Okay.  Who on the team?
13               THE WITNESS:  Can you help me out with
14   that?  We have --
15               MR. FITZGERALD:  No.
16               THE WITNESS:  You can't help me.
17               Let's see.  So we have Mitchell,
18   Mitchell Panter, I think is his last name.  And then
19   I'm blanking out -- this is terrible, just from
20   yesterday, it was --
21               MR. BIGELOW:  If he needs it to -- I'm
22   happy to let -- give him two minutes to look it up, if
23   he needs it, Counsel.  I'm fine with that.
24               THE WITNESS:  Okay.  Sorry.

```
 1   BY MR. BIGELOW:
 2        Q    That's okay.  Normally, like in court, you
 3   wouldn't be able, like, look at your phone, but I'm --
 4        A    Rachel Powell --
 5        Q    Okay.  Have you discussed anything with
 6   the -- with Ryan Stinett, the general counsel?
 7        A    No.
 8        Q    Okay.  What have you said to Mr. Laughter
 9   or -- and what has he said to you, with regards to
10   this matter?
11        A    Well, we have -- through the fall, you know,
12   there was -- there were faculty opinions, strong
13   opinions sometimes, about the case, how it was
14   handled, some pro, some con, et cetera.
15             And so, you know, this was an important
16   topic for faculty senate leaders to discuss, and so we
17   discussed more managing faculty input into the
18   process.
19             In other words, we would -- we discussed how
20   there was a committee, a faculty affairs committee,
21   within senate that, ultimately, felt that we -- they
22   should -- they wanted to propose a resolution, which
23   you've seen.
24             And so we -- a lot of it was procedural,
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1   basically, talking about what was going on

2   procedurally, what would have to happen next, how we

3   manage that through the senate process, and so on.

4          So that was the focus of our discussions.

5      Q    You said there are strong faculty opinions.

6   Could you explain that?

7      A    Well, I think you can see those in the

8   minutes of that meeting from -- let's see, what was

9   that November?  No.  That would be the September 22nd

10  meeting, I believe.

11     Q    I can.  I'm just asking you to explain,

12  though.

13     A    Sure.  Sure.  But, I'm just saying, that's a

14  good way to capture this.

15         So, yeah.  So, at that meeting, the

16  chancellor appeared.  It was a week or so after the

17  action to begin termination.  And there were faculty,

18  and, I believe, some graduate students, and maybe even

19  some outside people at our senate meeting.

20         Our senate meetings are open to anyone

21  really, open to the public, press, anyone.  There's

22  press there.

23         So people expressed opinions about the

24  decision, you know, in that setting.  I think it's

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    fair to say that the vast majority of the opinions
2    were -- were opposing the action.
3         Q    Opposing which action?
4         A    Opposing the chancellor's action to begin
5    that process.
6              And so the chancellor, you know, listened to
7    those comments.  I'm sure you'll ask her about that.
8    Wasn't able to offer much comfort because of the
9    litigation process that was going on, is what she was
10   citing at that time.
11             So you could ask her about that.
12        Q    Was there anyone who you've spoken with on
13   the faculty who agrees with the chancellor's decision?
14        A    Yes.
15        Q    Who?
16        A    I'm not going to name names.  I don't think
17   I should have to name names.  Those are private
18   conversations.
19        Q    Unfortunately, you have to name names, sir.
20        A    I have to name names of people who came to
21   me in confidence and told me they agreed with the
22   chancellor's decision?
23        Q    That's correct.
24                  MR. FITZGERALD:  It's discoverable

1    information.

2               THE WITNESS:  Well, I'll give you, for

3    example, Karen DeLong, who's a prestigious professor

4    in agriculture.  She told me that she supported the

5    decision, thought it was appropriate.

6    BY MR. BIGELOW:

7        Q    Anyone else?

8        A    There may have been some others.  I don't

9    remember specifically who.

10       Q    You don't remember if there was anyone other

11   than Professor DeLong?

12       A    There were a lot of quick conversations

13   during that time.  A lot of people, you know, who

14   said, you know, in a lot of cases, that they disagreed

15   with the decision, but, in some cases, that they

16   agreed.  But it was more of a -- it was more of a

17   two-word kind of comments here and there, like things

18   like that.

19              So -- so Karen was the one who I had the

20   most extended conversation with.

21       Q    Is there anyone else you remember who agreed

22   with the chancellor's decision?

23       A    I mean, yes.  There are lots of -- lots of

24   people, off campus, who've mentioned things as well.

1    Yeah.

2         Q    I'm just talking about people on campus.   \

3         A    Okay.

4         Q    And, actually, for that matter, that's not

5    even limited to professors, just anyone on campus who

6    works for university, who agrees.  Who has -- aside

7    from Ms. DeLong, Professor DeLong, who has come up to

8    you and told you?

9         A    So I didn't actively pursue opinions on

10   this.  You know, I didn't take a poll, I didn't take a

11   survey.  So it -- this is very -- it's not scientific

12   in any way.

13              So if I say that I don't have a long list of

14   people, that doesn't mean that there wasn't a long

15   list of people that felt a certain way.  So those --

16   that's all I have, in terms of specific names on that.

17        Q    Just Professor DeLong?

18        A    Yes.

19        Q    Okay.  And I'm -- like I said, I'm not

20   trying to trick you.  I promise you.  But earlier this

21   morning, when I asked who you -- name the people

22   you've spoken with, you did not say Ms. DeLong;

23   correct?

24        A    When you asked me to name what people I'd

spoken with?

Q    Yeah.  All the people you've spoken with about Dr. Shirinian, the only people you mentioned were Mr. Laughter and Mr. Alderman.

A    Well, when someone comes up and just gives me an opinion, in passing, I don't really consider that a conversation.

And so, with -- with Professor DeLong, it wasn't a conversation.  It was her giving me her opinion.

Q    But you spoke with her, and she spoke with you; right?

A    Yes.

Q    But you don't consider that a conversation?

A    No.  Because I didn't add anything to it. It was a -- she gave me her opinion in one sentence or -- you know, in one sentence or two, and -- and I said, "Thanks for that," and that was it.

Q    I thought you said the only person who went into it at length was her?

A    Yes.

Q    So it was just a sentence or two, or was it at length?

A    Depends how you define "at length," I guess.

1     Q    How do you define "at length"?

2     A    Well, then, maybe it was not at length.  So

3  we could say it's not at length, and then, we're down

4  to zero, if you want to use that math.

5     Q    Again, sir, I'm not trying to trick you.  I

6  promise.

7     A    Okay.

8     Q    I promise you.  What did Professor DeLong

9  say to you?

10     A    She told me that, as I recall, it was a

11  while ago now, that she thought that the comments that

12  came out were reprehensible and not appropriate for a

13  faculty member at the University of Tennessee.

14     Q    Do you agree with her?

15     A    I think the comments were hateful and

16  reprehensible.  Yeah, I do.  I do, in that sense,

17     Q    Do you think it's that Professor Shirinian

18  should be fired because of them?

19     A    I think that's not for me to decide.  I

20  think --

21     Q    I'm just asking your thoughts, sir.

22     A    I don't have a conclusive opinion.  I have

23  mixed feelings on it.  If you'd like me to share

24  those, I can.

Page 40

```
 1      Q    Sure.
 2      A    On the one hand, you know, I am a parent of
 3  two students, undergraduate students, at the
 4  University of Tennessee, soon to be three.
 5           And, you know, I have to say, I know people
 6  have different lived experiences and things like that.
 7           But, when I saw one of our UT faculty
 8  members expressing such vitriolic, hateful things
 9  towards someone that, as far as I know, she didn't
10  know, people she didn't know, the thought of my
11  student -- my -- my kids taking a class from someone
12  who could be that hateful to a stranger is pretty
13  appalling to me.
14           As a parent, I would not want them taking a
15  course from her.  I don't think that she can draw a
16  line between that level of animosity and kind of
17  strident opinion to come into a classroom and present
18  kind of a neutral, accepting world.  So -- so that's
19  one perspective.
20           What clouds that for me is, they are also
21  legal -- legal issues here, in terms of, you know,
22  free speech, and freedom of expression, and things
23  like that.  And that's where that's really outside my
24  area of expertise, and that's where it gets murky.
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1            I don't like to see anyone's career be
2    devastated by some -- by -- by an act that occurs in a
3    moment, especially.  So that's really unfortunate.  So
4    I'm -- I'm kind of conflicted, in terms of a bottom
5    line on this.
6        Q    Are you aware of any politicians who say
7    cruel or hateful things?
8        A    Politicians who say -- yeah.  I think we all
9    see that on -- on both sides of the -- the fence these
10   days in our world.  Yes.
11       Q    What politicians, are you aware of, who say
12   cruel or hateful things?
13       A    I think it's a matter of perspective, what's
14   cruel and hateful.  I think it depends on the -- the
15   person involved.
16           I tend to be fairly centrist in my -- which
17   is a rare thing, I think, in this world, but, so I see
18   cruel, hateful things coming from the left and the
19   right, in our political world these days.
20       Q    You think it's just a matter of one's view?
21   You said a matter of perspective; is that correct?
22       A    Well, what some people consider cruel and
23   hateful, other people might consider, in some
24   situations, as -- as something to be celebrated, you

www.veritext.com          Veritext Legal Solutions          800-556-8974

1  know, championed, but --

 2      Q    So what -- again, I'm going to ask the

 3  question, what politicians, in your view, say cruel or

 4  hateful things?

 5      A    You know, I can't -- I'm not a particularly

 6  political person, in terms of knowing, you know, lots

 7  of members of -- I mean, I know some, but members of

 8  Congress and so on.

 9           But, you know, I think our -- our President

10  has said things that I would probably classify as

11  cruel and hateful.  I think there have been, you know,

12  Democrats in this administration prior, who have also

13  done the same, so --

14      Q    So, based on what you were saying earlier,

15  if there is a faculty member who supports any of those

16  people who said cruel or hateful things, you would not

17  trust your children to be in that classroom; is that

18  fair?

19      A    I think there are some things that could be

20  considered cruel or hateful that are subjective, and

21  there's some things that are objective.

22           So, for example, saying that someone's

23  children are better off growing up without a father, I

24  consider that universally, unilaterally hateful.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   No -- no room for interpretation.
 2            The comments about his widow, maybe you
 3   could debate -- someone could debate that.  But yeah,
 4   that's how I feel about that.
 5       Q    If someone said that, if a gay person were
 6   to go to Gaza -- if someone said this, "You know, I
 7   used to say, hey, if you, as a gay person, were to go
 8   to Gaza, they would throw you off tall buildings;
 9   right?  Now, they don't have any tall buildings left.
10   So I don't -- wait.  Is that too soon?  Maybe you
11   shouldn't kill Jews, you stupid Muslims," would you
12   consider that to be cruel and hateful?
13       A    Do I have to answer that?  That seems
14   speculative or something.
15       Q    It's not speculative at all.  I'm just
16   asking what you would consider.
17                MR. FITZGERALD:  Rob, you're reading
18   from something.  Perhaps you could show that to him?
19                MR. BIGELOW:  Sure.
20   BY MR. BIGELOW:
21       Q    In page 8, I'm sure you've read -- page 8
22   states, at paragraph 66, "On the Alex Stein Show,
23   aired on December 14, 2023, Mr. Kirk stated," quote --
24       A    -- said that.  Okay.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    THE WITNESS:  Should I answer?
 2                    MR. FITZGERALD:  You can.
 3                    THE WITNESS:  I -- I -- sorry.  Would
 4   you mind reading it again then, the --
 5   BY MR. BIGELOW:
 6        Q    "You know, I used to say, hey, if you, as a
 7   gay person, were to go to Gaza, they would throw you
 8   off tall buildings; right?  Now, they don't have any
 9   tall buildings left.  So I don't -- wait, is that too
10   soon?  Maybe you shouldn't kill Jews, you stupid
11   Muslims."
12                    MR. FITZGERALD:  Object on grounds of
13   relevance.
14                    But go ahead and answer, if you can.
15                    THE WITNESS:  Okay.  So your question
16   is, again?
17   BY MR. BIGELOW:
18        Q    Do you consider that cruel and hateful?
19        A    I think we could argue about adjectives.  We
20   consider it maybe callous, at first glance.
21             I don't -- we're kind of maybe slicing
22   things thinly here, but I don't see, if I heard you
23   correctly, anything that is directly wishing ill on
24   anyone else.  That's how I heard that.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

But, and so, in that case, I would think
1

2    that would be less -- less hateful, perhaps, but, you

3    know, these are hard things to assess.

4        Q    Later, in the amended complaint -- you had

5    mentioned President Trump earlier.  I'm going to

6    mention a few things that he stated, and I want to ask

7    if you think they're cruel and hateful.

8        At a October -- I'm sorry, November 23, 2015

9    rally in Birmingham, Alabama, the President suggested

10   that heckler maybe should have been roughed up.

11       Do you consider that to be promoting

12   violence?

13       A    Yes.

14       Q    Okay.  Do you think that's okay?

15       A    No.

16            MR. FITZGERALD:  I'm going to object to

17   all the questions about the President on grounds of

18   relevance.

19            But, obviously, you answer where you

20   can.

21            MR. BIGELOW:  Well, I can answer the

22   relevance question, although I don't have to.

23   BY MR. BIGELOW:

24       Q    The relevance is this.  You had just

1   testified that the comment that Dr. Shirinian made the
2   Facebook comment was so cruel and hateful that you
3   would not want your kids to be in her classroom.
4       A    Yes.
5       Q    And what I'm asking you is, based on these
6   comments, would you want your kids to be in the
7   classroom of anyone who supported someone who said
8   these things?
9       A    For the latter comment, no.
10      Q    Okay.  But for the Charlie Kirk comment?
11      A    Maybe.  I -- I don't know.
12      Q    Okay.  Handing opposing counsel document.
13  Top of the document says, "Faculty Senate Information
14  and Accomplishments."  The -- I'm handing you the same
15  documents.
16           Do you recognize this?
17      A    Well -- what has it achieved -- yeah.  Yes.
18  I believe so.  This is a -- just kind of an
19  informational document about faculty senate.
20      Q    And it says, at the top, in the first
21  paragraph, at the bottom of the first paragraph, it
22  says, "In these times, shared governance and academic
23  freedom are more important than ever for all faculty
24  members."

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              Would you agree with that?
 2        A     Yes.
 3        Q     And then it says, "What are the duties of a
 4   faculty senator?"
 5              Do you see that, sir?
 6        A     Yes.
 7        Q     And the first duty, it says, "Represent the
 8   constituency and the broader interest of the faculty";
 9   correct?
10        A     Yes.
11        Q     So that's the duties of the faculty senator?
12        A     Senate at large.
13        Q     That's the duty of the faculty senate?
14        A     Correct.
15        Q     As the president --
16        A     Or each voting -- it does say each voting
17   member, so it's a collective effort.  Yes.
18        Q     So, as the president, is that one of your
19   duties?
20        A     It is.  Yeah.  To the best of my ability.
21        Q     How have you represented -- so is
22   Dr. Shirinian part of the constituency?
23        A     Yes.
24        Q     How have you represented her interests?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        A    A lot of what the senate president does is
 2   to kind of manage processes, manage giving people a
 3   voice when they have concerns.
 4            So, for example, in that September 22nd
 5   senate meeting, after that action on the 15th, we
 6   knew -- I knew that it was going to be a full meeting.
 7   I knew it would be a potentially boisterous meeting.
 8   There would be no -- we had no control over who would
 9   attend and things like that.
10            And so, I did everything in my power, at
11   that meeting, for example, to make sure we had a -- a
12   safe, open environment so that people would be allowed
13   to express themselves, but also that there was a
14   safety concern as well because, again, we have no
15   metal detectors on the doors.
16            We don't know who -- anyone can walk in the
17   door.  And so we made some arrangements for some sort
18   of quiet security to be in place in the building at
19   the time as part of that.
20            But also, we made a lot -- we went to
21   lengths to discuss how to allow as many people as
22   possible to express themselves.
23            So we set up, like you'd seen a town hall,
24   standing podium, microphone, which we don't usually
```

1    do.  We had rules, in terms of how long people could

2    speak and so on.  But that -- that wasn't an issue,

3    and -- and all that.

4          So -- so that was setting an environment

5    where people getting into --

6      Q   So by setting up the environment, you're

7    saying you represented her interests?

8      A   I created an environment where people could

9    express their concerns.

10      Q   Okay.

11      A   Later on, and I believe this came to

12    fruition in the November 17th faculty meeting, there

13    was a committee, the Faculty Affairs Committee, that

14    thought a resolution would be appropriate, which

15    you've seen.

16          I managed that process.  I managed all these

17    processes, despite the fact that I was named as a

18    defendant in this case.  So you could argue that I

19    was, to some extent, working against myself in

20    supporting all of this.

21          But that was okay.  I -- I signed up for the

22    president job, and -- and that's -- that's fine.

23      Q   Is there --

24      A   So --

www.veritext.com        Veritext Legal Solutions        800-556-8974

```
1        Q    I'm sorry.

2        A    Sorry.

3        Q    Is there anything that you did that didn't

4   represent her interests?

5        A    No.

6        Q    Okay.  Are you sure?

7        A    Let me be clear.  Like when you say,

8   "represent her interests," my job is not to champion

9   every single faculty member who's having a problem on

10  campus.  So, correct.

11            And then, since I was named immediately as a

12  defendant, it wasn't appropriate for me to reach out

13  to her, as I would in most cases of a -- a faculty

14  member having a bad situation to try to see if I could

15  help in some way more personally.

16            So yes.  I feel like I --

17       Q    Did you ever speak with the press?

18       A    You know, I had several requests to do that.

19  Just on the one occasion that ended up being quoted in

20  the -- I believe it was WBIR.

21       Q    Tell me about that.

22       A    That was, I believe, shortly after the 15th,

23  a day or two after that.  I could be wrong there.

24            But, you know, they asked for an opinion,
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    from a faculty senate perspective, on the situation
2    and what was happening.
3        Q     Did you get anyone's blessing to give them
4    your opinion?
5        A     No.  No.  I spoke as the faculty senate
6    president.  I don't have to do that.  I am -- you
7    know, I am a spokesperson for the senate.
8             And, in this case, I intentionally did not
9    want to involve other people on the leadership team.
10       Q     And what did you say to the press, sir?
11       A     Well, you've seen the quote.  I don't have
12   it in front of me to -- to read it to you.
13            But I will say that my -- my quote was very
14   intentionally not about Professor Shirinian, in her
15   specific case.
16            If you look at the wording of that quote, it
17   is very much about the general temperature and tenor
18   in society.  I talk about hate.  I use the phrase
19   "hate speech."
20            I -- I -- and I really did -- I did find --
21   I'm sorry to point at you -- I did find those comments
22   to be hateful, but --
23       Q     So it was about her speech?
24       A     I did find her comments to be hateful.  I

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    also found comments from what you could call the other

2    side, in -- in months surrounding, including Charlie

3    Kirk, I find some of his comments to be hateful as

4    well.

5              And so my -- my quote to the paper was very

6    much about saying that I -- I wish that we could bring

7    the temperature down on this sort of partisan acrimony

8    that that was in society at the time.

9              And that was my goal and to kind of

10   express -- really, what I was reflecting on, too, was

11   that faculty senate has a history, and I was speaking

12   based on my knowledge of the senate, which is

13   reasonably extensive, that -- you know, a history of

14   trying to, you know, lower hostilities on campus.

15        Q    How does that comment represent the

16   constituency and Dr. Shirinian's interest?

17        A    How --

18        Q    I mean, let's make it easier.  Would you

19   agree that that does not represent her interest?

20                   MR. FITZGERALD:  Object --

21   BY MR. BIGELOW:

22        Q    Okay.  How does it represent her interest?

23        A    So my duty is to the faculty senate, you

24   know, writ large.  And so, it's important -- my job,

```
 1   again, as faculty senate president, is not to run
 2   around and represent 2,500 faculty individually.
 3           In most cases, it is to support the campus,
 4   to support the faculty at large.  And, when I can help
 5   individual faculty, I do.  I spend a lot of time on
 6   that.
 7           So I thought that statement was important to
 8   send a message about the spirit of faculty senate and
 9   our values as a group.
10           And so, in terms of expressing that the
11   group has what I think are strong ethical values,
12   moral values, I think that does serve Dr. Shirinian
13   and all the faculty.
14       Q    To be fair, it does say, "each voting member
15   of the faculty senate," and you're a voting member;
16   correct?
17       A    Yes.
18       Q    It says, "shall represent the constituency";
19   correct?
20       A    Uh-huh.
21       Q    Yes?
22       A    Yes.  Sorry.  Yes.
23       Q    So you, as a voting member, represents
24   Dr. Sharinian because she's a member of the
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    constituency; correct?

2         A    She's actually not, if you want to read that

3    statement technically.

4              So a constituency tends to be applied to the

5    group that you're representing.  It's typically at the

6    college level.

7              So each college has a group of senators that

8    form a constituency.  And so that group is -- so the

9    College of Education has a group of senators who are

10   representing that constituency specifically.

11             So, if you want to be technical about that

12   sentence, that's what that's saying.  Broader interest

13   of the faculty, of course, it would include all

14   faculty.

15        Q    Okay.  I'm going to --

16        A    So I'm a business professor, so,

17   technically, that part of that phrase is saying that I

18   need to represent the business faculty's interests,

19   that constituency.

20        Q    Okay.  Okay.  So the first sentence, then,

21   "The faculty senate is a volunteer organization made

22   up of faculty leaders who advocate for the faculty,"

23   what -- if I'm correct, and correct me if I'm wrong,

24   what you're saying is -- you know, is only based on

1    what school you're in?

2         A    The portion of representing the

3    constituency.  That's what that means.

4         Q    So, as the president of the entire faculty

5    senate, you don't represent everyone, you only

6    represent the people in the business school?

7         A    No.  That's not correct.

8         Q    Okay.  Explain it.

9         A    So I have -- I have a dual role, just like

10   in -- in academics, we tend to wear lots of different

11   hats.  I'm a -- I'm a professor, I'm an editor, and so

12   on, and so forth, so dual role.

13             So my -- my role, as a voting member from

14   the Haslam College of Business constituency, is -- is

15   fairly relegated.  I actually tend to not vote on

16   things.  I recuse myself from most votes.

17             So my emphasis, as president, is on kind of

18   the greater good, the faculty senate at large.

19             And I make great -- I go to great lengths to

20   understand and be empathic with people in other fields

21   because the fields across academia are so different

22   that understanding the concerns and the worries of,

23   again, a -- a dance professor or something is -- is

24   outside my -- my world coming into this.

```
 1           And so I go to great lengths to sort of
 2    understand, empathize, try to support faculty across
 3    the whole spectrum of campus.
 4        Q    It says, in the box, in the main box here,
 5    the faculty -- right here, "The appeals committee has
 6    continued to adjudicate complaints filed by faculty
 7    with regards for violations due -- of due process and
 8    fairness in tenure and promotion decisions,
 9    performance reviews, and violations of university's
10    policies and procedures."
11           Could you explain the -- how that works to
12    me?
13        A    Yes.  It doesn't happen often.  I would say
14    the -- the modal number is probably one, like one case
15    a year would be brought to the appeals committee
16    across the whole campus.
17           In my experience, those have always been
18    regarding promotion and tenure decisions, in
19    particular.
20           So we talked about that process before.  If
21    someone goes through the whole process and is denied
22    tenure, for example, they may -- a faculty member may
23    appeal through this appeals committee to say, "Hey,
24    I -- I was great in research.  I was great in
```

```
 1    teaching.  I -- I believe I should have been granted
 2    tenure."
 3              And then, there's a process from there.
 4       Q    So what is the process Dr. Shirinian would
 5    go through, if she filed an appeal?
 6       A    That process, well, we have never dealt --
 7    at least in my experience, we have never dealt with
 8    a -- an appeal of a termination decision, so I don't
 9    know what that process looks like.
10              I'd have to study that some more, in terms
11    of the steps involved.
12       Q    So you're unsure as to what she should do?
13    So, if she came to you and said, "What can I do?
14    You're the president of the faculty senate.  What am I
15    supposed to do next to appeal?
16              You'd say, "I don't know"?
17       A    I would look in -- I would study it, and I
18    would give an answer.
19       Q    Okay.  What is the AAUP?
20       A    I believe it is the American Association of
21    University Professors, I think.
22       Q    And the faculty center collaborates with
23    them to defend academic freedom; is that fair to say?
24       A    No.  It's not.  We don't have a formal
```

1   collaboration with them.

2        Q    Have you collaborated with them in the past?

3        A    They have asked to collaborate with us.  We

4   get various groups that always -- we have more of a

5   voice on campus than -- than outside groups do.

6             And so, we frequently have outside groups

7   want to collaborate with us.  We -- the -- you know,

8   some individual faculty are more involved in AAUP,

9   but, formally, as an organization, the senate doesn't

10  have any formal connection to them.

11       Q    Okay.  Do you -- have you -- have the

12  faculty senate collaborated with the UTK chapter of

13  the AAUP in the past to defend academic freedom?

14       A    Not that I'm aware of.

15       Q    Okay.  So, on page two of this, I mean,

16  it -- there's -- you see, "Academic Freedom."  It

17  says, "The FS has collaborated with the UTK chapter of

18  AAUP to defend academic freedom."

19            So does that make you aware that they have?

20       A    Collaborated with the UTK chapter.  You

21  know, I'm not sure what specific instance that's

22  referring to, and I'm also not sure how old this

23  document is.  These things have a way of hanging

24  around for many years.

1          So it -- perhaps, that -- that's happened in
2     the past.  Like I said, though, I'm not aware that.
3          Q    If I told you that this document is
4     currently available within -- on the faculty senate's
5     website, would you have any reason to doubt that?
6          A    No.
7          Q    Okay.  Do you know the AAUP'S position with
8     regards to Dr. Shirinian?
9          A    No.
10         Q    Okay.  Do you think that's something you
11    should know?
12         A    No.
13         Q    Okay.  Make this Exhibit 1.
14              (Exhibit 1 was marked for
15              identification.)
16              MR. BIGELOW:  And, Mike, just kind of
17    as a housekeeping matter, since we're going to have so
18    many exhibits that kind of overlap each other, I'm
19    just going to start with 1 and just keep going.  It's
20    just general Plaintiff's Exhibit, if that's cool with
21    you, just so we're not -- just to make it easy.
22              MR. FITZGERALD:  Multiple exhibits.
23    Yeah.  Let's do it the way you just suggested.
24              MR. BIGELOW:  Awesome.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              MR. FITZGERALD:  That's fine.
 2    BY MR. BIGELOW:
 3         Q    I meant to ask you, sir, we had talked about
 4    conversations you've had just, you know, verbally or
 5    on the phone with people; right, or just in person?
 6         A    Uh-huh.
 7         Q    Were the conversations that you talked about
 8    earlier, did they include both in person and on the
 9    phone, or were those just on the phone?
10         A    Actually, well, the conversations with the
11    leadership team, I mentioned Jud Laughter, Derek
12    Alderman, those -- the majority of those are on Zoom.
13    We do a lot of Zoom calls, so a third category there.
14         Q    Were any of them in person?  Did you have
15    any conversations about Dr. Shirinian in person with
16    anyone?
17         A    No.
18         Q    Okay.  Did you have any communication with
19    people about Dr. Shirinian on any platform, outside of
20    email?  And when I say that, I mean social media,
21    messaging apps, WhatsApp, Signal, Instagram, just
22    anything along those lines?
23         A    No.  I -- I don't use any of those.
24         Q    Okay.  Have you ever -- you never mentioned,
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

1  at least that I can recall, you never mentioned
2  talking with the chancellor or the president.  You've
3  never spoken with either of those people about
4  Dr. Shirinian?
5      A    I've spoken -- the conversation, I think
6  you're aware of, maybe not, but, on September -- is it
7  15th -- that Monday, when I got a call from the
8  chancellor informing me about the action that she was
9  pursuing.
10     Q    But you didn't mention that until now; is
11  that fair?
12     A    Yes.  That's fair.
13     Q    Is there any reason?
14     A    You know, you're asking me to think about
15  six months of lots of interactions with lots of
16  people.  So I -- that wasn't much of a conversation.
17  We could talk about that if you want.
18          But, so I -- I didn't -- yeah, so I
19  apologize if I didn't mention that.
20     Q    Tell me about that conversation.
21     A    Was very formal.  I sort of laughed.  It was
22  with my counsel, that it was the first time I'd ever
23  seen the chancellor's name show up in my caller ID
24  when my phone rang.

1        So it was very formal, the -- almost
2    verbatim, I -- I think she said, "You know, Charlie,
3    I'm calling you -- this is Donde Plowman, the
4    chancellor, I'm calling you to inform you that we're
5    beginning" -- I forget the exact phrase, termination
6    proceedings or whatever the -- the suspension,
7    whatever the -- the phrase was for Professor Shirinian
8    because of, you know, comments that she had made on
9    social media.
10       I asked her -- it was -- it was not a
11   conversation -- it was not a consultation in the sense
12   of a discussion.
13       You know, she did not ask my opinion.  She
14   did not ask if I thought it was a good idea.  She
15   didn't ask even how I thought people would react to it
16   or anything like that, which is, you know, I guess,
17   her prerogative.
18       So I would say I would characterize it as I
19   was informed, not -- not consulted in any kind of
20   interactive way.
21      Q    Have you ever had any more conversations
22   with her?
23      A    No.  No.  Yeah.  I did ask her just to --
24   to -- you know, full disclosure, I did ask her, in

www.veritext.com          Veritext Legal Solutions          800-556-8974

1   that conversation, which was a very short
2   conversation, I said, "Well, I understand this
3   decision that you're making.  There are going to be
4   questions.  There are going to be concerns.

5            "Faculty are going to want to know how
6   you're justifying this, you know, so can you give me
7   something, in terms of the basic premise that -- that
8   you're operating from here, in terms of referencing
9   bylaws or faculty handbook or whatever?"

10           And here, I'm a little less word for word,
11  but I believe she said, basically, that she thought it
12  was in the best interest of the university and the
13  campus, and to -- to go ahead with that termination
14  process.

15           And that's -- and she had made the decision,
16  she made it clear to me, also, that, while she had
17  taken input from other people, you know, President
18  Boyd, other people she'd interacted with, that -- that
19  it was her decision and that she was really owning
20  that decision.

21       Q    Did she say who else she spoke with?

22       A    I think just President Boyd was the only one
23  she mentioned specifically.

24       Q    Okay.  I'm going to hand you a document,

```
 1   give opposing counsel a copy as well, although I'm
 2   sure they've seen it.
 3           What is the document that I just handed you,
 4   sir?
 5       A    "Article I, Powers and Duties of the Faculty
 6   Senate," from the --
 7       Q    Is it fair to say that that's just the
 8   bylaws of the faculty senate?
 9       A    Yes.  It looks like it.
10           MR. BIGELOW:  Okay.  I'll have that
11   marked as Exhibit 2, please.
12               (Exhibit 2 was marked for
13               identification.)
14   BY MR. BIGELOW:
15       Q    Just hand that to the reporter, if you
16   would.
17           I'm going hand you another document.  What
18   is the document that I just handed you, sir?
19       A    I believe this is the screen capture from
20   Professor Shirinian's, I guess, alleged social media
21   activity around this.
22       Q    When you say "alleged," why did you say
23   that?
24       A    Well, I -- you know, I -- I didn't gather
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   this.  I didn't -- you know, so I -- I don't know.  I
 2   can't certify it.
 3        Q    Okay.  Have you seen this before?
 4        A    Yes.
 5        Q    And how was it brought to your attention?
 6        A    It was in the -- the press.  I -- I think I
 7   probably saw the screen capture first in the press.
 8        Q    So when the chancellor called you and said
 9   she's going to terminate or begin a termination of
10   Dr. Shirinian, did you ask to see what it was based
11   on?
12        A    I -- I believe I had seen it already.  I'd
13   seen it that weekend, I believe.  Actually, I -- I
14   mentioned the press.  I think it -- it was
15   circulating, this was circulating, over that weekend,
16   I believe, via some other channel.
17             So I think I had seen this.  I'm -- I'm
18   sorry.  I'm a little fuzzy on the --
19        Q    Do you know, or are you just guessing?
20        A    I recall that I knew -- I knew the quote
21   when -- when the chancellor called me.
22        Q    How did you know it?
23        A    That's what I'm -- that's what's a little
24   bit fuzzy to me.  I don't recall.  I'd seen it, I
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

believe, over that weekend somehow, but I don't recall
where.

    Q    Have you spoken with anyone in
Dr. Shirinian's department about Dr. Shirinian?

    A    No.

    Q    I want to focus on this for a few minutes.
Keep it.  Yeah.

    The first part, the actual, I think -- well,
are you -- have you -- do you have Facebook?

    A    Yes.

    Q    So you understand, like, people can post
things on Facebook, make a post, and then, people can
make comments; is that fair?

    A    Yes.

    Q    Okay.  So what is the post here?

    A    Well, I'm no Facebook expert, but it seems
like it starts with this comment from Hasmik Geghamyan
about unfriending four people since Kirk's
assassination and so on.

    Q    And she's -- well, continue.  You could --

    A    You want me to read it?

    Q    Yeah.  Please.

    A    "I've unfriended four people since Kirk's
assassination.  I get it.

1          "They're mourning him because of his
2    message, but the content of his message was full of
3    hate, genocide apologia, and bigotry.  Yet, they're
4    treating him like the next best thing since Jesus.
5          "So my secular sensibilities find that to be
6    blasphemous and a little de loo loo.  I guess we grew
7    apart."
8         Q    So, in your opinion, what is this post
9    addressing?
10        A    Well, it's addressing the societal fallout
11   from the Kirk assassination.
12        Q    What else?
13        A    Well, this person is taking a stand that
14   I -- I believe they're saying that they did not think
15   much of Charlie Kirk and his views.
16             And, because of that, getting back to some
17   comments I made earlier, I think you see that -- that
18   sort of polarization of people, based on -- on
19   political views.
20        Q    And those views, at least according to this,
21   include, "messages full of hate, genocide apologia,
22   and bigotry"; correct?
23        A    That's what it says.
24        Q    And it also goes on to say that people, that

www.veritext.com          Veritext Legal Solutions          800-556-8974

1   at least this person believed, that some people are
2   treating him like the next best thing since Jesus; is
3   that correct?
4       A    That's what it says.
5       Q    Prior to September of this past year, did
6   you know who Charlie Kirk was?
7       A    A little bit.  Not a big follower.  Was
8   never a follower, for or against.
9       Q    Do -- have you since learned of any of his
10   messages?
11      A    I really haven't studied it in any kind of
12   organized way.  No.
13      Q    Did you read the complaint or amended
14   complaint in this matter?
15      A    I'm sorry, which complaint are we talking
16   about here?
17      Q    The complaint that Dr. Shirinian filed.
18      A    Sure.  Yes.  I read -- I read the complaint.
19      Q    Okay.  And you're aware that the complaint
20   has a number of quotations from Mr. Kirk; is that
21   true?
22      A    Yes.
23      Q    Would you consider any of those quotes full
24   of hate?

www.veritext.com          Veritext Legal Solutions          800-556-8974

1     A     I didn't study them extensively, so I can't
2   really comment on that.
3     Q     Would you consider any of his quotes full of
4   genocide apologia?
5     A     I have no idea.  Can't comment on that.
6     Q     What about the quote that I just told you
7   about earlier that talked about there's no more,
8   essentially, buildings left in Gaza.  Would you
9   consider that genocide apologia?
10     A     To be honest, I don't even know what
11   apologia means, so sorry for that.
12          But, as I mentioned, I thought that was a
13   very callous comment.  You know, I -- I could think
14   about better adjectives, perhaps, but certainly not a
15   comment that I would endorse or be proud of.  Wouldn't
16   support someone saying things like that.
17     Q     What about bigotry?
18     A     What's your question?
19     Q     Do you think that any of the quotes that
20   were in the complaint or amended complaint show that
21   Mr. Kirk was a bigot?
22     A     I didn't study those quotes.  I don't think
23   it's my job to assess that.
24     Q     I'm just asking your opinion, sir.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1       A     Yeah.  I don't have an opinion on that.

 2       Q     You don't?

 3       A     No.

 4       Q     Okay.  What is a "bigot" to you?

 5       A     I suppose a bigot is someone who makes

 6   assumptions about people, judges them, usually

 7   negatively, based on their race, ethnicity, other

 8   kinds of factors.

 9       Q     Okay.  And then, Dr. Shirinian writes a

10   comment; correct?  In response to the -- for the post?

11       A     If we're going to -- yeah.  I'm assuming

12   this is accurate, but yes, that's what this shows.

13       Q     And have you read that comment?

14       A     Yes.

15       Q     Okay.  Do you believe that that comment

16   advocates for violence?

17       A     No.

18       Q     Okay.  Do you believe it celebrates

19   violence?

20       A     Yes.

21       Q     Okay.  How do you think it celebrates

22   violence?

23       A     It's celebrating the fact that his -- "his

24   kids are better off living in a world without a
```

```
 1  disgusting psychopath like him," after he was
 2  assassinated.
 3       Q    So, if Mr. Kirk were killed in a car wreck
 4  and it said the same thing, would it be celebrating
 5  car wrecks?
 6                MR. FITZGERALD:  Object to the form.
 7  BY MR. BIGELOW:
 8       Q    You can answer.
 9                MR. FITZGERALD:  Hypothetical.
10                Answer, if you can.
11                THE WITNESS:  Would that be celebrating
12  car wrecks?
13  BY MR. BIGELOW:
14       Q    Or, better yet, if Mr. Kirk were killed by a
15  drunk driver, and Dr. Shirinian made that same
16  complaint, that same comment, would you consider that
17  being celebratory of drunk driving?
18                MR. FITZGERALD:  Same objection.
19                THE WITNESS:  I -- I think it would be
20  celebrating two children -- I think he has two -- who
21  lost a parent.  It would be celebrating what should be
22  considered a sad, tragic event.
23  BY MR. BIGELOW:
24       Q    But it wouldn't be celebrating drunk
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   driving, specifically?

 2        A     No.

 3               MR. BIGELOW:  Yeah.  Could we have that

 4   as Exhibit -- marked as Exhibit 3, please.

 5               (Exhibit 3 was marked for

 6               identification.)

 7               MR. FITZGERALD:  Rob, not to suggest

 8   that you're dawdling, but the chancellor was expecting

 9   to start around ten, and --

10               MR. BIGELOW:  I'm hurrying up as quick

11   as I can.

12               MR. FITZGERALD:  Okay.

13               MR. BIGELOW:  I will do my best to --

14   BY MR. BIGELOW:

15        Q     Are you familiar with this post by President

16   Boyd?

17        A     No.  I'm not, actually.

18        Q     Okay.  Just for -- just let's -- to make it

19   easier, let's just mark this as Exhibit 4, and we'll

20   reference it later.  Could we mark that as Exhibit 4,

21   please?

22               (Exhibit 4 was marked for

23               identification.)

24               And then, my guess is, you're also not
```

1  familiar with what I'm handing you, which is President
2  Boyd's X profile, I suppose?
3       A    No.  I'm not.  I don't use X very much at
4  all.  I -- I do have an account, but I -- I'm not
5  familiar with his account.
6       Q    Okay.  Exhibit 5, please.
7                 (Exhibit 5 was marked for
8                 identification.)
9                 MR. BIGELOW:  This is where we fast
10  track.  Promise, Mike.
11  BY MR. BIGELOW:
12       Q    Here we go.  Exhibit 6, are you familiar
13  with this?
14                 (Exhibit 6 was marked for
15                 identification.)
16       A    Yes.  This is just kind of an introductory
17  page, prompting people to go to our new intranet hub.
18       Q    At the second page, it says, "The faculty
19  senate president serves on the university faculty
20  council, and elected representatives of the faculty
21  senate represent the faculty on the UTK Advisory Board
22  and some board of trustees committees."
23                 Can you explain that for me?
24       A    Yes.  Excuse me.  I'll do my best.

```
 1              We have a tremendous number of committees
 2      that faculty senate and -- and various members get
 3      involved with on campus.
 4              So the -- let's see.  So the University
 5      Faculty Council, the UFC is a group across the system,
 6      so it's not just UTK, it includes Chattanooga and
 7      Martin, all the other campuses there.
 8              And so we meet periodically with President
 9      Boyd and other people and -- and mostly from this
10      office here, this building, and to talk about issues
11      affecting campus.
12              So, just as a quick example, so if
13      there's -- with some discussion, in the fall, of a
14      new --
15          Q    Only because I want to hurry up --
16          A    Yeah.  Sorry.
17          Q    -- and be mindful of the --
18          A    Got you.
19          Q    -- chancellor, I'm going to interrupt you,
20      if that's okay, if there's no objection to that.
21          A    Sure.
22          Q    Do any of the members of the faculty senate
23      speak with members of the board of trustees?  It says
24      some board of trustees --
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        A     Yeah.  Yeah.

 2        Q     -- I'm just curious.

 3        A     To be honest, I -- I don't know what that

 4   reference is.  I apologize.  I probably should know.

 5   I'm not sure what board of trustees committees are

 6   there.

 7              Faculty senate members do interact with the

 8   board of trustees through, for example, this

 9   University Faculty Council.

10              So John Compton, who is the chair of the

11   board of trustees, you know, he -- he will attend

12   those meetings occasionally.  So I've asked him a

13   question, for example, in some mundane issue in the

14   context of that.

15              But, in terms of serving on committees in

16   Nashville or something like that, I -- I don't know

17   what that's referencing.

18        Q     Are you aware -- have you ever personally

19   spoken with any of the members of the board of

20   trustees regarding Dr. Shirinian?

21        A     No.

22        Q     Okay.  Are you aware of anyone in the

23   faculty senate speaking with a member of the board of

24   trustees --
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1        A    I'm not aware of that.  No.

 2        Q    -- with regards to Dr. Shirinian.

 3                   MR. FITZGERALD:  Don't talk together.

 4                   THE WITNESS:  Okay.  Sorry.

 5                   MR. FITZGERALD:  It's okay.

 6                   MR. BIGELOW:  Can we label this 6?

 7                   THE REPORTER:  Seven.

 8                   MR. BIGELOW:  Seven.  Okay.  So that's

 9   7.

10                   (Exhibit 7 was marked for

11                   identification.)

12                   THE REPORTER:  Which one is 7?  Sorry.

13                   MR. BIGELOW:  See, I thought it was 6,

14   but --

15                   THE REPORTER:  I think we've gotten off

16   the track here.

17                   MR. BIGELOW:  Let's just go off the

18   record just for a second.

19                   THE REPORTER:  Yep.

20                   THE VIDEOGRAPHER:  We are off the

21   record.  The time is 10:23.

22                   (Off the record.)

23                   THE VIDEOGRAPHER:  We are on the

24   record.  The time is 10:24.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

BY MR. BIGELOW:

    Q    What I'm about to hand you next, sir, is
the -- it's labeled, "Memorandum, Friday, October 3,
2025."

         Are you familiar with this document?

    A    Yes.

    Q    Okay.  And what is this document?

    A    This is AAUP document from our faculty
Senate Faculty Affairs Committee chairs, David Butler
and Eva Cowell, expressing specific concerns about the
personnel action against Dr. Shirinian.

    Q    And it's addressed to you; correct?

    A    Yes.

    Q    Have you looked into all of these concerns?

    A    Well, I -- I think I need to ask you to
define, "looked into."

    Q    What have you done to address all of these
concerns?

    A    The biggest thing we can do is to give them
kind of a space to vocalize them, to let them air to
the world.

         You know, the senate does not have a lot of
real power to change a lot of things.  And so, what
this was, the precursor to the resolution that ended

1   up coming through the faculty senate, you know,

2   generally protesting this situation.

3      Q   There are a number of -- would you agree

4   that there are a number of questions in these, in this

5   four pages?  Would you agree with that?

6      A   Questions for the university and how it was

7   handled?  Yes.  I would agree.

8      Q   And questions for you to help answer;

9   correct, because it's addressed to you?

10      A   Let's see.  I don't -- I'd -- I'd have to

11   read it.  I'm just trying to skim it here.

12      But these questions -- any questions in here

13   were really not -- as I remember, not questions to me

14   to solve, to answer.

15      I mean, most of them are legal procedural

16   questions.  So a lot of these were almost rhetorical,

17   as I interpreted it.

18      Q   So the -- lets just -- I'm not trying to

19   make your life difficult.  I promise, I'm not trying

20   to take longer.  I really thought we'd be done.

21      The first question it says, "Is the

22   university pursuing a termination of Dr. Shirinian

23   under faculty handbook section," and then it

24   mentions -- and it says, "yet it has bypassed the

www.veritext.com      Veritext Legal Solutions      800-556-8974

```
 1   standard procedures," and it mentions a whole bunch of
 2   different sections; correct?
 3        A    Yes.
 4        Q    Under the handbook; right?  That's not a
 5   legal question, that's a handbook question; correct?
 6        A    Well, I mean, the -- the handbook has power.
 7   There is some -- some governing influence there.
 8             It may not be legal, in the sense that you
 9   attorneys would consider it, but, I mean, there is --
10   there is weight to it.
11        Q    Have you done anything to answer questions
12   about the handbook?
13        A    No.  Because these -- well, these specific
14   questions about procedures and handbook clauses and
15   things like that were not addressed to me or to the
16   leadership team.
17             They were expressing dismay or disagreement
18   with how the case was handled by university leadership
19   and citing these different documents as evidence of,
20   in -- in their view, of it not being handled
21   correctly.
22        Q    Okay.  It states, on the first page, "We
23   request that this memo be added to the Faculty Senate
24   Executive Council agenda for October 13th, and request
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
1    that Provost Zomchick be prepared to respond to these
2    questions at the meeting."
3         A    Yes.
4         Q    "We also request that a follow-up written
5    responses be provided by Provost Zomchick to limit the
6    potential for misunderstandings and so that this
7    important information can be shared with the faculty
8    senate as a whole."
9         A    Yes.
10        Q    Did I read that correctly?
11        A    You did.
12        Q    To your knowledge, has Provost Zomchick
13   responded in writing to these requests?
14        A    I do have knowledge, and the answer is no.
15        Q    Why not?
16        A    I can't speak for him.
17        Q    Do you know why not?
18        A    Every opportunity, in face-to-face
19   interactions with the senate, he has cited ongoing
20   litigation as a reason for not being able to share
21   more.
22        Q    Do you know the answers to these questions?
23        A    No.  Because a lot of them are -- are fairly
24   legal questions, and a lot of them speak to the
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   motivation of senior leadership, in terms of going
 2   through this action.
 3           And so I -- I don't have insights into these
 4   things.
 5       Q    Have you spoken with Mr. Zomchick about
 6   these?
 7       A    No.
 8               MR. BIGELOW:  Okay.  Let's mark this as
 9   Exhibit 8.
10               THE REPORTER:  Seven.
11               MR. FITZGERALD:  Seven.
12               MR. BIGELOW:  Oh, God.  I think I did
13   that because of the -- sorry.
14               THE REPORTER:  It's my fault.
15               MR. BIGELOW:  It's -- no.  I'll -- it's
16   on me.  It's on me.  I wrote it as Exhibit 8, and
17   then, I did not cross it back out again.
18               Okay.  I'm going to hand you another
19   document that is now going to be Exhibit 8 and enter
20   the --
21               (Exhibit 8 was marked for
22               identification.)
23   BY MR. BIGELOW:
24       Q    What I'm handing you right now is from the
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1   AAUP, and says, "Civility."  Do you see that, sir?
 2        A    I do.
 3        Q    And are you familiar with the statement on
 4   extramural utterances under their position on
 5   civility?
 6        A    No.  I'm not.
 7        Q    Okay.  All right.  If you'll turn to that
 8   second page, it says, "The controlling principles that
 9   a faculty member's expression of opinion as a citizen
10   cannot constitute grounds for dismissal unless it
11   clearly demonstrates the faculty member's unfitness to
12   serve"; correct?
13        A    That's what it says.  Yes.
14        Q    Okay.  And, at the very bottom, the second
15   to last paragraph, at the bottom right, it says, "The
16   consideration of the manner of expression is rarely
17   appropriate to an assessment of academic fitness";
18   correct?
19        A    Yes.  That's what it says.
20        Q    Do you believe that Professor Shirinian is
21   academically fit to teach?
22        A    I would just revert to my earlier response,
23   that I -- I don't have a clear personal view on this.
24   I'm somewhat conflicted, to tell you the truth.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    Q    So you're unsure.  Is that your answer?

2    A    Yes.

3    Q    Okay.  So you're saying, because of her one

4    comment, it -- her -- she may be academically unfit to

5    teach?

6    A    Well, let me clarify.  The AAUP has -- does

7    not govern the University of Tennessee.  We don't

8    follow these rules.  We haven't signed up for this.

9         So I don't really think --

10   Q    I'm just asking you --

11   A    -- addressing these point by point is not

12   appropriate, as far as I'm concerned.

13   Q    Aside from that, I'm just asking you, do you

14   think she's academically fit to teach?

15   A    I'm just going to stand by my comment that

16   I'm just unsure on this.

17   Q    I'm going to hand you -- if you would hand

18   that to the court reporter, please.  And that will be

19   marked as Exhibit 8.

20        Are you familiar with what I just handed

21   you, sir?

22   A    I am not.

23            MR. BIGELOW:  Okay.  Let's have that

24   marked as Exhibit 9.

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1                (Exhibit 9 was marked for
 2                identification.)
 3   BY MR. BIGELOW:
 4        Q    Would you agree -- what I handed you is, it
 5   says, "GE0004, Philosophy on Institutional Leadership
 6   Statements."
 7             It says, "The principal mission of the
 8   University of Tennessee is the pursuit and the
 9   dissemination of knowledge through teaching, research,
10   and service."
11             Would you agree with that?
12        A    Yes.
13        Q    It also says, "To foster this mission, when
14   speaking in the name of, or on behalf of, the
15   university or any university unit, the university
16   employees shall honor the principle of institutional
17   neutrality and refrain from making statements on
18   disputed political, moral, and religious topics."
19        A    That's what it says.  Yeah.
20        Q    Do you agree with that?
21        A    I would probably have a caveat in there
22   about other than as pertains to teaching specific
23   topics that are relevant.  You know, if you teach --
24        Q    Does it say that in here, though, or is that
```

1    just your caveat?

2         A    That's my own caveat here.  And you asked if

3    I agreed with the statement or not so --

4         Q    When you made a comment to the press about

5    what you believed was hate speech, were you remaining

6    institutionally neutral?

7         A    Was I remaining institutionally neutral?

8    Well, I -- I wasn't speaking for the institution.  I

9    wasn't speaking for the University of Tennessee.  I

10   was speaking for the faculty senate, which is a

11   collective of faculty.

12             So, to me, there's a difference there.

13        Q    Well, explain that difference.

14        A    The faculty senate is -- you know, does not

15   represent the entire university.

16             This document is actually a senate -- sorry,

17   system level document even.  It's even beyond the

18   University of Tennessee at Knoxville.  So this is

19   representing all of our campuses across the state.

20             So, you know, I think the faculty senate is

21   allowed to have opinions that are more pointed at

22   times than -- than the spirit of institutional

23   neutrality in all things.  And there's a long history

24   of that.

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1        Q     When you spoke to the press, you did so as
 2   the faculty senate president at the University of
 3   Tennessee Knoxville; correct?
 4        A     Correct.
 5        Q     Would one consider that to be part of the
 6   university?
 7        A     Yes.
 8        Q     Okay.  So you were speaking on behalf of the
 9   university?
10        A     I was speaking on behalf of one part of the
11   university.
12        Q     Okay.  Again, was what you said
13   institutionally neutral, in your opinion?
14        A     Yes.
15        Q     What does "institutionally neutral" mean to
16   you?
17        A     Well, it's -- according to this document,
18   it's about refraining from statements on disputed
19   political, moral, and religious topics.
20              So, in that comment or statement to the
21   press, I did not come down -- we'll just take Charlie
22   Kirk as a focus, I did -- I intentionally did not come
23   down as pro or anti Charlie Kirk.  I did not --
24        Q     I'm sorry to interrupt you.  I'm just trying
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    to get through quicker, but you did say, you talked

2    about, what you believed was hateful speech; correct?

3        A    On both sides of the spectrum.  Yes.

4        Q    That's a moral view, though.  What is

5    hateful is -- would you agree that's a moral view?

6    That's based on your morals?

7        A    You know, hate is an interesting word.  I

8    think you can define it in different ways.  We've

9    tried to -- to even define it and -- but yes, you

10   could say it's -- I would say it is largely a moral

11   issue.  Yes.

12              MR. BIGELOW:  Okay.  I'll have that

13   marked as Exhibit 9, please.

14   BY MR. BIGELOW:

15       Q    I hand you what is a Daily Beacon article

16   from November 13th, "United Campus Workers to Protest,

17   Hand-Deliver Petition to Reinstate Shirinian."

18              Are you aware of protests that took place on

19   your campus with regards to Dr. Shirinian?

20       A    Yes.

21       Q    Were there any sort of violence that

22   happened during those protests?

23       A    Not that I'm aware of.  No.

24       Q    Okay.  Are -- were you ever aware of any

1  political positions or positions from politicians with
2  regards to Dr. Shirinian's posts -- or comment, I'm
3  sorry?
4      A    Just the basic things that I saw in the
5  press.  For example, Marsha Blackburn was quoted quite
6  a bit as weighing in on that, so I did see that.
7                  MR. BIGELOW:  Okay.  That's going to be
8  marked as Exhibit 10, please.
9                  (Exhibit 10 was marked for
10                 identification.)
11  BY MR. BIGELOW:
12     Q    Just handed you an agenda of a faculty
13  senate meeting dated Monday, November 17, 2025; is
14  that correct, sir?
15     A    Yes.
16                 MR. BIGELOW:  We'll have that marked as
17  Exhibit 11.
18                 (Exhibit 11 was marked for
19                 identification.)
20  BY MR. BIGELOW:
21     Q    I just handed you a November 19th article
22  from Knox News entitled, "Faculty Presses University
23  of Tennessee to Publicly Affirm Professor's Private
24  Speech Rights."

www.veritext.com          Veritext Legal Solutions          800-556-8974

1           And do you see that, sir?  Is that correct?

2      A    I do.

3      Q    And, in that, it states that faculty senate

4   passed a resolution November 17th requesting that the

5   university publicly reaffirm its commitment to free

6   speech by providing a written statement to the school

7   community.

8           Do you believe that that's important that

9   the university do that?

10     A    I think -- yes.  I think that, you know,

11  affirming the basic defense of free speech, that, in

12  itself, has a definition -- you know, definitions that

13  can be argued, but free speech is a -- is a core

14  principle in -- in what we do on a campus, and I think

15  it's really important.

16     Q    And are you familiar with the fact that

17  there was a resolution that was passed 59 to 11 to 9?

18     A    Yes.

19     Q    And that was in favor of what position?

20     A    In favor of putting forward the resolution.

21     Q    Okay.  The second page, the resolution, says

22  that, "Actions have created a chilling effect on

23  faculty, staff, and student speech and damaged trust

24  in university governance, and the university's

1    representation and strength are built upon the

2    foundation of trust in its governance and adherence to

3    the law."

4              Would you agree with that?

5        A    I would speak for the -- the faculty on the

6    whole and say that most faculty would have agreed with

7    this statement, I believe.

8        Q    Do you agree with it?

9        A    I'm not sure what "chilling effect" really

10   means, so I -- I guess I can't unequivocally say yes

11   or no.

12             But, certainly, there were concerns that --

13   that I would share.  There were worries coming out of

14   this whole situation.  So I can -- I can respect the

15   spirit of this.

16       Q    What are those worries?

17       A    To boil it down, I would say the fundamental

18   concern that faculty have, to this day, is -- is about

19   this line between personal life and professional life,

20   you know, freedom of expression, we'll call it, in --

21   in one world versus the other, how those worlds

22   collide, things like that.

23       Q    So they're worried that, if they -- is it

24   fair to say that faculty is worried that, if they say

1 something in their personal life, then, it could be

2 used against them?

3     A    Yes.  I think that's fair.

4     Q    Okay.  And they're basing that worry on

5 Dr. Shirinian, what happened to Dr. Shirinian?

6     A    I would imagine so, largely.

7              MR. BIGELOW:  Okay.  Have that marked

8 as Exhibit 12, please.

9              (Exhibit 12 was marked for

10              identification.)

11              MR. BIGELOW:  Obviously, let the record

12 reflect I'm handing opposing counsel all of these as

13 we go.

14              MR. FITZGERALD:  Received.

15 BY MR. BIGELOW:

16     Q    I just handed you an agenda for a faculty

17 senate meeting marked October 20, 2025; correct, sir?

18     A    Yes.

19     Q    On the second page of it, there's a question

20 at the very bottom.

21         It says, "I think it's pretty clear that

22 faculty are able to write on social media as private

23 citizens.  It's already in the law."

24         Do you know who asked that question?

www.veritext.com        Veritext Legal Solutions        800-556-8974

```
 1        A    I don't remember.  I'm sorry.

 2        Q    And do you know who gave the response that

 3   many share that view, but not everyone agrees.

 4        A    Let's see.

 5        Q    If you don't, it's okay.  I'm just asking.

 6        A    I don't.  I'm sorry.

 7        Q    That's okay.

 8             MR. BIGELOW:  Could we have that marked

 9   as Exhibit 13?

10             (Exhibit 13 was marked for

11             identification.)

12   BY MR. BIGELOW:

13        Q    What I just handed you, sir, was -- first,

14   it says, "Reinstate Dr. Tamar Shirinian, Defend Speach

15   at UTK."

16             And it says that there were 1,379 signatures

17   collected.  And, if you go to the third page, it's

18   from the -- it's a statement from United Campus

19   Workers; is that correct?

20        A    Yes.

21             MR. BIGELOW:  Okay.  If we would have

22   that marked as Exhibit 14.

23             (Exhibit 14 was marked for

24             identification.)
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    MR. BIGELOW:  I gave you a copy of
 2    that; right?
 3                    MR. FITZGERALD:  Yeah.
 4    BY MR. BIGELOW:
 5        Q    Okay.  What I just handed you, sir, is a
 6    board of trustees policy affirming principles of free
 7    speech for students and faculty.
 8            Are you familiar with this at all?
 9        A    I am somewhat familiar.  Yes.
10        Q    Okay.  Who does the board of trustees have
11    power over?
12        A    The board of trustees, as I understand it,
13    has power over the entire UT system, which is all of
14    our six or so campuses that we have.
15        Q    Okay.  Do they have power over the
16    president?
17        A    I believe he reports to the board of
18    trustees.  Yes.
19        Q    And, therefore, they also have power over
20    the chancellor; is that fair to say?
21        A    I believe so.  Yes.
22                    MR. BIGELOW:  Okay.  If we would have
23    that marked as Exhibit 15.
24    //
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    (Exhibit 15 was marked for

 2                    identification.)

 3   BY MR. BIGELOW:

 4        Q    Are you familiar with this news article,

 5   sir, that I just handed you?

 6        A    I am, somewhat.

 7        Q    Okay.  And it -- the news articles, the

 8   title is, "No UT Penalty for Tennessee Prof who

 9   Tweeted Run Them Down."

10             What's your understanding of that?

11        A    So I was not in any kind of campus

12   leadership role in 2016, so I really wasn't -- maybe I

13   should have been paying more attention, but I really

14   wasn't paying attention to all the events going on in

15   the world that affected campus, as -- as I would

16   today.

17             So I have just read light -- heard lightly

18   about this, more recent -- recent months, but, at the

19   time, I -- I really wasn't aware of what was going on.

20             So I'm sorry, to your question, then, was?

21        Q    What's your understanding of what went on?

22        A    Just what I've gathered from the press, that

23   there was some protest, and a University of Tennessee

24   professor, who, I believe, was a law professor,
```

1  commented that -- I -- I -- as I understand it, which
2  I could be very wrong, was commenting on kind of
3  self-defense, and what you can do in a threatening
4  situation, and things like that, you know, right or
5  wrong.
6          But as I understand it, that was the context
7  for this.
8      Q    The initial tweet was simply, "Run them
9  down"; correct?
10     A    I don't know.
11     Q    Okay.  Well, let's say that it was.  If
12 there are a bunch of protesters, and someone tweets,
13 "Run them down," would you consider that to be
14 endorsing violence?
15     A    Yes.
16     Q    Okay.  And that professor kept his job;
17 correct?
18     A    As far as I know.
19     Q    No.  And he still works in the University of
20 Tennessee; correct?
21     A    As far as I know he does.  Yes.
22              MR. BIGELOW:  And if we could mark that
23 as Exhibit 16.
24 //

```
 1                    (Exhibit 16 was marked for
 2                    identification.)
 3    BY MR. BIGELOW:
 4        Q    I won't go into this too much.  I have a few
 5    more questions, then, we'll be done.
 6             I'm just handing you -- is an NPR article
 7    dated November -- I'm sorry, December 15th, "Trump
 8    Says Rob Reiner Had Trump Derangement Syndrome in Post
 9    on His Death."
10             Are you familiar with that at all, sir?
11        A    No.
12        Q    What happened?
13        A    Well, I'm sorry.  When you say, "What
14    happened" --
15        Q    With Trump's, the President's, post on X,
16    with regards to Mr. And Mrs. Reiner?
17        A    I don't.  No.  I did not see this.
18                    MR. BIGELOW:  Okay.  I will have that
19    as Exhibit 17, please.
20                    (Exhibit 17 was marked for
21                    identification.)
22                    MR. FITZGERALD:  I'm going object to 17
23    on grounds of relevance, but you can pose --
24    //
```

BY MR. BIGELOW:

        Q    I have a handful more questions, then, we'll
let you go.

             Are you aware that Dr. Shirinian's Facebook
comment was made on her personal Facebook account?

        A    I believe I read that, in -- in some
coverage.

        Q    Are you made -- that it was made off campus?

        A    I'm not sure where she was when she posted
that.

        Q    Are you aware that was made outside her
teaching duties?

        A    Yes.  It seems like it was.

        Q    It wasn't made in the classroom, was it?

        A    I don't believe so.  No.

        Q    And it wasn't directed at UT students, was
it?

        A    No.  Doesn't seem to be.

        Q    Did the discipline of Dr. Shirinian become a
matter of concern among faculty?  I think you already
said yes; correct?

        A    The discipline?  What do you mean by
"discipline"?

        Q    The fact that she was disciplined.

```
 1       A    Oh, yes.  It was a concern to some portion
 2   of the faculty.  Yes.
 3       Q    And you've stated, publicly or internally,
 4   that -- actually, publicly that you lacked sufficient
 5   information about your -- about the basis for
 6   disciplining Dr. Shirinian; correct?  Specifically, in
 7   your answers to the amended complaint?
 8       A    Yes.
 9       Q    Okay.  How much time did you take in
10   answering the amended complaint?
11       A    Two hours.
12       Q    Okay.  Did you do any research at all?
13       A    I don't -- I don't recall having to do any
14   research.  No.
15       Q    Okay.  You just kind of saw it and answered?
16       A    Yes.
17       Q    Okay.  Were you provided with a complete
18   investigation report at any time with regards to
19   Dr. Shirinian?
20       A    I'm not sure what an "investigative report"
21   is --
22       Q    Was there ever an investigative report that
23   was done to your knowledge?
24       A    I've never heard of such a report.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1       Q    Okay.  Do you know, or have you been
 2   provided evidence, of actual disruption caused by
 3   Dr. Shirinian's speech?
 4       A    No.  I have not been provided such evidence.
 5       Q    Have you been provided evidence of threats
 6   caused by Dr. Shirinian's speech
 7       A    Threats?  I have not been provided evidence.
 8   No.
 9       Q    Have you been provided evidence that
10   Dr. Shirinian was unable to teach?
11       A    Sorry, but when you say "unable," what do
12   you mean by "unable"?
13       Q    Unable to teach.
14       A    Not allowed to teach or not physically able
15   to teach?
16       Q    Not mentally or physically able to teach?
17       A    No.  I have not been provided evidence along
18   those lines.
19       Q    Have you been provided evidence that
20   Dr. Shirinian refused to perform any academic duties?
21       A    No.
22       Q    Have you been provided evidence of any of
23   her colleagues refusing to work with her?
24       A    No.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      Q     Have you been provided evidence of any
 2   departmental breakdown caused by her speech?
 3      A     No.
 4      Q     Have you been provided with any evidence of
 5   impairment of faculty discipline caused by her speech?
 6      A     No.
 7      Q     Are you aware of any substantiated complaint
 8   that Dr. Shirinian should or could not teach?
 9      A     I don't know what you mean by
10   "substantiated."
11      Q     Any evidence?
12      A     I've seen a lot of public commentary that
13   she should not be allowed to teach.
14      Q     So those are just people's opinions;
15   correct?
16      A     Correct.
17      Q     Okay.  Is that all you've seen?
18      A     Yes.
19      Q     Okay.  Are you aware of any classroom
20   misconduct of Dr. Shirinian?
21      A     No.
22      Q     Are you aware of any academic deficiencies
23   Dr. Shirinian has?
24      A     No.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      Q    Are you aware that she caused any harm to
 2  any of -- any students that she taught?
 3      A    No.
 4      Q    Did the faculty senate vote to censure
 5  Dr. Shirinian?
 6      A    No.
 7      Q    Did the faculty senate conclude that
 8  Dr. Shirinian violated any academic norms?
 9      A    No.
10      Q    Did the faculty senate conclude that she was
11  unfit to teach?
12      A    No.
13      Q    The faculty senate was not asked to evaluate
14  whether any discipline of Dr. Shirinian was
15  appropriate or not, were they?
16      A    Correct.  They were not.
17      Q    Are you aware that alumni complained about
18  Dr. Shirinian's comment?
19      A    Yes.
20      Q    How many alumni are you aware of who
21  complained?
22      A    I didn't receive any personal complaints.  I
23  just read whatever I read in the press about that.
24      Q    They weren't any part of the faculty
```

Page 102

```
 1    governance, though, were they?
 2         A    No.
 3         Q    Does faculty governance or does the faculty
 4    senate treat alumni outrage as ground for discipline?
 5         A    No.
 6         Q    Are you aware if University of Tennessee
 7    tracked how many people agreed or disagreed with
 8    Dr. Shirinian's comment?
 9         A    I'm not aware of any process like that.
10         Q    Would you be surprised if they have a
11    process that tracked that?
12         A    Yes.  I would be surprised if there was a
13    process to track that.
14         Q    Why would you be surprised?
15         A    I mean, as a researcher, it's not a -- it
16    just -- it's not a controlled survey.  It's not a --
17    it's not a scientific approach.  Lots of reasons like
18    that.
19         Q    I mean, the faculty senate doesn't determine
20    academic freedom by counting agreement or
21    disagreement, do they?
22         A    Correct.
23         Q    In fact, they don't discipline faculty if
24    more people agree or disagree; correct?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1        A    Correct.

2        Q    Has the faculty senate defended

3   controversial speech in the past?

4        A    Yes.  I believe so.

5        Q    And they haven't disciplined any faculty

6   simply because that speech was offensive, or hateful,

7   or anything like that, have they?

8        A    Not that I'm aware of.

9        Q    Have they ever treated criticism of a

10  conservative figure as unprotected speech?

11       A    The senate doesn't weigh in on things like

12  that.

13       Q    Dr. Shirinian remains excluded from her

14  position as of today; correct?

15       A    I'm not aware.  I'm -- I'm not privy to that

16  kind of information, so I don't know.

17       Q    Do you think that she's allowed to go back

18  to teach as of today?

19       A    Don't know.

20       Q    You don't know?

21       A    Don't know.

22       Q    Did you ever object to Dr. Shirinian being

23  placed on leave?

24       A    I facilitated -- I did not object
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    personally.  I facilitated the process which became

2    the resolution from the faculty senate, which objected

3    to her status.

4         Q    Did you ever advise the chancellor that

5    the -- that her discipline was unconstitutional?

6         A    I wasn't asked my opinion on that and -- and

7    didn't -- didn't weigh in on that.  I'm not a

8    constitutional lawyer.

9         Q    Did you ever call for due process

10   protections?

11        A    Due process protections?  Well, I'm not sure

12   what that means exactly.

13        Q    Do you think that faculty at the University

14   of Tennessee and are entitled to due process?

15        A    I do.  And -- and a lot of the resolution

16   that came out of the senate has to do with due process

17   not being followed.

18        Q    Do you believe that Dr. Shirinian received

19   due process?

20        A    I believe the processes that are laid out

21   were -- were not followed 100 percent.  There were

22   some -- some twists along the way, which -- which

23   weren't to the letter of the process.

24        Q    So you're -- to be fair, you're saying she

```
 1  did not receive her due process; is that correct?
 2       A    I believe there were elements of the process
 3  that -- that did not meet the letter of -- of our
 4  policies.  Yes.
 5       Q    So is the answer that yes, I'm correct, that
 6  she did not receive due process?
 7                 MR. FITZGERALD:  Object to the form of
 8  the question.  And that it calls for a legal
 9  conclusion.
10                 But you can answer, if you can.
11                 THE WITNESS:  I think that, as I
12  understand it, there were elements of the process
13  which were not followed to the letter of our
14  guidelines.
15  BY MR. BIGELOW:
16       Q    What elements of the process were not
17  followed?
18       A    As I -- just a simple example, as I
19  understand it, that call that I received, informing me
20  as the senate president, that this termination action
21  had begun is meant to come from the chief academic
22  officer, i.e., provost, and it came from the
23  chancellor instead.
24                 And then, there are some other technical
```

```
 1   points, as I understand it, about -- which are really
 2   outside my expertise, but -- in terms of whether she
 3   was suspended with pay or without pay, and so on,
 4   which didn't match up exactly with the guidelines for
 5   expedited termination.
 6        Q     Did the faculty senate overwhelmingly oppose
 7   Dr. Shiridian's termination?
 8        A     The faculty senate quorum that was present
 9   in that meeting, in November 17th, majority opposed
10   it.  "Overwhelmingly" is a subjective word to me.
11        Q     The faculty senate has not rescinded any
12   sort of academic freedom protections for Dr.
13   Shiridian, has it?
14        A     No.
15        Q     They haven't declared her speech as
16   unprotected, have they?
17        A     No.
18        Q     And the administration continued discipline,
19   despite the absence of faculty condemnation; is that
20   true?
21        A     This -- they can -- I'm sorry, would you
22   repeat that again?
23        Q     Yeah.  The administration has continued
24   discipline of Dr. Shirinian, despite the absence of
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1   faculty condemnation?
2        A    I -- is that phrased the way you intend?  It
3   should be "despite the faculty condemnation"?  There
4   has been a faculty condemnation.
5        Q    I guess it's not worded ideally.  The
6   administration has continued discipline, despite the
7   vote?
8        A    Despite the faculty resolution condemning --
9        Q    Correct.
10       A    -- process?  Yes.  Correct.
11       Q    Do you believe that Dr. Shirinian's academic
12  freedom was undermined?
13       A    I think this is not an issue of academic
14  freedom to me, so no, I do not think it was
15  undermined.
16       Q    Did Dr. Shirinian's speech impair faculty
17  operations?
18       A    Not that I'm aware of.
19       Q    Are you aware of any professor being
20  disciplined for praising Charlie Kirk?
21       A    No.
22       Q    Are you aware of any professor being
23  disciplined for having a conservative -- for
24  conservative speech?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1       A     No.

 2       Q     Are you aware of any other cases in the

 3  United States where a faculty member of a public

 4  university was punished for being critical of Charlie

 5  Kirk?

 6       A     Yes.  I did read some things.  I believe

 7  there were some other cases around the same time that

 8  were similar.

 9       Q     And do you know what happened in those

10  cases?

11       A     I'm not aware of how -- the resolution on

12  those.  No.

13       Q     In your opinion, is it fair to say that

14  Dr. Shirinian's being critical of Charlie Kirk trigger

15  her being disciplined?

16       A     Yes.

17             MR. BIGELOW:  I don't have any other

18  questions.

19             MR. FITZGERALD:  None from me.

20             THE VIDEOGRAPHER:  We are off the

21  record.  The time is 11:01.

22             (Signature waived.)

23             (Whereupon, at 11:01 a.m., the

24             proceeding was concluded.)
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1              CERTIFICATE OF DEPOSITION OFFICER
2              I, JONI C. BOLDEN, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.      Joni Bolden

17                               JONI C. BOLDEN
18                     Certified Reporter in and for the
19                               State of Tennessee
20
21
22
23
24

                                         Page 110
```

```
 1              CERTIFICATE OF TRANSCRIBER

 2              I, DAWN STCLAIR, do hereby certify that this

 3    transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to,

 8    nor employed by any of the parties to the action in

 9    which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

15                                          DAWN STCLAIR

16

17

18

19

20

21

22

23

24

                                            Page 111
```

| **0** | **14**  4:7 14:19 | **350**  15:22 17:5 | **73**  3:11,12 |
|---|---|---|---|

**0**

**09/27/2016**
  4:14

**1**

**1**  3:7 14:17
  60:13,14,19
**1,379**  93:16
**10**  3:20 18:14
  89:8,9
**10/20/2025**  4:6
**100**  105:21
**10:23**  77:21
**10:24**  77:24
**11**  3:22 18:14
  89:17,18 90:17
**11/03/2017**
  4:11
**11/13/2025**
  3:21
**11/17/2025**
  3:23
**11/18/2025**  4:4
**1155**  2:15
**11:01**  109:21
  109:23
**12**  4:3 92:8,9
**12/15/2025**
  4:15
**13**  4:5 14:19
  93:9,10
**13th**  80:24
  88:16

**14**  4:7 14:19
  44:23 93:22,23
**15**  4:9 94:23
  95:1
**15th**  49:5 51:22
  62:7 97:7
**16**  4:12 96:23
  97:1
**17**  4:15 89:13
  97:19,20,22
**17th**  50:12 90:4
  107:9
**1995**  18:2
**19th**  89:21

**2**

**2**  3:9 14:17
  65:11,12
**2,500**  54:2
**20**  92:17
**2015**  46:8
**2016**  95:12
**2023**  44:23
**2025**  3:15 78:4
  89:13 92:17
**2026**  1:16 5:13
**22nd**  35:9 49:4
**23**  46:8
**28335**  110:16
**29837**  111:13

**3**

**3**  3:10,15 14:18
  73:4,5 78:3

**350**  15:22 17:5
  17:13 18:12
  24:23 25:2
**37215**  2:6
**37902**  1:20
  2:16
**3:25**  1:8

**4**

**4**  3:12 14:17
  73:19,20,22
**400**  1:19 2:15
**4235**  2:5

**5**

**5**  3:13 14:18
  74:6,7
**50**  25:3
**528**  1:8
**59**  90:17

**6**

**6**  3:14 14:18
  74:12,14 77:6
  77:13
**60**  3:8
**65**  3:9
**66**  44:22

**7**

**7**  1:16 3:3,15
  5:13 14:18
  77:9,10,12
**70**  28:12
**72**  28:12

**73**  3:11,12
**74**  3:13,14
**77**  3:16
**7824638**  1:22

**8**

**8**  3:17 44:21,21
  82:9,16,19,21
  84:19
**80**  25:23
**804-6272**  2:8
**82**  3:17
**85**  3:19
**865**  2:8,18
**89**  3:21,23

**9**

**9**  3:18 14:19
  84:24 85:1
  88:13 90:17
**92**  4:4
**93**  4:6,8
**95**  4:11 25:15
  25:16
**97**  4:14,15
**974-9321**  2:18
**9:05**  1:17 5:5

**a**

**a.m.**  1:17 5:5
  109:23
**aaup**  3:17
  58:19 59:8,13
  59:18 78:8
  83:1 84:6

**aaup's** 60:7
**abd** 16:8,11,13
  16:22,24 18:2
  18:24
**ability** 29:21
  48:20 110:10
  111:7
**able** 34:3 36:8
  81:20 92:22
  100:14,16
**absence** 107:19
  107:24
**absent** 5:17
**academia**
  19:18,21 56:21
**academic** 22:6
  22:10 24:22
  25:5 30:14
  47:22 58:23
  59:13,16,18
  83:17 100:20
  101:22 102:8
  103:20 106:21
  107:12 108:11
  108:13
**academically**
  83:21 84:4,14
**academics**
  56:10
**accept** 23:23
**accepted** 26:5,7
**accepting**
  41:18

**accomplishm...**
  3:8 47:14
**account** 74:4,5
  98:5
**accurate** 71:12
  110:9 111:5
**achieved** 47:17
**acknowledge...**
  5:16
**acrimony** 53:7
**act** 42:2
**action** 35:17
  36:2,3,4 49:5
  62:8 78:11
  82:2 106:20
  110:12,16
  111:8,12
**actions** 90:22
**actively** 38:9
**activity** 65:21
**actual** 67:8
  100:2
**actually** 20:12
  23:21 26:11
  32:13 38:4
  55:2 56:15
  61:10 66:13
  73:17 86:16
  99:4
**add** 21:16
  39:15
**added** 80:23
**addition** 21:5

**additionally**
  5:17
**address** 26:1
  31:1,7 78:17
**addressed**
  78:12 79:9
  80:15
**addresses**
  30:19
**addressing**
  68:9,10 84:11
**adherence** 91:2
**adjectives**
  45:19 70:14
**adjudicate** 57:6
**administer**
  5:16
**administration**
  43:12 107:18
  107:23 108:6
**advantage**
  16:20
**advise** 105:4
**advisor** 15:13
**advisory** 20:19
  74:21
**advocate** 55:22
**advocates**
  71:16
**affairs** 34:20
  50:13 78:9
**affected** 95:15
**affecting** 75:11

**affirm** 89:23
**affirming** 4:9
  90:11 94:6
**afraid** 29:6
**agenda** 3:22
  4:5 26:22
  80:24 89:12
  92:16
**ago** 7:21 10:10
  40:11
**agree** 5:19
  40:14 48:1
  53:19 79:3,5,7
  85:4,11,20
  88:5 91:4,8
  103:24
**agreed** 36:21
  37:16,21 86:3
  91:6 103:7
**agreement**
  103:20
**agrees** 36:13
  38:6 93:3
**agriculture**
  37:4
**ahead** 45:14
  64:13
**air** 78:20
**aired** 44:23
**alabama** 46:9
**alderman**
  32:18 33:4
  39:4 61:12

Case 3:25-cv-00528-KAC-JEM   Document 44   Filed 01/21/26   Page 113 of 146
PageID #: 546

| | | | |
|---|---|---|---|
| **alex** 44:22 | **anti** 87:23 | **area** 28:23 | **assassinated** |
| **alleged** 65:20 | **anxious** 10:4 | 41:24 | 72:2 |
| 65:22 | **anyone's** 42:1 | **areas** 14:6 29:5 | **assassination** |
| **allow** 49:21 | 52:3 | **argue** 45:19 | 67:19,24 68:11 |
| **allowed** 49:12 | **anytime** 21:1 | 50:18 | **assess** 46:3 |
| 86:21 100:14 | **apart** 68:7 | **argued** 90:13 | 70:23 |
| 101:13 104:17 | **apologia** 68:3 | **arizona** 17:24 | **assesses** 22:2 |
| **alumni** 102:17 | 68:21 70:4,9 | 18:15,24 | **assessment** |
| 102:20 103:4 | 70:11 | **arm** 10:2 | 83:17 |
| **amended** 46:4 | **apologies** 29:2 | **arrangements** | **assigned** 5:3 |
| 69:13 70:20 | **apologize** 62:19 | 49:17 | **associate** 27:20 |
| 99:7,10 | 76:4 | **article** 3:20 4:3 | **association** |
| **american** 58:20 | **appalling** 41:13 | 4:12,15 65:5 | 58:20 |
| **amount** 19:13 | **appeal** 28:8 | 88:15 89:21 | **assuming** 71:11 |
| **analyzed** 16:17 | 57:23 58:5,8 | 95:4 97:6 | **assumptions** |
| **animosity** | 58:15 | **articles** 29:20 | 71:6 |
| 41:16 | **appeals** 57:5,15 | 95:7 | **attend** 49:9 |
| **annual** 23:6 | 57:23 | **artist** 15:6 | 76:11 |
| **answer** 9:9 | **appeared** 35:16 | **arts** 14:6 | **attendance** 6:6 |
| 26:20 28:7 | **applicable** 5:23 | **artwork** 15:7 | **attention** 27:9 |
| 44:13 45:1,14 | **applied** 55:4 | **asap** 21:8 | 66:5 95:13,14 |
| 46:19,21 58:18 | **appreciate** | **aside** 38:6 | **attorney** 6:19 |
| 72:8,10 79:8 | 26:15 | 84:13 | 110:14 111:10 |
| 79:14 80:11 | **approach** | **asked** 8:14 | **attorneys** 80:9 |
| 81:14 84:1 | 103:17 | 30:13 38:21,24 | **audio** 110:8 |
| 106:5,10 | **appropriate** | 51:24 59:3 | 111:3 |
| **answered** | 30:2,4,9 37:5 | 63:10 76:12 | **august** 23:16 |
| 99:15 | 40:12 50:14 | 86:2 92:24 | **authorized** |
| **answering** 9:5 | 51:12 83:17 | 102:13 105:6 | 5:15 |
| 99:10 | 84:12 102:15 | **asking** 8:8,22 | **available** 60:4 |
| **answers** 81:22 | **approved** | 35:11 40:21 | **aware** 42:6,11 |
| 99:7 | 15:24 | 44:16 47:5 | 59:14,19 60:2 |
| **anthropologist** | **apps** 61:21 | 62:14 70:24 | 62:6 69:19 |
| 29:4 | | 84:10,13 93:5 | 76:18,22 77:1 |

Page 3

Case 3:25-cv-00528-KAC-JEM Document 44 Filed 01/21/26 Page 114 of 146 PageID #: 547

88:18,23,24
95:19 98:4,11
101:7,19,22
102:1,17,20
103:6,9 104:8
104:15 108:18
108:19,22
109:2,11
**awesome** 60:24

**b**

**b** 3:5 4:1
**back** 18:15,18
19:1,20 26:3,9
68:16 82:17
104:17
**background**
10:15
**bad** 51:14
**balance** 11:21
**based** 14:19
24:21 33:1
43:14 47:5
53:12 55:24
66:10 68:18
71:7 88:6
**basic** 64:7 89:4
90:11
**basically** 11:13
12:3,5 35:1
64:11
**basing** 92:4
**basis** 99:5

**beacon** 3:20
88:15
**beginning** 19:9
63:5
**begun** 16:11
106:21
**behalf** 2:2,10
85:14 87:8,10
**believe** 15:22
17:14 18:2
23:17,24 27:1
27:8 29:4
35:10,18 47:18
50:11 51:20,22
58:1,20 64:11
65:19 66:12,13
66:16 67:1
68:14 71:15,18
83:20 90:8
91:7 94:17,21
95:24 98:6,15
104:4 105:18
105:20 106:2
108:11 109:6
**believed** 69:1
86:5 88:2
**belong** 11:1
**best** 48:20
64:12 68:4
69:2 73:13
74:24 110:10
111:6
**better** 43:23
70:14 71:24

72:14
**beyond** 86:17
**big** 8:18 10:18
69:7
**bigelow** 2:3,4
3:3 6:18,18 7:9
7:14 8:13
33:21 34:1
37:6 44:19,20
45:5,17 46:21
46:23 53:21
60:16,24 61:2
65:10,14 72:7
72:13,23 73:3
73:10,13,14
74:9,11 77:6,8
77:13,17 78:1
82:8,12,15,23
84:23 85:3
88:12,14 89:7
89:11,16,20
92:7,11,15
93:8,12,21
94:1,4,22 95:3
96:22 97:3,18
98:1 106:15
109:17
**bigelowlegal....**
2:7
**biggest** 27:14
78:19
**bigot** 70:21
71:4,5

**bigotry** 68:3,22
70:17
**binders** 23:4
**binding** 20:21
21:11,21 22:4
**bio** 3:13
**birmingham**
46:9
**bit** 10:9 12:8
19:21 25:17
27:7 66:24
69:7 89:6
**blackburn** 89:5
**blanking** 33:19
**blasphemous**
68:6
**blessing** 52:3
**board** 23:22
26:17 74:21,22
75:23,24 76:5
76:8,11,19,23
94:6,10,12,17
**boil** 25:3 91:17
**boisterous** 49:7
**bolden** 1:21 5:3
110:2,17
**bottom** 42:4
47:21 83:14,15
92:20
**box** 57:4,4
**boyd** 1:10 2:11
3:12,13 5:11
64:18,22 73:16
75:9

Case 3:25-cv-00528-KAC-JEM Document 44 Filed 01/21/26 Page 115 of 146 PageID #: 548

**boyd's** 74:2
**break** 8:16,18
**breakdown**
  101:2
**brief** 11:10
**bring** 27:5 53:6
**broader** 48:8
  55:12
**brought** 57:15
  66:5
**building** 5:13
  49:18 75:10
**buildings** 44:8
  44:9 45:8,9
  70:8
**built** 91:1
**bunch** 8:22
  80:1 96:12
**business** 9:15
  9:16 19:7
  24:19 55:16,18
  56:6,14
**butler** 78:9
**bylaws** 3:9 64:9
  65:8
**bypassed** 79:24

**c**

**c** 1:21 2:1 5:1
  110:2,17
**caiazza** 2:22
  6:12,12
**call** 8:19 11:15
  12:4 13:5

20:23 29:24
53:1 62:7
91:20 105:9
106:19
**called** 7:3 16:1
  16:8 18:5
  20:18,19 66:8
  66:21
**caller** 62:23
**calling** 63:3,4
**callous** 45:20
  70:13
**calls** 61:13
  106:8
**campus** 4:7
  10:1 11:14
  18:23 21:13,24
  22:1 37:24
  38:2,5 51:10
  53:14 54:3
  57:3,16 59:5
  64:13 75:3,11
  88:16,19 90:14
  93:18 95:11,15
  98:8
**campuses** 75:7
  86:19 94:14
**capacities** 1:12
  5:13
**capture** 35:14
  65:19 66:7
**captures** 14:21
**car** 72:3,5,12

**career** 28:1
  42:1
**case** 1:7 20:3
  25:3 26:24,24
  27:2,2 31:17
  31:19 32:5
  34:13 46:1
  50:18 52:8,15
  57:14 80:18
**cases** 12:1 14:8
  14:21 15:10
  22:1 37:14,15
  51:13 54:3
  109:2,7,10
**category** 61:13
**caused** 100:2,6
  101:2,5 102:1
**caveat** 85:21
  86:1,2
**celebrated**
  42:24
**celebrates**
  71:18,21
**celebrating**
  71:23 72:4,11
  72:20,21,24
**celebratory**
  72:17
**censure** 102:4
**center** 58:22
**centrist** 42:16
**certain** 38:15
**certainly** 70:14
  91:12

**certificate**
  110:1 111:1
**certified** 5:20
  110:18
**certify** 66:2
  110:4 111:2
**cetera** 34:14
**chair** 15:14
  20:11 29:24,24
  30:7 76:10
**chairing** 10:8
**chairs** 78:9
**champion** 51:8
**championed**
  43:1
**chancellor**
  35:16 36:6
  62:2,8 63:4
  66:8,21 73:8
  75:19 94:20
  105:4 106:23
**chancellor's**
  36:4,13,22
  37:22 62:23
**change** 78:23
**channel** 66:16
**chapter** 59:12
  59:17,20
**characterize**
  63:18
**charles** 1:10,15
  2:11 5:8,12
  6:20 7:2

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 116 of 146
PageID #: 549

charlie   3:16
47:10 53:2
63:2 68:15
69:6 87:21,23
108:20 109:4
109:14
chattanooga
75:6
chief   22:5,10
106:21
children   43:17
43:23 72:20
chilling   90:22
91:9
choice   12:15
church   10:24
circulating
66:15,15
circumstance
30:6
cited   81:19
citing   36:10
80:19
citizen   83:9
citizens   92:23
civility   83:1,5
clarify   84:6
class   41:11
classes   19:2
classify   43:10
classroom
41:17 43:17
47:3,7 98:14
101:19

clauses   80:14
clear   22:13
51:7 64:16
83:23 92:21
clearly   83:11
clouds   41:20
cnoble   30:21
31:2,4
cnoble6   31:8,9
collaborate
59:3,7
collaborated
59:2,12,17,20
collaborates
58:22
collaboration
59:1
colleagues   24:6
100:23
collected   93:17
collective   48:17
86:11
college   9:16
10:6 12:21
16:4 55:6,7,9
56:14
collegiality
27:13
collide   91:22
colloquially
13:5
come   38:7
41:17 87:21,22
106:21

comes   16:19
39:5
comfort   36:8
coming   21:2
42:18 56:24
79:1 91:13
comment   20:20
21:17 30:13
47:1,2,9,10
53:15 67:17
70:2,5,13,15
71:10,13,15
72:16 84:4,15
86:4 87:20
89:2 98:5
102:18 103:8
commentary
21:5,17 101:12
commented
96:1
commenting
96:2
comments   26:2
36:7 37:17
40:11,15 44:2
47:6 52:21,24
53:1,3 63:8
67:13 68:17
commitment
90:5
committee
15:15,24 16:3
18:17 20:13
22:2 34:20,20

50:13,13 57:5
57:15,23 78:9
committees
10:8 27:17
74:22 75:1
76:5,15
common   13:18
communication
31:14 61:18
community
90:7
complained
102:17,21
complaint   46:4
69:13,14,15,17
69:18,19 70:20
70:20 72:16
99:7,10 101:7
complaints
57:6 102:22
complete   99:17
compton   76:10
con   34:14
concern   49:14
91:18 98:20
99:1
concerned
84:12
concerns   49:3
50:9 56:22
64:4 78:10,14
78:18 91:12
conclude   102:7
102:10

Page 6

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 117 of 146
PageID #: 550

concluded
  109:24
conclusion
  106:9
conclusive
  40:22
condemnation
  107:19 108:1,3
  108:4
condemning
  108:8
confidence
  36:21
conflicted  42:4
  83:24
congress  43:8
connection
  59:10
consent  26:21
conservative
  104:10 108:23
  108:24
consider  26:24
  27:2 39:6,14
  42:22,23 43:24
  44:12,16 45:18
  45:20 46:11
  69:23 70:3,9
  72:16 80:9
  87:5 96:13
consideration
  25:5 83:16
considered
  18:4 20:17

43:20 72:22
constituency
  48:8,22 53:16
  54:18 55:1,4,8
  55:10,19 56:3
  56:14
constitute  6:3
  83:10
constitutional
  105:8
consultation
  63:11
consulted
  63:19
cont'd  4:1
content  68:2
context  76:14
  96:6
continue  67:20
continued  57:6
  107:18,23
  108:6
continues
  21:23
contract  13:1
contractor  7:24
control  49:8
controlled
  103:16
controlling
  83:8
controversial
  104:3

conversation
  37:20 39:7,9
  39:14 62:5,16
  62:20 63:11
  64:1,2
conversations
  36:18 37:12
  61:4,7,10,15
  63:21
cool  60:20
copy  65:1 94:1
core  90:13
correct  13:12
  13:13 14:4,14
  15:3 16:8 17:8
  19:18,19 20:11
  36:23 38:23
  42:21 48:9,14
  51:10 54:16,19
  55:1,23,23
  56:7 68:22
  69:3 71:10
  78:12 79:9
  80:2,5 83:12
  83:18 87:3,4
  88:2 89:14
  90:1 92:17
  93:19 96:9,17
  96:20 98:21
  99:6 101:15,16
  102:16 103:22
  103:24 104:1
  104:14 106:1,5
  108:9,10

correctly  45:23
  80:21 81:10
council  74:20
  75:5 76:9
  80:24
counsel  6:10,11
  33:5,7,9,23
  34:6 47:12
  62:22 65:1
  92:12 110:11
  110:14 111:7
  111:10
counting  26:10
  103:20
counts  22:7
couple  13:9
course  41:15
  55:13
courses  11:18
coursework
  19:8
court  1:1 9:7
  32:1 34:2
  84:18
coverage  98:7
cowell  78:10
crazy  26:8
created  50:8
  90:22
credentials
  30:15
critical  109:4
  109:14

Page 7

www.veritext.com          Veritext Legal Solutions          800-556-8974
Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 118 of 146
PageID #: 551

| | | | |
|---|---|---|---|
| **criticism** 104:9 | **de** 68:6 | **defense** 16:2 | **departmental** |
| **cross** 82:17 | **deadline** 23:18 | 18:23 90:11 | 101:2 |
| **cruel** 42:7,12 | **deal** 8:18 | 96:3 | **departments** |
| 42:14,18,22 | **dealt** 58:6,7 | **deficiencies** | 10:1 |
| 43:3,11,16,20 | **deans** 10:3 | 101:22 | **depending** 12:7 |
| 44:12 45:18 | **death** 97:9 | **define** 39:24 | 13:21 15:20 |
| 46:7 47:2 | **debate** 44:3,3 | 40:1 78:16 | **depends** 20:14 |
| **curious** 76:2 | **december** | 88:8,9 | 29:18 39:24 |
| **currently** 9:11 | 44:23 97:7 | **definition** | 42:14 |
| 60:4 | **decent** 10:12 | 90:12 | **deposition** 1:15 |
| **cut** 17:1 | **decide** 40:19 | **definitions** | 5:6 6:1 7:16 |
| **cv** 1:8 10:15 | **decipher** 9:9 | 90:12 | 32:2 110:1 |
| 29:17 | **decision** 12:16 | **degree** 10:1 | **derangement** |
| | 21:21 22:8 | 11:24 13:10,14 | 97:8 |
| **d** | 27:23 35:24 | 13:17,19 14:9 | **derek** 32:18 |
| | 36:13,22 37:5 | 19:16 | 61:11 |
| **d** 2:13 3:1 5:1 | 37:15,22 58:8 | **deliver** 88:17 | **description** 3:6 |
| **daily** 3:20 | 64:3,15,19,20 | **delong** 37:3,11 | 4:2 |
| 88:15 | **decisions** 57:8 | 38:7,7,17,22 | **deserve** 23:14 |
| **damaged** 90:23 | 57:18 | 39:8 40:8 | **despite** 50:17 |
| **dance** 12:9 | **declared** | **democrats** | 107:19,24 |
| 56:23 | 107:15 | 43:12 | 108:3,6,8 |
| **dark** 24:5 | **defend** 17:15 | **demonstrates** | **detail** 32:23 |
| **data** 15:19 | 18:16 19:1 | 83:11 | **details** 32:21 |
| 16:17 | 58:23 59:13,18 | **denied** 20:2 | **detectors** 49:15 |
| **date** 1:16 | 93:14 | 57:21 | **determination** |
| **dated** 89:13 | **defendant** | **department** | 20:10 |
| 97:7 | 50:18 51:12 | 9:15 10:2 12:7 | **determine** |
| **david** 78:9 | **defendants** | 12:20 16:3 | 103:19 |
| **dawdling** 73:8 | 1:13 2:10 6:11 | 20:11,13,14,24 | **devastated** |
| **dawn** 111:2,15 | **defended** 17:17 | 21:2,12,14,15 | 42:2 |
| **day** 51:23 | 17:19 25:1 | 21:18,20,22 | **development** |
| 91:18 | 104:2 | 67:4 | 12:11 |
| **days** 42:10,19 | | | |

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 119 of 146    PageID #: 552

difference
86:12,13
different 8:3
12:10 14:6,7
15:5,19 24:4
27:7,18 32:7
41:6 56:10,21
80:2,19 88:8
difficult 9:7
14:24 79:19
digital 23:3
110:8 111:3
directed 98:16
directly 45:23
disagree
103:24
disagreed
37:14 103:7
disagreement
80:17 103:21
discipline
13:22 27:19,20
98:19,22,23
101:5 102:14
103:4,23 105:5
107:18,24
108:6
disciplined
98:24 104:5
108:20,23
109:15
disciplining
99:6

disclosure
63:24
discoverable
36:24
discuss 31:14
31:16,19 34:16
49:21
discussed 32:20
32:21,22 34:5
34:17,19
discussing
30:20
discussion
63:12 75:13
discussions
35:4
disgusting 72:1
dismay 80:17
dismissal 83:10
dispute 7:20,23
disputed 85:18
87:18
disruption
100:2
dissemination
85:9
dissertation
15:2,4,14,22
16:12,14,16
17:7 18:12,16
18:21 19:3
24:23,24 25:2
distinguished
9:14

district 1:1,2
doctoral 13:15
doctorate 12:1
13:11,14
document 3:17
15:22 47:12,13
47:19 59:23
60:3 64:24
65:3,17,18
78:5,7,8 82:19
86:16,17 87:17
documents
47:15 80:19
doing 10:14
24:8
donde 1:9 2:11
5:11 63:3
door 49:17
doors 49:15
dossier 23:2,17
doubt 60:5
downtown 5:14
dr 4:8 5:8 6:11
6:19,20 7:10
7:15 28:18
30:20 31:15
32:10 33:3
39:3 47:1
48:22 53:16
54:12,24 58:4
60:8 61:15,19
62:4 66:10
67:4,4 69:17
71:9 72:15

76:20 77:2
78:11 79:22
88:19 89:2
92:5,5 93:14
98:4,19 99:6
99:19 100:3,6
100:10,20
101:8,20,23
102:5,8,14,18
103:8 104:13
104:22 105:18
107:7,12,24
108:11,16
109:14
dramatic 12:17
dramatically
24:18
draw 41:15
drive 1:19 2:15
driver 72:15
driving 72:17
73:1
drunk 72:15,17
72:24
dual 56:9,12
due 57:7,7
105:9,11,14,16
105:19 106:1,6
duly 7:3 110:5
duties 48:3,11
48:19 65:5
98:12 100:20
duty 48:7,13
53:23

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 120 of 146
PageID #: 553

| e | | | |
|---|---|---|---|
| **e** 2:1,1 3:1,5 4:1 5:1,1 | **email** 30:19 31:1,13 61:20 | **estate** 7:20 8:1 | **excluded** 104:13 |
| **earlier** 20:9 38:20 43:14 46:5 61:8 68:17 70:7 83:22 | **emails** 30:18 31:5,11 | **et** 34:14 | **exclusively** 19:10 |
| **early** 23:18 | **empathic** 56:20 | **ethical** 54:11 | **excuse** 74:24 |
| **easier** 53:18 73:19 | **empathize** 57:2 | **ethnicity** 71:7 | **executive** 80:24 |
| **eastern** 1:2 | **emphasis** 56:17 | **eva** 78:10 | **exhibit** 3:7,9,10 3:12,13,14,15 |
| **easy** 9:8 60:21 | **employed** 110:11,14 111:8,11 | **evaluate** 21:16 102:13 | 3:17,18,20,22 4:3,5,7,9,12,15 |
| **editor** 25:9,10 25:14 56:11 | **employee** 17:3 110:13 111:10 | **evaluated** 12:6 | 60:13,14,20 65:11,12 73:4 |
| **editors** 27:20 | **employees** 85:16 | **evaluating** 30:14 | 73:4,5,19,20,22 74:6,7,12,14 |
| **education** 14:16 32:18 55:9 | **ended** 51:19 78:24 | **evaluation** 12:20 | 77:10 82:9,16 82:19,21 84:19 |
| **effect** 90:22 91:9 | **endorse** 70:15 | **evaluations** 23:6 | 84:24 85:1 88:13 89:8,9 |
| **effective** 4:11 | **endorsing** 96:14 | **event** 72:22 | 89:17,18 92:8 92:9 93:9,10 |
| **effectively** 20:3 | **endurance** 8:21 | **events** 95:14 | 93:22,23 94:23 95:1 96:23 |
| **effort** 48:17 | **enter** 13:15 82:19 | **evidence** 80:19 100:2,4,5,7,9 | 97:1,19,20 |
| **eight** 11:18 | **entire** 56:4 86:15 94:13 | 100:17,19,22 101:1,4,11 | **exhibits** 60:18 60:22 |
| **either** 21:6 62:3 | **entitled** 89:22 105:14 | **evidentiary** 5:24 | **expectation** 27:16 |
| **elaborate** 11:11 | **environment** 49:12 50:4,6,8 | **exact** 63:5 | **expecting** 73:8 |
| **elect** 32:13,14 32:17 | **es** 110:4 | **exactly** 9:19 105:12 107:4 | **expedited** 107:5 |
| **elected** 32:12 32:13 74:20 | **especially** 27:22 42:3 | **examination** 3:2 7:8 | **experience** 28:16 57:17 58:7 |
| **elements** 106:2 106:12,16 | **esquire** 2:3,13 | **examined** 7:5 | |
| | **essentially** 70:8 | **example** 12:9 24:24 27:3 37:3 43:22 49:4,11 57:22 75:12 76:8,13 89:5 106:18 | |

www.veritext.com          Veritext Legal Solutions          800-556-8974

| | | | |
|---|---|---|---|
| **experienced** 25:12 | **extramural** 83:4 | 53:23 54:1,2,4 | 65:7 67:13 |
| **experiences** 41:6 | **extremely** 19:24,24 | 54:5,8,13,15 | 91:24 92:3 |
| **expert** 67:16 | **f** | 55:13,14,21,22 | 94:20 105:24 |
| **expertise** 41:24 | **face** 81:18,18 | 55:22 56:4,18 | 109:13 |
| 107:2 | **facebook** 3:10 | 57:2,5,6,22 | **fairly** 12:16 |
| **explain** 11:3 | 47:2 67:9,12 | 58:14,22 59:8 | 14:6 42:16 |
| 16:10 26:18 | 67:16 98:4,5 | 59:12 60:4 | 56:15 81:23 |
| 35:6,11 56:8 | **facilitated** | 64:5,9 65:5,8 | **fairness** 57:8 |
| 57:11 74:23 | 104:24 105:1 | 74:18,19,20,21 | **fall** 32:6 34:11 |
| 86:13 | **fact** 50:17 | 75:2,5,22 76:7 | 75:13 |
| **explaining** 26:16 | 71:23 90:16 | 76:9,23 78:8,9 | **fallout** 68:10 |
| **exploring** 30:15 | 98:24 103:23 | 79:1,23 80:23 | **familiar** 28:18 |
| **express** 49:13 | **factors** 71:8 | 81:7 83:9,11 | 28:21 32:8 |
| 49:22 50:9 | **faculty** 3:7,9,14 | 86:10,11,14,20 | 73:15 74:1,5 |
| 53:10 | 3:22 4:5,11 | 87:2 89:12,22 | 74:12 78:5 |
| **expressed** 35:23 | 9:18,22 11:14 | 90:3,23 91:5,6 | 83:3 84:20 |
| **expressing** 41:8 | 11:15,16,17,21 | 91:18,24 92:16 | 90:16 94:8,9 |
| 54:10 78:10 | 11:23 15:15 | 92:22 94:7 | 95:4 97:10 |
| 80:17 | 16:21 18:10 | 98:20 99:2 | **family** 20:5 |
| **expression** | 20:13,24 21:16 | 101:5 102:4,7 | **far** 41:9 84:12 |
| 12:13 41:22 | 21:18 24:2 | 102:10,13,24 | 96:18,21 |
| 83:9,16 91:20 | 26:23 27:16 | 103:3,3,19,23 | **fast** 74:9 |
| **extended** 37:20 | 30:8 32:3 | 104:2,5 105:2 | **father** 43:23 |
| **extensive** 53:13 | 34:12,16,17,20 | 105:13 107:6,8 | **fault** 82:14 |
| **extensively** 70:1 | 35:5,17 36:13 | 107:11,19 | **favor** 90:19,20 |
| **extent** 50:19 | 40:13 41:7 | 108:1,3,4,8,16 | **feedback** 20:15 |
| **extra** 29:22 | 43:15 47:13,19 | 109:3 | 22:4 |
| | 47:23 48:4,8 | **faculty's** 55:18 | **feel** 44:4 51:16 |
| | 48:11,13 50:12 | **fair** 7:22 9:1 | **feelings** 40:23 |
| | 50:13 51:9,13 | 10:17 14:16 | **felt** 34:21 38:15 |
| | 52:1,5 53:11 | 19:12,14 22:22 | **fence** 42:9 |
| | | 33:1 36:1 | **field** 23:13 |
| | | 43:18 54:14 | 25:15 26:3 |
| | | 58:23 62:11,12 | 29:18 |

Page 11

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 122 of 146 PageID #: 555

| | | | |
|---|---|---|---|
| **fields** 14:5 56:20,21 | 73:12 77:3,5 82:11 92:14 94:3 97:22 106:7 109:19 | **forth** 18:19 26:3 56:12 | **fundamental** 91:17 |
| **figure** 104:10 | | **fortunate** 19:17 | **further** 110:13 111:9 |
| **filed** 57:6 58:5 69:17 | **five** 12:4,5,12 12:19 18:23 26:4 | **forward** 13:8 90:20 | **fuzzy** 66:18,24 |
| **final** 23:20 | **focus** 19:6 29:5 35:4 67:6 87:22 | **foster** 85:13 | **g** |
| **finally** 9:3 | | **found** 53:1 | **g** 5:1 |
| **financially** 110:15 111:11 | **focused** 11:17 19:10 | **foundation** 91:2 | **gather** 65:24 |
| **find** 15:10 20:6 30:6,7 52:20 52:21,24 53:3 68:5 | **folks** 21:4 | **four** 14:2,3,13 18:24 22:17 25:22 67:18,23 79:5 | **gathered** 95:22 |
| | **follow** 81:4 84:8 | | **gathering** 15:18 |
| **fine** 8:20 33:23 50:22 61:1 | **followed** 105:17,21 106:13,17 | **frankly** 29:16 33:3 | **gay** 44:5,7 45:7 |
| **fired** 20:3 40:18 | **follower** 69:7,8 | **free** 4:10 41:22 90:5,11,13 94:6 | **gaza** 44:6,8 45:7 70:8 |
| **first** 7:3 12:18 13:9 14:1 19:2 24:24 45:20 47:20,21 48:7 55:20 62:22 66:7 67:8 79:21 80:22 93:13 | **following** 13:2 18:13 | **freedom** 41:22 47:23 58:23 59:13,16,18 91:20 103:20 107:12 108:12 108:14 | **ge0004** 3:18 85:5 |
| | **follows** 7:5 | | **geghamyan** 3:11 67:17 |
| | **foregoing** 110:3,4 111:4 | | **general** 6:9 28:23 34:6 52:17 60:20 |
| | **forget** 30:23 63:5 | **frequently** 59:6 | **generalize** 14:5 |
| | **form** 55:8 72:6 106:7 | **friday** 78:3 | **generally** 10:23 79:2 |
| **fit** 83:21 84:14 | | **front** 52:12 | **genocide** 68:3 68:21 70:4,9 |
| **fitness** 83:17 | **formal** 58:24 59:10 62:21 63:1 | **fruition** 50:12 | **geographer** 32:19 |
| **fitzgerald** 2:13 2:23 6:8,9 33:15 36:24 44:17 45:2,12 46:16 53:20 60:22 61:1 72:6,9,18 73:7 | | **fs** 59:17 | **getting** 14:5 15:6 19:23 20:10 22:20,23 22:24 23:1,12 50:5 68:16 |
| | **formality** 23:22 | **full** 21:1 49:6 63:24 68:2,21 69:23 70:3 | |
| | **formally** 59:9 | **fully** 16:17 | |

www.veritext.com                Veritext Legal Solutions                800-556-8974

**giant** 15:22
23:5,17
**give** 21:8 27:8
31:3 32:2
33:22 37:2
52:3 58:18
64:6 65:1
78:19
**given** 7:16 13:1
**gives** 39:5
**giving** 39:9
49:2
**glance** 45:20
**go** 6:7 10:24
12:1,19 13:19
14:1,11 20:5,7
24:14 25:7,20
26:1,9 32:1,1
44:6,7 45:7,14
56:19 57:1
58:5 64:13
74:12,17 77:17
92:13 93:17
97:4 98:3
104:17
**goal** 53:9
**god** 82:12
**goes** 10:2 21:12
21:13,24 22:5
26:3 57:21
68:24
**going** 12:13
13:8 19:20
20:6 24:3,18

35:1 36:9,16
43:2 46:5,16
49:6 55:15
60:17,19,19
64:3,4,5,24
65:17 66:9
71:11 75:19
82:1,18,19
84:15,17 89:7
95:14,19 97:22
**good** 5:2 7:10
7:11,13,14
24:8 25:1
28:12 35:14
56:18 63:14
**gotten** 77:15
**govern** 84:7
**governance**
47:22 90:24
91:2 103:1,3
**governing** 80:7
**graduate** 13:23
14:3 35:18
**granted** 13:8
58:1
**great** 56:19,19
57:1,24,24
**greater** 56:18
**grew** 68:6
**grind** 24:13
25:7
**ground** 103:4
**grounds** 45:12
46:17 83:10

97:23
**group** 54:9,11
55:5,7,8,9 75:5
**groups** 10:22
11:1 27:18
59:4,5,6
**growing** 43:23
**guess** 18:22
39:24 63:16
65:20 68:6
73:24 91:10
108:5
**guessing** 66:19
**guidelines**
106:14 107:4

**h**

**h** 3:5 4:1
**half** 19:8
**hall** 49:23
**hand** 6:24 41:2
64:24 65:15,17
78:2 82:18
84:17,17 88:15
88:17
**handbook** 64:9
79:23 80:4,5,6
80:12,14
**handed** 65:3,18
84:20 85:4
89:12,21 92:16
93:13 94:5
95:5

**handful** 98:2
**handing** 47:12
47:14 74:1
82:24 92:12
97:6
**handle** 24:4
**handled** 34:14
79:7 80:18,20
**hanging** 59:23
**happen** 35:2
57:13
**happened** 60:1
88:22 92:5
97:12,14 109:9
**happening** 52:2
**happens** 10:7
23:24
**happy** 9:19
10:5 33:22
**hard** 14:5 22:8
46:3
**harder** 24:21
**harm** 102:1
**haslam** 9:16
10:6 56:14
**hasmik** 3:10
67:17
**hate** 52:18,19
68:3,21 69:24
86:5 88:7
**hateful** 40:15
41:8,12 42:7
42:12,14,18,23
43:4,11,16,20

Page 13

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 124 of 146
PageID #: 557

43:24 44:12
45:18 46:2,7
47:2 52:22,24
53:3 88:2,5
104:6
**hats** 56:11
**head** 21:12,14
21:15,20,22
**heads** 10:3
**heard** 28:23
45:22,24 95:17
99:24
**hearing** 6:22
**heckler** 46:10
**help** 33:13,16
51:15 54:4
79:8
**helped** 26:11
**helps** 17:23
**henry** 9:14
**hereto** 110:15
111:11
**hey** 8:13 44:7
45:6 57:23
**high** 22:3
**higher** 14:15
**highest** 26:18
**hill** 1:19 2:15
**hillsboro** 2:5
**hired** 11:23
**hiring** 27:3
**history** 53:11
53:13 86:23

**hold** 28:8
**home** 20:5
**honest** 70:10
76:3
**honor** 85:16
**hostilities**
53:14
**hour** 11:6,9,9
**hours** 99:11
**housekeeping**
60:17
**hub** 74:17
**huge** 23:4
**huh** 9:4,8 17:6
17:9 54:20
61:6
**hurry** 75:15
**hurrying** 73:10
**hypothetical**
72:9

**i**

**i.e.** 22:12
106:22
**idea** 63:14 70:5
**ideally** 108:5
**identification**
60:15 65:13
73:6,23 74:8
74:15 77:11
82:22 85:2
89:10,19 92:10
93:11,24 95:2
97:2,21

**identify** 6:6
**imagine** 22:19
92:6
**immediate**
32:15
**immediately**
51:11
**impair** 108:16
**impairment**
101:5
**important**
27:24 34:15
47:23 53:24
54:7 81:7 90:8
90:15
**include** 55:13
61:8 68:21
**includes** 75:6
**including** 6:11
53:2
**individual** 54:5
59:8
**individually**
26:23 54:2
**influence** 80:7
**inform** 63:4
**information**
3:7 29:9,14
37:1 47:13
81:7 99:5
104:16
**informational**
21:12 47:19

**informed** 63:19
**informing** 62:8
106:19
**initial** 96:8
**innovation**
25:11
**input** 21:3,4,20
22:3 34:17
64:17
**inquired** 10:13
**insights** 82:3
**instagram**
61:21
**instance** 59:21
**institution** 86:8
**institutional**
3:18 85:5,16
86:22
**institutionally**
86:6,7 87:13
87:15
**intend** 108:2
**intended** 5:22
**intentionally**
32:21 52:8,14
87:22
**interact** 76:7
**interacted**
64:18
**interactions**
62:15 81:19
**interactive**
63:20

www.veritext.com
Veritext Legal Solutions
800-556-8974

| | | | |
|---|---|---|---|
| **interest** 10:14<br>48:8 53:16,19<br>53:22 55:12<br>64:12<br>**interested**<br>110:15 111:12<br>**interesting**<br>88:7<br>**interests** 10:17<br>15:11 48:24<br>50:7 51:4,8<br>55:18<br>**internally** 99:3<br>**interpretation**<br>44:1<br>**interpreted**<br>79:17<br>**interrupt** 75:19<br>87:24<br>**intranet** 74:17<br>**introductory**<br>74:16<br>**investigation**<br>99:18<br>**investigative**<br>99:20,22<br>**involve** 52:9<br>**involved** 8:3<br>10:19,21 30:22<br>32:24 42:15<br>58:11 59:8<br>75:3<br>**involves** 23:12 | **issue** 8:1 50:2<br>76:13 88:11<br>108:13<br>**issues** 41:21<br>75:10<br>**iterative** 25:20<br><br>**j**<br>**january** 1:16<br>5:13<br>**jem** 1:8<br>**jesus** 68:4 69:2<br>**jews** 44:11<br>45:10<br>**job** 1:22 13:5,7<br>16:19 18:3<br>19:18 50:22<br>51:8 53:24<br>70:23 96:16<br>**john** 76:10<br>**joni** 1:21 5:3<br>110:2,17<br>**journal** 24:21<br>25:5,8,11<br>**journals** 24:22<br>25:10 27:19<br>29:19<br>**jud** 32:17 61:11<br>**judges** 71:6<br>**june** 23:10,10<br>23:15,24<br>**justifying** 64:6 | **k**<br>**kac** 1:8<br>**karen** 37:3,19<br>**keep** 11:10<br>60:19 67:7<br>**kept** 96:16<br>**kids** 41:11 47:3<br>47:6 71:24<br>**kill** 44:11 45:10<br>**killed** 72:3,14<br>**kind** 9:23 11:19<br>12:16 15:15<br>16:5,15 17:2<br>19:16,20 20:19<br>20:20 22:2<br>23:6 30:24<br>31:13 32:2,23<br>37:17 41:16,18<br>42:4 45:21<br>47:18 49:2<br>53:9 56:17<br>60:16,18 63:19<br>69:11 74:16<br>78:20 95:11<br>96:2 99:15<br>104:16<br>**kinds** 11:14<br>15:19 71:8<br>**kirk** 44:23<br>47:10 53:3<br>68:11,15 69:6<br>69:20 70:21<br>72:3,14 87:22 | 87:23 108:20<br>109:5,14<br>**kirk's** 67:18,23<br>**knew** 49:6,6,7<br>66:20,20<br>**know** 7:15 8:16<br>11:4,11 12:8<br>13:16,20 15:6<br>15:10,14 16:5<br>18:11,15,18<br>19:6 20:2,4,5<br>21:6,13 23:2<br>24:1,3,11,17<br>25:9,11,15,17<br>26:17,20 27:12<br>28:9,13 29:3,6<br>29:16 32:1,3,4<br>32:5,23 34:11<br>34:15 35:24<br>36:6 37:13,14<br>38:10 39:17<br>41:2,5,5,9,10<br>41:10,21 43:1<br>43:5,6,7,9,11<br>44:6 45:6 46:3<br>47:11 49:16<br>51:18,24 52:7<br>53:13,14,24<br>55:24 58:9,16<br>59:7,21 60:7<br>60:11 61:4<br>62:14 63:2,8<br>63:13,16,24<br>64:5,6,17 |

Veritext Legal Solutions

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 126 of 146<br>PageID #: 559

65:24 66:1,1
66:19,22 69:6
70:10,13 76:3
76:4,11,16
78:22 79:1
81:17,22 85:23
86:14,20 88:7
90:10,12 91:20
92:24 93:2
96:4,10,18,21
100:1 101:9
104:16,19,20
104:21 109:9
**knowing** 43:6
**knowledge**
53:12 81:12,14
85:9 99:23
110:10 111:6
**knox** 89:22
**knoxville** 1:3,9
1:20 2:11,16
4:3,12 5:11,14
9:12 10:23
86:18 87:3

**l**

**label** 77:6
**labeled** 78:3
**lacked** 99:4
**laid** 105:20
**large** 48:12
53:24 54:4
56:18

**largely** 88:10
92:6
**laughed** 62:21
**laughter** 32:17
33:3 34:8 39:4
61:11
**law** 91:3 92:23
95:24
**laws** 5:24
**lawsuit** 30:7
**lawyer** 8:3
105:8
**leaders** 34:16
55:22
**leadership** 3:19
10:11 32:4,11
52:9 61:11
80:16,18 82:1
85:5 95:12
**learned** 69:9
**leave** 13:3
16:21 104:23
**left** 16:12 17:22
18:2 42:18
44:9 45:9 70:8
**legal** 2:4 41:21
41:21 79:15
80:5,8 81:24
106:8
**length** 13:20
39:20,23,24
40:1,2,3
**lengths** 49:21
56:19 57:1

**letter** 21:5
105:23 106:3
106:13
**letters** 23:11
**level** 12:20,21
12:21 20:13
22:1,1,3 29:22
41:16 55:6
86:17
**levels** 22:17
**life** 9:7 13:5
79:19 91:19,19
92:1
**light** 95:17
**lightly** 95:17
**limit** 81:5
**limited** 38:5
**line** 41:16 42:5
91:19
**lines** 61:22
100:18
**list** 29:20 38:13
38:15
**listened** 36:6
**litigation** 2:22
36:9 81:20
**little** 8:12 10:9
19:21 24:6
25:17 27:7,8
64:10 66:18,23
68:6 69:7
**lived** 41:6
**living** 71:24

**location** 1:18
**long** 15:23 23:1
24:13 26:12
38:13,14 50:1
86:23
**longer** 79:20
**loo** 68:6,6
**look** 15:5,17
33:22 34:3
52:16 58:17
**looked** 27:11
29:11 78:14,16
**looking** 12:6
**looks** 58:9 65:9
**loose** 17:1
**lose** 13:6,6
**lost** 72:21
**lot** 9:3 13:4,7
19:5 24:21
29:18 34:24
37:12,13,14
49:1,20 54:5
61:13 78:22,23
79:16 81:23,24
101:12 105:15
**lots** 37:23,23
43:6 56:10
62:15,15
103:17
**lower** 25:17
53:14
**lucky** 24:7 26:5

Page 16

Case 3:25-cv-00528-KAC-JEM　　Document 44　　Filed 01/21/26　　Page 127 of 146
PageID #: 560

| m | | | |
|---|---|---|---|
| **made** 47:1<br>  49:17,20 55:21<br>  63:8 64:15,16<br>  68:17 72:15<br>  86:4 98:5,8,8<br>  98:11,14<br>**main** 57:4<br>**majority** 36:1<br>  61:12 107:9<br>**make** 28:12<br>  49:11 53:18<br>  56:19 59:19<br>  60:13,21 67:12<br>  67:13 73:18<br>  79:19<br>**makes** 9:6 22:8<br>  71:5<br>**making** 64:3<br>  85:17<br>**manage** 35:3<br>  49:2,2<br>**managed** 50:16<br>  50:16<br>**managing**<br>  34:17<br>**manner** 6:1<br>  83:16<br>**mark** 73:19,20<br>  82:8 96:22<br>**marked** 60:14<br>  65:11,12 73:4<br>  73:5,22 74:7 | 74:14 77:10<br>82:21 84:19,24<br>85:1 88:13<br>89:8,9,16,18<br>92:7,9,17 93:8<br>93:10,22,23<br>94:23 95:1<br>97:1,20<br>**marketing** 9:16<br>  10:18 25:10<br>**marsha** 89:5<br>**martin** 75:7<br>**master's** 13:18<br>  14:9<br>**masters** 14:18<br>**match** 107:4<br>**math** 14:20<br>  26:9 40:4<br>**matter** 5:9 33:3<br>  34:10 38:4<br>  42:13,20,21<br>  60:17 69:14<br>  98:20<br>**mean** 12:8<br>  13:11 27:12<br>  28:2,6 32:22<br>  37:23 38:14<br>  43:7 53:18<br>  59:15 61:20<br>  79:15 80:6,9<br>  87:15 98:22<br>  100:12 101:9<br>  103:15,19 | **means** 6:2<br>  16:15 26:10<br>  56:3 70:11<br>  91:10 105:12<br>**meant** 61:3<br>  106:21<br>**media** 61:20<br>  63:9 65:20<br>  92:22<br>**meet** 28:3,15<br>  32:4 75:8<br>  106:3<br>**meeting** 3:22<br>  4:5 35:8,10,15<br>  35:19 49:5,6,7<br>  49:11 50:12<br>  81:2 89:13<br>  92:17 107:9<br>**meetings** 35:20<br>  76:12<br>**member** 11:23<br>  18:10 21:16<br>  24:2 40:13<br>  43:15 48:17<br>  51:9,14 54:14<br>  54:15,23,24<br>  56:13 57:22<br>  76:23 109:3<br>**member's** 83:9<br>  83:11<br>**members** 41:8<br>  43:7,7 47:24<br>  75:2,22,23<br>  76:7,19 | **memo** 80:23<br>**memorandum**<br>  3:15 78:3<br>**mentally**<br>  100:16<br>**mention** 46:6<br>  62:10,19<br>**mentioned** 20:1<br>  37:24 39:3<br>  46:5 61:11,24<br>  62:1 64:23<br>  66:14 70:12<br>**mentions** 79:24<br>  80:1<br>**message** 54:8<br>  68:2,2<br>**messages** 68:21<br>  69:10<br>**messaging**<br>  61:21<br>**met** 21:9<br>**metal** 49:15<br>**michael** 2:13<br>  6:8<br>**michigan** 8:11<br>**microphone**<br>  49:24<br>**midstream**<br>  16:16<br>**mike** 2:22<br>  33:11 60:16<br>  74:10<br>**mike.fitzgerald**<br>  2:17 |

**mind** 45:4
**mindful** 75:17
**minutes** 33:22
  35:8 67:6
**misconduct**
  101:20
**misrepresent**
  29:3
**mission** 11:20
  85:7,13
**mississippi**
  18:3,9
**misunderstan...**
  81:6
**mitchell** 33:17
  33:18
**mixed** 40:23
**modal** 57:14
**model** 14:23
**moment** 42:3
**monday** 62:7
  89:13
**months** 18:14
  24:1 53:2
  62:15 95:18
**moral** 54:12
  85:18 87:19
  88:4,5,10
**morals** 88:6
**morning** 5:2
  7:10,11,12
  38:21
**motivation**
  82:1

**mourning** 68:1
**multiple** 30:24
  60:22
**mundane** 76:13
**murky** 41:24
**muslims** 44:11
  45:11

**n**

**n** 2:1 3:1 5:1
**name** 5:2,7 6:8
  7:14 32:17
  33:18 36:16,17
  36:19,20 38:21
  38:24 62:23
  85:14
**named** 50:17
  51:11
**names** 36:16,17
  36:19,20 38:16
**nashville** 2:6
  76:16
**nay** 22:9
**need** 8:15,19,20
  10:5 21:8
  28:12 55:18
  78:15
**needs** 12:8
  15:23 33:21,23
**negatively** 71:7
**negotiate** 15:16
**neither** 110:11
  111:7

**neutral** 41:18
  86:6,7 87:13
  87:15
**neutrality**
  85:17 86:23
**never** 31:18,20
  58:6,7 61:24
  62:1,3 69:8
  99:24
**new** 10:18
  74:17 75:14
**news** 4:3,12
  89:22 95:4,7
**nice** 20:1 29:20
**night** 18:11
**nine** 24:1
**noble** 1:10,15
  2:12 3:16 5:8,8
  5:12 6:11,20
  6:20 7:2,10
**non** 11:15,17
  20:21 21:11,21
  22:4 31:13
**normally** 14:2
  19:3 34:2
**norms** 102:8
**north** 8:10
**notch** 20:12
**november** 35:9
  46:8 50:12
  88:16 89:13,21
  90:4 97:7
  107:9

**npr** 4:15 97:6
**number** 57:14
  69:20 75:1
  79:3,4

**o**

**o** 5:1
**oaths** 5:16
**object** 45:12
  46:16 53:20
  72:6 97:22
  104:22,24
  106:7
**objected** 105:2
**objection** 5:17
  6:22 72:18
  75:20
**objective** 43:21
**obviously** 14:1
  46:19 92:11
**occasion** 51:19
**occasionally**
  31:9 76:12
**occurs** 42:2
**october** 3:15
  23:18,18 46:8
  78:3 80:24
  92:17
**offensive** 104:6
**offer** 36:8
**office** 6:9 75:10
**officer** 22:6,10
  106:22 110:1,2

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 129 of 146
PageID #: 562

**official** 1:11
5:12 31:8
**oh** 11:6 17:10
82:12 99:1
**okay** 7:18,22
8:2,9,17,24
10:21 11:3
14:22 17:11,11
17:18 18:1
19:15 22:13,19
22:22 24:10
28:18,21 29:13
29:15 30:11
31:13,18 33:12
33:24 34:2,5,8
38:3,19 40:7
44:24 45:15
46:14,14 47:10
47:12 50:10,21
51:6 53:22
55:15,20,20
56:8 58:19
59:11,15 60:7
60:10,13 61:18
61:24 64:24
65:10 66:3
67:15 69:19
71:4,9,15,18,21
73:12,18 74:6
75:20 76:22
77:4,5,8 78:7
80:22 82:8,18
83:7,14 84:3
84:23 87:8,12

88:12,24 89:7
90:21 92:4,7
93:5,7,21 94:5
94:10,15,22
95:7 96:11,16
97:18 99:9,12
99:15,17 100:1
101:17,19
**old** 59:22
**once** 7:17 19:15
25:1
**one's** 42:20
**ones** 23:5
**ongoing** 81:19
**open** 35:20,21
49:12
**operating** 64:8
**operations**
108:17
**opinion** 39:6,10
39:16 40:22
41:17 51:24
52:4 63:13
68:8 70:24
71:1 83:9
87:13 105:6
109:13
**opinions** 34:12
34:13 35:5,23
36:1 38:9
86:21 101:14
**opportunity**
16:19 81:18

**oppose** 107:6
**opposed** 107:9
**opposing** 36:2
36:3,4 47:12
65:1 92:12
**organization**
55:21 59:9
**organized**
69:12
**originally** 8:10
**outcome**
110:16 111:12
**outrage** 103:4
**outside** 23:11
23:12 27:10
35:19 41:23
56:24 59:5,6
61:19 98:11
107:2
**overlap** 60:18
**overwhelmin...**
107:6,10
**own** 21:17 86:2
**owning** 64:19

**p**

**p** 2:1,1 5:1
**pack** 20:6
**package** 12:14
**page** 3:2,6 4:2
18:12 24:23
25:2,3 44:21
44:21 59:15
74:17,18 80:22

83:8 90:21
92:19 93:17
**pages** 15:23
17:5,13 79:5
**panter** 33:18
**paper** 23:5 25:4
25:4,21,23
26:2,4,6,7 53:5
**papers** 25:16
27:19
**paragraph**
44:22 47:21,21
83:15
**paralegal** 2:22
6:12
**parent** 41:2,14
72:21
**part** 48:22
49:19 55:17
67:8 87:5,10
102:24
**particular** 29:4
57:19
**particularly**
24:17 43:5
**parties** 5:18
110:12,14
111:8,11
**partisan** 53:7
**party** 7:22
**pass** 16:6
**passed** 90:4,17
**passing** 18:18
39:6

Page 19

www.veritext.com Veritext Legal Solutions 800-556-8974
Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 130 of 146
PageID #: 563

| | | | |
|---|---|---|---|
| **past** 30:18 | **perfect** 26:15 | **phd** 12:1 13:19 | 73:4,21 74:6 |
| 32:14,15,18 | **perform** 100:20 | 13:24 14:11,12 | 84:18 88:13 |
| 59:2,13 60:2 | **performance** | 14:16,24 15:6 | 89:8 92:8 |
| 69:5 104:3 | 57:9 | 15:12 16:12,21 | 97:19 |
| **path** 9:23 | **period** 12:3,12 | 17:19,24 19:16 | **pllc** 2:4 |
| **pay** 107:3,3 | **periodically** | 22:20,23 | **plowman** 1:9 |
| **paying** 95:13 | 75:8 | **philosophy** | 2:11 5:11 63:3 |
| 95:14 | **permitted** 5:22 | 3:18 85:5 | **podium** 49:24 |
| **penalty** 4:13 | **person** 10:12 | **phone** 31:16,19 | **point** 9:20 13:8 |
| 95:8 | 21:7 22:11,15 | 31:23 32:9 | 16:6 17:2 |
| **pendleton** 2:24 | 27:4 28:5 | 34:3 61:5,9,9 | 52:21 84:11,11 |
| 6:14 | 30:22 32:16 | 62:24 | **pointed** 86:21 |
| **people** 9:3 10:3 | 39:19 42:15 | **phones** 31:14 | **points** 28:12 |
| 12:22 13:5,17 | 43:6 44:5,7 | **phrase** 30:23 | 107:1 |
| 14:9 22:2 | 45:7 61:5,8,14 | 52:18 55:17 | **polarization** |
| 23:11 33:2,6 | 61:15 68:13 | 63:5,7 | 68:18 |
| 35:19,23 36:20 | 69:1 | **phrased** 108:2 | **policies** 57:10 |
| 37:13,24 38:2 | **personal** 1:11 | **physically** | 106:4 |
| 38:14,15,21,24 | 5:12 31:11 | 18:15 100:14 | **policy** 4:9 94:6 |
| 39:2,3 41:5,10 | 83:23 91:19 | 100:16 | **political** 10:22 |
| 42:22,23 43:16 | 92:1 98:5 | **picking** 25:22 | 42:19 43:6 |
| 49:2,12,21 | 102:22 | **pike** 2:5 | 68:19 85:18 |
| 50:1,5,8 52:9 | **personally** | **pipeline** 26:12 | 87:19 89:1 |
| 56:6,20 61:5 | 51:15 76:18 | **place** 20:7 | **politicians** 42:6 |
| 61:19 62:3,16 | 105:1 | 49:18 88:18 | 42:8,11 43:3 |
| 63:15 64:17,18 | **personnel** | **placed** 104:23 | 89:1 |
| 67:11,12,18,23 | 78:11 | **plaintiff** 1:6 2:2 | **poll** 38:10 |
| 68:18,24 69:1 | **perspective** | 2:21 6:17 | **portfolio** 15:7 |
| 71:6 74:17 | 41:19 42:13,21 | **plaintiff's** | **portion** 56:2 |
| 75:9 103:7,24 | 52:1 | 60:20 | 99:1 |
| **people's** 101:14 | **pertains** 85:22 | **platform** 61:19 | **pose** 97:23 |
| **percent** 25:16 | **petition** 4:7 | **please** 5:7 6:6 | **position** 9:13 |
| 25:16 105:21 | 88:17 | 6:24 11:12 | 9:15 16:21 |
| | | 65:11 67:22 | 60:7 83:4 |

www.veritext.com    Veritext Legal Solutions    800-556-8974

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 131 of 146
PageID #: 564

| | | | |
|---|---|---|---|
| 90:19 104:14 | 46:5,9,17 | **private** 36:17 | 24:5,14 25:7,8 |
| **positions** 89:1 | 48:15,18 49:1 | 89:23 92:22 | 25:20 26:8,13 |
| 89:1 | 50:22 52:6 | **privy** 29:14 | 27:7 28:9 |
| **possible** 49:22 | 54:1 56:4,17 | 104:15 | 34:18 35:3 |
| **post** 3:10,12 | 58:14 62:2 | **pro** 34:14 | 36:5,9 50:16 |
| 67:11,12,15 | 64:17,22 73:15 | 87:23 | 57:7,20,21 |
| 68:8 71:10 | 74:1,19 75:8 | **probably** 13:18 | 58:3,4,6,9 |
| 73:15 97:8,15 | 87:2 94:16 | 17:1 20:7 | 64:14 103:9,11 |
| **posted** 98:9 | 106:20 | 23:15 27:13 | 103:13 105:1,9 |
| **posts** 89:2 | **president's** | 43:10 57:14 | 105:11,14,16 |
| **potential** 81:6 | 97:15 | 66:7 76:4 | 105:19,23 |
| **potentially** | **press** 35:21,22 | 85:21 | 106:1,2,6,12,16 |
| 49:7 | 51:17 52:10 | **probationary** | 108:10 |
| **powell** 34:4 | 66:6,7,14 86:4 | 12:3,12 | **processes** 49:2 |
| **power** 28:11 | 87:1,21 89:5 | **problem** 51:9 | 50:17 105:20 |
| 49:10 78:23 | 95:22 102:23 | **procedural** | **produced** 5:20 |
| 80:6 94:11,13 | **presses** 89:22 | 5:23 34:24 | **products** 10:18 |
| 94:15,19 | **prestigious** | 79:15 | **prof** 4:13 95:8 |
| **powers** 65:5 | 27:4 37:3 | **procedurally** | **professional** |
| **praising** 108:20 | **pretty** 8:4 10:7 | 35:2 | 12:11 91:19 |
| **precursor** | 25:11 41:12 | **procedures** | **professor** 9:14 |
| 78:24 | 92:21 | 57:10 80:1,14 | 18:6,7 21:1 |
| **premise** 64:7 | **principal** 85:7 | **proceed** 7:7 | 37:3,11 38:7 |
| **prepared** 81:1 | **principle** 85:16 | **proceeding** 5:4 | 38:17 39:8 |
| 111:3 | 90:14 | 5:21 109:24 | 40:8,17 52:14 |
| **prerogative** | **principles** 4:9 | 111:4 | 55:16 56:11,23 |
| 63:17 | 83:8 94:6 | **proceedings** | 63:7 65:20 |
| **present** 2:20 | **printed** 3:13 | 32:7 63:6 | 83:20 95:24,24 |
| 16:1,2 41:17 | **printout** 3:10 | 110:3,5,6,9 | 96:16 108:19 |
| 107:8 | 3:12,14 | 111:6 | 108:22 |
| **president** 9:17 | **prior** 28:19 | **process** 11:7 | **professor's** |
| 9:21 32:3,13 | 43:12 69:5 | 12:2,19 16:6 | 89:23 |
| 32:13,14,14,15 | 110:5 | 21:16,23 22:7 | **professors** 12:9 |
| 32:17,19 43:9 | | 23:1,10,20 | 38:5 58:21 |

www.veritext.com Veritext Legal Solutions 800-556-8974

**profile** 3:13
74:2
**program** 13:15
13:19 15:12
16:13 18:22
19:5,9
**programs**
13:16,20
**project** 15:16
**promise** 38:20
40:6,8 74:10
79:19
**promoting**
46:11
**promotion** 57:8
57:18
**prompting**
74:17
**propose** 34:22
**protections**
105:10,11
107:12
**protest** 88:16
95:23
**protesters**
96:12
**protesting** 79:2
**protests** 88:18
88:22
**proud** 70:15
**provide** 20:15
**provided** 81:5
99:17 100:2,4
100:5,7,9,17,19

100:22 101:1,4
**providing** 22:3
90:6
**provost** 12:21
22:6,11,12
23:21,23 28:4
28:10 81:1,5
81:12 106:22
**psychopath**
72:1
**public** 35:21
101:12 109:3
**publications**
10:16 24:22
**publicly** 89:23
90:5 99:3,4
**publishing**
29:19
**punished** 109:4
**pursue** 38:9
**pursuing** 62:9
79:22
**pursuit** 85:8
**put** 23:16
**putting** 90:20

**q**

**qualifications**
29:8
**qualified** 110:7
**quality** 29:19
29:22 30:16
**quantity** 30:16

**queer** 29:5
**question** 8:8
9:5 28:7 31:22
43:3 45:15
46:22 70:18
76:13 79:21
80:5,5 92:19
92:24 95:20
106:8
**questions** 8:23
46:17 64:4
79:4,6,8,12,12
79:13,16 80:11
80:14 81:2,22
81:24 97:5
98:2 109:18
**quick** 8:12
37:12 73:10
75:12
**quicker** 88:1
**quickly** 10:8
**quiet** 49:18
**quite** 12:8 89:5
**quorum** 107:8
**quotations**
69:20
**quote** 44:23
52:11,13,16
53:5 66:20
70:6
**quoted** 51:19
89:5
**quotes** 69:23
70:3,19,22

**r**

**r** 2:1 5:1
**race** 71:7
**rachel** 34:4
**raise** 6:24
**rally** 46:9
**randy** 1:9 2:11
3:12,13 5:11
**rang** 62:24
**rare** 42:17
**rarely** 83:16
**rate** 25:15
**rbigelow** 2:7
**reach** 51:12
**reached** 10:13
**react** 63:15
**read** 10:15
44:21 52:12
55:2 67:21
69:13,18,18
71:13 79:11
81:10 95:17
98:6 102:23,23
109:6
**reading** 44:17
45:4
**reaffirm** 90:5
**real** 7:20 8:1
78:23
**really** 9:7,7
10:24 11:2
13:6 15:9
19:10 22:7,8

www.veritext.com          Veritext Legal Solutions          800-556-8974

29:21 35:21
39:6 41:23
42:3 52:20
53:10 64:19
69:11 70:2
79:13,20 84:9
90:15 91:9
95:12,13,19
107:1
**reason** 10:11
28:2 30:3 60:5
62:13 81:20
**reasonably**
53:13
**reasons** 103:17
**recall** 31:16
40:10 62:1
66:20,24 67:1
99:13
**receive** 102:22
106:1,6
**received** 23:7
92:14 105:18
106:19
**recent** 95:18,18
**recently** 26:7
**recognize**
47:16
**recommendat...**
23:13,23
**record** 5:4,5,18
6:6 22:14
77:18,21,22,24
92:11 109:21

110:9 111:5
**recorded** 6:1
110:6
**recording** 5:20
110:8 111:4
**recuse** 56:16
**reduced** 110:7
**reference** 73:20
76:4
**referencing**
64:8 76:17
**referendum**
20:21
**referring** 59:22
**reflect** 92:12
**reflecting**
53:10
**refrain** 85:17
**refraining**
87:18
**refused** 100:20
**refusing** 100:23
**regarding**
57:18 76:20
**regards** 30:19
31:6 32:10
34:9 57:7 60:8
77:2 88:19
89:2 97:16
99:18
**regular** 10:6
**regularly** 11:1
**reiner** 97:8,16

**reinstate** 4:8
88:17 93:14
**rejecting** 25:21
**rejection** 25:15
**relate** 30:16
**related** 29:5
110:11 111:7
**relative** 110:13
111:10
**relegated** 56:15
**relevance**
45:13 46:18,22
46:24 97:23
**relevant** 30:17
85:23
**religious** 10:22
85:18 87:19
**remaining** 86:5
86:7
**remains** 104:13
**remember** 11:8
37:9,10,21
79:13 93:1
**repeat** 107:22
**repeats** 21:15
**report** 99:18,20
99:22,24
**reported** 1:21
**reporter** 5:2,3
5:9 6:21 7:6
65:15 77:7,12
77:15,19 82:10
82:14 84:18
110:18

**reporter's** 9:7
**reports** 94:17
**reprehensible**
40:12,16
**represent** 7:15
48:7 51:4,8
53:15,19,22
54:2,18 55:18
56:5,6 74:21
86:15
**representation**
9:24 91:1
**representatives**
74:20
**represented**
48:21,24 50:7
**representing**
55:5,10 56:2
86:19
**represents**
54:23
**request** 80:23
80:24 81:4
**requesting** 90:4
**requests** 51:18
81:13
**requirements**
13:16
**requires** 9:24
**rescinded**
107:11
**research** 11:22
12:6 15:10,16
15:21 19:10

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 134 of 146
PageID #: 567

21:10 24:16,18
25:4 27:10
28:3,14,21,23
29:15,22 30:15
57:24 85:9
99:12,14
**researcher**
103:15
**resolution** 32:7
34:22 50:14
78:24 90:4,17
90:20,21 105:2
105:15 108:8
109:11
**respect** 91:14
**respond** 81:1
**responded**
81:13
**response** 71:10
83:22 93:2
**responses** 81:5
**restroom** 8:15
**resubmit** 26:2
**retained** 12:23
12:24 13:4
**revert** 83:22
**review** 25:8
26:2 27:19
**reviewers**
25:22,22
**reviews** 23:7
57:9
**rhetorical**
79:16

**right** 6:7,24
12:4 17:21,21
21:23 39:12
42:19 44:9
45:8 57:5 61:5
80:4 82:24
83:7,15 94:2
96:4
**rights** 89:24
**ring** 23:4
**rob** 6:18 7:14
44:17 73:7
97:8
**robert** 2:3
**role** 10:12 56:9
56:12,13 95:12
**room** 44:1
**roughed** 46:10
**roughly** 11:13
**roundabout**
14:20
**roundabouts**
17:13
**rounds** 26:4
**rules** 5:24 8:4,4
50:1 84:8
**run** 54:1 95:9
96:8,13
**ryan** 34:6

**s**

**s** 2:1 3:5 4:1 5:1
**sad** 72:22

**safe** 49:12
**safety** 49:14
**saw** 29:17,20
41:7 66:7 89:4
99:15
**saying** 21:5
33:2 35:13
43:14,22 50:7
53:6 55:12,17
55:24 68:14
70:16 84:3
105:24
**says** 21:22
28:11 47:13,20
47:22 48:3,7
54:18 57:4
59:17 68:23
69:4 74:18
75:23 79:21,24
83:1,8,13,15,19
85:5,7,13,19
90:21 92:21
93:14,16 97:8
**scholars** 23:13
**school** 14:3
16:21,24 27:4
56:1,6 90:6
**schools** 24:4
**sciences** 15:9
24:20,21
**scientific** 38:11
103:17
**scoring** 28:11

**screen** 65:19
66:7
**second** 8:7
74:18 77:18
83:8,14 90:21
92:19
**section** 79:23
**sections** 80:2
**secular** 68:5
**security** 13:7
49:18
**see** 33:17 35:7
35:8 42:1,9,17
45:22 48:5
51:14 59:16
66:10 68:17
75:4 77:13
79:10 83:1
89:6 90:1 93:4
97:17
**seem** 98:18
**seems** 44:13
67:16 98:13
**seen** 34:23
49:23 50:15
52:11 62:23
65:2 66:3,12
66:13,17,24
101:12,17
**self** 96:3
**senate** 3:7,9,14
3:22 4:5 9:18
9:22,24 30:8
32:3,12 34:16

Page 24

www.veritext.com Veritext Legal Solutions 800-556-8974
Case 3:25-cv-00528-KAC-JEM Document 44 Filed 01/21/26 Page 135 of 146
PageID #: 568

34:21 35:3,19
35:20 47:13,19
48:12,13 49:1
49:5 52:1,5,7
53:11,12,23
54:1,8,15
55:21 56:5,18
58:14 59:9,12
65:6,8 74:19
74:21 75:2,22
76:7,23 78:9
78:22 79:1
80:23 81:8,19
86:10,14,16,20
87:2 89:13
90:3 92:17
102:4,7,10,13
103:4,19 104:2
104:11 105:2
105:16 106:20
107:6,8,11
**senate's** 60:4
**senator** 10:7
48:4,11
**senators** 55:7,9
**send** 25:4 54:8
**senior** 20:13,24
21:18 82:1
**sense** 31:20
40:16 63:11
80:8
**sensibilities**
68:5

**sentence** 39:16
39:17,22 55:12
55:20
**sentinel** 4:3,12
**september**
23:16 35:9
49:4 62:6 69:5
**serve** 10:3,5
27:17,18 54:12
83:12
**served** 10:6
**serves** 74:19
**service** 18:9
27:13,15 85:10
**serving** 9:17
27:15 76:15
**set** 49:23
**setting** 35:24
50:4,6
**seven** 11:18
13:21 14:13
26:7 77:7,8
82:10,11
**seventh** 13:2
**several** 7:20
51:18
**share** 40:23
81:20 91:13
93:3
**shared** 47:22
81:7
**sharinian**
54:24

**she'd** 64:18
**shiridian**
107:13
**shiridian's**
107:7
**shirinian** 1:5
2:2,21 4:8 5:10
6:16,16,19
7:15 28:18
30:20 31:15
32:10 33:3
39:3 40:17
47:1 48:22
52:14 54:12
58:4 60:8
61:15,19 62:4
63:7 66:10
67:4 69:17
71:9 72:15
76:20 77:2
78:11 79:22
83:20 88:17,19
92:5,5 93:14
98:19 99:6,19
100:10,20
101:8,20,23
102:5,8,14
104:13,22
105:18 107:24
**shirinian's**
53:16 65:20
67:4 89:2 98:4
100:3,6 102:18
103:8 108:11

108:16 109:14
**short** 64:1
**shortly** 51:22
**show** 44:18,22
62:23 70:20
**shows** 71:12
**side** 18:11
24:18 25:14
53:2
**sides** 42:9 88:3
**signal** 61:21
**signature**
109:22 110:16
111:13
**signatures**
93:16
**signed** 50:21
84:8
**significant**
27:23
**similar** 109:8
**simple** 8:4
106:18
**simply** 96:8
104:6
**single** 51:9
**sir** 5:7 9:11
36:19 40:5,21
48:5 52:10
61:3 65:4,18
70:24 78:2
83:1 84:21
89:14 90:1
92:17 93:13

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 136 of 146
PageID #: 569

94:5 95:5
97:10
**sit** 28:22
**situation** 21:13
51:14 52:1
79:2 91:14
96:4
**situations** 27:3
42:24
**six** 62:15 94:14
**sixth** 12:18,19
**skills** 110:10
111:6
**skim** 79:11
**slicing** 45:21
**slow** 8:13
**social** 10:21
11:1 15:9
24:20 61:20
63:9 65:20
92:22
**societal** 68:10
**society** 52:18
53:8
**soliciting** 23:11
**solve** 79:14
**someone's**
43:22
**somewhat**
83:24 94:9
95:6
**soon** 41:4 44:10
45:10

**sorry** 17:10
22:15 26:14
33:24 45:3
46:8 51:1,2
52:21 54:22
66:18 69:15
70:11 75:16
77:4,12 82:13
86:16 87:24
89:3 93:1,6
95:20 97:7,13
100:11 107:21
**sort** 11:2,24
13:18 15:19
49:17 53:7
57:1 62:21
68:18 88:21
107:12
**space** 78:20
**speach** 93:14
**speak** 8:11 15:8
18:11 24:19
30:13 50:2
51:17 75:23
81:16,24 91:5
**speaking** 11:13
53:11 76:23
85:14 86:8,9
86:10 87:8,10
**specific** 27:8
29:18 38:16
52:15 59:21
78:10 80:13
85:22

**specifically**
21:18 37:9
55:10 64:23
73:1 99:6
**spectrum** 57:3
88:3
**speculative**
44:14,15
**speech** 4:10
41:22 52:19,23
86:5 88:2
89:24 90:6,11
90:13,23 94:7
100:3,6 101:2
101:5 104:3,6
104:10 107:15
108:16,24
**spend** 54:5
**spirit** 54:8
86:22 91:15
**spoke** 39:11,11
52:5 64:21
87:1
**spoken** 31:18
31:23 32:9
33:2,7,10
36:12 38:22
39:1,2 62:3,5
67:3 76:19
82:5
**spokesperson**
52:7
**spouse** 20:4

**springs** 10:10
**staff** 90:23
**stand** 68:13
84:15
**standard** 80:1
**standards** 21:9
24:15 28:4,15
28:16
**standing** 49:24
**stands** 16:13
**start** 19:3
23:15 60:19
73:9
**started** 18:14
**starts** 12:20
20:10 23:10
67:17
**state** 5:7 17:24
18:3,9,24
86:19 110:19
**stated** 44:23
46:6 99:3
**statement** 54:7
55:3 83:3 86:3
87:20 90:6
91:7 93:18
**statements**
3:19 85:6,17
87:18
**states** 1:1 44:22
80:22 90:3
109:3
**status** 105:3

stclair 111:2,15
stein 44:22
stenographic 6:2
step 23:20 24:24
stephen 2:24 6:14
steps 58:11
stinett 34:6
stipulation 6:3
straight 13:17
straightaway 27:6
stranger 41:12
strength 91:1
stressful 19:23 19:24 20:8 22:20 24:14 25:7,18 26:13
strident 41:17
strong 34:12 35:5 54:11
strongly 21:7
student 19:11 25:1 27:18 41:11 90:23
students 4:10 35:18 41:3,3 94:7 98:16 102:2
studied 69:11
studies 29:4,5

study 58:10,17 70:1,22
studying 15:11 15:20
stuff 23:7
stupid 44:11 45:10
subjective 43:20 107:10
submit 23:2,8 23:19 25:16
submitting 12:14
substantiated 101:7,10
sue 7:24
sufficient 99:4
suggest 73:7
suggested 46:9 60:23
suite 2:15
summer 18:14
summit 1:19 2:15
superficial 31:24
superstar 21:7
support 21:7 54:3,4 57:2 70:16
supported 37:4 47:7
supporting 50:20

supports 43:15
suppose 28:6 71:5 74:2
supposed 58:15
sure 5:8 9:10 9:19 11:12 15:1 17:17 20:22 25:13 35:13,13 36:7 41:1 44:19,21 49:11 51:6 59:21,22 65:2 69:18 75:21 76:5 91:9 98:9 99:20 105:11
surprised 103:10,12,14
surrounding 53:2
survey 38:11 103:16
suspended 107:3
suspension 63:6
swear 6:22
sweeping 26:22
sworn 5:18 7:3 110:5
syndrome 97:8
synonymous 31:1,8
system 28:11 75:5 86:17

94:13

**t**

t 3:5 4:1
take 5:4,15 8:16,18,19 11:6 13:17 16:20,21,24 18:20 19:2 25:2,7 26:6 38:10,10 79:20 87:21 99:9
taken 5:9 64:17 110:3,12 111:9
takes 14:10
talk 11:9 52:18 62:17 75:10 77:3
talked 20:9 57:20 61:3,7 70:7 88:1
talking 14:15 14:19 19:16 23:17 35:1 38:2 62:2 69:15
tall 44:8,9 45:8 45:9
tamar 1:5 2:2 2:21 4:8 5:10 6:16 93:14
taught 18:8 102:2

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 138 of 146    PageID #: 571

| | | | |
|---|---|---|---|
| **teach** 11:18 | **ten** 24:1 73:9 | **tenured** 9:15 | 78:19 |
| 83:21 84:5,14 | **tend** 42:16 | 12:9 17:2 | **things** 9:4 10:8 |
| 85:23 100:10 | 56:10,15 | 27:16 | 12:10 13:9 |
| 100:13,14,15 | **tendency** 8:11 | **term** 9:17 | 15:7,20 16:18 |
| 100:16 101:8 | 9:4 | 32:12 | 18:10,18 23:19 |
| 101:13 102:11 | **tends** 55:4 | **terminal** 11:24 | 25:14,23 27:14 |
| 104:18 | **tenn** 4:13 | 13:1,10 19:15 | 27:18,20 29:17 |
| **teaching** 11:18 | **tennessee** 1:2,8 | **terminate** 66:9 | 37:17,24 41:6 |
| 11:22 12:6 | 2:10,14 5:10 | **termination** | 41:8,22 42:7 |
| 19:11 21:10 | 5:14,16 6:10 | 35:17 58:8 | 42:12,18 43:4 |
| 23:6 24:16 | 6:13 9:12 | 63:5 64:13 | 43:10,16,19,21 |
| 27:11 28:3,14 | 40:13 41:4 | 66:9 79:22 | 45:22 46:3,6 |
| 28:22 29:7 | 84:7 85:8 86:9 | 106:20 107:5,7 | 47:8 49:9 |
| 58:1 85:9,22 | 86:18 87:3 | **terms** 21:21 | 56:16 59:23 |
| 98:12 | 89:23 95:8,23 | 22:9 38:16 | 67:12 70:16 |
| **team** 10:11 | 96:20 103:6 | 41:21 42:4 | 78:23 80:15 |
| 32:4,11,16 | 105:14 110:19 | 43:6 50:1 | 82:4 86:23 |
| 33:11,12 52:9 | **tennessee.edu** | 54:10 58:10 | 89:4 91:22 |
| 61:11 80:16 | 2:17 31:2 | 64:7,8 76:15 | 96:4 104:11 |
| **technical** 55:11 | **tenor** 52:17 | 82:1 107:2 | 109:6 |
| 106:24 | **tenure** 11:4,5,7 | **terrible** 33:19 | **think** 14:8,21 |
| **technically** | 11:9,15,15,17 | **test** 8:21 | 18:4 21:9 23:9 |
| 18:5 23:22 | 11:21,23 12:14 | **testified** 7:5 8:5 | 24:10,19 26:7 |
| 27:12 28:6 | 12:14,15 13:6 | 47:1 | 30:17 31:2 |
| 55:3,17 | 13:8 18:6 | **testifying** 110:5 | 33:18 35:7,24 |
| **tell** 7:4,18 8:5,8 | 19:21,23 20:2 | **texted** 31:20 | 36:16 40:15,17 |
| 20:5 24:16 | 20:10,17 21:2 | **thank** 6:21,21 | 40:19,20 41:15 |
| 29:1 33:8 | 21:8 22:9,24 | 7:6 | 42:8,13,14,17 |
| 51:21 62:20 | 23:1,14 26:9 | **thanks** 7:13 | 42:20 43:9,11 |
| 83:24 | 26:10 27:5,6 | 39:18 | 43:19 45:19 |
| **temperature** | 27:23 28:12 | **thing** 10:19 | 46:1,7,14 |
| 52:17 53:7 | 57:8,18,22 | 25:2 32:2 | 54:11,12 58:21 |
| **temporary** 17:3 | 58:2 | 42:17 68:4 | 60:10 62:5,14 |
| | | 69:2 72:4 | 63:2 64:22 |

Case 3:25-cv-00528-KAC-JEM   Document 44   Filed 01/21/26   Page 139 of 146
PageID #: 572

66:6,14,17
67:8 68:14,17
70:13,19,22
71:21 72:19,20
77:15 78:15
82:12 84:9,14
86:20 88:8
90:10,10,14
92:3,21 98:20
104:17 105:13
106:11 108:13
108:14
**thinly** 45:22
**third** 61:13
93:17
**thought** 10:11
37:5 39:19
40:11 41:10
50:14 54:7
63:14,15 64:11
70:12 77:13
79:20
**thoughts** 40:21
**threatening**
96:3
**threats** 100:5,7
**three** 13:21
14:13 22:16
23:4,4 25:22
25:22 26:4
32:12,16 41:4
**throw** 44:8
45:7

**thumbs** 26:19
26:19 28:5
**time** 1:17 6:5
8:16 32:6,6
36:10 37:13
49:19 53:8
54:5 62:22
77:21,24 95:19
99:9,18 109:7
109:21
**times** 27:2
47:22 86:22
**tina** 2:22 6:12
**title** 9:14 95:8
**tn** 1:20 2:6,16
**today** 95:16
104:14,18
**together** 20:14
20:16,24 23:16
77:3
**told** 36:21 37:4
38:8 40:10
60:3 70:6
**ton** 29:21
**took** 18:3 26:12
88:18
**top** 25:9,11
47:13,20
**topic** 15:10
34:16
**topics** 85:18,23
87:19
**touched** 32:5

**towards** 41:9
**tower** 1:18 2:15
**town** 49:23
**track** 11:15,15
11:17,21,23
17:2 18:7
19:21,21 74:10
77:16 103:13
**tracked** 103:7
103:11
**tragic** 72:22
**transcriber**
111:1
**transcript** 5:20
111:3,5
**transcriptionist**
110:8
**transpired**
32:23
**treat** 103:4
**treated** 104:9
**treating** 68:4
69:2
**tremendous**
19:12 75:1
**trick** 8:21
38:20 40:5
**tried** 88:9
**trigger** 109:14
**true** 13:6 19:4
69:21 107:20
110:9 111:5
**trump** 46:5
97:7,8

**trump's** 97:15
**trust** 26:17
43:17 90:23
91:2
**trustees** 23:22
74:22 75:23,24
76:5,8,11,20,24
94:6,10,12,18
**truth** 7:4,4,5
8:6 83:24
**try** 11:10 12:7
51:14 57:2
**trying** 38:20
40:5 53:14
79:11,18,19
87:24
**turn** 83:7
**turned** 25:17
25:19
**tweet** 96:8
**tweeted** 95:9
**tweets** 96:12
**twisting** 10:2
**twists** 105:22
**two** 10:10
11:14 14:10
19:8 22:16
23:4 27:14
33:22 37:17
39:17,22 41:3
51:23 59:15
72:20,20 99:11
**typewriting**
110:7

Page 29

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 140 of 146
PageID #: 573

**typical** 9:23
24:20
**typically** 10:2,7
11:18,22,24
13:1 14:10
15:18 16:23
19:7 20:12
21:15 23:24
25:1 26:4
27:24 55:5

**u**

**ufc** 75:5
**uh** 9:4,4,4,8,8,8
17:6,9 54:20
61:6
**ultimately** 11:3
16:2 17:17
19:17 22:5,16
34:21
**unable** 100:10
100:11,12,13
**unconstitutio...**
105:5
**under** 5:23
79:23 80:4
83:4
**undergrad**
14:1,17
**undergraduate**
13:17 41:3
**undermined**
108:12,15

**understand**
5:19 8:7,14
21:21 22:6
26:21 27:1
29:2,22 30:12
30:22 56:20
57:2 64:2
67:11 94:12
96:1,6 106:12
106:19 107:1
**understanding**
29:7,9 56:22
95:10,21
**unequivocally**
91:10
**unfit** 84:4
102:11
**unfitness** 83:11
**unfortunate**
42:3
**unfortunately**
36:19
**unfriended**
67:23
**unfriending**
67:18
**unilaterally**
43:24
**unit** 85:15
**united** 1:1 4:7
88:16 93:18
109:3
**universally**
43:24

**university** 1:8
2:10,14 5:10
6:10,13 9:12
17:22,24 18:3
18:9 38:6
40:13 41:4
58:21 64:12
74:19 75:4
76:9 79:6,22
80:18 84:7
85:8,15,15,15
86:9,15,18
87:2,6,9,11
89:22 90:5,9
90:24 95:23
96:19 103:6
105:13 109:4
**university's**
57:9 90:24
**unprotected**
104:10 107:16
**unsure** 58:12
84:1,16
**unusual** 27:3
**use** 8:15 30:21
30:23 31:3,3,9
40:4 52:18
61:23 74:3
**used** 23:3 30:19
31:5,11,14
44:7 45:6 92:2
**username** 31:8
**uses** 5:22

**using** 31:16
**usually** 13:10
27:16 28:15
49:24 71:6
**ut** 1:18 2:15 3:7
4:13 5:13 41:7
94:13 95:8
98:16
**utk** 9:13 59:12
59:17,20 74:21
75:6 93:15
**utk.edu** 31:9
**utk.edu.** 30:21
31:4
**utterances** 83:4

**v**

**v** 1:7
**valid** 15:16
**values** 54:9,11
54:12
**varies** 19:5
**various** 9:24
59:4 75:2
**vary** 12:8 13:16
13:21 24:4,18
**vast** 36:1
**verbally** 61:4
**verbatim** 63:2
**veritext** 5:4
**versus** 91:21
**videographer**
2:24 6:14,15
77:20,23

Page 30

www.veritext.com
Veritext Legal Solutions
800-556-8974
Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 141 of 146
PageID #: 574

109:20

**videotaped**
1:15

**view** 42:20 43:3
80:20 83:23
88:4,5 93:3

**views** 68:15,19
68:20

**violated** 102:8

**violations** 57:7
57:9

**violence** 46:12
71:16,19,22
88:21 96:14

**visiting** 18:5

**vitriolic** 41:8

**vocalize** 78:20

**voice** 49:3 59:5

**volunteer**
55:21

**vote** 20:19,23
20:24 21:4
22:7 26:18,18
26:22,23 56:15
102:4 108:7

**votes** 23:21,23
56:16

**voting** 12:22
16:6 48:16,16
54:14,15,23
56:13

**vs** 5:10

**w**

**wait** 44:10 45:9

**waived** 109:22

**walk** 49:16

**want** 16:20
19:18 27:5
40:4 41:14
46:6 47:3,6
52:9 55:2,11
59:7 62:17
64:5 67:6,21
75:15

**wanted** 22:13
30:1 32:24
34:22

**way** 6:7 17:9
24:2 31:24
35:14 38:12,15
51:15 59:23
60:23 63:20
69:12 105:22
108:2

**ways** 88:8

**wbir** 51:20

**we've** 32:6
77:15 88:8

**wear** 56:10

**webpage** 3:14

**website** 60:5

**wednesday**
1:16

**week** 35:16

**weekend** 66:13
66:15 67:1

**weigh** 104:11
105:7

**weighing** 89:6

**weight** 80:10

**went** 18:15
19:1 39:19
49:20 95:21

**west** 1:19 2:15

**whatsapp**
61:21

**who've** 37:24

**widow** 44:2

**winks** 24:6

**wish** 53:6

**wishing** 45:23

**witness** 5:18,19
6:23 7:3 33:13
33:16,24 37:2
45:1,3,15
72:11,19 77:4
106:11 110:4

**word** 37:17
64:10,10 88:7
107:10

**worded** 108:5

**wording** 52:16

**words** 21:22
31:1 34:19

**work** 9:11
15:13 16:2
19:13 27:17
100:23

**workers** 4:7
88:16 93:19

**working** 16:15
18:12,17 50:19

**works** 31:2
38:6 57:11
96:19

**world** 41:18
42:10,17,19
56:24 71:24
78:21 91:21
95:15

**worlds** 91:21

**worried** 91:23
91:24

**worries** 56:22
91:13,16

**worry** 92:4

**worth** 19:8

**wow** 11:6

**wreck** 72:3

**wrecks** 72:5,12

**writ** 53:24

**write** 15:21
18:20 21:5
92:22

**writes** 71:9

**writing** 16:18
19:3 81:13

**written** 6:3
23:6 81:4 90:6

**wrong** 25:23
51:23 55:23
96:2,5

Page 31

Case 3:25-cv-00528-KAC-JEM    Document 44    Filed 01/21/26    Page 142 of 146
PageID #: 575

| | |
|---|---|
| **wrote** 17:4 82:16 | **years** 7:20 12:5 12:13 13:21 14:2,3,10,13,17 14:17,19 18:20 18:23,24 19:8 25:7 26:6,8 59:24 |

**x**

**x** 3:1,5,12,13 4:1 74:2,3 97:15

**years** 7:20 12:5
  12:13 13:21
  14:2,3,10,13,17
  14:17,19 18:20
  18:23,24 19:8
  25:7 26:6,8
  59:24
**yep** 22:15
  77:19
**yesterday**
  33:20

**y**

**yay** 22:8
**yeah** 9:2 14:14
  14:21,23 16:11
  17:14 19:5
  20:8 24:9,9,13
  26:14 28:13
  31:21 35:15
  38:1 39:2
  40:16 42:8
  44:3 47:17
  48:20 60:23
  62:18 63:23
  67:7,22 71:1
  71:11 73:3
  75:16 76:1,1
  85:19 94:3
  107:23
**year** 9:17 11:19
  12:5,18,19
  13:2,2 16:23
  16:24 18:8,18
  18:24 20:15
  30:18 32:12,14
  32:14,15 57:15
  69:5

**z**

**zero** 40:4
**zomchick** 81:1
  81:5,12 82:5
**zoom** 61:12,13

www.veritext.com    Veritext Legal Solutions    800-556-8974

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.