# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| TAMAR SHIRINIAN | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:25-cv-528 |
| | ) | |
| v. | ) | Judge Crytzer |
| | ) | Magistrate Judge McCook |
| DONDE PLOWMAN, | ) | |
| in her individual capacity | ) | |
| and in her official capacity | ) | JURY DEMAND |
| for prospective injunctive relief only, | ) | |
| RANDY BOYD, | ) | |
| CHARLES NOBLE, | ) | |
| RYAN STINNETT, | ) | |
| CYNTHIA MOORE, | ) | |
| JOHN C. COMPTON, | ) | |
| BRADFORD D. BOX, | ) | |
| WILLIAM E. HASLAM, | ) | |
| CHARLES HATCHER, | ) | |
| ANDREW H. HOLT, | ) | |
| DECOSTA E. JENKINS, | ) | |
| SHANEA A. MCKINNEY, | ) | |
| CHRISTOPHER L. PATTERSON | ) | |
| WILLIAM C. RHODES III, | ) | |
| DONALD J. SMITH, | ) | |
| DAVID WADE, | ) | |
| DAVID N. WATSON, | ) | |
| T. LANG WISEMAN, | ) | |
| JAMIE R. WOODSON, | ) | |
| CAREY WHITWORTH, | ) | |
| TISHA BENTON, | ) | |
| MELISSA TINDELL, and | ) | |
| MATTHEW M. SCOGGINS, III | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PROPOSED SECOND AMENDED COMPLAINT

---

## **INTRODUCTION**

1.      This action arises from the University of Tennessee's decision to remove a tenure-track professor from teaching and academic duties, place her on paid administrative leave, and initiate expedited termination proceedings because of off-duty, private speech on a matter of public concern. The adverse action was imposed within hours of political and donor pressure, without any contemporaneous safety assessment, threat evaluation, or evidence-based disruption analysis.

2.      This case is not about a mistake or a close call. It is about public-university officials and trustees choosing to impose discipline immediately following political and donor demands, without conducting any contemporaneous safety assessment, threat evaluation, or disruption analysis required by clearly established First Amendment law.  No Defendant has identified a single contemporaneous fact showing that Plaintiff's speech disrupted her classroom, threatened campus safety, or impaired University operations.

3.      Defendant Donde Plowman is sued in her individual capacity because sworn testimony and documents establish that she personally initiated, implemented, and continues to enforce the adverse actions against Plaintiff. She is sued in her official capacity for prospective injunctive relief only because she continues to exercise authority to maintain, rescind, or finalize those actions.

4.      All other Defendants are sued solely in their individual capacities for damages because, after receiving actual notice that Plaintiff's constitutional rights were being violated—or with reckless indifference to those rights—they knowingly ratified, prolonged, enabled, and affirmatively chose not to intervene to stop ongoing First Amendment and Due Process violations. Their liability arises from personal participation after notice, including deliberate indifference and affirmative facilitation of the continued enforcement of unconstitutional discipline.

2

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper in this District under 28 U.S.C. § 1391.

7.      At all relevant times, each Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983. Defendants exercised power possessed by virtue of state law and made possible only because they were clothed with the authority of state office, including authority over faculty discipline, employment status, governance oversight, and the enforcement of policy at a public university in the State of Tennessee.

8.      Although sued in their individual capacities, Defendants' actions were taken while exercising responsibilities and authority derived from their official positions at the University of Tennessee, a public university and arm of the State. Their conduct constituted action under color of state law even when undertaken informally, through calls, texts, silence, ratification, or failure to intervene.

## PARTIES

9.      Plaintiff Tamar Shirinian, Ph.D. is a tenure-track anthropology professor at the University of Tennessee, Knoxville ("UTK"). Dr. Shirinian has been placed on administrative leave with pay and removed from teaching and other significant academic duties pending termination proceedings.

10.      Plaintiff does not seek damages against the State of Tennessee or any arm of the State and seeks prospective injunctive relief only against Defendant Plowman in her official capacity.

3

11.    Defendant Donde Plowman is Chancellor of UTK. Defendant Boyd led the search of UTK's new Chancellor in 2019 and identified Plowman as the top candidate. Chancellor Plowman's appointment was confirmed by the UT Board of Trustees in May of 2019.

12.    Defendant Randy Boyd is President of the statewide University of Tennessee System ("UT"). He founded Radio Systems Corporation, a pet safety and pet care company, in 1991, and sold it to the private investment firm of Clayton, Dubilier, & Rice in 2020.

13.    Defendant Charles Noble is UTK Faculty Senate President.

14.    Defendant Ryan Stinnett is General Counsel for the University of Tennessee.

15.    Defendant Cynthia Moore is Secretary and Special Counsel to the UT Board of Trustees and principal staff liaison to the Board.

16.    Defendant John C. Compton, a UT graduate, is the former President of PepsiCo, Inc., and current Chair of the UT Board of Trustees. He joined one of the world's largest private investment firms, Clayton, Dubilier, & Rice ("CD&R"), in 2013, and is currently an Operating Partner at CD&R. In addition to being the Chair of the UT Board of Trustees, he also chairs numerous private companies, including TruGreen, Drive DeVilbiss Healthcare, and PetSafe Brands (a company formerly known as Radio Systems Corporation that was founded by Defendant Boyd).

17.    Defendants Box, Haslam, Hatcher, Holt, Jenkins, McKinney, Patterson, Rhodes, Smith, Wade, Watson, Wiseman, and Woodson are members of the UT Board of Trustees, with Defendant Holt replacing Defendant Hatcher on October 1, 2025.

18.    Defendant Carey Whitworth is UT's Vice President of Government Relations, Advocacy and Economic Development. She regularly works with elected officials to advance

4

University interests and often serves as spokesperson before the Tennessee General Assembly. She also serves as Secretary to the UT Commission on Agriculture.

19. Defendant Tisha Benton is UT's Vice Chancellor of Communications and Marketing. She is also a member of UT's Chancellor's Cabinet.

20. Defendant Melissa Tindell was appointed as Vice President for Communications and Marketing and approved by the Executive Committee of the UT Board of Trustees in January of 2026, after having previously served as the Interim.

21. Defendant Matthew M. Scoggins, III is Chancellor Plowman's Chief of Staff and former University of Tennessee General Counsel.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Protected Speech

22. On September 12, 2025, Plaintiff engaged in off-duty, private speech on a matter of public concern through a personal social-media comment expressing Plaintiff's viewpoint on a high-profile public figure, unrelated to her teaching, research, or university duties. The speech was not made pursuant to any official job duty or professional obligation. It did not threaten violence, incite unlawful action, or reference the University.

23. That same day, September 12, 2025, Defendant Plowman became aware of other UTK-related social-media speech about the same public individual by other UTK faculty members and students.

24. Until the evening of September 14, 2025, Defendant Plowman had no knowledge of Plaintiff's private Facebook comment.

5

25. Plaintiff's speech was protected by multiple, overlapping institutional safeguards, including the University of Tennessee Board of Trustees Policy Affirming Principles of Free Speech for Students and Faculty (BT0031), Section 2.1.3 ("Freedom as a Citizen") of the Faculty Handbook, and a Board of Trustees charged with enforcing constitutional compliance—each of which was rendered meaningless by Defendants' knowing inaction.

26. Defendants understood that disciplining a public-university faculty member for off-duty speech on a matter of public concern triggers First Amendment constraints and requires a fact-based assessment of disruption and institutional interests. Defendants nonetheless imposed and maintained the adverse action without conducting any contemporaneous investigation or documenting any workplace disruption attributable to Plaintiff.

### B. Political and Donor Pressure

27. In the evening of September 14, 2025, Board leadership and trustees became aware of Plaintiff's speech, after it was redistributed through third parties without the knowledge or blessing of Dr. Shirinian.

28. As of 8:31 p.m. on September 14, 2025, Defendant Plowman had received emails expressing concern about Plaintiff's comment.

29. At 8:54 p.m. on September 14, 2025, Tennessee State Representative Chris Todd, Chair of Tennessee's Agriculture and Natural Resources Committee, emailed a written demand to Defendant Whitworth calling for Plaintiff's termination based on the content of Plaintiff's viewpoint—explicitly referencing the word "viewpoint." Dr. Shirinian's viewpoint, made via a private Facebook comment responding to a friend's private Facebook post, was that the world was a better place without Charlie Kirk.

6

30. Whitworth's role is to interface with elected officials to advance University interests; the communication was therefore not an internal personnel concern, but an external political intervention routed through UT's government-relations apparatus.

31. At 9:35 p.m. that night, Defendant Tindell emailed Defendants Boyd, Stinnett, Scoggins, Plowman, Whitworth and Benton to notify them that she was "up to about 95 emails to my mtindell email address."

32. Around the same time, donors and politically connected individuals communicated displeasure with Plaintiff's viewpoint and threatened reputational and financial consequences if adverse action was not taken.

33. One donor threatened to withhold giving over ten million dollars ($10,000,000.00) if Plaintiff was not terminated.

### C. Coordinated Response, "Privilege" Labeling, and Record-Avoidance

34. At 5:47 a.m. on September 15, 2025, Whitworth forwarded Representative Todd's demand to General Counsel Stinnett, Chief of Staff Scoggins, Chancellor Plowman, and marketing/communications leadership (Benton and Tindell), expressly noting it was being sent to "Ryan, for continued legal evaluation."

35. At 8:22 a.m. on September 15, 2025, Boyd publicly accused Plaintiff—without investigation—of advocating violence and murder.

36. Boyd's accusation was false and made without any investigation or contemporaneous factual basis, and it predictably fueled third-party outrage that Defendants later attempted to impute to Plaintiff as "disruption."

7

37. At 9:14 a.m. on September 15, 2025, Boyd emailed all of the trustees individually (with the exception of Defendant Compton, who he has already spoken with) concerning draft responses, copied General Counsel Stinnett and senior administrators, and instructed trustees to "text him" to see social media responses and welcomed calls to discuss further.

38. At 9:16 a.m. on September 15, 2025, Boyd again emailed all of the individual trustees, attached materials, and wrote words to the effect of "If you would like to comment, please call rather than email."

39. Board Chair Compton admitted under oath that Boyd had not previously asked the entire Board to communicate by text in this manner and that one-on-one calls between the UT President and trustees do not require written minutes or contemporaneous notes.

40. On September 15, 2025, Board counsel Moore received a media inquiry seeking a statement on behalf of the Board and routed it to Boyd and Compton.

41. At 12:29 p.m., Defendant Compton responded that he would provide no written response.

42. Boyd instructed trustees to communicate by call or text rather than email; Compton testified such calls generated no minutes or written record; and Moore declined to issue a written Board response, resulting in no contemporaneous documentation of deliberations concerning discipline for Plaintiff's protected speech.

### D. The Adverse Action Imposed Without Investigation or Due Process

43. At approximately 12:59 p.m. on September 15, 2025—within hours of political demands and coordinated communications—Chancellor Plowman placed Plaintiff on administrative leave and initiated expedited termination proceedings.

8

44.     As a direct and foreseeable result of Defendants actions, Plaintiff lost eligibility for competitive grant cycles, conference participation, publication opportunities, and external academic placements; suffered interruption of her tenure timeline; and experienced reputational harm within the academic community that has materially diminished her future earning capacity and academic mobility.

45.     At no point before or after imposing the adverse action did Defendants conduct any contemporaneous safety assessment, threat evaluation, police consultation, faculty consultation, classroom review, or evidence-based disruption analysis attributable to Plaintiff's workplace conduct.

46.     On September 16, 2025, Plowman informed Plaintiff in writing of purported due process options. Plowman later testified that, with Defendant Stinnett's involvement, the options provided were not based on written Board policy known to faculty and instead reflected an ad hoc process. Defendant Noble ratified this course of action despite testifying that he recognized due process problems. Chancellor Plowman invited Dr. Shirinian to submit a written response.

47.     On September 22, 2025, Dr. Shirinian sent Chancellor Plowman a written response that noted, among other things, that she did not endorse violence and never has endorsed violence. Dr. Shirinian requested that Chancellor Plowman change her mind and allow her to return to the things that she loved:  scholarship and teaching students.  Dr. Shirinian noted that if she is not allowed to return, she would appeal that decision within the University and, if necessary, go to court to protect her First Amendment rights.  She added that it was her hope that such actions would not be necessary.

48.     As of February 10, 2026, Plaintiff still has not received a formal written decision from Chancellor Plowman, though Chancellor Plowman, in sworn testimony, stated that it would require a court's decision for Dr. Shirinian to ever return to the University of Tennessee.

49.     Defendant Plowman's failure to issue a written decision is not a neutral delay but a substantive deprivation. By maintaining Plaintiff on administrative leave, barring her from teaching and academic duties, and conditioning her return on a court ruling, Defendants imposed and continue to impose the adverse action without constitutionally adequate process. The deprivation is ongoing, complete, and operative notwithstanding the absence of a formal written termination decision.

**E. Comparator Knowledge and Selective Enforcement**

50.     Defendants were contemporaneously aware of other UTK-affiliated speech about Mr. Kirk, including by faculty and students, and chose not to impose comparable discipline when the speech aligned with politically favored viewpoints or did not generate the same political pressure.

51.     On September 12, 2025, UTK officials—including the Chancellor and senior marketing/communications leadership—became aware of a UTK professor's social-media post about Mr. Kirk (including inflammatory commentary about the deceased individual and his family), and, separately, became aware of social-media posts by UTK students on the same topic. Defendants did not impose administrative leave or initiate termination proceedings against those speakers.

52.     Defendants were aware of a separate incident in which a UTK-affiliated speaker, Professor Glenn Reynolds, used social media to endorse violence, encouraging motorists to run

down protestors. UT officials reviewed the Reynolds incident and determined the speech was protected under the First Amendment, and imposed no discipline, leave, or termination proceedings in response. However, UT officials continued and continue to ratify the actions taken against Dr. Shirinian.

53. Defendants were made aware of their selective enforcement, policy violations, and constitutional violations in numerous manners, including but not limited to:

- "Reinstate Dr. Tamar Shirinian! Defend Free Speech at UTK!" United Campus Workers petition signed by over 1,000 people

- An October 2025 formal memorandum from the UTK Faculty Senate Affairs Committee pointing out constitutional and due process violations,

- Pro-Shirinian on-campus protests,

- Frequent news articles from UT's Daily Beacon, Knox News, and other papers around the United States,

- A November 2025 Resolution from the Faculty Senate in favor of Dr. Shirinian's due process and free speech rights (with a vote of 59-11-11), and,

- A January 2026 open letter from Dr. Shirinian to the Board of Trustees published in the Knoxville News Sentinel.

54. Plaintiff was singled out because of the viewpoint expressed and the political and donor pressure surrounding it, not because of evidence-based disruption or safety facts.

11

## F. Notice, Personal Participation After Notice, Ratification, and Deliberate Indifference

55. Each individual trustee received actual notice—via emails, forwarded demands, calls/texts, media briefings, counsel communications, deliberations, and/or internal updates—that Plaintiff's speech was protected and that discipline for off-duty speech required an evidence-based disruption assessment.

56. Each Defendant's liability arises from their own receipt of notice and their own decision—made individually and within their respective authority—not to intervene, correct, or halt the unconstitutional punishment.

57. Defendants' conduct was undertaken with reckless or callous indifference to Plaintiff's federally protected rights, including after repeated notice of constitutional deficiencies (not only from Plaintiff, but from constitutional law scholars around the nation), the absence of any contemporaneous safety assessment, and the foreseeable professional and reputational harm to Plaintiff, thereby supporting an award of punitive damages against appropriate Defendants in their individual capacities.

58. At the time of Defendants' actions, it was clearly established that a public employer may not discipline an employee for off-duty speech on a matter of public concern absent evidence-based disruption attributable to the employee's workplace conduct; may not transform third-party outrage into "disruption" by amplifying it; and may not punish protected speech to appease political or donor pressure.

59. After September 16, 2025, each Defendant personally participated in the ongoing constitutional violations by either a) affirmatively facilitating and prolonging the enforcement of the adverse action after notice of constitutional risk; and/or

12

b) not exercising final or participating policymaker authority and deliberately refusing to act to halt or remediate the unconstitutional punishment.

### (1) Trustees and Board Leadership: Authority + Deliberate Choice Not to Act

60.     Board Chair Compton and trustee Defendants possessed actual authority, as final or participating policymakers, to require constitutional compliance, demand adherence to written disciplinary procedures, halt or remediate the adverse action, or require an evidence-based assessment of disruption.

61.     Despite knowledge of the political catalyst, the absence of any contemporaneous safety assessment, and the foreseeable constitutional risk, trustees deliberately chose not to intervene, stop, reverse, or remediate the adverse action.

62.     The Board's inaction was not passive; it was an affirmative governance choice to allow unconstitutional punishment to stand, thereby ratifying and causing the continuation of ongoing violations.

### (2) Counsel and Legal/Governance Officials: Facilitation of Unwritten Process + Risk Suppression

63.     General Counsel Stinnett and Board special counsel Moore had specialized roles involving governance oversight and knew or recklessly disregarded the constitutional constraints on disciplining off-duty speech, effectively turning into de facto public relations coordinators.

64.     Plowman later testified under oath that she made the decision without a prior investigation, without neutral First Amendment guidance, and without legal analysis consistent with clearly established law.

13

65. Defendants Stinnett and Moore knew or should have known of that sworn testimony and the absence of any contemporaneous safety assessment.

66. Defendants nevertheless facilitated, prolonged, and/or failed to correct the use of a new, unwritten "due process" not rooted in written Board policy known to faculty.

### (3) Government Relations / Communications / Chief of Staff: Routing Political Demands + Messaging + Process Suppression

67. Defendants Whitworth, Benton, Tindell, and Scoggins personally participated in the continuation of constitutional violations by routing political demands, shaping messaging, helping draft, approving, suppressing or bypassing normal process, and facilitating continued enforcement of the adverse action after receiving notice that Plaintiff's speech was protected and that no safety basis existed. Their conduct was not ministerial; it affirmatively enabled and prolonged the unconstitutional punishment.

68. Defendant Whitworth personally participated in the constitutional violations by (a) receiving Representative Todd's written demand calling for Plaintiff's termination based on viewpoint, (b) forwarding and escalating that demand to legal and marketing/communications leadership, and (c) continuing to coordinate with senior administrators after September 15, 2025 to pursue and maintain the adverse action despite notice that Plaintiff's speech was protected and no safety assessment existed.

69. Defendant Benton personally participated by drafting, approving, or disseminating communications that framed Plaintiff as a safety risk and justified the adverse action, despite knowing that no threat assessment, police consultation, or disruption analysis had been conducted.

14

70. Defendant Tindell personally participated by approving and managing institutional messaging regarding Plaintiff, suppressing or bypassing ordinary review processes, and facilitating continued enforcement of the adverse action after notice of its constitutional infirmity.

71. Defendant Scoggins personally participated by managing the internal disciplinary process, interfacing with legal counsel and the Chancellor, and ensuring continuation of the adverse action after notice that it was imposed without written policy authority, neutral process, or contemporaneous safety findings.

### (4) Continuing Updates Demonstrating Knowledge and Ratification

72. On September 24, 2025, Boyd emailed trustees regarding documents related to Plaintiff and invited calls to discuss further.

73. Trustees and Board leadership were kept informed through September and October 2025 (and beyond) about the controversy, the University's chosen course, the ongoing restrictions imposed on Plaintiff, and the legal risk.

74. On October 2, 2025, trustee Wiseman forwarded Board counsel Moore materials reflecting serious First Amendment concerns regarding the University's response and the broader implications for free speech.

75. Despite these red flags, Defendants continued and continue to enforce the adverse action, continued to claim Plaintiff posed a safety risk, and deny Plaintiff restoration of duties and academic standing.

15

## G. Due Process Violations and Stigma-Plus

76. Plaintiff possessed a protected property interest in her tenure-track appointment, continued employment, and tenure-review trajectory under UT policies, practices, and established academic norms requiring cause and process before removal from core duties and before termination.

77. Plaintiff was deprived of that interest without meaningful notice, a pre-deprivation hearing, or neutral decision-making, and through a new, unwritten process created and implemented by Plowman and Stinnett.

78. Defendants publicly characterized Plaintiff as dangerous and as advocating violence—including through Boyd's public statements—thereby imposing stigma that foreseeably foreclosed future academic employment opportunities.

79. The stigma was coupled with a tangible alteration of Plaintiff's legal status and professional standing, including removal from teaching and academic duties, interruption of tenure review, and initiation of termination proceedings—constituting a stigma-plus deprivation of liberty interests protected by the Fourteenth Amendment.

80. Defendants continue to keep Plaintiff in indefinite limbo: paid, but barred from the meaningful incidents of her academic appointment, in a manner that chills speech and preserves the retaliatory status quo.

81. This absence of a final decision itself constitutes a deprivation because it forecloses appeal, freezes professional status, and chills free speech.

## H. Absence of *Pickering*-Relevant Disruption

82. There was no classroom disruption attributable to Plaintiff.

83. No faculty member refused to work with Plaintiff; many, including the Faculty Senate, spoke out in her favor.

84. Plaintiff's department leadership supported her continued employment.

85. No student complained about her instruction.

86. Defendants filed no police reports, conducted no threat assessment, and completed no behavioral assessment regarding Plaintiff.

87. Defendants imposed discipline before any facts relevant to *Pickering* balancing were known and later sought deposition testimony to justify discipline imposed without contemporaneous safety assessment or disruption analysis.

## I.     Clearly Established Law

88. At the time of Defendants' actions, it was and has continued to be clearly established that public universities may not discipline faculty for off-duty speech on matters of public concern absent evidence-based disruption, may not rely on donor or political pressure as justification, and may not substitute reputational discomfort for constitutional compliance.

89. Long before September 2025, it was clearly established that (a) public universities may not discipline faculty for off-duty speech on matters of public concern absent evidence-based disruption attributable to the speaker's workplace conduct; (b) third-party outrage, donor pressure, or political backlash cannot constitutionally substitute for disruption; and (c) post-hoc safety rationales unsupported by contemporaneous investigation do not satisfy *Pickering* balancing. Defendants, many of whom are lawyers and all of whom had access to legal counsel competent to

advise on clearly established First Amendment constraints and Supreme Court precedent, had actual notice of these constraints and proceeded anyway.

**CLAIMS FOR RELIEF**

**COUNT I — FIRST AMENDMENT VIEWPOINT DISCRIMINATION (42 U.S.C. § 1983)**

**Against Defendant Plowman in her official capacity for prospective injunctive relief and against all Defendants in their individual capacities for damages**

90.     Plaintiff incorporates the preceding paragraphs.

91.     Defendants punished Plaintiff because they disagreed with the viewpoint she expressed.

92.     Defendants would not have punished a UTK professor who made a pro–Charlie Kirk private comment on Facebook.

93.     Defendants were aware of other UTK-affiliated speakers—including faculty and students—who expressed viewpoints aligned with politically favored perspectives and took no comparable adverse action against them.

94.     Defendants' disparate treatment was driven by political hostility to Plaintiff's viewpoint and the external pressure it generated, not any content-neutral enforcement of neutral standards.

95.     Viewpoint discrimination is presumptively unconstitutional and fails strict scrutiny.

18

## COUNT II — FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

**Against Defendant Plowman in her official capacity for prospective injunctive relief and against all Defendants in their individual capacities for damages**

96.    Plaintiff engaged in protected speech as a private citizen on a matter of public concern.

97.    Defendants took adverse actions that would chill a person of ordinary firmness, including removal from teaching and academic duties, placement on administrative leave, and initiation of termination proceedings.

98.    Plaintiff's protected speech was a substantial or motivating factor in Defendants' actions.

99.    Defendants lacked adequate justification under Pickering. Any asserted safety rationale was unsupported by contemporaneous facts, uninvestigated, and invoked only after political and donor pressure was applied.

100.    Any claimed disruption was attributable to third-party outrage and political amplification, including Defendants' own public and internal messaging, which cannot constitutionally be imputed to Plaintiff.

101.    Defendants' conduct violated the First Amendment.

## COUNT III — PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)

**Against Defendant Plowman in her official capacity for prospective injunctive relief and against all Defendants in their individual capacities for damages**

102.    Plaintiff incorporates the preceding paragraphs.

103.    Plaintiff possessed protected property and liberty interests.

104. Defendants deprived Plaintiff of those interests without adequate notice and a meaningful opportunity to be heard before a neutral decisionmaker.

105. Defendants implemented an unwritten, ad hoc process not grounded in written Board policy or the Faculty Handbook known to faculty and vested unilateral control in Plowman while leaving Plaintiff in indefinite limbo without meaningful appellate review.

106. The deprivation included removal from teaching and academic duties, interruption of the tenure timeline, and initiation of termination proceedings without constitutionally adequate process.

107. Defendants' public stigmatization of Plaintiff as dangerous, coupled with tangible alteration of her professional status, constitutes stigma-plus.

108. Defendants' conduct violated the Fourteenth Amendment.

## COUNT IV — DECLARATORY AND INJUNCTIVE RELIEF
### Against Defendant Plowman in her official capacity only

109. Plaintiff incorporates the preceding paragraphs.

110. Plaintiff seeks prospective declaratory and injunctive relief to halt ongoing constitutional violations, restore Plaintiff to her prior position with its benefits, and prevent continuation of termination proceedings premised on protected speech absent constitutionally sufficient justification supported by contemporaneous evidence. The current deprivation includes removal from teaching and academic duties, interruption of the tenure timeline, and initiation of termination proceedings without constitutionally adequate process. It also includes a significant chilling effect throughout faculty and students at UTK.

20

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.      Declare that Defendants' actions violated Plaintiff's rights under the First and Fourteenth Amendments;

B.      Enter a preliminary and permanent injunction against Defendant Plowman in her official capacity requiring rescission of the administrative leave, restoration of Plaintiff's teaching and academic duties, and restoration of Plaintiff's tenure-review timeline;

C.      Enjoin Defendants from continuing termination proceedings or equivalent adverse action based on Plaintiff's protected speech absent a documented, evidence-based disruption finding consistent with the First Amendment;

D.      Award Plaintiff compensatory damages against Defendants in their individual capacities, including back pay, front pay, emotional distress damages, reputational damages, and loss of enjoyment of life;

E.      Award punitive damages against appropriate Defendants in their individual capacities;

F.      Award Plaintiff reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54(d);

G.      Tax costs to Defendants;

H.       Grant such other and further relief as the Court deems just and proper; and

I.      Grant Plaintiff a trial by jury on all triable issues.

Respectfully Submitted,

  /s/ Robert C. Bigelow, Esq.
Robert C. Bigelow, Esq. #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
(615) 829-8986
rbigelow@bigelowlegal.com

22