UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TAMAR SHIRINIAN,

        Plaintiff,

vs.                        3:25-cv-528-KAC-JEM

DONDE PLOWMAN, et al.,

        Defendants.


DEPOSITION OF TAMAR SHIRINIAN

Friday, February 6, 2026


APPEARANCES:

        FOR THE PLAINTIFF:

        ROBB BIGELOW, ESQ.
        Bigelow Legal PLLC
        4235 Hillsboro Pike, Suite 301
        Nashville, TN  37215


        FOR THE DEFENDANTS:

        MICHAEL D. FITZGERALD, ESQ.
        T. MITCHELL PANTER, ESQ.
        The University of Tennessee
        505 Summer Place, U.T. Tower 1107
        Knoxville, Tennessee  37902

---

Deborah A. Shoemaker, LCR
1947 Cascade Falls Lane
Knoxville, Tennessee  37931
(865) 300-0370

Case 3:25-cv-00528-KAC-JEM    Document 54-4    Filed 03/02/26    Page 1 of 117
PageID #: 1480

                          INDEX

                                           Page No.
Examination,
      by Mr. Fitzgerald                         6
Examination,
      by Mr. Bigelow                           112



                         EXHIBITS

Exhibit #1,
      Notice to take deposition               13

Exhibit #2,
      Dr. Tamar's comment on Michelle         14
      Gutierrez's post

Exhibit #3,
      Posts from the name Trita Shirin         14

Exhibit #4,
      Communications with any media or social  25
      media organization

Exhibit #5,
      Supportive emails from individuals       26

Exhibit #6,
      Supportive texts from individuals        29

Exhibit #7,
      Outlook emails                           29

Exhibit #8,
      CV showing current position at Millsaps  33
      College

Exhibit #9,
      U.T. System-wide Policy                  40

Exhibit #10,
      The Mighty 990's Post                    53

Exhibit #11,
      Trump Train News Media's Post            53

Exhibit #12,
Packet of emails Dr. Tamar received directly     55
or that were sent to her department and was
copied on

Exhibit #13,
Email from Gina P. Owens                          57

Exhibit #14,
Packet of emails with the goal of getting         60
Dr. Tamar's information off the web page and
the faculty directory

Exhibit #15,
Emails received by the Anthropology               61
Department about Dr. Tamar

Exhibit #16,
Packet of emails floating around the              64
Anthropology Department

Exhibit #17,
Report for violent threats                        79

Exhibit #18,
Degrading emails referring to Dr. Tamar           80

Exhibit #19,
Knox News:  Charlie Kirk post spurs               81
article

Exhibit #20,
"We are in a firestorm..." article                86

Exhibit #21,
"Shrinian discusses lawsuit in first              86
public interview" article

Exhibit #22,
"Judge sets trial date for Tennessee              88
professor's Charlie Kirk comment suit

Exhibit #23,
Know News:  "Read professor's open letter         89
saying Tennessee was wrong to fire her"
article

Exhibit #24,
    Emails from students to leadership at the          91
    university or your department complaining
    about Dr. Tamar's comment

Exhibit #25,
    Strategic Vision:   It Takes a Volunteer          94
    Our Vision

Exhibit #26,
    Strategic Vision:   It Takes a Volunteer          95

Exhibit #27,
    Amended Complaint                                  99

Exhibit #28,
    Current CV                                         106

Exhibit #29,
    Robby Starbuck post                                109

STIPULATION

The deposition of TAMAR SHIRINIAN, called as a witness, taken pursuant to the Federal Rules of Civil Procedure, on February 6, 2026, at the U.T. Tower, 400 W. Summit Hill Drive, Knoxville, Tennessee, before Deborah A. Shoemaker, LCR, and Notary Public in and for the State of Tennessee.

All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing. It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., including the reading and signing of the completed deposition of the witness and the signature of the witness, are expressly waived.

--------------------------------------------------------------

Serving as IMPARTIAL OFFICERS OF THE COURT: We abide by all professional and ethical principles of the National Court Reporters Association and do not contract with any Party in interest.

TAMAR SHIRINIAN, called as a witness, for purposes of discovery, having been first duly sworn, was examined and deposed as follows:

EXAMINATION

BY MR. FITZGERALD:

Q   Could you state your full name and address please.

A   Tamar Shirinian.  5107 Wilkshire Drive, Knoxville, California  37912.

Q   Knoxville what?

A   Knoxville, Tennessee.  I'm so sorry. Knoxville, Tennessee.

Q   I was going to say, that's quite a commute.  Dr. Shirinian, let me say now, I know from interviews you've given that your students call you Dr. Tamar.  I think the total number of syllables we use today will be reduced if I can call you Dr. Tamar, if that's okay.

A   You can call me Tamar if you wish.

Q   Okay.  Well, I don't want to be disrespectful.  But Shirinian is a mouthful to say as many times as I'll probably say it today.

In any event, my name is Mike Fitzgerald. I'm an attorney for the University of Tennessee, and

we're taking your deposition today by agreement in the lawsuit you have pending against Randy Boyd, Donde Plowman, and Charlie Noble in the Eastern -- United States District Court for the Eastern District of Tennessee.

Have you ever given a deposition before?

A   No.

Q   Okay.  You certainly have seen a few over the last few months, so you have some sense of how the process works.  So I won't go through all of the instructions, but I do want to remind you of a few rules.  You were just sworn in, so you are under oath. And you were sworn to tell the truth, and subject to the perjury laws of Tennessee if you do not.

You are required to answer every question I ask unless your attorney instructs you not to answer, which might happen if I ask about privileged communication.  But otherwise, you have to answer every question I ask today.

A couple of things that will help her:  1, if you will let me finish my question, I will try to let you finish your answer.  I'm not great at that.  But if we can not talk over each other, that will give her a cleaner record.  If you can answer yes or no verbalized, that will also help a lot.  So do you understand that?

A    Yes.

Q    Good job.  If you don't understand a question I ask for some reason, just ask and I will rephrase.  Otherwise, I will assume you do understand what I'm asking.  You know we take breaks as we need them.  So if you do, just let Robb know or me know and we can take a break.

Other than meeting with your attorney, what did you do to prepare for today?

A    I slept.  That's it.

Q    Okay.  Did you review any documents?

A    In preparing for the documents that were requested by you --

Q    Yes.

A    -- I had to compile all of it.  So I looked at it, yes.

Q    When did you do that?

A    Beginning last Friday.

Q    A week ago today?

A    Yes.

Q    Okay.  And when did you complete that process?

A    Last -- last evening.  Yesterday evening.

Q    Okay.  Who knows about this deposition amongst your friends and family?

A    My husband.

Q    Uh-huh.

A    My father.

Q    That's all?

A    That's it.

Q    Okay.  When was the last time you communicated with someone from the University of Tennessee other than us lawyers?

A    Well, my husband works at the University of Tennessee.

Q    Sure.  Not including him as well.

A    Chancellor Plowman on Wednesday.

Q    Wednesday.  Okay.  How about prior to that?

A    Over the last four months?

Q    Yes.

A    I have friends who work at the University of Tennessee.  I've communicated with Mr. John Compton also on Wednesday.  Mr. Boyd.  And I have communicated with Dr. Barbara Heath, who's the department head of anthropology --

Q    Okay.

A    -- in email.

Q    When did you last speak with Dr. Heath?

A    The last I spoke with her, I believe, was

Christmas Eve --

Q Uh-huh.

A -- when I sent her an email I had received in my UTKA inbox that was harassing. And I asked her if I should report it. Which the night before Christmas Eve. She responded Christmas Eve.

Q You sent an email to her the day before; the 23rd?

A Yes.

Q Okay. You said friends. Is that mostly colleagues in the Department of Anthropology?

A Colleagues in the Department of Anthropology and other -- other -- other people who are -- I'm friends with who work at U.T. for faculty, who I see in other activities that I'm a part of.

Q Okay. What other source of activities are you a part of other than your daily work in the Department of Anthropology?

A I do a hip-hop dance class.

Q I will ask no further --

MR. BIGELOW: What kind of moves do you --

Q Okay. Any other community activities or things like that where you've made friends outside of your department?

A I've attended a couple of protests at

which I've met other people who work at the University of Tennessee.

Q Uh-huh. We have a lot of protests around here. Any in particular that come to mind that you attended?

A Last Friday, I attended a protest against ICE murders. And there were a couple of faculty from the University of Tennessee there who approached me and told me that they stood with me.

Q Any other protests that you've attended?

A In the last four months?

Q Even beyond. You talked about friends you have that you've met outside the department, your hip-hop class, and at protests. So whenever they occurred, just wherever you kind of cultivated those friendships.

A I'm going to try to remember protests that I've attended. There was a protest about three weeks ago, I don't recall exactly when, against U.S. actions in Venezuela. I've attended protests against the genocide in Gaza.

Q Was that the Pro-Palestinian Protests that went on about a year ago or so? It went on for several weeks. There were protests on campus daily. Were you a part of those protests?

A   I have attended various protests in downtown Knoxville against the genocide in Gaza since its -- since it began in October of 2023.

Q   Uh-huh.

A   I can't count how many.

Q   Sure.  The protests I'm referring to in particular were on campus.

A   I -- I went to where students were protesting --

Q   Okay.

A   -- on campus.  Yes.

Q   Where was that?

A   It -- I went to -- I think in April of 2024.  April of 2024, I believe.

Q   Uh-huh.

A   Students had organized a memorial. Students who had family who had been killed in Gaza had organized a memorial on campus, and that was, I believe, on the HSS quad on campus.  I attended that memorial. And I also, over the next week, went when students asked me to go to outside of the student union.

Q   Okay.  Around the same time period in 2024?

A   In April or May 2024.  It was around when classes were ending.

Q    Okay.   Have you ever been arrested for your protest activities?

A    No.

(Exhibit No. 1 marked.)

Q    Tamar, the document I've just handed you is the notice of the deposition that we're doing today. Have you seen this document before?

A    Yes.

Q    Okay.   Starting on page 2, I asked you to bring eight things to this, so.  A lot of them I got yesterday, but I want to go through them and make sure we got -- we got everything we need.  One thing I asked for was a printout or a copy of the Facebook page from which you sent the famous post.  Is that page still accessible?

A    When you say post, I think you mean comment.

Q    I do.   Right.   You're correct.   Is that account still in existence?

A    Yes.

Q    Okay.   I'd like to see it.

MR. BIGELOW:   Can I make it easier for you?   You have it.   It's just not under her name, just so -- just to make life easier for you.

MR. FITZGERALD: Okay.

MR. BIGELOW: I mean, it is her name, but it's -- you do have it.

(Exhibit No. 2 marked.)

Q   That is a document I'm sure you're familiar with. And the name on the comment is Tamar Shirinian. Yesterday --

(Exhibit No. 3 marked.)

Q   -- I received this document. Let's keep them all together.

A   I have this one.

Q   Give that one back to Robb, and then you can have that one. There you go. This is a different name. This says you live in Armenia. You work for Duke University. It doesn't have any threads or comments similar to that. I'm no expert in Facebook, but are these -- are these the same account?

A   Yes.

Q   Okay.

A   I can explain the name if you would like.

Q   Yes, please.

A   This comment was made on my friend's Facebook post from this account. So when on Facebook, when you post -- when you comment on someone else's post, it does not show up on your Facebook page. It

shows up on their Facebook page.

On September 15th, I would -- I would assume, I don't know for certain, but I'm pretty confident on September 15th I was being inundated with friend requests from people I did not know as a result of, I assume, Mr. Boyd's Facebook post about me, and attention to my Facebook page, attention to me. I assume I was getting many Facebook friend requests because I have a private page, which means that no one can see anything on my page. No one can comment on anything on my page if they are not friends with me. So I have to add them as a friend before they can say anything to me on Facebook, except through messaging, which I don't even really see, because you have to be my friend to send me a message, or else it sends me a message request, which I usually don't even look at.

After receiving probably about 15, I don't know for sure, friend requests on Facebook from people who I did not recognize at all, people who live in places or whose Facebook pages said they lived in places I've never been, I got really tired of that. So I changed my name. T -- Trita Shirin. T is -- my first name is Tamar. Rita is my middle name. And Shirin is a, kind of, you know, shortened last name. So that if people do know me, they would know that, oh, that's

Tamar Shirinian.

Q    Uh-huh.

A    But people who don't know me, who are just trying to harass me on Facebook, won't be able to find me when they search Tamar Shirinian on Facebook.

Q    Okay.

A    But this is the same Facebook page from which I commented on my friend's Facebook post.

Q    Okay.  So since the post you made on September the 12th, Exhibit 2, you changed your name to make you more difficult to find on Facebook?

A    Yes.

Q    Okay.  Has this front photo and information -- has this changed?  Did you change any of that at the time you changed your name?

A    The cover photo is the big banner photo on top.  That is the same -- that's been that way since the beginning of the genocide on Palestinians.

I did change my profile photo, which is the photo that appears in the circle.  As you can see from the comments I made on my friend's Facebook post, my photo was one of me and my child.  I decided at some point that I did not even -- in case people who did not know me did find my private Facebook page, that they at least wouldn't see a photo of my child.  So I changed it

to me standing in front of a statue in Armenia where I do research.

Q    Okay.  Did you remove any references to the University of Tennessee at the time you made the name change and changed the photograph?

A    No.

Q    Okay.  You posted a lot of things about this lawsuit on here.  If you would turn to the end of that, maybe the seventh page, the -- someone named Sunny Almonte asked if you could make this shareable.  And then you said, "I've had to narrow who can contact my Facebook account and who can find me.  Can you copy paste?  Thank you!"  Not to ask an obvious question, but why did you have the need to narrow your Facebook account and who could find you?

A    My Facebook is for friends and family. And I was getting many, many friend requests from people I did not recognize or know.  And it -- it was annoying to keep getting Facebook requests, friend requests.  So I changed my -- I changed my names on there so that I couldn't be findable by people who did not know me.  And I don't want things that I post on my private personal Facebook page to be shared outside of my page in the case that -- for example, Sunny Almonte has friends on their Facebook page who I don't trust, who I don't want

to see things that I say. I don't want them to be able to take my words from my page and put it on theirs.

Q The next to next to last page of that document, October 16th.

A Uh-huh.

Q Can you read that post? Those are, I believe, your words. Can you read that into the record please.

A "The worst way that you can show support is through sympathy. I don't need your sympathy. This is not about something happening to me. They are destroying free speech, academic freedom, and institutions of higher education. If you have any respect for these things, you should be PERSONALLY (and politically) ENRAGED. Not for me but for yourself. They will come after all of us in the end. Your silence will not save you. I don't need your hugs, your meal trains, your, quote, please let me know if there's anything I can do for your family, end quote. Act for yourself. Act politically. Not with sympathy but in solidarity."

Q Who is that message for?

A It is for my friends on Facebook.

Q Of which you have 1.1K --

A Yes.

Q    -- friends?

A    Yes.

Q    Okay.  So even in its tightened format, your Facebook page, everything you post is available to 1,100 people?

A    Yes.

Q    Let's look back at Exhibit 2 if we could. Yeah.  I don't want to focus so much on the words but kind of what happened.  I don't want to mispronounce the name above.  What is that person's name?

A    Her name is Hasmik Geghamyan.

Q    Okay.  And her message -- I don't want to misuse all the Facebook terms.  Her message, was that posted to the world?  Was it on her public feed?

A    Her Facebook post was posted on her private Facebook account.  You can tell that it's private because it has, under her name, the people logo here --

Q    Uh-huh.

A    -- the friends logo.  That means that it's only available to her Facebook friends, which includes all of the comments that also go in response to this post, are only visible to her Facebook friends, which means these are people that she, herself, added as a friend onto her private Facebook page.

Q   Okay.  And you are one of her friends?

A   Yes.

Q   Okay.  Do you know how many friends this person has?

A   I don't.

Q   Okay.  But you were one of them.  And Michelle Gutierrez is one of them?

A   Yes.

Q   Okay.  So you knew or reasonably should have expected, I guess, that every person who was friends with Ms. Hasmik would have seen this post?

A   I don't know if every person who would -- who was friends with Hasmik would have seen my comment on her Facebook post.  I could go into how Facebook algorithms work and all that, but --

Q   How would they have not seen it?  If you posted a comment on her post that's available to all of her friends, wouldn't the comments that follow also be available to all of her friends?

A   I think it's a different -- those are two different questions.  What is available is one thing.  It's available.  My comment there would be available to every single one of Hasmik's friends.

Q   Okay.

A   If they wanted to go and look for my

comment when it was still up there, all of her friends, people who she knows and added onto Facebook, would be able to go find it. But I think because of the way Facebook works, there -- the algorithm often shows you things that you agree with, or friends who -- whose posts you often look at often. So it is available, yes. But we don't -- on Facebook, for, you know, people who use Facebook, things are often not necessarily presented to you and everybody all -- all the time.

Q   Okay.  Your comment would have been seen by your 1,100 friends.  Is that correct?

A   No.

Q   Okay.  Would it have been seen by all of Hasmik's friends?

A   It could have been seen by all of Hasmik's friends.

Q   Okay.

A   And if they wanted to, they could have seen it.  Yes.

Q   Could they have seen -- could Hasmik's friends' friends have been able to see it?

A   No.

Q   Okay.  Now why not?

A   Because of the way Facebook works, when you have that logo, the friends logo under your page,

comments posted under your posts are only available to people with whom you are friends.

Q  Okay.  So the circle of people who would have had access to this is limited to people who are friends with Hasmik?

A  Yes.

Q  Okay.  How do you think this got into the hands of someone who wanted to use it maliciously?

MR. BIGELOW:  Objection to form.

A  I don't know.

Q  Do you think it's fair to assume that one of Hasmik's friends sent it to someone?

MR. BIGELOW:  Same objection.

A  I would have to assume things I don't know, because I -- I have no idea how.

Q  As of today, Hasmik has 2,200 friends on Facebook.  So that number probably has -- hasn't changed much in the last four months.  So would it be safe to assume that this comment --

MR. BIGELOW:  I'm going to object to that as wrong.

Q  Okay.  She had some number of friends in September.  That number is now 2,200.  Again, you reasonably expected --

MR. BIGELOW:  I'm not trying -- I promise

I'm not trying to be difficult. But I'm going to object to that as well. But you can answer whatever question he has.

MR. FITZGERALD: Okay. Can you explain your objection?

MR. BIGELOW: Not allowed to.

Q   Okay. If Hasmik had 2,200 friends as she does today, is it fair to assume that this text was seen by 2.2K people the minute you pushed send?

A   No.

Q   How am I wrong?

A   If she has 2,200 friends -- and I don't doubt your assess- -- I don't know, but I'm going to trust you. When I -- when I sent this comment in as a response to the post, it is not likely that right away -- it is very unlikely, I'll say, to the best of my knowledge, that 2,200 people saw it right away. It is very unlikely.

Q   Okay. But is it possible that 2.2K people saw it? Let me ask that a better way. Would you agree that 2.2K people had access to it?

A   Having -- yes. Having access to it and seeing it are two very different things.

Q   Agree.

Okay. That was item No. 1 on the list.

Item 2 is all copies of posts and comments made by you or in response on any social media platform in the rest of September. I mean, you have other stacks, but these are --

(Discussion off record.)

Q -- copies of all posts and comments made by you. Let me back up. So it's your testimony that this is -- this constitutes full production of all the posts and comments made by you in response on any social media platform from September 12, 2025, to September 30th, 2025?

MR. BIGELOW: It's actually more than that, Mike. Because you can -- I'm sorry. I'm just trying to help you.

MR. FITZGERALD: Yeah, yeah, yeah.

MR. BIGELOW: Because it actually goes -- it goes into October as well, and it includes comments. This is like 2 and 3, because it includes comments about Charlie Kirk.

MR. FITZGERALD: Okay. Same packet though?

MR. BIGELOW: Yes, sir.

Q Okay. So this is full production of item 2 and item 3?

A Yes.

Q   Okay.  Item 4 is all messages, including text messages, voicemails, emails, social media posts, or any other forms of communication containing any threats against you or others, including but not limited to all communications referenced in your letter to Chancellor Plowman.  Did you produce to your attorney all of the documents requested in item 4?

A   I didn't have any threats.  I never received any threats.  What I produced were text messages, voicemail -- voicemails, emails, social media posts that were -- that were either supporting me or that were harassing me.  Yes.

Q   Okay.

MR. BIGELOW:  And you have those, just for the record.

(Exhibit No. 4 marked.)

Q   We're going to have to share that one because I didn't have a chance to make copies.  But I believe what I've just handed you is the response I received from your attorney about request No. 5, which was all communications between you (or anyone acting on your behalf) and any member [sic] of any media or social media organization, including but not limited to the Gannet News Company, the Knoxville News Sentinel and the Daily Beacon."  And that is what I received from your

attorney in response.

A   Yes.

Q   Is that a full and complete set of all communications you have received from -- to or from the listed media outlets?

A   Yes.

Q   Okay.  You said you've spent a week working on these?

A   Yes.

Q   In that total week, how much time did you spend compiling these documents?

A   I would have to guess.  I would guess 20 to 25 hours.

Q   Okay.

(Exhibit No. 5 marked.)

Q   Okay.  Asked as item 6 were all letters or communications soliciting letters of support or advocacy -- letters of support from advocacy organizations.  Is that this production, or?

A   No.  I don't know what's been printed out. But this is, I think, the packet of supportive emails I received from individuals.

Q   Okay.  Supportive emails.  Okay.  Let's leave that as Exhibit 5.  I asked for all communications between you and any law enforcement or security

officials or organizations from September 10th, 2025, to the present. Do any such documents exist?

A No document exist. I had one phone conversation with a UTPD officer who called me on Christmas Eve af- -- because Dr. Barbara Heath, the head of the Department of Anthropology, had reported an email I had received that in -- that said -- I don't remember the exact words.

MR. BIGELOW: You have it.

A You have it.

Q Uh-huh.

A I -- "Suicide is a good option."

Q Yeah, yeah, yeah.

A I was troubled by someone thinking that I should kill myself. I sent it to -- I forwarded that email to Dr. Heath. Dr. Heath -- I don't know how she communicated with UTPD, but she said that she would report it to U.T. She instructed me to report it to UTPD, but that she would as well. I believe -- I think you have those emails. And an hour -- less than an hour later, I think, UTPD called me. So it was a phone conversation. There's no record of it.

Q Sure.

A I told the -- I told the UTPD officer that I was disturbed by this email. He said, "That does not,

unfortunately, constitute a threat." It doesn't -- I said, "Could it constitute harassment? Could I report this person" -- I was imagining the FBI -- "for harassment"? He said, "It does not constitute harassment. If this person continuously writes to you, save those messages. And only after you tell them that they cannot contact you again and they continue to contact you would that be considered harassment by us, and we might then pursue this person."

Q    That's what UTPD told you?

A    Yes.

Q    Okay.  Did you also contact the Office of Title IX about that email?

A    I contacted the Office of Title IX because -- and this was months before.

Q    Okay.

A    This was a different email sent by a student.  I -- again, I received an email from a student.  It was --

MR. BIGELOW:  Which you have, too, by the way.

A    It was mean and degrading; in my opinion, inappropriate for a student to write to a professor.  I forwarded that email to Dr. Heath, and asked her "How can I report this?"  She told me to contact Title IX.

So I forwarded the email to Title IX. I don't remember if I forwarded the email or Dr. Heath did, to -- but anyway. Title IX wrote back to me and said, "This is not a Title IX issue. We have, however, reported it to student" -- student something and something.

Q  Student conduct?

A  Yes.

MR. FITZGERALD:  Let's go ahead and mark these just so we have them.

(Exhibit No. 6 marked.)

MR. FITZGERALD:  And that looks like texts of support, and this looks like the letters of support.

(Exhibit No. 7 marked.)

Q  Are there any other documents that are responsive to any of these requests that you have not sent to your attorney, to your knowledge?

A  The only thing that I see missing here that I did send off are the harassing emails, text messages. And I received some items in the mail that I took photos of and --

MR. BIGELOW:  Which you have, for the record.

MR. FITZGERALD:  Yeah. We'll get to those.

A    But I think everything else that is here on this list that I see is in these -- in these packages.

Q    Okay.  Got it.  A couple of quick background questions.  What's your date of birth?

A    April 1st, 1985.

Q    Where were you born?

A    In Beirut, Lebanon.

Q    What is your citizenship?

A    I am a citizen of the United States.

Q    Anywhere else?

A    No.

Q    Your family of origin, your parents, you mentioned at least one of them is still alive.  Are both of your parents still alive?

A    Both of my parents are alive.

Q    Okay.  Where do they live?

A    In California.

Q    At what age did your family move -- what age for you did your family move from Lebanon to California?

A    My father did not move here from Lebanon.  He moved here from Soviet Armenia as a refugee.

Q    Uh-huh.

A    I don't -- I feel really weird now that I

don't know this. I don't know if he moved here before or after -- no. He moved here after I was born in Lebanon. My parents were married in Armenia, when my mother had a Visa to work -- to study in the Soviet Union.

Q Uh-huh.

A She then -- her Visa expired, and the Soviet Union had very strict policies about residing in the coun- -- in the republics. My mother had to go back to Lebanon. She was pregnant with me. My -- I was born in Lebanon. My father, shortly after I was born in Lebanon, moved to the United States from Armenia. I was 3 years old when my mother and I came from Beirut to the United States.

Q Okay. So you grew up in the United States?

A Yes.

Q Where did you go to high school?

A Van Nuys High School.

Q Your husband's name is?

A Raja Swamy.

Q And he also works in the Department of Anthropology. Correct?

A Well, I don't currently work in the Department of Anthropology. But he does, yes.

Q  Okay.  How many children do you have?

A  I -- Raja and I have one child together. And Raja has three older children.

Q  What is the age of the child that you have together?

A  Three years old.

Q  Okay.  And the three older children?

A  Seventeen.  They're twins.  Both of them are 17.  And the older kid is 19.

Q  Do they reside in the Knoxville area?

A  The twins, who are 17, live part-time with us in our home and part-time with their mother, who also does live in Knoxville.  And the older -- the older child is in college.

Q  Where?

A  In Chattanooga.

Q  UTC?

A  Yes.

Q  Have you ever been married, before Raja, to anyone else?

A  No.

Q  Okay.  And you told me at the beginning your current address.  Remind me again, because I didn't write it down.

A  5107 Wilkshire Drive in Knoxville,

Tennessee.

Q How long have you lived on Wilkshire Drive?

A January 6th, 2021.

Q What part of town is that in?

A North Knoxville.

Q Fountain City?

A No. I -- it's Cumberland Estates area. It's right off of Clinton Highway.

Q Okay. I gotcha. And you've lived there for five years?

A Yes.

Q Okay.

(Exhibit No. 8 marked.)

Q This is a most recent copy I could kind of your CV. Does it look reasonably current?

A It's not current.

Q Okay. Where could I find the most current version of your CV?

A That probably -- the most current version was never -- it never went up because I was undergoing annual review when I compiled it. But I never got the chance to submit those documents because I was placed on administrative leave. But probably the most current was -- before that was the one that I submitted with my

10-year dossier.

Q   This will, even if it's outdated, accomplish two things.  It will skip the "Tell me about your educational background" part of the deposition, and "Tell me about your professional history" part of the deposition.  So let's go ahead and mark that with the understanding that there is a more recent version out there, and I would not suggest otherwise based on this.  Is that fair?

A   I can have a more recent version sent to you.  This one lists me as working at Millsaps College.

Q   If you could send a more recent version to your attorney.

MR. BIGELOW:  You also should be able to get it, because it was submitted with her dossier --

MR. FITZGERALD:  Yeah.

MR. BIGELOW:  -- which the University of Tennessee has the ability to get.

MR. FITZGERALD:  Correct.

Q   Okay.  You began working for U.T. when?

A   August 1st, 2019.

Q   What was your title then?

A   Post-doctoral teaching fellow.

Q   Okay.  How long were you a post-doc

teaching fellow?

A    For two years.

Q    And what happened two years later?

A    My name was submitted in 2020; I think the fall of 2020. Dr. Barbara Heath believed that I was a strong asset to the department, and approached me on Zoom because we were all online then, asking me if I would agree for her to submit my name as part of a program called the "Target of Opportunity Hiring Program" that I'm not sure exactly where it's -- I think it's part of the provost office.

And she said that it was not a guarantee, but that this would help -- that this would be an opportunity for me to join the faculty. And I agreed. She submitted my name and my application, as well as letters in favor of me. And the provost office, I believe, picked my application amongst others submitted from the university. And my department thus hired me as an assistant professor on the tenure track.

Q    And that was the position you occupied up until the time of your suspension?

A    Yes.

Q    And I understand you had submitted an application for tenure, and that process was just starting. Correct?

A    The tenure review was just starting.

Q    Right.

A    Yes.

Q    Okay.  What was your workload in the fall 2025 semester?  Classes?  Research?  What were you doing?

A    I was teaching two courses.  I was the chair of the bylaws committee in the department.  I was -- I must have been on other service committees in the department.  I don't remember.  I was on the Dean's Advisory Council as part of my service.

Q    Uh-huh.

A    I had two graduate students I was advising.  And I don't remember how many dissertation committees I was sitting on; seven, eight maybe.  And I was working on three different books, submitting fellowships and grant applications.

Q    Okay.  Were you PI on any grant-funded projects?

A    I had a September 25th application that I was near complete in preparing when I was placed on administrative leave.  That was for the American Council for Learned Societies Fellowship.  And I was planning on submitting for a November 1st and January 15th deadline, for which I would have been the PI, that I didn't

submit.

Q    Okay.  Do you know what the First Amendment is?

A    Yes.

Q    Tell me in your words what the First Amendment says about speech.

A    The First Amendment protects speech, especially on matters of public concern, without the threat of government retaliation, to the best of my knowledge.

Q    Okay.  Do you believe the First Amendment to be limitless?

A    No.

Q    Give me some examples of speech that would be outside the -- (unintelligible cross-talk) --

MR. BIGELOW:  I'm just going to object
generally as she's not a lawyer, obviously.

A    I'm not a lawyer.

Q    I understand.

A    I do know that there are things that, of course, you cannot say.  You cannot threaten people. You can't -- you can't incite violence.  You can't incite other forms of chaos.  I think the, you know, most popular example is yelling "fire" in a movie theater.  I don't even know if that's legally accurate

or not.  But that's something I do know about the limits of the First Amendment.

Libel is a First -- is not covered by the First Amendment.  Defamation is not covered by the First Amendment.  Those are all forms of speech, but they wouldn't be covered in my -- in my understanding.

Q   You've stated throughout this lawsuit and in media reports that you were speaking in your capacity as a private citizen.  Tell me your understanding of what that means with respect to your free speech rights.

A   I -- I'm an anthropologist, so I can explain it in my understanding.  I'm not a lawyer.

Q   I understand.

A   As an anthropologist, I understand that every person plays multiple roles in their lives.  We call this "code switching" in anthropology.  The way that we -- the way that we comport ourselves, the kinds of things that we say, and the kinds of things that we don't say in particular roles sometimes differ in other roles.

And, so, I understand private capacity to mean that when I am on my personal private social media, Facebook or -- Facebook is really the only one that I use -- things that I say on there I am not saying in other capacities.  For example, as a public employee.  I

am saying it as Tamar Shirinian citizen.

Q Do you think an employer, a public employer, has any power to restrain speech of its employees when acting as private citizens?

MR. BIGELOW: I'm just going to kind of continue the objection in as much as she's obviously not a lawyer.

A Can you repeat that question?

Q Sure.

MR. FITZGERALD: Can you read me back that question?

(Court reporter reads back pending question.)

A I don't know legally if -- if it does. I believe, if you want me to assume things about the law that I don't know -- I believe, in what I've read and what I know, that there are certain things that even as a public employee you can't say. And I think those fall in the lines of all of those other things that, you know, are limited in terms of free speech. Inciting violence for example. Threatening people. Those -- those are not only restrained by public institutions, they're restrained by the laws.

Q Okay. Can we fish out Exhibit 2? It's floating around. It's certainly a familiar document. It's your Facebook post. There you go. I don't -- I

don't want to spend a lot of time on it. The words are the words. But it has been said many times that in this message you celebrated the death of Charlie Kirk. Do you agree with that characterization?

A No.

Q Okay. What word would you use instead of celebrated?

A I would characterize this as a refusal to mourn and grieve.

Q Did you rejoice in the celebration of Charlie Kirk's death?

MR. BIGELOW: Objection.

A No.

(Exhibit No. 9 marked.)

Q What I've handed you is the University's code of conduct, HR0580, which reads, "People are the University of Tennessee's most important resource; as such, employees are expected to treat one another, students, and the general public with dignity, respect, and professionalism at all times. Employees are expected to create an environment that promotes academic freedom, diversity, fair treatment, and respect for others." Do you think your tweet violated this provision of the code of conduct?

A No.

Q    You do not.  Explain for me how it did not.

A    It says, "Employees are expected" in multiple places.  Employees are expected.  Employees are expected to create.  Employees are expected to treat one another, students, and the general public.  I wasn't -- my -- the comment that I made was not made as an employee.

Q    Do you believe you have two existences; one as a U.T. employee and one as a private citizen?

A    I think I have more than -- as I explained anthropologically, right, there's things -- can I give you an example?

Q    Sure.

A    The way that I talk to my child is not the way I would ever interact with you.  That would be completely inappropriate.

Q    Okay.  Is it -- is it your position that this does not apply to you because you were not acting as an employment -- employee at the time you made your comment?  Is it a comment or a post?

A    It's a comment.

Q    Comment.

A    And yes.  I was not acting as an employee when I made that.

Q   So you don't think this applies to you at all?

MR. BIGELOW:  Objection.  Asked and answered.

MR. FITZGERALD:  Okay.  Let's take a five-minute break.

(Break taken.)

Q   Dr. Shirinian, Tamar -- I've called you a hundred things today, but it's all you.  What time of day on Friday the 12th did you make your comment?

A   After -- it was -- it was at night, definitely at night.  It was definitely after dinner.  And because we have a 3-year-old, we usually don't eat dinner until nine, after he stops yelling and screaming from his bed.  So it was after nine.  I don't know exactly when, but it was definitely after nine.

Q   In the evening?

A   Yes.

Q   Okay.  I'm going to ask you this, and then I'm going to tell you why I'm asking.  Had you consumed any alcoholic beverages before you made that comment?

A   No.

Q   Okay.  I had a case where a guy posted a dumb tweet, and I asked him that question, and he said he had had seven beers.

A     Oh, I -- sorry.

Q     I just thought I would ask.

Walk me through Saturday, the next day. You wake up the next day. You posted this the night before. You wake up. What was Saturday the 13th like for you?

A     Saturday the 13th, a friend of mine from Durham, North Carolina, and I were planning on meeting in the early afternoon for a day-long writing retreat in Asheville. And, so, I woke up. I got my kid ready and did all of those things, and packed and got on the road to Asheville. And then I was in Asheville. I spent about seven hours writing with a friend.

Q     Uh-huh.

A     And then we went out to dinner. And then we went back to the cabin and had a drink, and went to sleep.

Q     Okay. So you spent Saturday night in Asheville?

A     Yes.

Q     Okay. At that time, as you laid your head on your pillow that night, did you have any understanding of -- that your comment was going to set off a fire storm?

MR. BIGELOW: Objection.

Q    Be widely circulated?

A    No.

Q    Okay.

A    And if I could add another detail --

Q    You can.

A    -- to Saturday.  I was driving to Asheville.  I got a phone call from a friend who was frantic.  He was -- who was frantic, telling me that people were being fired for Charlie Kirk posts.  And he was like, "Did you post anything?"  And I had actually posted something on my Facebook page.  I had posted about Charlie Kirk on my Facebook page.  He was like, "Look, I just deleted like five things.  You need to delete it.  They are really going after people."

I had -- I had no idea that this was all happening.  I found out that there was a concerted political attack.  J.D. Vance had made comments: "Terminate anyone who says anything bad about Charlie Kirk."  He was like, there was like three universities in Tennessee who have fired people.  Like, you know, delete anything that you have posted.

So when I got to the cabin, I did.  I deleted a post that I had made on my -- on -- a post.  Not a comment, a post on my Facebook page.  I don't remember when.  It must have been that Thursday night.

It was probably that Thursday night that I -- that I made that post. I got to my friend's cabin. I deleted that post. And I felt glad that my friend had called and possibly protected my job.

Q Okay. I assume no copy of that post still exists?

A No. I -- after receiving your request, I tried to figure out how I might retrieve deleted posts. Those are kept in the activities log of Facebook for 30 days, and it's gone.

Q Tell me what you recall about saying in the post.

A In the post -- I don't remember the exact words. What I do remember was it was a quote from -- it was a quote by Charlie Kirk about how -- I don't remember the exact quote. Something about how like, yes, some people will die. And, unfortunately, that's what it takes to protect our Second Amendment rights. And I had said something to the effect of "Charlie Kirk was not against campus shootings," or something like that.

And when my friend called me and told me that people were being fired, I was -- I told him -- I was like, I don't -- I didn't say anything like bad. He was like, "It doesn't matter. It doesn't matter what

you say. Anything like critical of Charlie Kirk they're firing you for now." So I did. I deleted it.

Q  Okay. You did not, however, delete the comment on the -- your friend's page. That remained up?

MR. BIGELOW:  Objection only to the relevancy of the time, because it ultimately was deleted.

Q  Right. But as of the night of September -- of Saturday, September the 13th, it was up, and had been up for about 24 hours?

A  Yes.

Q  Okay.

A  I had forgotten about that post; that comment.

Q  Okay. So you wake up Sunday morning in Asheville. Tell me about Sunday, September the 14th.

A  Saturday night, sometime late at night while I was sleeping, my sister had texted me telling me that my grandmother had passed. So I woke up on my friend's couch. She was still sleeping. I didn't want to wake her up. I got this text message from my sister. California is three hours behind, so it was like really early California time.

And then I laid there in -- on the couch for a while, waiting for my friend Leigh to wake up.

And then she woke up, and I told her. She gave me a hug and we talked for a little bit. And then she made me coffee. And then I got on the road to head back to Knoxville. And then -- I don't know. You asked me about the morning, I think.

Q   Just about the day.

A   The day.

Q   Walk me through the day. Yeah.

A   I drove back to Knoxville. I didn't want -- I didn't want to call my sister. I called my -- I called my mother after I arrived, when it was late enough in California. Then I spent many -- kind of that early afternoon just like sitting, crying. Talking to my mom, talking later to my sister, to my aunt in Canada.

And then I decided to take my -- to take my son on an outing. We went to the park. I was pushing him on the swing. And I got a -- I got a Facebook message request. And that doesn't happen. Very rarely does it happen. And, so, I looked at it, and it was somebody who was like telling me that they were going to do everything they could to get me fired. They would send thousands of messages if that's what it took.

And I was like what is this? I -- I was

confused. I had no idea why someone would like -- someone who I had never met, who I didn't know, who didn't even live in Tennessee or anywhere else -- like anywhere else that I had been. I don't remember where this person was listed as living.

I called -- I called my husband. I was panicking, I was with my child, about this. And then I -- and then I took my -- took my son to go get ice cream at Kern's Market, and then we went home. I made dinner. And then I checked my email, because I was teaching that week, of course. And, you know, students are always, like Sunday night and -- you know, emailing about things for the week.

And I checked my email, and there were like three emails in there of like "You're a horrible person" in many words. And I was just -- I didn't know why. I didn't understand. It was maybe like a little bit after that -- seeing that, that I checked my email again, and I had an email that actually had a screenshot of my comment on Hasmik Geghamyan's post. And that's when I realized that -- that's when I remembered that I had made that comment. I had forgotten about it. I had forgotten about it.

And, so, then later that night a friend of mine called me and told me like, "Hey, you know, there's

this whole social media campaign against you." And I was -- I was confused about why this was all happening. The -- yeah. That was -- that was Sunday. I --

Q When did you remove the comment?

A I don't remember the exact date. It was maybe Tuesday or Wednesday that week.

Q In the interview you gave online, you said that at that moment you were very scared. Tell me a little bit more about why you were scared.

MR. BIGELOW: Objection, only as to what you're -- what interview you're talking about.

MR. FITZGERALD: The interview she gave online to the Knoxville News Sentinel.

MR. BIGELOW: What day?

Q How many interviews have you given to the Knoxville News Sentinel?

A One.

Q Was it about 40 minutes long, where you sat down and Keenan Thomas asked you questions; Robb was sitting right beside you? Do you recall that interview?

A I gave an interview on video to Knox News Sentinel. Robb was not sitting next to me.

Q He spoke during the interview, so I assume he was close by.

A He might have been on the phone.

Q   Possibly.  Okay.

A   He doesn't live in Knoxville.

Q   I understand.  I heard the unmistakable voice of Robb Bigelow during that interview.  Doesn't matter where he was.  The point is, you recall the interview I'm talking about with the Knoxville News Sentinel?

A   Yes.

Q   Okay.  And in the interview you said you were very scared.  And I'm asking you to elaborate on that.

A   On the night of September 15th, I was notified by a friend that my home address had been posted on X.

(Court reporter clarification.)

A   Formerly Twitter.  And we considered leaving home.  We didn't know if someone was going to try to come to the house to hurt me.  No one had threatened to do that.  But the -- the tweet or the X post that had posted my home address had said something to the extent of, "I'm not saying to do anything, but here's her address."

And, so, I was scared to be at home.  I was scared for my family.  Having a 3-year-old is really difficult, because moving him around from place to place

messes with his sleep cycle and his schedule. And he doesn't do well sleeping in other places. We considered going to a friend's house that night. We ultimately decided not to. We slept instead in the living room, which is right in front of the front door, because our son's bedroom is right next to the front door, while our bedroom is in the back of the house. We were -- I was scared that someone was going to come to my house.

MR. BIGELOW: Also, just for the record, and I think this is important, is your last line of questioning was around September; September 14th, 15th. This interview was three months later, in mid-December.

MR. FITZGERALD: I understand.

MR. BIGELOW: Okay. I just -- it wasn't like in September. It just -- timeline-wise it's important to know.

MR. FITZGERALD: Okay. The question was about that time period.

Q   So you and your husband moved your bed, or slept in the living room between your front door and your child that night. Correct?

A   Yes. That night.

Q   How many nights did you do that?

A   One.

Q One? Okay. Did you do anything else to protect yourself? Take any other measures?

A That -- this is ridiculous, but that night -- we don't have security. We don't have cameras or anything. So we put a barbell in front of the door, hoping that that would stop someone from coming in at night. That -- and that was -- we did that, that one night. We slept in the living room that one night.

And the next day no one came to the house. I didn't get any threats. And the X post with our address was reported. And we got -- the person who reported it sent over a notice that it had been removed. And, so, we didn't take any other precaution.

Q Did you take action to have the X post removed or did someone else do that?

A Someone else did that.

Q Do you or your husband own a firearm?

A No.

Q I think I heard you mention that you have an Instagram feed. Do you have any -- or do you use any other social media outlets on a regular basis besides Facebook?

A No.

Q Okay. I could not find the post by Robby Starbuck or Starbucks, who is alleged to have been the

person who re-tweeted your -- but I do have a couple of threads on Facebook.

(Exhibit No. 10 marked.)

Q   This is one from Monday, with many comments following it.  Does this look familiar?  I'm sure you saw stuff like this.  Does this -- did you see this from The Mighty 990?

MR. BIGELOW:  May I have a copy of that?

MR. FITZGERALD:  Yes.  Of course.

MR. BIGELOW:  Thank you.

A   I have not seen this.

(Exhibit No. 11 marked.)

Q   This is another of the same thing.  This is a thread.  And I'll represent --

MR. BIGELOW:  I'm going to also object to that simply because -- well, I'll just lodge my objection.

Q   Okay.  I'll represent that I printed both of these this morning.  So this is on Facebook as we speak.  Did you do any name searches of yourself on Facebook during this time?  Did you -- were you exposed to any of these threads that were going up on Facebook?

A   I tried my best to avoid reading social media commentary about me.  But I did see things that I wish I had not seen.

Q Things like -- that look like this?

MR. BIGELOW: Objection.

A Not these, but similar things.

Q Uh-huh. When did you start receiving emails in your work account?

A Sunday afternoon.

Q Tell me what you recall receiving.

A I think you have all of the emails that I received about this on my email. I don't remember what the first messages were. It was a few hours before I knew what -- what people were referring to, what they -- what they seemed to be angry about, before probably around 8 p.m. Sunday night. I was utterly confused as to why I was being attacked, as in like why people were saying really mean things about me. It wasn't until I saw an email that had the screenshot in it that I understood that they did not like my opinions about Charlie Kirk.

Q Okay. What time on Sunday did you see that and kind of connect the dots about what was going on?

A I don't -- it was later in the evening. Because for hours that day, I kept thinking about that Facebook message request and the few other emails that I received and wondering why. I -- of course, I had -- I

had a Facebook post, but I had removed it. And, so, I kept wondering if maybe people were mad about that post. But I had removed it, so I kept wondering -- I kept checking my Facebook page to see if maybe I had not actually removed it, but I had removed it; wondering if it had -- if people had seen it, how they would have seen something I had posted on my private Facebook page.

And then it wasn't until later that evening when someone did send a screenshot and I think that was actually Robby Starbuck's Twitter post or X post with -- with my -- with the screenshot of my comment on Hasmik's post, as well as my faculty page at U.T., that I realized -- that I remembered and realized that it was about this comment that I had made, that I had forgotten about.

(Exhibit No. 12 marked.)

Q Okay. Here is a packet of emails that you either received directly or that were sent to your department and you were copied on them. But these were all in your inbox. Did you -- did you read these as they -- as they came in?

A I did.

Q Okay. Turn, if you will, to the last page. If you're looking at the right thing, is an email from weirjs@yahoo.com directly to your inbox. I think

you referenced this email earlier. The end of it says, "Are your bloodsuckin lawyers working for free? I doubt it. If you're not already ruined, I hope this lawsuit finishes the job. We don't want -- we don't -- your -- we don't want you your monkey ass back to Armenia or at least New York or California, cause you are not wanted in Tennessee. Suicide is a good option, too." That was the email that you reported to Dr. Heath, who reported to the police, or you called the police? Remind me. What did you do in response to that email?

A   I forwarded it to Dr. Heath.

Q   Uh-huh.

A   And I remember thinking that this kind of suggests maybe a threat. And, so, I forwarded it to Heath. And then Dr. Heath -- Dr. Heath is the one who reported it to UTPD. She didn't respond until -- I believe she didn't respond until the next day, because I remember having this feeling that like, oh, no, it's the holidays, and am I bothering her about something so stupid.

And -- but she did, the next day -- I think the next day she responded. Yeah, December 24 she responded to me. And she must have had -- she must have reported it to UTPD, which is what she says she is going to do. She says, "I will send it to the dean and VP of

communication and the UTPD." And then she said, "I think that you should" -- she said that she thinks I should report it to UTPD. I didn't. It was Christmas Eve. I didn't report it. And she did, because within like an hour or two of my -- of my -- of her email, I think, I got a phone call from UTPD.

Q Okay. So this is three and a half months after the original comment, and you're still getting emails like this?

A I gave an interview to News Channel 5 that was aired on television. And after that, I got this and one other harassing, mean email.

Q Okay.

A I believe -- I don't -- I don't know for sure why, but I believe that that interview might have informed people who didn't know about me before.

Q Okay.

(Exhibit No. 13 marked.)

Q In this email, if you go back to the first email in the thread, on page 2, at 9:46 p.m., you -- on Sunday you emailed Dean Owens, who is divisional dean; not the top dean of the College of Arts and Sciences, but the next dean down. Is that right?

A Yes.

Q Okay. Why did you email her at almost

10:00 on a Sunday night?

A   So because I had gone on that writing -- -- day-long writing retreat that weekend, I had not done any work to prepare for my class, my classes, but especially the new class that I was teaching that term that I hadn't taught before, which means that I didn't have any of my lectures prepared for that class.  I was doing it as the weeks went by.

And, so, Sunday night as we're going into the week where I'm going to have to do these two lectures Tuesday and Thursday, I had to write new lectures that I had never written before, and I was stressed out about that, because I had been out of town, and I was really trying to focus Sunday night on preparing for my classes for the week.

Q   Uh-huh.

A   But every time I would open my email, there would be distracting things in there, things that had nothing to do with my teaching.  But I also needed to keep checking my email because students kept also, at the same time, emailing me about missing class, or about whether they could meet with me to discuss something.  I wanted to be able to focus on my work, and was wondering -- I emailed -- I emailed Gina Owens to see if there was a way of stopping non-U.T. emails from coming

in or something like this. She then called me the next morning. We talked twice the next day.

First, she helped me -- she gave me information on how to remove my name from the -- my name, phone number, and email address from the directory, which I had already done, because Dr. Heath had, that morning, called me and told me how to do that, just so I could focus on my work and wouldn't have to keep getting these other things in my email inbox.

But if I'm not -- if I'm remembering correctly, Dr. Owens also helped me remove my faculty profile so that -- because that information -- my email address and phone number were also listed on there. So she helped me remove that so that people couldn't find me and then start, you know, bothering me while I was trying to work.

And Dr. Owens asked me if I was planning on coming to campus that day, Monday, September 15th. I te- -- I taught -- I was teaching Tuesdays and Thursdays. Usually when I don't have any meetings or don't teach, I wasn't going to campus. I would work sometimes at home. I didn't have any meetings that day, so I told her that I was probably unlikely to go to campus that day. And she told me that if I were to go to campus, if I decided to go to campus and if I thought

that I might need UTPD or have anything to report to them, to -- that she would get me information on how to go about doing that. I told her, "Sure, if you want to do that. I don't think that that's necessary." And she told me that she would call me back in a couple of hours with whatever information she could find. And then she did. And she called me. She -- she told me -- I don't remember what she told me honestly now. Yeah. That --

Q    Okay. Let me make sure. Did you go to work on Monday?

A    I did not.

Q    Okay. And the dean instructed you that if you planned to go to work, that you needed to let her know so she could alert the police?

A    No. The dean asked me if I felt like I needed to let U.T. -- if I felt like I needed UTPD to know anything threatening, that she would give me the information I would need if I chose to do that. I told her that there didn't seem to be any threats that had come in. But if there were, I assured her that if any threats did come in, I would make sure to contact UTPD.

MR. FITZGERALD:    This is 14.

(Exhibit No. 14 marked.)

Q    Tamar, this is a packet of emails that -- some start with outsider emails and then are forwarded

to administrators at U.T., but all kind of with the goal of getting your information off the web page and the faculty directory. You understand that that information was removed?

A    (Nodding head.)

Q    Did you request that it be removed?

A    I did.

Q    Okay. It looks like Dr. Heath was involved in that and R.J. Hinde was involved?

A    Yes.

Q    Okay. And do you know what time it was removed?

A    I don't remember what time, but it was -- it was in the morning.

(Exhibit No. 15 marked.)

Q    I'm sure you know this. The general Anthropology Department email also received a large number of emails about you, and that is the packet I've just handed you as Exhibit 15.

MR. BIGELOW:  I'm going to object to "large number of emails."

MR. FITZGERALD:  Do you want me to count them?

A    I'm not sure what general Anthropology -- oh, anthrodepart@utk?

Q   Yes.  These came into that.  Were copied on some.  But I don't know.  Were you aware that the department was receiving a number of emails about your post over the course of the early part of the week?

A   Yes.

MR. BIGELOW:  I'm also going to object only -- and only because it's not a post.

Q   A comment.  You were aware that the department was receiving emails about your comment?

A   I am aware because I was copied on many emails.  Not -- not some of these, but many of the emails that were sent to senators, congress, representatives, and legislators, and Randy Boyd, and Donde Plowman.  And I -- I had been copied on many of those.  So I was aware that people other than -- or, you know, entities at the university other than me were receiving emails in their inboxes.

Q   How did you feel about that?

A   I -- it was upsetting to me.

Q   What about it was upsetting?

A   To have powerful people, and I mean very powerful people, Chancellor Plowman, President Boyd, Marsha Blackburn, Tim Burchett, Bill Lee, and at some point I think Ted Cruz had tweeted about me.  To have people with a great deal of power, including over your

life, to know about you through really annoying emails is not a good position to be in.

Q   Were you concerned for your job?  I'm talking about that morning, before you got the letter from the chancellor, where you started to feel like your job might be in jeopardy?

A   I was aware that people were being fired for being critical of Charlie Kirk all over the country. Yes.

Q   And you had seen emails, numbers of emails, demanding your termination.  Correct?

A   Yes.

Q   Do you think it would have been safe for you to go to the office on Monday?

MR. BIGELOW:  Objection.

A   Yes.

Q   Why do you think that?

A   I went to the office.  I went to my office pretty regularly multiple times a week for years.

Q   The Monday after you made this tweet on September the 15th, do you think you would have been safe in the office that day?

A   Yes.

MR. BIGELOW:  Sorry.  She answered.

Q   Okay.  Did you know another anthropology

class had someone in the classroom who was not a U.T. student that day?

A    I received an email sometime that week, I don't remember when, from Dr. Heath, informing the faculty listservs, of which I was still on and I'm still on, that -- to be aware of students in your classes who you don't recognize. So I -- I assumed that that had happened to somebody. Yes.

Q    Okay. Did you know another anthropology class moved online on Monday the 15th?

A    No.

Q    The Department of Anthropology circulated emergency management plan for the department to every person I believe in the building. Did you receive that?

A    I don't remember.

(Exhibit No. 16 marked.)

Q    Okay. This is a packet of emails floating around the Anthropology Department around this time. The first page is the request to -- for someone to move their class -- Kara R to move her class online. The second one says, "UTPD is monitoring this situation." Were you aware of that?

A    I was told, I think by Gina Owens, that she had informed them, and that they would be monitoring the situation. Yeah.

Q   On the third page of this document, it's from an Amanda Williams.  "Hi, Barbara.  I missed the meeting this afternoon due to class.  However, I wanted to make you aware of an odd situation that occurred this morning in my anthropology 105 class.  I believe I had a non-enrolled individual showed up for my class."  Do you think it is at least possible that this is someone who showed up in the Department of Anthropology on Monday morning looking for you?

A   No.

Q   Why do you think that's not possible?

A   Amanda Williams is a biological anthropology lecturer.  She teaches biological anthropology, very, very removed from what I teach; cultural anthropology.  Amanda Williams' courses, as far as I'm aware, are outside of the department.  Amanda's office was two doors down from my office in the department.  And she regularly, every time I saw her, complained about how she had to run across campus, on certain days three times a day, to teach her classes that were very far away.

Q   So your testimony today is that there is no chance that this unidentified individual who showed up in her class was looking for you?

MR. BIGELOW:  Objection.  Calls for

speculation.

A  I can't know what other people are looking for or trying to do.  But it would be very shocking to me if someone somehow thought by going across the campus from where the anthropology department is located to look for someone who works in the Department of Anthropology, in an extremely unrelated field to what Amanda Williams works on, would be looking for me.

Q  The next page of that email is from Giovanna Vidoli.  Who is that?

A  She was recently promoted to the director of the forensic anthropology center.

Q  She emailed Dr. Heath and said, "I'm sure you know but Tamara's details have been posted publically.  I don't have X but it was shared secondhand.  Apparently some of the comments are threatening, but I have not seen them.  If she doesn't know already, they should."  Did Dr. Heath inform you about the information on X or did you find that out from someone else?

MR. BIGELOW:  Objection.

A  I was never informed by Dr. Heath about the X post that listed my home address.  I did have a phone conversation with Dr. Heath that -- that night, the night of the -- the night of September 15th.  She

was very apologetic that all of this is happening to me. And she wanted -- she just wanted to let me know that she wants me and my family to be safe. It could have been as a result of knowing that my home address had been shared on X. I had also told colleagues earlier that day, who had asked if -- if -- if I want to take my family to their house for the night and stay there with them instead, so.

Q   Did you ever take anyone up on that offer?

A   No.

Q   Okay.  If you would turn to the next page.

A   (Witness complies.)

Q   This is -- looks like a tweet.  That's probably not the right term anymore, but I don't know what it is.  "Tamara Shirinian lives at 5107 Wilkshire Drive, Knoxville, Tennessee  37921.  Her phone number is (818)438-9887.  To reiterate, I DEFINITELY, quote, do not, quote, condone any harassment or violence against this individual.  Wink."  You testified earlier today that you did not receive any threatening messages.  Do you remember that?

A   Yes.

Q   You don't consider this to be a threatening message?

A   This was never sent to me.

Q   Okay.  So --

A   This is my first time seeing this.  I -- a friend of mine informed me, and -- informed me that this had happened.  And, so, I knew that my home address had been posted on X.

Q   Does this sound threatening to you as you look at it now?

A   It's threatening to the extent that my home address is out there.  I mean, my home address is also publicly available, which is how this person got it.  So even before someone informed me that my home address had been posted on X, I was a little weary of someone looking for it, and finding it, and coming to my house.

In fact, that day, Monday, when I decided to work from home, because I had a lot of -- I had a lot of preparation to do for class the next day, because I hadn't prepared for my lectures on the weekend, because I was at a writing retreat.  I decided to stay home, because when I go to the office, students often stop by, have long conversations; colleagues stop by, have long conversations.

At some point during the day, I wondered if it would be safer for me to go to campus.  I didn't. But I wondered if it would be safer for me to go to

campus. There's a lot more people around. So if someone did come to my house by finding my address, I was terrified that I was home alone all day. My husband was at work. My child was in daycare; not that my child being home would have made me feel any better. But I was at home by myself. On campus, I would have been surrounded by colleagues; by students who care about me. I would be less alone and less violable.

And, so, it's the -- yeah. I find this threatening in a way because of my home address. It puts me in a very vulnerable position. I received letters in my -- in the mail to my home address. When someone knows where you are located, that always feels uncomfortable. I don't know if that has ever happened to you. But it's very uncomfortable for people to know where you live.

Q    And you thought the safer thing to do would be to go to work?

A    At the time, I believed, yeah, that it would have been safer for me to be at work, where I wouldn't be alone for someone to do something to me.

Q    If you'll look a few pages later, there's an email that begins, "Thank you, Kandi." It's from September 16th.

A    Yes.

Q   So Tuesday.  And the email below that, Kandi Hollenbach -- who is Kandi Hollenbach by the way?

A   She is the -- the assistant -- assistant head of the Department of Anthropology.

Q   Okay.  It looks like the previous evening, Monday night, she emailed a group of five people.  "One of the grad students asked today about what would happen in the off-chance that there is a bomb threat in the building.  So a building emergency action plan was developed last year for Strong Hall, and emergency placards were posted on each floor.  At the time, I asked Helen to serve as warden for the fifth floor, and Steven and I on the fourth floor.  The idea is that if there is an emergency, then the floor wardens help to make sure that people know where to go, whether to shelter in place or to evacuate."

MR. BIGELOW:  Just for the record, I'm going to object to this entire line of questioning, because all of this was -- was sent after decisions were made by the administration.

MR. FITZGERALD:  Noted.

Q   Look at the next email.  Kandi reports back to the same group that she emailed Bryan Gard in the Office of Emergency Management."  They're talking

about a phone tree to send out word in the event of an emergency. Were you aware that this was going on? Did you receive any of these emails?

A I don't know if I received any of these emails. They were not on the faculty listserv, and they were not addressed to me. But I -- these are pretty -- there's a lot of concern regarding safety on campus regularly in our department. As you might know, the Department of Anthropology is located in one of the main science buildings. So there's a -- regularly we get sent information about what to do in case of a fire. There have been police -- actual police trainings in our department on how to go about in the case of an active shooter. I think it's -- it's an important caution to take in the case of anything going on.

And it says in -- as far as I can tell, it says, "One of the grad students asked today about what would happen in the off-chance that there is a bomb threat in the building." I think that it's -- it's really -- it's a responsible thing to do, to consider all possible safety issues on -- on a campus as large as the University of Tennessee.

Q Is it your testimony that it is just coincidental that these precautionary measures were taken in the day or two after your comment circulated on

the internet, or do you think some of these actions were taken as -- in a response to the swirl of activity generated by your comment?

MR. BIGELOW: I'm going to object to that.

A    These emails were certainly in response to the fact that the department and the university had received emails, perhaps also phone calls, about a comment that I had made in my private capacity as a citizen on a friend's private social media page. These are precautions that any organization as large as the University of Tennessee, I think, would take in anything that seems to be an incident.

Every time, for example, that there is a school shooting in the United States, our faculty and our department have conversations with graduate students and faculty about what to do in the case of an active shooter. As far as I'm aware, there -- there hasn't been any threats of an -- I think there was actually one earlier last year. But those are never in response to "Someone is threatening us right now. We have to prepare for a shooter right now." I think when something happens in the United States, we react.

An organization as large as the University of Tennessee would react and think if these were to happen here, what would we do? And I think those are

very legitimate concerns to have because it's a very, very large institution. As far as I can tell, there was never a bomb threat. I think it's a completely legitimate thing to think about in the context of, very unfortunately, the world that we're living in.

Q Do you think it's an important thing to think about in a context of you and the attention you were getting for your comment over the weekend?

A Shortly before I made my comment, as I'm sure you're aware, a very, very famous political commentator had been shot on a university campus. And, so, this is in a context of a lot of anxiousness about what had happened the week prior to this, as well as being bombarded by emails and nervousness. Am I suggesting that my comment and the attention it received had absolutely nothing to do with these feelings of anxiety? No. I'm not saying that. I'm just saying that these are all very legitimate things to think about.

It has nothing to do with the content of what I wrote or my First Amendment rights. It's about the attention that the Department of Anthropology and the University of Tennessee is receiving as a result of Robby Starbuck and President Boyd.

Q These are safety measures that the

department is taking, and I think you just agreed that they are, at least in part, actions taken in response to the comment and the attention it had gotten. Do you agree with that?

A This, I think, is a response to the fact that the president of the university, of which this department is a part, went out there on his very, very, very populated and popular social media platforms and claimed that there was a member of the faculty of one of the universities that he oversee who celebrates and advocates for violence. That has nothing to do with me. That is the way that the president of the university chose to represent a member of the faculty at the University of Tennessee.

Q Dr. Shirinian, on September the 16th, at 10 a.m., Dr. Heath told the entire anthropology faculty, including you, "I think it would be a good idea for those of you who teach large classes to take attendance for the next few weeks. We had an incident yesterday of an unenrolled visitor to a class, and would like to ensure that we are aware if other cases arise." Are you telling me that this is in response to Randy Boyd's tweet, or your comment and all of the messages that followed?

MR. BIGELOW: Objection.

A   The comments --

MR. BIGELOW:  That's not what she said.

A   -- that I made was visible to, as we found out earlier today -- visible to 2,200 people maximum. The comment that was circulated was a screenshot.  It was a redistribution.  It was not what I said.  But I think beyond what I said, things about what I said, mischaracterizing what I said, were said by the university.

And, in fact, the university's representation who made those mischaracterizations about my comment actually have far larger of an audience than I or Hasmik Geghamyan have.  And, so, if there were a lot of attention to the Department of Anthropology, and if there was a lot of attention to Dr. Tamar Shirinian who works in the Department of Anthropology, the people who are speaking about Dr. Tamar Shirinian in the Department of Anthropology, who had a far larger audience, are probably more likely to point to, in terms of what causes this kind of panic in the Department of Anthropology.

Q   I'm not sure what you just said, but let me ask the question again.  Do you think this request for people to take attendance because of concerns about unenrolled visitors was a response to concerns -- safety

concerns relating to your comment and the attention it drew?

MR. BIGELOW: She -- asked and answered.

She already said it was in part because of the president's or -- the president's post.

A    I'll answer.

Q    Please.

A    Those of us -- and this is not me -- at the University of Tennessee, my largest class has ever been 26 students, all of whom I know by name. Those of us in the faculty at the University of Tennessee and I would say, in fact, any university in the United States, we fear people who are not our students showing up in our classes for one main reason, and that is being recorded and taken out of context for words that are protected by academic freedom.

My colleagues, in fact, since then, have told me that they are really afraid in their large lecture classes to be recorded by students, students or non-students, or students who are not enrolled in that case, and showing up just to be able to get some kind of clip from them to be able to send to Fox News or wherever else.

Q    Are you denying --

MR. BIGELOW: Let her finish, please.

A   Now you have asked me about this plan.  In the off-chance that there is a bomb threat in the building, I think that this happened because someone decided to screenshot a comment that I had made to a very small, comparatively very small audience; send it out to somebody who had political motivations to start a termination attack on me, to try to get me terminated, that came from a call by J.D. Vance, who is the vice president of the United States, and the mischaracterization of my comment, which in no way advocated violence or celebrated violence, as celebrating and advocating violence by the president of the University of Tennessee's system got a lot of attention.  And a lot of attention makes people nervous. A lot of attention for any reason makes people nervous.

I think that my colleagues in the Department of Anthropology, including graduate students, were nervous about the kind of massive national attention that they were getting.  And I think that it is, of course, a very responsible thing to do, in the case of so much national attention, to educate yourself about what if this and what if that.

As far as I am aware, however, that off-chance that there was a bomb threat never became an on-chance.  And as far as I'm aware, there was never a

bomb threat, nor was there any other kind of threat to the university. But I -- I think that this precaution is a really important thing for an organization as large as the University of Tennessee to take.

Q Okay. Two pages down the road, Ms. -- or excuse me, Dr. Hollenbach sends an email to the entire anthropology faculty, and attaches the building emergency action plan. This was done on Tuesday at 9:58 a.m. Does this -- do you or do you not think that this was an action taken out of concern about the comment you made and the attention it drew?

A I think that this is coming out of a lot of nervousness and a lot of anxiety having to do with a lot of attention placed on the Department of Anthropology and the University of Tennessee because of things that were being said about it as a result of the mischaracterization of a faculty member in the Department of Anthropology as endorsing and advocating for violence.

Q Okay.

MR. FITZGERALD: Can we take a short break?

(Break taken.)

Q I want to ask a couple of questions of stuff I had skipped. You said that when you were

driving to Asheville on Saturday that a friend called you and said, "Hey, watch out for Charlie Kirk stuff." Who was that? Do you remember?

A    My colleague Arsalan Khan in the Department of Anthropology.

Q    Okay.

(Exhibit No. 17 marked.)

Q    Also, you said you had never been arrested during a protest. Have you ever been arrested for anything else; any other reason?

A    Yes.

Q    Tell me about that.

A    When I was 20, I was arrested for shoplifting.

Q    Okay. Where was that?

A    In Northridge, California.

Q    What did you shoplift?

A    A pair of jeans.

Q    How did that criminal case resolve itself?

A    It was a misdemeanor petty theft. I pled guilty and paid a fine.

Q    Have you ever been arrested any other times?

A    No.

Q    The packet I've handed you -- lets trade.

Exhibit 17 is another set of documents that your attorney provided me in response to the requests in the deposition notice. Do you agree that you received all of these emails, letters, voicemails, communications?

A   Yes.

Q   Okay. Is it still your testimony that at no time did you receive a threat?

MR. BIGELOW: Asked and answered many times.

A   There's no threat. If the -- the one time that I felt like there was something slightly threatening, I reported it and was told by UTPD "That's not a threat."

Q   Okay. Do you consider this a threat, page 1 of this packet?

A   No.

Q   Okay.

MR. FITZGERALD: Off for one second.

(Break taken.)

(Exhibit No. 18 marked.)

Q   This is just a quick one.

MR. BIGELOW: May I see it?

MR. FITZGERALD: Do what?

MR. BIGELOW: May I see one?

MR. FITZGERALD: Oh, yeah.

Q This email went to another college altogether. Actually several colleges. "Professor Tamar lives by the sword." Have you seen this email before?

A No.

Q Okay. It went to at least two departments in the College of Engineering. I was just curious if you had seen that.

(Exhibit No. 19 marked.)

Q This is 19. This article was published about five hours after you received the email from Chancellor Plowman. Did you reach out to Mr. Thomas or did Mr. Thomas reach out to you?

A I was not in touch with Mr. Thomas at the time of this publication. He had, if I'm remembering correctly, emailed me, or someone from Knox News had emailed me, and had left a voicemail or a text message, I don't remember now, on my phone. I didn't talk to any press or media until much later.

Q How did they know to reach out to you so quickly?

A Robby Starbuck had published my redistributed screenshot of my Facebook comment on my friend's Facebook post, and had, alongside that, also went and found the name on my Facebook at the time,

which was Tamar Shirinian, which is my name, and Googled it. I'm assuming someone had, because they had associated my Facebook comment with my faculty profile.

And, so, he must have found my email address on the directory. I don't know how any press got my phone number. That's still a mystery to me. Because the phone number even that was shared on X was my mother -- is my mother's cell phone number. I don't know how any press -- I'm assuming that my U.T. directory had my -- because I, of course, gave U.T. my cell phone number at some point. I'm assuming that that's where this information came from, but otherwise, I don't know.

Q I bet your mother got an ear full, didn't she?

A My mother is old and doesn't know how to text message, thankfully.

Q So this -- you're talking about the comment and the directory information with your picture posted by Robby Starbuck on X. He has 845,000 followers on X. And I checked this morning, and he has about a hundred thousand followers on Facebook. And just some quick back-of-the-envelope math, would you say it's safe to say that at a minimum, a million people saw the words that you posted?

MR. BIGELOW: Objection. That's -- objection.

A    I don't know how many people saw it. One thing that we have learned about X and Facebook and social media now is that there are a lot of bots on there, operating sometimes in various different countries, that have nothing to do with anything in the U.S. I mean, there has been many, many reports on this. So when it says 845,000 followers, I have no idea. But I'm going to assume that some of those are bots.

And, also, just because something is posted doesn't mean every single follower sees it. I have friends on Facebook who are often upset with me that I didn't like their wedding photos or whatever because I did not see it.

Q    You make a good point, especially for a non-Facebook user like me. Would you agree that it probably passed through the inboxes of more than 1 million people?

MR. BIGELOW: That's not how it works.

MR. FITZGERALD: Sure it is.

MR. BIGELOW: It's not.

A    That's not how Facebook works.

MR. BIGELOW: It's not.

Q    Okay.

A   There is no -- there is an inbox.  It's a message.  That's when something gets sent directly to you that's private.  It will -- it can only be seen by the user of that page.

Q   Okay.

A   Facebook posts, this is -- it's called the wall.  I don't know what it's called now.  I mean, I grew up on --

Q   Right.

A   -- MySpace, and then started using Facebook when I was in my early 20s.  At the time, it was called the wall.  I have no idea what they're calling it now.  On the wall or a timeline -- maybe timeline is what it's called now.  Things pop up on Facebook now.  From when I look at my phone on my feed, more than 70 percent of the things that pop up are advertisements.

And, so, if something has been posted by someone who you're friends with, it's not necessarily true that you would see it.  And, in fact, I am very frequently upset that because of the algorithm that Mark Zuckerberg has openly admitted to that actually hides posts that have political content in them, my political posts that I find very important, and it's usually information or news about things that are happening that

I really would like to be seen by all of my 1,100 Facebook friends, are rarely seen, and that's really upsetting to me.

Q   Can we agree that Robby Starbuck's Facebook post at least passed across the main page of his 110,000 followers?

MR. BIGELOW: Objection. You can't. You simply cannot. That's not how it works.

A   No.

Q   I do know a little bit more about how X works. And you would agree with me that if he posted this on X, then it went to 845,000 people?

MR. BIGELOW: Objection. That's not how that works either.

A   X is a lot like Facebook as far as I understand. I don't use X. But when you post on X, if you -- it doesn't necessarily mean that people who follow you will see it. It will -- it will be amongst other contents and -- it's not -- again, I have -- I have no way of knowing, in fact, based on my knowledge of how social media works, and I have actually published on social media, so I have looked into some of this before as a researcher.

And the likelihood of -- at the time, if you had 845,000 followers, for those 845,000 people to

have seen it on that day is quite unlikely. I'm not saying it's impossible. And if one knows that it's there and goes looking for it, it is accessible. That's why I think there's a difference between something being accessible and something being there to be seen.

Q    That's fine.

MR. BIGELOW:  Can we go off the record just for a second?

MR. FITZGERALD:  No.

MR. BIGELOW:  Okay.

(Exhibit No. 20 marked.)

Q    The University of Tennessee received a records request, and produced more than 3,000 pages about this case. I assume you saw that because your attorney has used that production quite a bit in these depositions. Am I correct?

A    Yes. I've seen that.

Q    Okay.

A    I've seen the article. I haven't seen --

Q    Okay. The document production?

A    -- the documents. Yes.

(Exhibit No. 21 marked.)

Q    The interview with the Knoxville -- I call it the News Sentinel because I'm an old newspaper person, but it's now just knoxnews.com. Actually, this

one isn't even that. This is The Daily Beacon. You gave an interview with them, and then this article -- do you remember doing this? It was on December the 2nd, so about three months after everything went down.

A    Yes.

Q    Okay. I'm going to start reading at the fourth paragraph. "Shirinian's comment, which she made on a private social media account, surfaced online the evening of September 14th. Harassment emails swarmed her inbox soon after." Do you agree with that statement?

A    If "surfaced online" means that the redistributed screenshot of it became public knowledge. Yes.

Q    Yeah. I was really talking about the next sentence. "Harassment emails swarmed her inbox soon after." Do you agree with that statement?

A    Yes.

Q    "The whole day is kind of a blur now," Shirinian said in her first interview with media. "Shirinian wrote in a letter of appeal to Plowman that she received a 'significant amount of hate mail' as political influencers and government officials publicized her comment. One email from a U.T. student said, quote, this university is already a much better

place without you. Thank you for exposing yourself as a parasite to not only UTK, the city of Knoxville, but the United States of America, closed quote."

And the next quote from you, "I was seriously concerned about my safety," Shirinian said. Did you say that to Ms. Lee?

A   Yes.

Q   Okay.  Were you truthful with Ms. Lee?

A   Yes.

Q   Okay.  Were you, in fact, seriously concerned about your safety?

A   Yes.  I was at home by myself.

(Exhibit No. 22 marked.)

Q   This is another article setting the trial date in this case.  This is dated 12/31, New Year's Eve. "Shirinian wants to return to the classroom and is seeking compensation for back pay, emotional distress, 'loss of enjoyment of life' and damages."  And that's something you discussed with your attorney, so I won't get into it.  But you are, in fact, seeking all of those things in this case?

A   Yes, I am.

Q   Okay.

A   Yes.

Q   Sorry.  I didn't hear you answer.

A   Sorry.

(Exhibit No. 23 marked.)

Q   This is a letter to the editor.  This is Exhibit 23, a letter to the editor that you published a few weeks ago, an open letter to the board of trustees. Why did you do this?

A   The semester was starting, I think, within a week of when I finalized this letter.  I was -- I wanted to get back to the classroom.  I -- at the beginning of the fall of 2025, I had signed up already for two courses that I was planning on teaching in the spring of 2025, before I was placed on administrative leave.  I had many students who wanted to take those courses.

I have a grad- -- I had a graduate student who has come to the United States from India to study with me, particularly because of the way in which I approach feminist anthropology.  She was very excited to take that course with me.

And a week before classes were starting, I was looking for any way that I could get back to the classroom.  I wanted to get back to the classroom.  And I realized that the board of trustees is the ultimate boss and decision-maker of the University of Tennessee. I know that.  The board of trustees has many law- --

three lawyers, I believe, on it. I really do believe that any lawyer who knows about this case, and I imagine including you, understand that what the University of Tennessee has done violates constitutional law. That should be clear to anyone who studied law. It is clear -- I have not studied law, but it is clear to me. It is clear to most people who I have talked to. It is clear to lawyers who have written statements in support of me.

And I was hoping that -- I was thinking perhaps the board of trustees is just not aware of how things are going or what is happening, and maybe they will act now. Maybe they will say, "This is wrong. We cannot do this, and she needs to be reinstated."

Q   Did you ask the News Sentinel or Knox News to publish that for you?

A   Yes.

Q   And they agreed, obviously?

A   Yes.

Q   Who wrote that?

A   I did.

Q   You did? So this was hopes of public pressure on the board to reinstate you. That was the goal in this letter?

A   I cannot contact the board. I cannot

write to them individually and personally. On top of which the University of Tennessee, as I say in my first line, has already publicly made claims about me. Mischaracterized me in thin- -- in ways that are extremely dangerous to my reputation. And I decided that a public letter would get to them somehow. That they might read this. I assumed that maybe a friend of a board member would see this and pass it on to the board.

(Exhibit No. 24 marked.)

Q    These are emails from students to leadership at the university or your department complaining about your comment. In fact, included in here is the one from the person who you reported to, the Office of Title IX, and then to student conduct and community standards. You probably have seen most all of these emails. And a couple you may not have been copied on. But do you think the university should take seriously complaints from students?

MR. BIGELOW:  I'm going to object in as much -- please.

A    There is two emails here. There is one from someone who I cannot confirm is a student. I imagine this person is "Student A". I cannot confirm that that person is a student. I don't see if they have

the @vols.utk address on here. And below their email address has been redacted.

And then there's the other one that I received that did have -- I know that student, because I know this email, and it did have an @vols.utk address, which I reported. So there is this one email from, I imagine, "Student A," and then there's this one from the student that I forwarded, that I complained about. There are two emails in this package.

(Discussion off record.)

A    To answer your question, I think it is very important for students to have a voice at the university. I think that the student who wrote to Dr. Hinde and Barbara Heath has every right to write and voice their opinion to leadership of the University of Tennessee. Whether I think that the student who wrote a very crude message to me should'-- should be doing that is, you know -- I don't think they should be doing that. But is it their right to do that? I suppose it is their right to do that.

But there were also very supportive emails from students that I received, and I think that Dr. Plowman has received. And I also know many students would have liked to say how they felt about this but they were afraid to. Many students also did sign, very

bravely signed, the UCW petition for my reinstatement, and actually put their names and their affiliation with the University of Tennessee on there knowing what kinds of serious repercussions could come to their education and careers in doing so, after they witnessed a faculty member at the University of Tennessee being terminated for extramural First Amendment protected speech.

Q   Do you think your comment and the attention it received harmed the reputation of the university?

A   I think that different people have different viewpoints and different opinions about what transpired. I think there are some people who believe that having a professor like me is terrible, and that I am terrible, and that Charlie Kirk was like Jesus. But I think that there are also many people who think that it's significantly and very, very horribly damages the reputation of the University of Tennessee to have such disregard for the U.S. Constitution. And that has been an opinion that has been voiced to me time and time and time again.

Q   Some of the emails that I have given you today are emails from parents talking about sending their child to U.T. and its left-wing indoctrination; that it's unsafe. Do you think that's important for the

university to consider how it's perceived by parents of students and perspective students?

A   I think it is important for a university to consider how parents who send their children -- not their children, their adult children -- to the university feel about the university. I think that they should do everything they can to make sure that parents have confidence in the university to be able to educate their children. Yes, I do think that.

However, I don't think that public opinions, parents' opinions, Marsha Blackburn's opinions, you know, Tim Burchett's opinions about me, or my scholarship, or my extramural speech on social media is a cause for the University of Tennessee to terminate me.

(Exhibit No. 25 marked.)

Q   This is the Strategic Vision for the University of Tennessee Knoxville. Have you ever seen this document before?

A   I've never -- I've never read this document before.

Q   Okay. Chancellor Plowman testified that your comment was inconsistent with division for the university. But if you haven't seen it, I won't -- I won't ask you about it.

(Exhibit No. 26 marked.)

Q   This is similarly a Strategic Vision for the University of Tennessee system. This would have come from the president. Do you think that your comment was consistent with the vision that the University of Tennessee has for itself?

MR. BIGELOW: Objection. Calls for speculation.

A   I haven't read this. I don't know exactly what is in it. But I don't even think that that matters necessarily. Because my comment that I made on my friend's personal Facebook page and my personal and private capacity as a citizen has absolutely nothing to do with the University of Tennessee or its mission.

Q   However many people saw the tweet by Robby Starbucks or the post on Facebook from him, the University of Tennessee's name was attached to all of it. So can you really say that the University of Tennessee had nothing to do with this or wasn't impacted by it?

MR. BIGELOW: That's not what she said. Objection.

Q   Straighten me out then.

A   I never attached -- and you have it written there "comment." I never attached my comment to

the University of Tennessee.  I have that comment here.
We can read it again.

Q   I've read it a thousand times.

A   Okay.  Well, I don't see the University of
Tennessee mentioned anywhere on even that screenshot.
And you have a copy of what my Facebook page looks like.
Nowhere on my Facebook page is the University of
Tennessee mentioned or has ever been mentioned.

Q   I understand all of that.  But whether due
to you or circumstances beyond your control, your
tweet -- your comment and the name the University of
Tennessee became linked in hundreds of thousands of
social media posts.

MR. BIGELOW:  Objection.  It's just not
correct.

A   I have no idea how many social media posts
went out about me, like I said.  I tried as much as I
possibly could to not read anything about me on social
media.  But if my name was attached to the -- if my
comment was attached to the University of Tennessee, I
never did that.  That happened completely outside of my
control.  In fact, if it had been in my control, I would
have tried to prevent it.  I never spoke in the name of
the University of Tennessee in my comment on my friend's
Facebook post.  And I would never post my political

opinions anywhere under the name of the University of Tennessee.

Q But someone did. And someone connected you and the University of Tennessee, rather quickly it appeared. And your name and the university's name were splashed all over the internet. Do you agree that that was -- that the actions you set in motion were harmful to the reputation of the University of Tennessee?

MR. BIGELOW: I'm going to object to that whole thing. That's you testifying.

A I would take issue with the characterization of the association of my comment with the University of Tennessee having come from actions that I took. My action was, I had just had dinner. I was in bed. I was reading the news as I do while I am laying in bed after dinner.

It was a Friday night. I was looking through the news. Terrible things were happening in the world. I was regularly horrified beyond what I can even imagine horror even being. I regularly was just -- things that were happening were so beyond horrible and awful that I could not even comprehend them a lot of the time. And I saw other things outside of some of these horrible, horrible things that were happening all over the world, but especially in -- you know, in Gaza. And

then I -- I'm a mother. So I am on a bunch of mom groups on Facebook, some of which I have added myself onto, some of which I haven't, because most of Facebook is advertisements now.

And I kept seeing these posts about grieving for Charlie Kirk, grieving for his widow, grieving and all of this. And then I saw my friend Hasmik's post. And I had my own political ideas, political understandings of Charlie Kirk, of grief, of genocide. And, so, I expressed an opinion mostly in agreement with her post. And that then was taken completely out of my control, completely out of context. And things were done with it that I would never approve of.

Q Okay. So will you agree with me on this, and we can move on? Do you agree that this was a PR nightmare for the university even if it wasn't your fault?

A It was, I imagine -- I imagine it was some kind of nightmare. But I don't know if it's a PR nightmare. I think mostly the kind of nightmare that the University of Tennessee faced was threats to withhold funds from donors, and by the state legislature, and by senators, and U.S. congressmen.

Q What's your evidence for believing that?

A    Posts calling me a lunatic by a senator of the United States.  A post by a congressman who represents my district, saying he's on it, as in responding to demands that I get terminated.  I imagine saying "I'm on it to fire this person" is "I am going to make that happen."

Q    Social media posts.  It's the entirety of your evidence?

A    And we have letters written by --

Q    Sure.  We do.  Correspondence?

A    -- state legislators.

Q    Yes.

MR. BIGELOW:  Continue.

A    That, I think, is a real nightmare for any institution.  When people who have all of the money on whom the university depends -- or not all of the money.  But people who control a lot of money say you're not going to get this money if you don't ruin this person's life, I think that's a nightmare.  Because ruining that person's life is illegal.  But losing those funds is pretty uncomfortable as well.  So I would say that the university is in a pretty, pretty difficult place that is not my fault.

(Exhibit No. 27 marked.)

Q    Have you seen this document before?

A    Yes.

Q    I think we've probably covered all the fact section, so I would just like to talk about the claims starting on page 42. So at Count One you are seeking injunctive relief to return to work?

A    (Nodding head.)

Q    Is it your belief that you could safely return to work today?

A    Yes.

Q    Do you agree that if the judge orders you back to work, that that's going to be a big news story?

A    Yes.

Q    You don't think it's at all possible that someone who harbors ill will toward you might come to the Department of Anthropology and find you if you were to return to work?

MR. BIGELOW:  Objection.  That calls for so much speculation.

MR. FITZGERALD:  Sure it does.

A    I think that if someone wanted to -- I'm going to be very crude, because what you're describing is a really horrible and really scary situation.

Q    Uh-huh.

A    I think that if someone were in sane enough, completely I would say demented enough to want

to murder me, they have my address. They can come -- I'm not home right now. But as soon as I get home, they could come to my -- I have been home, because I don't -- I don't go to work anymore. For the past four months, I have pretty much been home most of the day, every day, and no one has attempted to do that.

I would also say that if -- if there is someone insane enough to go and murder somebody, then I -- I don't think that we can be operating within the rational realm of -- you know, that -- that someone who is thinking -- wanting to go and murder Dr. Tamar Shirinian no matter what, there's really no -- that's a completely irrational person.

I also think that we are four months past this. I am on campus right now. I have been on campus for depositions a few weeks ago. I walked all through campus to get from the parking lot in which I parked my car to Dr. Plowman's office on Wednesday. No one had any -- I recognized a few people while I was walking through campus. No one felt the need to hurt me.

Q    Uh-huh.

A    And no one has felt the need to come and hurt me in my home.

Q    Okay. At the time all this happened, do you think the university should have done more to

protect your safety?

A   Yes.

Q   What do you think the university should have done?

A   I think the university should have avoided labeling me as a person who advocates violence and murder.

Q   Okay.

A   That really placed me at risk.  That is what endangered my life.  So when I say that I felt for my security, I really felt scared for my safety in my home, is a result of someone who is the president of a massive institution, one of the largest institutions if not the largest in the state of Tennessee, referring to me as somebody who celebrates violence and murder, that is putting a target on me.  That seriously compromised my feelings of safety that day in my home.

Q   Is it your testimony that you didn't have a target on you, to use your words, until he made that post?

A   Yes.

Q   Back to the Amended Complaint, page 44, Count Two.  You're seeking compensatory and punitive damages against all defendants in their individual capacities.  Just to hear it in your words, why punitive

damages?

A    Can you show me where you are again?

Q    Sure.

A    Page 44?

Q    Page 44.  Just look at the heading.

A    For over four months, I have been locked outside of the classroom.  Teaching is something that I have trained for, for over a decade.  It is some- -- it was my profession.  It was my life's work.  That has been taken from me.  I have been made to feel that even though there is a Constitution of the United States of America, even though there is a First Amendment, even though almost every other university that took actions based on J.D. Vance's, and Senator Marsha Blackburn's, and Congressman Tim Burchett's demands that they be fired from public institutions for their extramural speech have now been returned to their jobs.  And I am still waiting for that to happen.

My colleagues are terrified.  My colleagues at the University of Tennessee are terrified that they cannot say what they think and what they believe.  For those of us in the social sciences, in fields like political science, sociology, anthropology, human geography, having opinions and ideas about the world in which we live is a big part of what we do.  And

my colleagues are afraid of the most minimal of political statements online, teaching in their classrooms. Because if I can get fired for a comment that I made on a friend's social media page on my personal time, in my private capacity, they can be fired literally at this point for anything.

Q   Tell me why you think you're a victim of viewpoint discrimination.

MR. BIGELOW:  Objection as much it calls for a legal conclusion.  But she can answer.

A   The viewpoint that Charlie Kirk was not a great person is now barred from possible speech.  People were fired for it.  I was fired for it.  I was fired because I had an opinion about Charlie Kirk that was unpopular.

Q   Why do you think you were fired for your opinion about Charlie Kirk and not because you said "I'm glad he's dead, and I'm glad his kids are going to grow up without a father, and his wife is a sick fuck for marring him?"

MR. BIGELOW:  Objection.  That's actually not what she said.  That's mischaracterizing her comment.

A   I wouldn't say that.

Q   You did say that.

A    That is not how I -- no.  I did not say "I'm glad he's dead."  I was absolutely not glad he was dead.  I was not glad about anything.

Q    Let me pull it out.  "The world is better off without him in it.  Even those who are claiming to be sad for his wife and kids ... like, his kids are better off living in a world without a disgusting psychopath like him and his wife, well, she's a sick fuck for marrying him, so I don't care about her feelings."  Why do you think you were testi- -- you were terminated or suspended for your opinions about Charlie Kirk and not for the repugnancy of the words you used?

A    I am pretty confident that if I had written those exact same words about someone who is not as favored as the leaders of the state of Tennessee, or at this point the United States of America, that I would not have been terminated.

For example, if my -- if the post on which I commented were about Osama bin Laden, I'm pretty sure that those comments about Osama bin Laden, his many wives and his many children, would not have been seen as a terminable offense by the University of Tennessee.  It is because they were about Charlie Kirk.  It is because Tim Burchett and Marsha Blackburn are huge fans of Charlie Kirk, to the extent that they now want a Turning

Point USA Chapter in every school in the state of Tennessee. And it is because of donor pressure coming from conservative parents and others in the state of Tennessee pressuring the university to terminate me that the university took action against me. That is a viewpoint. It is their viewpoint that Charlie Kirk was an excellent person. It is my viewpoint that he was absolutely not.

Q   Okay. One financial question. As we sit here today, you have not missed a single paycheck from the University of Tennessee. Is that correct?

A   I have not.

MR. FITZGERALD:  Let's take a break for five minutes.

(Break taken.)

(Exhibit No. 28 marked.)

Q   I just have a few things I wanted to clean up. Somehow I started with the oldest version of your CV that I could possibly find. So now I would like to add as an exhibit a more current version. Does this appear to be a reasonably current version of your CV?

A   This is pretty current. Yes.

Q   Okay. I understand it may have evolved even further since then.

I know reinstatement is your goal. Have

you talked to other universities or organizations, or reached out to anybody about alternative employment?

A    No.

Q    No?

A    No.

Q    Have you had any conversations with anybody about jobs elsewhere?

A    Somebody from -- somebody who I know and with whom I was discussing some -- a publication that we're collaborating on said that if I wanted, she might be able to find a year -- a year of visiting position at the university. She chairs a department that she's at. And I told her that that's not really possible for me.

Q    What school was that, out of curiosity?

A    The University of Massachusetts at Amherst.

Q    Has your husband done any job searching, sent out any applications, done anything to look for employment elsewhere?

A    No.

Q    Okay.

MR. BIGELOW:  Mike, just to help you, can she explain why?  I think it will be beneficial for you.  But you don't have to if you don't want.

Q    Why not.  Sure.

A    I don't know why I should leave.  I don't -- I did not do anything wrong.

Q    Okay.

A    The one thing that I -- you know, that --

MR. BIGELOW:  That's not what I was -- sorry.  That's not what I was trying to get.  I promise.  It was your family situation.  That's all.

A    But it is because of my family situation.

MR. BIGELOW:  That's why.

A    We have a two-academic household.  The likelihood of a spousal higher is so small.  And we -- we got what many of our friends would call just like, you know, the Holy Grail.  Two academics.  Both of us are anthropologists, too.  And we somehow landed, and we got in a department.  And I don't want to leave that.  His children --

MR. BIGELOW:  That's what I was talking about.

A    -- live here.

MR. BIGELOW:  Just so you know.

A    Their mother lives here.  We have a community here; an entire life here.

Q    Okay.  Thank you.

Okay. We have a lot of confusion about how widespread the comment was. This will bring us some clarity.

(Exhibit No. 29 marked.)

Q This was posted at 3:23 in the afternoon on Sunday. "Meet Tamara Shirinian. Tamar is a professor at U.T. Knoxville. Someone sent this horrific post to my DM's. U.T. must take action." And this has been -- at the bottom it says 4.1 million views. Do you agree with that?

A I agree that it says that. Yes.

Q Okay. Do you know who the someone is who sent this post to Robby Starbucks?

A No.

Q Okay. Presumably someone who is a friend of the person who made the post to which you commented, who has the 2,000 friends. Right?

A It would probably have to be. Yes.

Q Okay. Have you started a GoFundMe page?

A I have not. No.

Q Okay. Has someone started a GoFundMe page on your behalf?

A Yes.

Q Do you know how much money it has raised so far?

A     6,000 something.

Q     How much, if any of that, have you received so far?

A     I believe I've received most of it and with whatever fees that GoFundMe charges for each donation.

Q     Right.  How much have the donations been?

A     I haven't counted how much money has been placed in my account.  I gave the person who organized this my bank account information so it gets deposited into my account.  I haven't gone and counted each time that GoFundMe transfers money into my account.

Q     Who organized it?

A     Some friends in California.

Q     Okay.  Personal friends?

A     One guy who I had never -- who I've never met.  Hasmik Geghamyan was one of the organizers.  And a friend of Hasmik's, who I also have never met, was part of organizing that.  And I think I put them in touch with my friend Graciela Cabana, who's here, to get -- get word out in here.

Q     You said a number of members of the faculty of the Department of Anthropology have reached out to support you.  Which ones?

A     I'm afraid of -- I will answer your

question.  I have to say, however, I'm afraid of answering your question, because I'm afraid of retaliation against my colleagues in the same way that I've been retaliated against by the university.  But I will answer your question.

Q  Okay.  Go ahead.

A  I just very sincerely hope that there is no retaliation against my colleagues.

Q  That's not at all the purpose of my question.  I promise.

A  My colleague Anneke texted me, "I'm so sorry about what's happening."  My colleague Kandi Hollenbach emailed me asking if Raja and I would like her to organize a meal train for us.  Dawnie Steadman volunteered her house for us to stay in if we wanted to for any amount of time.  Graciela Cabana was very -- wanted very much to help fundraise for legal fees.  And thus, I put her in touch with my friends in California to facilitate that.  Arsalan Khan has -- was -- has been really supportive.  He's a -- he's a good friend.  He -- he has come over a few times when I've been kind of really sad at home.  We've talked.  Watched videos on YouTube.  And just played music and hung out so that I could feel better.

Did you -- your question was about the

Department of Anthropology?

Q   Yes.

A   Dr. Heath has been very supportive.  She has called me -- or she called me a couple of times in those first few days after I was placed on administrative leave, apologizing for this; saying that she wished me the best.  My colleague Dee Ann Pendry has written to me multiple times checking in on me, asking me how I am.  She also wrote to me when she found out the news that I was placed on administrative leave, saying that she's so sorry that this is happening to me.

Ehsan Lor Afshar has told me on the phone that this is all absurd and terrible, and he's so sorry that this is happening to me.  Karim Alizadeh has expressed his solidarity and apologized that all of this is happening to me.  I think that is it.

Q   Okay.  No further questions at this time.

MR. BIGELOW:  I have some follow-up questions.

EXAMINATION

BY MR. BIGELOW:

Q   Opposing counsel throughout the day has made a pretty big deal of the number of views that something has had.  Do you recall that?

A   Yes.

Q   Should your First Amendment rights be dictated by the number of views on a post?

MR. FITZGERALD:  Objection.

MR. BIGELOW:  You can object.

MR. FITZGERALD:  Argumentative.

Q   Okay.  Please answer.

A   I would object because I'm not a lawyer and I don't know for a fact.  However, I know that there's a thing called the heckler's veto.  After I was placed on administrative leave with expedited termination proceedings against me, I did a lot of research on the First Amendment.  In fact, I listened to a couple of lectures by Dr. Glenn Reynolds as well.

Q   Who's that?

A   Glenn Reynolds is a law professor at the University of Tennessee who, I think in 2016, posted on Twitter "Run 'em down" in response to protests in, I believe, Charlotte, North Carolina.  Basically calling for protestors to be run down.

There was a huge scandal.  In fact, one of the journalists who -- when I was preparing -- when I was preparing all of this stuff to produce, I came across one of the text messages from WBIR, I believe, someone who had covered that whole scandal, because it had really, according to many people, damaged the

reputation of the university and all of that. And he became a huge scandal. A lot of reporters covered it, and all of this.

And eventually the university found that they could not fire him because it was his First Amendment right to say "Run 'em down" in terms of -- in regards to protestors. And, so, he was not disciplined in any kind of way. And, so, I was very confused about why, you know, they do that with him and they don't do that with me.

And I actually wanted to hear what he had to say about the First Amendment, because I believe he's a constitutional lawyer. So I listened to his lectures. And, in fact, in his own lectures he explains heckler's veto. He explains the narrowness of the definition of incitement to violence and how it's actually very difficult to prove; or to legally define something as inciting violence.

And, in fact, I think that lecture that I heard was after he had posted "Run 'em down." And he talks about how tweeting "Run 'em down" is not incitement because it's not in the direct vicinity. It doesn't actually call on people who are there and can actually do violence to do violence. And, so, there's all of these ways. So I learned a lot about the First

Amendment from Dr. Glenn Reynolds.

Q   A few days ago were you at a deposition of the chair of the board of trustees?

A   Yes.

Q   And did anything that was said during that deposition come as a surprise to you?

A   Yes.

Q   Were you there when he testified that he didn't know this case was about the First Amendment?

A   Yes.

Q   Why did that come as a surprise to you?

A   For a few reasons.  First, I think that before -- before I ever filed a lawsuit, I think that everyone knew that this was a First Amendment issue.  So many of the emails and text messages and phone calls I received, so many of the news reporting about what was happening to me raised the question of the First Amendment.

And, so, it was shocking to me that someone who has so much power over the University of Tennessee wouldn't know that the University of Tennessee has done such a massive First Amendment violation.  It also surprised me because he's on a board with lawyers.  And I would have assumed that if the university is facing a lawsuit, that at least the lawyers on the board

would talk about or mention the First Amendment. I also was surprised because I did write that open letter to the board, and I would have assumed that he would have seen it. But I guess at the time that maybe he just never read my letter.

MR. BIGELOW: I don't have any other questions.

MR. FITZGERALD: Me neither. Thank you.

THE WITNESS: Thank you.

(End of deposition.)

CERTIFICATE

STATE OF TENNESSEE      )

COUNTY OF KNOX       )

I, Deborah A. Shoemaker, LCR, and Notary Public in and for the State of Tennessee, do hereby certify that I reported in machine shorthand the deposition of TAMAR SHIRINIAN; that the witness was first duly sworn by me; that the foregoing pages were transcribed by computer-aided transcription and constitute a true record of the deposition by said witness; and further certify that I am not an attorney or counsel of any of the parties, nor an employee or relative of anyone connected with the action, nor financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 6th day of February, 2026.

_____
Deborah A. Shoemaker, LCR

My Commission Expires:  8-29-26