# TAMAR SHIRINIAN

vs

# DONDE PLOWMAN

Deposition of

# CHRIS TODD

# February 09, 2026

H
HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TAMAR SHIRINIAN,  )
  )
    Plaintiff,  )
  )
vs.  )No. 3:25-cv-528
  )
DONDE PLOWMAN, et al. in  )Judge Crytzer
their individual and  )Magistrate Judge McCook
official capacities,  )
  )JURY DEMAND
    Defendants.  )

DEPOSITION OF

REPRESENTATIVE CHRIS TODD

Taken on Behalf of the Plaintiff

February 9, 2026

Commencing at 4:00 P.M.

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Ann E. Ramage, RPR, LCR No. 372

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 2 of 48
PageID #: 1598

APPEARANCES:

For the Plaintiff:
ROBERT C. BIGELOW
Bigelow Legal PLLC
4235 Hillsboro Pike
Suite 301
Nashville, Tennessee   37215
(615) 829-8986
rbigelow@bigelowlegal.com


For Representative Chris Todd:
MIRANDA JONES
Senior Assistant Attorney General
Constitutional Defense Division

HARRISON KILGORE
Senior Assistant Attorney General
Special Advocacy Section

Office of the Tennessee Attorney General
PO Box 20207
Nashville, Tennessee   37202-0207
(615) 521-0417
miranda.jones@ag.tn.gov
harrison.kilgore@ag.tn.gov

For the University of Tennessee:
MICHAEL D. FITZGERALD
Associate General Counsel
University of Tennessee
Office of General Counsel
505 Summer Place, UTT #1155
Knoxville, Tennessee   37902
(865) 974-9321
mike.fitzgerald@tennessee.edu

For the Tennessee House of Representatives:
DOUGLAS HIMES
Ethics Counsel
Tennessee House of Representatives
638 Cordell Hull Building
Nashville, Tennessee   37243
(615) 741-1195
doug.himes@capitol.tn.gov

I N D E X

INDEX OF EXAMINATIONS

Page

By Mr. Bigelow .....................................5

INDEX OF EXHIBITS

Page

No. 1    Stipulations for Deposition of ...........5
         Representative Chris Todd

No. 2    9/14/2025 Todd email .....................8

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 4 of 48
PageID #: 1600

The deposition of REPRESENTATIVE CHRIS TODD was taken on behalf of the plaintiff on February 9, 2026, on the 6th Floor, John Sevier Building, 500 Charlotte Avenue, Nashville, Tennessee, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Ann E. Ramage, being a Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

* * *

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 5 of 48
PageID #: 1601

REPRESENTATIVE CHRIS TODD

was called as a witness, and after having been first duly sworn, testified as follows:

E X A M I N A T I O N

(Premarked Exhibit No. 1.)

BY MR. BIGELOW:

Q        If you would, sir, just state your full name for the record.

A        Christopher Paul Todd.

Q        Representative Todd, my name is Robb Bigelow, as you know.  I'm just here to take your deposition.  It should not last all that long.  We have already stipulated that the longest we're going to go is an hour.  So you will be out of here pretty much by 5:00 o'clock, if not earlier.  So I know you have a bunch of stuff you need to do.

Have you ever had your deposition taken before?

A        Yes.

Q        And how often has that occurred?

A        I think over the years maybe three times, if I recall.

Q        I will not ask you what all of those were because -- were any of them in something similar to this matter, like a First Amendment case?

A        No.

Q        Okay.   Were they all just in your personal capacity?

A        Yes.

Q        Okay.   Then with that said, you probably know the ground rules for depositions, but I'm going to go over them one more time.   The first and most important one is -- well, you have already said you would do, which is to tell the truth.   The second is it's often hard for a court reporter, if you answer like uh-huh or huh-uh, stuff like that, so if you would, just yes or no or explain your answer as opposed to doing that if you don't mind.   The third is if you ever need to take a break, let me know, fair?

A        Fair.

Q        And finally, I hope you don't hold this against me, I have been here a long time, I have been here since 1995, but I am from the north.   I am from Michigan.   I have a tendency to speak a little quickly.   If I do and you don't understand something that I'm saying, just say, hey, Robb, just slow down and ask me again and I will be happy to do that. And that's not a knock on anything.   It's just generally even people in the north are like, hey,

Case 3:25-cv-00528-KAC-JEM      Document 54-5      Filed 03/02/26      Page 7 of 48
PageID #: 1603

can you just slow it down. Fair enough?

A      Yes, sir.

Q      And you are currently, sir, a member of the Tennessee House of Representatives, correct?

A      Yes.

Q      And could you explain to me a little bit about your job as a member of the House of Representatives.

A      As the people's elected representative, I look out for their liberties and their freedoms, first and foremost. I protect their rights under the Constitution and represent their interest in the General Assembly.

Q      And you understand that today's deposition is limited by stipulation to certain non-legislative topics, correct?

A      Yes.

Q      Okay. Kind of with that, as a preface, please note that I'm not asking you about your legislative voting. I'm not going to ask you about policy deliberations. I'm not going to ask you about caucus discussions. I'm not going to ask you about internal legislative strategy. Any of those things are off limits, off -- just not going to be addressed today, fair?

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 8 of 48
PageID #: 1604

A        Yes.

Q        If at any point you believe a question that I ask you calls for any of those privileged legislative deliberations, feel free to let your counsel object.  I promise you I'm not doing it on purpose.  I'm not trying to sneak anything by you. You have very smart counsel and we have already had a number of discussions.  So what I'm going to ask you is within the parameters of what we agreed upon, fair?

A        Yes, sir.

Q        Okay.  You have in front of you something that I handed you earlier, which I have given to your counsel and to opposing counsel in this case. Do you recognize what it is?

A        As I mentioned earlier, it's a weak copy, but it appears to be a print of an email that I sent in September.

Q        Okay.  And specifically on September 14th at 8:54 p.m., correct?

A        Yes, sir.  That's what it appears.

MR. BIGELOW:  If we would just have this marked as Exhibit 2, please.

(Marked Exhibit No. 2.)

BY MR. BIGELOW:

Q        From what email address did you send this email?

A        My legislative email address.

Q        Do you have a separate personal email address?

A        I do.

Q        Okay.  To whom did you send this email?

A        Sent it to Carey Whitworth.

Q        And who is Carey Whitworth?

A        I don't remember her exact title, but she is with University of Tennessee and she's in administration.  I think she may be some type of assistant to President Boyd.

Q        Would it surprise you if she was the vice president of government relations?

A        Wouldn't surprise me at all.

Q        Okay.  And is it fair to say that this email concerns Dr. Tamar Shirinian, correct?

A        Yes.

Q        And you had sent this email before any sort of decision had to be made about Dr. Shirinian, correct?

A        As far as I know, yes.

Q        Okay.  And it wasn't by accident you sent

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 10 of 48
PageID #: 1606

this email.  You knew what you were doing, correct?

A        Certainly was not by accident.

Q        Okay.  Why did you send this email?

A        I felt very strongly that what I had seen posted, that Dr. Shirinian had put forth statements, she had put forth about the Charlie Kirk assassination and his family, that as public as that was, students in her care, I couldn't see how they would ever feel safe or feel like they could comfortably express themselves, their own opinions with someone with such an extreme position that she had expressed.

Q        Did you investigate the email or the comment that Dr. Shirinian made or the original Facebook post from which that comment stemmed?

A        I don't remember exactly if it was Facebook, Twitter.  I don't remember which social media that I had seen it.  And then went to -- I believe went to the UT website to see who this person was, what they taught, that kind of thing just to figure out who this person was because I had never heard of them.

Q        The only reason I ask, I believe your testimony was, was that she had made her opinions public according to you?

A        I saw it in a public setting like that,

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 11 of 48
PageID #: 1607

Facebook or Twitter.  I don't recall exactly.

Q        Do you know if she had made those comments publicly or if she had made those comments privately?

A        I don't know.

Q        Okay.  So it could have been privately; you just don't know.  Is that fair?

A        I don't know.  At the time, the impression I have is that it was public, that it was out in a format that was released to the public, but I couldn't say for sure.

Q        Have you ever heard of the word "doxing"?

A        Yes.

Q        What does that mean to you?

A        I think it would mean that someone is targeted for their, you know, some form of their beliefs.  They're targeted -- usually it's a public figure from my understanding.  And folks put forth some kind of effort, some kind of concerted effort to miscredit them, to do harm to them, I guess.

Q        Did you ever learn that Dr. Shirinian made her Facebook comment in a private setting?  Have you since learned that?

A        I have not.

Q        You have not?

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 12 of 48
PageID #: 1608

A        No.

Q        Have you looked into that at all?

A        I have not.

Q        Okay.   Do you know who Robby Starbuck is?

A        I do.

Q        And who is Robby Starbuck?

A        I know he's somewhere here in Middle Tennessee.   I don't know how he would classify himself.   I see him as an advocate, I would say a conservative advocate.   Other than that, I don't know how I would classify him.

Q        Okay.   When you sent this email, what outcome were you hoping for?

A        That the professor would be removed from the classroom setting and would not be in a position to either influence our youth or put them in a position where they felt very uncomfortable expressing their own views.

Q        How do you think a professor's beliefs would influence students at the University of Tennessee?

A        With what I saw posted that I understood came from the professor, I felt like any student would feel maybe potentially threatened that if they expressed thoughts that were different that were more -- I would even say more mainstreamed that they

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 13 of 48
PageID #: 1609

might be targeted by a professor for poor grades and certainly maybe some ridicule because of the extreme nature of what was expressed in the post.

Q        **Explain the extreme nature of the post in your words.**

A        And it's been quite some time, months since I have seen it, so I'm just going on recollection and what I had -- what the impression was at that time.  It was hateful.  It was even to the point of harmful that, you know, this person deserved to be assassinated and his children are better off, you know, that they don't have a father anymore.  I mean, that's just such an absurd thought that I just can't imagine a human being having that about somebody like that.  Seemed just really off the chart to me.

Q        **Do you believe that after certain -- some people -- after certain people die, others are happy that they're dead?**

MS. JONES:  Objection.  You can answer if you can.

THE WITNESS:  Say again.

MS. JONES:  I objected, but you can answer.

THE WITNESS:  Ask it again.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 14 of 48
PageID #: 1610

BY MR. BIGELOW:

Q        Let me give you an example to make it easier.  When Osama bin Laden died, would it have surprised you that people were happy that Osama bin Laden was dead?

A        I don't guess it would have surprised me.

Q        Why not?

A        Certainly folks that thought he had something to do with the murder of their family members.

Q        That they might be happy that he's dead?

A        I would -- that wouldn't surprise me.

Q        Okay.  Did you expect the University to investigate Dr. Shirinian?

A        Yes.

Q        And did you ultimately expect that she would be terminated?

A        Yes.

Q        Okay.  In your email to Ms. Whitworth on like the, let's see, eighth line down towards the very end, you use the word "viewpoint."  Do you see that?

            MS. JONES:  Is that on the first paragraph?

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 15 of 48
PageID #: 1611

BY MR. BIGELOW:

Q       That's in the first paragraph, eighth or ninth line down on the right-hand side.

A       Okay.  What is your question around that?

Q       Did you use the word "viewpoint"?

A       Yes.

Q       What did you mean by that?

A       I would think, in general, perspective on life, perspective on our society.

Q       What about in this context?

A       The same.

Q       Okay.  Your concern about Dr. Shirinian was not about her job performance as a professor, correct?

A       It was.  I mean, it centered around -- I mean, her job is to educate students in a neutral environment and I didn't see how anybody with the statements that were made by her could have a neutral environment.

Q       Are you aware of any other University of Tennessee professors who have espoused what some might consider to be dangerous viewpoints online?

A       I couldn't say that I'm aware of any.

Q       Are you aware of a professor by the name of Glenn Reynolds years ago saying that -- suggesting

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 16 of 48
PageID #: 1612

that motorists run down protestors?

A        I'm not familiar with that.

Q        Okay.  Before sending this email, had any of your constituents contacted you?

A        I don't recall if I had gotten anything from, you know, any calls about anybody or from anyone specifically.  I just don't -- you know, it was so many months ago, I don't recall.

Q        That's totally fair and that's all I'm asking, if you remember.  Do you know if any other elected officials have contacted you?

A        I don't believe so, but I don't remember, you know, again, with the time, I don't remember very clearly having anybody call me about this.

Q        Okay.  Was anyone urging you to act or did you act on your own accord?

A        Completely on my own.

Q        Would you consider to be expressing kind of outrage based on your email?

MS. JONES:  Objection.

THE WITNESS:  I think the words stand for themselves, however you want to classify it.  I don't know that I can characterize that.

BY MR. BIGELOW:

Q        Okay.  I will make it easier.  Tell me how

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 17 of 48
PageID #: 1613

you felt when you sent this email.

A          My purpose in sending this and how I felt about it are very similar.  I wanted to make sure the University had a perspective.  I felt like they would already have this perspective looking out for students, but I certainly wanted to put forth a perspective that my constituents are likely to have some kids in the classroom and they would not feel safe to express themselves and feel like they're going to get a fair shake in the class and the University certainly had to consider that.

Q          I want to turn to the actual words that -- some of the words that you had written in your email.  You start off by saying, "I'm anticipating you'll receive this email Monday morning with at least dozens on this topic."  So that means that the 14th was a Sunday evening, correct?

A          I don't -- I guess so.  It may have been a Saturday.  I don't recall.

Q          Okay.  It was.  Just --

A          It was a Sunday?

Q          Yes, sir.  When did you first see -- like, when did you first see any media or news on this issue or when were you forwarded it?  Do you recall?

A          As best I recall, it was that afternoon when

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 18 of 48
PageID #: 1614

I wrote this email. That was the initial time that I saw her post, her words.

Q      Now, to be fair, though, you didn't -- you're not saying you actually saw her initial post. You're saying you saw a copy of her comment, correct?

A      Again, I don't remember exactly the format, if it was someone retweeting or reposting, I don't -- I don't remember that. I don't recall.

Q      Okay. On the fifth -- well, actually, let's keep going. "In the wake of the assassination of Charlie Kirk, many evil folks have exposed their extreme, antisocial beliefs to the world, including UTK Cultural Anthropology Assistant Professor Shirinian." Did I read that correctly?

A      I believe so, yes, sir.

Q      What are you talking about when you say, "many evil folks have espoused [sic] their extreme antisocial beliefs to the world"?

A      The word I believe I used is "exposed" and I think there are probably folks that have thoughts similar to Dr. Shirinian that keep them suppressed and that this event seemed to bring that out, seemed to bring those thoughts out that may have been hidden.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 19 of 48
PageID #: 1615

Q       Were you aware of any other people who had posted against -- posted in similar manners?

A       I honestly do not remember if I knew of any more at that time on that particular day.

Q       You write, "It would be obvious to anyone that her Facebook comments of 'his kids are better off living in a world without a disgusting psychopath like him and his wife, well, she's a sick fuck for marrying him, so I don't care about her feelings' will not allow her students that admired Kirk to feel as if they will be treated fairly or impartially in her classes," correct?

A       That's correct.

Q       And you believe that, correct?

A       Yes.

Q       What about, do you think that all of her students admired Kirk?

A       Admired?

Q       Charlie Kirk.

A       No.

Q       Okay.  So if a professor wrote, Charlie Kirk is the greatest thing in the world and that professor had students who did not like Charlie Kirk, do you believe those students could be treated fairly?

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 20 of 48
PageID #: 1616

A        I do.

Q        Why is that?  Explain that to me.

A        That's not -- that's not a position of wishing someone were dead, as her comment seemed to indicate her viewpoint around Kirk's assassination.

Q        Why do you think that she wished Mr. Kirk were dead?

A        She was celebrating it.

Q        Explain that to me, how was she celebrating it?

A        His kids are better off living in a world without a disgusting psychopath like him and his wife.  That says all I need to know right there. And then to continue on with that, you know, it just -- it takes a demented person to say those things about a grieving family.

Q        I want to focus on your words that you just used which is wishing someone were dead.  My question to you is:  Why do you think that Dr. Shirinian was wishing Charlie Kirk was dead?

A        Well, I honestly don't know if she was wishing.  I'm saying that her words indicate that she may have wished he was dead.  She certainly was celebrating.  That's what I'm focusing on is her celebrating his death, at least that's what it

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 21 of 48
PageID #: 1617

appears to me.

Q        And I'm not trying to trip you up.  I'm just saying because I had written down that you had said, wishing someone was dead.  I mean, the fact is Charlie Kirk was already dead, correct?

A        Sure.  That was in a different context.

Q        Explain that.

A        Well, just -- well, you would have to read back the question and my answer for me to recall exactly what the setting was for me to use that word, but what I'm indicating is the words that she used would indicate to me that she may have wished he was dead.

Q        But that's your guess?

A        That's my guess.

Q        Okay.  That's fair.  That's fair.  You also write, "They also would be expected to question their very own safety around someone that celebrated an assassination for a viewpoint not her own." Could you explain that to me?

A        I would think a lot of students at that age would wonder if a professor celebrated an assassination, a gruesome assassination like this, what else would they be capable of doing?  Would I be safe as a student even being around this person?

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 22 of 48
PageID #: 1618

That's where my mind goes, thinking about an 18 or 19 year old.

Q        So that there was, in your opinion, your viewpoint, a potential that she might be violent?

A        I would think that would be a concern.

Q        Explain more how you came to that conclusion.  I'm not -- explain more if you would.

A        When I think back of different criminal cases where evidence has come out after the fact, after murder has taken place, and again, I have no specific case, but just in general, sometimes there are thoughts that are viewpoints that are expressed that when you look back you say, oh, yeah, I should have seen that, that person was really having some dangerous thoughts and it led to this act.  So that's what I'm basing it on, just a variety of cases over decades of information that came out after a crime was committed.

Q        So you were concerned about student safety?

A        Yes.

Q        Did you call the police?

A        I did not.

Q        Well, why not?

A        I'm physically not there.  I don't know this person, but I'm bringing it to the attention of

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 23 of 48
PageID #: 1619

folks that do know her.

Q        But you're a state congressperson, I would imagine you have lots of contacts with police if you felt there was danger, correct?

A        Certainly.

Q        But you chose not to use any of those contacts?

A        I never thought that there was an imminent danger necessarily.  I'm just saying there was a potential.  My thoughts went to a potential danger. And from an 18 or 19 year old perspective, I think they would naturally feel that.  Now, they might not express it, but I think they would have to feel that there's some concern there.

Q        And that danger was based on words, correct?

A        Yes.

Q        And the specific words of the world is a better place without Charlie Kirk, correct?

A        Yes.  Words indicate thoughts and beliefs and, you know, especially in a situation like this, you get someone's true core beliefs expressed and that can be very indicative of what might be to come.

Q        Do you believe that there are millions of people who think that the world is a better place

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 24 of 48
PageID #: 1620

without Charlie Kirk? You may not agree with them, but do you believe there are millions of people who believe that?

MS. JONES: Objection.

THE WITNESS: I don't even know how to answer that.

BY MR. BIGELOW:

Q      I'm just asking your belief, sir.

A      I don't believe there are millions of people that believe that.

Q      Do you believe that there are hundreds of thousands of people who believe that?

MS. JONES: Objection.

THE WITNESS: I have no idea.

BY MR. BIGELOW:

Q      Do you believe that anyone who believes that has -- could potentially be violent?

A      I would think there's a possibility. If they celebrated on the level that she did, I think there's a possibility.

Q      You continue to write, "The certain emotional distress for a young adult trying to better themselves by attaining an educational goal should not be allowed, especially in our State's flagship university." Explain that if you would.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 25 of 48
PageID #: 1621

A       First, I believe there would be almost certain emotional distress for an 18 or 19 year old to be in a classroom with a professor that had just publicly put forth this type of mindset, this type of belief.  And they're there trying to make a better life for themselves by going through this process, spending a lot of money to do that.  And I just don't see how that the University can knowingly allow that type of atmosphere to continue.

Q       You had mentioned in the past, you both said an 18 or 19 year old and you also said at that age. What does the student's age have to do with anything?

A       Emotional development.

Q       Explain that.

A       I think an 18 or 19 year old has a different level of emotional development than a 25 year old or a 50 year old.

Q       What do you base that viewpoint on?

A       Experience.

Q       Are you a psychologist?

A       No.

Q       Are you a psychiatrist?

A       No.

Q       What do you do for a living other than as a

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 26 of 48
PageID #: 1622

representative?

A        I'm a business owner.

Q        Okay.  And what business do you own?

A        A company called Envirogreen, Incorporated.

Q        And what is that?

A        We're an erosion control and grassing contractor.

Q        Okay.  Do you have a degree in psychology -- or do you have a degree in psychology?

A        I would have to double-check if I had a minor in that or not.  I came really close if I didn't.  But I have a number of classes in it, but I have had a lot of experience with people, especially employing literally hundreds and hundreds of folks over 30 years.

Q        Tell me about your academic background, sir.

A        One more time, please.

Q        Tell me about your academic background.

A        I have a bachelor's in science in biology, a minor in prelaw.  I have certifications in my industry.

Q        And where did you go to school?

A        Union University.

Q        Okay.  And when did you graduate?

A        In 1989.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 27 of 48
PageID #: 1623

Q      Have you taken any sort of psychology classes or anything along those lines since 1989?

A      No, just experience.

Q      When you say experience, tell me about that.

A      Dealing with people every day, customers, employees.

Q      How many customers do you deal with on a regular basis?

A      I don't even know how to answer that.

Q      Do you think any of your customers could be happy that Charlie Kirk is no longer around?

A      I would have no idea.

Q      But if you had customers who believe that, do you think that those customers could be dangerous?

A      If they expressed it like this, I think they could be.

Q      Okay.  At the end of your -- well, towards the end, your next paragraph you write, "I unapologetically call on President Boyd to immediately terminate Ms. Shirinian and anyone else on the taxpayer payroll that appears to believe this assassination is justified for any reason whatsoever."  Did I read that correctly?

A      You did.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 28 of 48
PageID #: 1624

Q       Did you send anything to President Boyd?

A       No, sir.

Q       Okay.  Just -- you just sent this to Ms. Whitworth?

A       Yes.

Q       Did you expect this to be forwarded to President Boyd?

A       I did.

Q       Okay.  And why did you expect that?

A       I think the role of -- that Ms. Whitworth has would be to pass it on, something of this nature, something this serious from a state representative.

Q       Why do you think she would do that?

A       I think that's expected in her role.

Q       Because you're a state representative, correct?

A       Yes, sir.

Q       Okay.  And is it fair to say that you would think that when you email her she would think that is important?

A       Yes.

Q       Okay.  When you wrote anyone else on the taxpayer payroll, could you explain why you said that, taxpayer payroll?

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 29 of 48
PageID #: 1625

A          Well, it's a state university, so it is funded -- formed and funded with state dollars and those come from taxpayers.

Q          Do you think that there are any differences between public universities and private universities when it comes to the First Amendment?

A          Ask that one more time.  I want to make sure I'm catching every word.

Q          Absolutely.  Do you think that there is any difference between public universities and private universities when it comes to the First Amendment?

A          I don't know that I think there's any difference.

Q          Okay.  Have you ever looked into it or asked any of your lawyers within the state to look into that?

A          No.

Q          Do you think that might be important to look into?

A          No.

Q          Why not?

A          I think we all know what the First Amendment says.

Q          What does it say?

A          It says we have to have the right to free

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 30 of 48
PageID #: 1626

speech, freedom to express our thoughts, but it also indicates, and courts have indicated for a long, long time, there are consequences for those things. There are certain things you can't do with speech that can be harmful to other people.

Q      I'm only asking you this because you brought it up and I normally would -- like, you had said courts had indicated.  Explain what you mean by that.

A      Well, courts have indicated for a long time that you can't yell "fire" in a movie theater.  That can cause danger and harm to other people.  That's what I mean.

Q      Are you suggesting that that is what Dr. Shirinian did, she yelled the equivalent of yelling "fire" in a movie theater?

A      Not the equivalent.

Q      Okay.  You wrote and I just read part of this back, you said, "that appears to believe this assassination is justified for any reason whatsoever."  Why do you believe that Dr. Shirinian thought that the assassination was justified?

A      Reading her comments indicated to me she felt like it was justified, that this was a reasonable thing to expect and even celebrate as she

Case 3:25-cv-00528-KAC-JEM      Document 54-5      Filed 03/02/26      Page 31 of 48
PageID #: 1627

did.

Q        What led you to that belief?

A        Just the way she formed her words and the things she said.

Q        What does it mean to you to be justified?

A        That's one of those words you use to define other words, so -- that it qualified for that end, it was reasonable to expect that end, that outcome.

Q        Are you suggesting that it was your belief that Dr. Shirinian was rooting for Mr. Kirk to be killed?

A        I'm not aware of that.  I don't know what happened prior to this post, what her mindset was prior to this.  This just exposed this apparent celebration of the assassination and that it should have happened.  That's the impression I got.

Q        So your impression was that she was -- her thought was that Mr. Kirk's assassination should have happened?

A        It appeared to me that way.

Q        That's your belief.

A        That's my belief.

Q        And you base that belief on what?

A        Her wording.

Q        Okay.  For saying that the world is a better

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 32 of 48
PageID #: 1628

place without Charlie Kirk in it?

A        The way that was -- the way her words were formed, what she put out left me with that impression.

Q        Do you think that the University of Tennessee would fire someone if they wrote, I'm really sad that Charlie Kirk is dead?

A        I don't think so.

Q        Why not?

A        That's a normal human response of care and concern for others.

Q        Who gets to decide what is a normal response?

A        I guess each individual.

Q        So based on that, if Dr. Shirinian believed that the world is a better place without Charlie Kirk, who was to decide that she is wrong?

          MS. JONES:  Objection.

BY MR. BIGELOW:

Q        You can answer.

A        I choose not to.

Q        You need to answer, sir.  I'm not trying to be difficult.

A        I would think in the would we live in many people are going to make their own decision about

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 33 of 48
PageID #: 1629

that. Society has some norms, some accepted, I guess, behaviors that are thought to be cohesive and conducive to a society. And someone expressing something totally contrary to that that could indicate an inclination to harm others and certainly indicate a propensity to create an atmosphere in a classroom that students don't feel safe around and don't feel like they can fully express themselves, or give the answer that they truly believe on a test or in class without some kind of ridicule or retribution, I think that then falls on the employer to make that decision to say, can this person stay employed in this role and do what we've asked them to do.

Q      Because you as an employer have the ability to fire people that you like, correct?

A      Yes.

Q      Is that the type of similar --

A      Yes.

Q      So this in this case, though, you decided that what she said was wrong; is that fair to say?

A      I expressed my opinion, yes.

Q      Your view?

A      Yes.

Q      Okay. And based on that you thought that

she should be fired by the University of Tennessee?

A        Yes.

Q        You finish by -- you had written, "I trust you will work toward that end, and I thank you for doing so."  And I think we already established you expected her to be fired, correct?

A        Yes.

Q        Did anyone help you write this?

A        No.

Q        Okay.  Were you -- where were you when you wrote this?

A        I was in my home.

Q        And where is that?

A        Near Humboldt, between Humboldt and Jackson, Tennessee.

Q        Okay.  And at the end of the email you write, Rep. Chris Todd, means Representative Chris Todd, correct?

A        Yes, sir.

Q        And Chair of the House Ag & Natural Resources Committee, correct?

A        Yes, sir.

Q        What does the -- what do you do as the Chair of the House Ag & Natural Resources Committee?

A        I'm a referee in committees.

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 35 of 48
PageID #: 1631

Q        Explain that.

                MS. JONES:  Objection.  This is getting close to his role of legislature.

                MR. BIGELOW:  Oh, I just want to know what he does.  I'm not asking like what he did -- actually, you know what, that's fine.  We'll stay away from it just to make it as promised.

                MS. JONES:  Thank you.

                MR. BIGELOW:  Certainly.

BY MR. BIGELOW:

Q        Did you ever follow up on this email?

A        No, sir.

Q        Did you ever contact Dr. Shirinian?

A        No.

Q        Did you ever contact any of the students at University of Tennessee?

A        No.

Q        Or any of her students in any of her classes?

A        No.

Q        Did you ever talk with anyone about this?

A        About?

Q        About this email.

A        This email?

Q        Yes.

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 36 of 48
PageID #: 1632

A      Yes.

Q      Who did you speak with about it?

A      My wife.

Q      Okay.  Anyone else?

A      No.

Q      When did you learn or did you learn that the University of Tennessee was firing Dr. Shirinian?

A      I don't recall.

Q      Did you ever learn that that was taking place?

A      I think I heard something about it, but, again, I don't -- I don't recall the timing or how I might have received that.

Q      Okay.  Have you ever spoken with anyone about Dr. Shirinian since sending this email?

A      My attorneys.

Q      Don't tell me what you told them or what they told you.  Anyone other than your attorneys?

A      I don't believe so.

Q      Okay.  Did you do any research whatsoever into Dr. Shirinian before you sent this email?

A      The best I recall I looked up, as I mentioned earlier, her page, introduction, whatever, on the UT website just to see what she did.  I think I then looked for her social media platforms.  So I

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 37 of 48
PageID #: 1633

had her picture from the UT, because there's so many names that are the same on social media, and found what appeared to be her platform on Facebook, I think, and maybe on X, the best I recall, and certainly Facebook.

Q        Did you find her Facebook page?

A        I believe so.

Q        Okay.  And what did it say?

A        I remember seeing some posts about -- I don't remember the topics exactly, but they seemed somewhat concerning, the pictures, images that, if I recall what she had on there, and I don't even know, I can describe some of it.  I remember a couple of scenes that seemed a little troubling, but the impression is what I was left with more than anything.

Q        Explain that.

A        Just something there that she posted that a picture with maybe some words or something that seemed troubling.  Again, I don't know what that was.  I don't have a quote.  I don't recall.  But I just remember coming away with that impression, that this is very interesting, it's troubling, and I would be surprised that the University knew about this.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 38 of 48
PageID #: 1634

Q    But you don't remember what that is?

A    No, sir.

Q    But it was troubling then?

A    It was.

Q    Very troubling then?

A    Not as much as what she had posted about Charlie Kirk, not to that level, but it seemed to be maybe even progressive that the most recent things left me with a more concerned impression than the older ones.  And that may go toward -- I hadn't really thought about that until now, but that may have gone toward my concerns about safety.

Q    Sure, sure.  Explain what you mean by progressive.

A    The progression of images, comments over some period of time, and I couldn't even tell you what period of time it was, I don't recall that, that she had posted that made me think her emotional state may be changing and getting more concerning.

Q    Can you explain that more?  I'm not trying to trick you, I promise.  I'm just trying to figure out why you were thinking that.

A    Sure.  I don't know that I can explain it any more.  You know, I don't have that material.

Q    Okay.

Case 3:25-cv-00528-KAC-JEM    Document 54-5    Filed 03/02/26    Page 39 of 48
PageID #: 1635

A        I don't recall exactly.  I just remember having that impression.

Q        Did it -- to your recollection, do you remember anything on her Facebook page as to where she was from or where it said she was from?  Would it surprise you if it said she lived in Armenia?

A        It wouldn't surprise me.  I remember some Armenian studies or something, but I don't -- that stands out as a word I saw there.

Q        Sure.  There was nothing about the University of Tennessee, correct, that you saw on her Facebook page that was there?

A        I don't recall seeing anything about the University.

Q        Okay.

MR. BIGELOW:  I really appreciate your time.  It is all of 4:45.  So as I promised, I got you out early.

MS. JONES:  Can I have just a couple of minutes before we close?

(Recess observed.)

MS. JONES:  We have no further questions.

MR. BIGELOW:  I think we have already marked that as Exhibit 2.

Case 3:25-cv-00528-KAC-JEM     Document 54-5     Filed 03/02/26     Page 40 of 48
PageID #: 1636

Sir, thank you for your time.

THE WITNESS:  You're very welcome.

FURTHER DEPONENT SAITH NOT.

(Proceedings concluded at 4:48 p.m.)

## REPORTER'S CERTIFICATE

I, Ann E. Ramage, RPR, Court Reporter, do hereby certify that I recorded to the best of my skill and ability by machine shorthand all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 16th day of February, 2026.

_Ann Ramage_

_____

Ann E. Ramage, RPR, LCR

Tennessee LCR No. 372
Expires: 6/30/2026

**Exhibits**

**Todd Exhibit 1**
3:8 5:5

**Todd Exhibit 2**
3:9 8:23,24 39:25

**1**

**1** 5:5

**14th** 8:19 17:17

**18** 22:1 23:11
25:2,11,16

**19** 22:2 23:11
25:2,11,16

**1989** 26:25 27:2

**1995** 6:19

**2**

**2** 8:23,24 39:25

**25** 25:17

**3**

**30** 26:15

**4**

**4:45** 39:17

**4:48** 40:4

**5**

**50** 25:18

**5:00** 5:15

**8**

**8:54** 8:20

**A**

**ability** 33:15

**Absolutely** 29:9

**absurd** 13:13

**academic** 26:16,
18

**accepted** 33:1

**accident** 9:25
10:2

**accord** 16:16

**act** 16:15,16
22:15

**actual** 17:12

**address** 9:2,4,6

**addressed** 7:25

**administration**
9:13

**admired** 19:10,
17,18

**adult** 24:22

**advocate** 12:9,
10

**afternoon** 17:25

**Ag** 34:20,24

**age** 21:21 25:11,
12

**agree** 24:1

**agreed** 8:9

**allowed** 24:24

**Amendment**
5:25 29:6,11,22

**Anthropology**
18:14

**anticipating**
17:14

**antisocial** 18:13,
19

**anymore** 13:12

**apparent** 31:14

**appeared** 31:20
37:3

**appears** 8:17,21
21:1 27:22 30:19

**Armenia** 39:6

**Armenian** 39:8

**assassinated**
13:11

**assassination**
10:7 18:11 20:5
21:19,23 27:23
30:20,22 31:15,
18

**Assembly** 7:13

**assistant** 9:14
18:14

**atmosphere**
25:9 33:6

**attaining** 24:23

**attention** 22:25

**attorneys** 36:16,
18

**aware** 15:20,23,
24 19:1 31:12

**B**

**bachelor's**
26:19

**back** 21:9 22:8,
13 30:19

**background**
26:16,18

**base** 25:19 31:23

**based** 16:19
23:15 32:15
33:25

**basing** 22:16

**basis** 27:8

**behaviors** 33:2

**belief** 24:8 25:5
31:2,9,21,22,23

**beliefs** 11:17
12:19 18:13,19
23:19,21

**believed** 32:15

**believes** 24:16

**Bigelow** 5:6,11
8:22 9:1 14:1
15:1 16:24 24:7,
15 32:19 35:4,9,
10 39:16,24

**bin** 14:3,4

**biology** 26:19

**bit** 7:6

**Boyd** 9:14 27:20
28:1,7

**break** 6:14

**bring** 18:23,24

**bringing** 22:25

**brought** 30:6

**bunch** 5:16

**business** 26:2,3

**C**

**call** 16:14 22:21
27:20

**called** 5:2 26:4

**calls** 8:3 16:6

**capable** 21:24

**capacity** 6:3

**care** 10:8 19:9
32:10

**Carey** 9:9,10

**case** 5:25 8:14
22:11 33:20

**cases** 22:9,17

**catching** 29:8

**caucus** 7:22

**celebrate** 30:25

**celebrated**
21:18,22 24:19

**celebrating**
20:8,9,24,25

**celebration**
31:15

**centered** 15:15

**certifications**
26:20

**Chair** 34:20,23

**changing** 38:19

**characterize**
16:23

**Charlie** 10:6
18:12 19:19,21,
23 20:20 21:5
23:18 24:1 27:11
32:1,7,16 38:7

**chart** 13:16

**children** 13:11

**choose** 32:21

**chose** 23:6

**Chris** 5:1 34:17

**Christopher** 5:9

**class** 17:10
33:10

**classes** 19:12
26:12 27:2 35:19

**classify** 12:8,11
16:22

**classroom**
12:15 17:8 25:3
33:7

**close** 26:11 35:3
39:20

**cohesive** 33:2

**comfortably**
10:10

**comment** 10:13,
15 11:22 18:5
20:4

**comments** 11:2,
3 19:6 30:23
38:15

**committed** 22:18

**Committee** 34:21,24

**committees** 34:25

**company** 26:4

**Completely** 16:17

**concern** 15:12 22:5 23:14 32:11

**concerned** 22:19 38:9

**concerns** 9:19 38:12

**concerted** 11:19

**concluded** 40:4

**conclusion** 22:7

**conducive** 33:3

**congressperso n** 23:2

**consequences** 30:3

**conservative** 12:10

**constituents** 16:4 17:7

**Constitution** 7:12

**contact** 35:13,15

**contacted** 16:4, 11

**contacts** 23:3,7

**context** 15:10 21:6

**continue** 20:14 24:21 25:9

**contractor** 26:7

**contrary** 33:4

**control** 26:6

**copy** 8:16 18:5

**core** 23:21

**correct** 7:4,16 8:20 9:19,23 10:1 15:14 17:17 18:6 19:12,13,14 21:5 23:4,15,18 28:17 33:16 34:6,18,21 39:11

**correctly** 18:15 27:24

**counsel** 8:5,7,14

**couple** 37:13 39:19

**court** 6:10

**courts** 30:2,8,10

**create** 33:6

**crime** 22:18

**criminal** 22:8

**Cultural** 18:14

**customers** 27:5, 7,10,13,14

**D**

**danger** 23:4,9, 10,15 30:12

**dangerous** 15:22 22:15 27:15

**day** 19:4 27:5

**dead** 13:19 14:5, 11 20:4,7,18,20, 23 21:4,5,13 32:7

**deal** 27:7

**Dealing** 27:5

**death** 20:25

**decades** 22:17

**decide** 32:12,17

**decided** 33:20

**decision** 9:22 32:25 33:12

**define** 31:6

**degree** 26:8,9

**deliberations** 7:21 8:4

**demented** 20:15

**DEPONENT** 40:3

**deposition** 5:12, 17 7:14

**depositions** 6:6

**describe** 37:13

**deserved** 13:10

**development** 25:14,17

**die** 13:18

**died** 14:3

**difference** 29:10,13

**differences** 29:4

**difficult** 32:23

**discussions** 7:22 8:8

**disgusting** 19:7 20:12

**distress** 24:22 25:2

**dollars** 29:2

**double-check** 26:10

**doxing** 11:12

**dozens** 17:16

**duly** 5:3

**E**

**earlier** 5:15 8:13, 16 36:23

**early** 39:18

**easier** 14:3 16:25

**educate** 15:16

**educational** 24:23

**effort** 11:19

**eighth** 14:20 15:2

**elected** 7:9 16:11

**email** 8:17 9:2,3, 4,5,8,18,21 10:1, 3,13 12:12 14:19 16:3,19 17:1,14, 15 18:1 28:20 34:16 35:11,23, 24 36:15,21

**emotional** 24:22 25:2,14,17 38:18

**employed** 33:13

**employees** 27:6

**employer** 33:11, 15

**employing** 26:14

**end** 14:21 27:18, 19 31:7,8 34:4,16

**Envirogreen** 26:4

**environment** 15:17,19

**equivalent** 30:15,17

**erosion** 26:6

**espoused** 15:21 18:18

**established** 34:5

**evening** 17:17

**event** 18:23

**evidence** 22:9

**evil** 18:12,18

**exact** 9:11

**Exhibit** 5:5 8:23, 24 39:25

**expect** 14:13,16 28:6,9 30:25 31:8

**expected** 21:17

28:15 34:6

**experience** 25:20 26:13 27:3, 4

**explain** 6:12 7:6 13:4 20:2,9 21:7, 20 22:6,7 24:25 25:15 28:24 30:8 35:1 37:17 38:13, 20,23

**exposed** 18:12, 20 31:14

**express** 10:10 17:9 23:13 30:1 33:8

**expressed** 10:12 12:24 13:3 22:12 23:21 27:16 33:22

**expressing** 12:17 16:18 33:3

**extreme** 10:11 13:2,4 18:13,18

**F**

**Facebook** 10:14, 16 11:1,22 19:6 37:3,5,6 39:4,12

**fact** 21:4 22:9

**fair** 6:15,16 7:1, 25 8:10 9:18 11:7 16:9 17:10 18:3 21:16 28:19 33:21

**fairly** 19:11,25

**falls** 33:11

**familiar** 16:2

**family** 10:7 14:9 20:16

**father** 13:12

**feel** 8:4 10:9 12:23 17:8,9 19:11 23:12,13 33:7,8

Case 3:25-cv-00528-KAC-JEM        Document 54-5        Filed 03/02/26        Page 44 of 48
PageID #: 1640

feelings' 19:10

felt 10:4 12:17,22 17:1,2,4 23:4 30:24

figure 10:20 11:18 38:21

finally 6:17

find 37:6

fine 35:6

finish 34:3

fire 30:11,16 32:6 33:16

fired 34:1,6

firing 36:7

flagship 24:25

focus 20:17

focusing 20:24

folks 11:18 14:8 18:12,18,21 23:1 26:14

follow 35:11

foremost 7:11

form 11:16

format 11:10 18:7

formed 29:2 31:3 32:3

forwarded 17:24 28:6

found 37:2

free 8:4 29:25

freedom 30:1

freedoms 7:10

front 8:12

fuck 19:9

full 5:7

fully 33:8

funded 29:2

**G**

general 7:13 15:8 22:11

generally 6:25

give 14:2 33:9

Glenn 15:25

goal 24:23

government 9:16

grades 13:1

graduate 26:24

grassing 26:6

greatest 19:22

grieving 20:16

ground 6:6

gruesome 21:23

guess 11:20 14:6 17:18 21:14,15 32:14 33:2

**H**

handed 8:13

happened 31:13, 16,19

happy 6:23 13:18 14:4,11 27:11

hard 6:10

harm 11:20 30:12 33:5

harmful 13:10 30:5

hateful 13:9

heard 10:21 11:12 36:11

hey 6:22,25

hidden 18:25

hold 6:17

home 34:12

honestly 19:3 20:21

hope 6:17

hoping 12:13

hour 5:14

House 7:4,7 34:20,24

huh-uh 6:11

human 13:14 32:10

Humboldt 34:14

hundreds 24:11 26:14

**I**

idea 24:14 27:12

images 37:11 38:15

imagine 13:14 23:3

immediately 27:21

imminent 23:8

impartially 19:12

important 6:8 28:21 29:18

impression 11:8 13:8 31:16,17 32:4 37:15,22 38:9 39:2

inclination 33:5

including 18:13

Incorporated 26:4

indicating 21:11

indicative 23:22

individual 32:14

industry 26:21

influence 12:16, 20

information 22:17

initial 18:1,4

interest 7:12

interesting 37:23

internal 7:23

introduction 36:23

investigate 10:13 14:14

issue 17:24

**J**

Jackson 34:14

job 7:7 15:13,16

JONES 13:20,23 14:23 16:20 24:4, 13 32:18 35:2,8 39:19,22

justified 27:23 30:20,22,24 31:5

**K**

kids 17:8 19:6 20:11

killed 31:11

kind 7:18 10:20 11:19 16:18 33:10

Kirk 10:6 18:12 19:11,17,19,21, 24 20:6,20 21:5 23:18 24:1 27:11 31:10 32:1,7,17 38:7

Kirk's 20:5 31:18

knew 10:1 19:3 37:24

knock 6:24

knowingly 25:8

**L**

Laden 14:3,5

lawyers 29:15

learn 11:21 36:6, 9

learned 11:23

led 22:15 31:2

left 32:3 37:15 38:9

legislative 7:20, 23 8:4 9:4

legislature 35:3

level 24:19 25:17 38:7

liberties 7:10

life 15:9 25:6

limited 7:15

limits 7:24

lines 27:2

literally 26:14

live 32:24

lived 39:6

living 19:7 20:11 25:25

long 5:12 6:18 30:2,3,10

longer 27:11

longest 5:13

looked 12:2 29:14 36:22,25

lot 21:21 25:7 26:13

lots 23:3

**M**

made 9:22 10:14, 23 11:2,3,21

15:18 38:18

**mainstreamed** 12:25

**make** 14:2 16:25 17:3 25:5 29:7 32:25 33:12 35:7

**manners** 19:2

**marked** 8:23,24 39:25

**marrying** 19:9

**material** 38:24

**matter** 5:25

**means** 17:16 34:17

**media** 10:17 17:23 36:25 37:2

**member** 7:3,7

**members** 14:10

**mentioned** 8:16 25:10 36:23

**Michigan** 6:20

**Middle** 12:7

**millions** 23:24 24:2,9

**mind** 6:13 22:1

**mindset** 25:4 31:13

**minor** 26:11,20

**minutes** 39:20

**miscredit** 11:20

**Monday** 17:15

**money** 25:7

**months** 13:6 16:8

**morning** 17:15

**motorists** 16:1

**movie** 30:11,16

**murder** 14:9 22:10

## N

**names** 37:2

**Natural** 34:20,24

**naturally** 23:12

**nature** 13:3,4 28:12

**necessarily** 23:9

**neutral** 15:16,19

**news** 17:23

**ninth** 15:3

**non-legislative** 7:15

**normal** 32:10,12

**norms** 33:1

**north** 6:19,25

**note** 7:19

**number** 8:8 26:12

## O

**object** 8:5

**objected** 13:23

**Objection** 13:20 16:20 24:4,13 32:18 35:2

**observed** 39:21

**obvious** 19:5

**occurred** 5:20

**officials** 16:11

**older** 38:10

**online** 15:22

**opinion** 22:3 33:22

**opinions** 10:10, 23

**opposed** 6:13

**opposing** 8:14

**original** 10:14

**Osama** 14:3,4

**outcome** 12:13 31:8

**outrage** 16:19

**owner** 26:2

## P

**p.m.** 8:20 40:4

**paragraph** 14:24 15:2 27:19

**parameters** 8:9

**part** 30:18

**pass** 28:11

**past** 25:10

**Paul** 5:9

**payroll** 27:22 28:24,25

**people** 6:25 13:18 14:4 19:1 23:25 24:2,9,12 26:13 27:5 30:5, 12 32:25 33:16

**people's** 7:9

**performance** 15:13

**period** 38:16,17

**person** 10:19,21 13:10 20:15 21:25 22:14,25 33:12

**personal** 6:2 9:5

**perspective** 15:8,9 17:4,5,7 23:11

**physically** 22:24

**picture** 37:1,19

**pictures** 37:11

**place** 22:10 23:18,25 32:1,16 36:10

**platform** 37:3

**platforms** 36:25

**point** 8:2 13:9

**police** 22:21 23:3

**policy** 7:21

**poor** 13:1

**position** 10:11 12:15,16 20:3

**possibility** 24:18,20

**post** 10:15 13:3,4 18:2,4 31:13

**posted** 10:5 12:21 19:2 37:18 38:6,18

**posts** 37:9

**potential** 22:4 23:10

**potentially** 12:23 24:17

**preface** 7:18

**prelaw** 26:20

**premarked** 5:5

**president** 9:14, 16 27:20 28:1,7

**pretty** 5:14

**print** 8:17

**prior** 31:13,14

**private** 11:22 29:5,10

**privately** 11:4,6

**privileged** 8:3

**proceedings** 40:4

**process** 25:7

**professor** 12:14, 22 13:1 15:13,24 18:14 19:21,23 21:22 25:3

**professor's** 12:19

**professors** 15:21

**progression** 38:15

**progressive** 38:8,14

**promise** 8:5 38:21

**promised** 35:7 39:17

**propensity** 33:6

**protect** 7:11

**protestors** 16:1

**psychiatrist** 25:23

**psychologist** 25:21

**psychology** 26:8,9 27:1

**psychopath** 19:8 20:12

**public** 10:7,24,25 11:9,10,17 29:5, 10

**publicly** 11:3 25:4

**purpose** 8:6 17:2

**put** 10:5,6 11:18 12:16 17:6 25:4 32:3

## Q

**qualified** 31:7

**question** 8:2 15:4 20:19 21:9, 17

**questions** 39:23

**quickly** 6:21

**quote** 37:21

**R**

read 18:15 21:8 27:24 30:18

Reading 30:23

reason 10:22 27:23 30:20

reasonable 30:25 31:8

recall 5:22 11:1 16:5,8 17:19,24, 25 18:9 21:9 36:8,12,22 37:4, 12,21 38:17 39:1, 13

receive 17:15

received 36:13

recent 38:8

recess 39:21

recognize 8:15

recollection 13:7 39:3

record 5:8

referee 34:25

regular 27:8

relations 9:16

released 11:10

remember 9:11 10:16,17 16:10, 12,13 18:7,9 19:3 37:9,10,13,22 38:1 39:1,4,7

removed 12:14

Rep 34:17

reporter 6:10

reposting 18:8

represent 7:12

representative 5:1,10 7:9 26:1 28:13,16 34:17

Representatives

7:4,8

research 36:20

Resources 34:21,24

response 32:10, 13

retribution 33:11

retweeting 18:8

Reynolds 15:25

ridicule 13:2 33:10

right-hand 15:3

rights 7:11

Robb 5:10 6:22

Robby 12:4,6

role 28:10,15 33:13 35:3

rooting 31:10

rules 6:6

run 16:1

**S**

sad 32:7

safe 10:9 17:9 21:25 33:7

safety 21:18 22:19 38:12

SAITH 40:3

Saturday 17:19

scenes 37:14

school 26:22

science 26:19

send 9:2,8 10:3 28:1

sending 16:3 17:2 36:15

separate 9:5

September 8:18,

19

setting 10:25 11:22 12:15 21:10

shake 17:10

Shirinian 9:19, 22 10:5,14 11:21 14:14 15:12 18:15,22 20:20 27:21 30:15,21 31:10 32:15 35:13 36:7,15,21

sic 18:18

sick 19:8

side 15:3

similar 5:24 17:3 18:22 19:2 33:18

sir 5:7 7:2,3 8:11, 21 17:22 18:16 24:8 26:16 28:2, 18 32:22 34:19, 22 35:12 38:2 40:1

situation 23:20

slow 6:22 7:1

smart 8:7

sneak 8:6

social 10:17 36:25 37:2

society 15:9 33:1,3

someone's 23:21

sort 9:21 27:1

speak 6:20 36:2

specific 22:11 23:17

specifically 8:19 16:7

speech 30:1,4

spending 25:7

spoken 36:14

stand 16:21

stands 39:9

Starbuck 12:4,6

start 17:14

state 5:7 23:2 28:12,16 29:1,2, 15 38:19

State's 24:24

statements 10:5 15:18

stay 33:12 35:6

stemmed 10:15

stipulated 5:13

stipulation 7:15

strategy 7:23

strongly 10:4

student 12:22 21:25 22:19

student's 25:12

students 10:8 12:20 15:16 17:6 19:10,17,23,24 21:21 33:7 35:15, 18

studies 39:8

stuff 5:16 6:11

suggesting 15:25 30:14 31:9

Sunday 17:17,21

suppressed 18:22

surprise 9:15,17 14:12 39:6,7

surprised 14:4,6 37:24

sworn 5:3

**T**

takes 20:15

taking 36:9

talk 35:21

talking 18:17

Tamar 9:19

targeted 11:16, 17 13:1

taught 10:20

taxpayer 27:22 28:24,25

taxpayers 29:3

tendency 6:20

Tennessee 7:4 9:12 12:8,20 15:21 32:6 34:1, 15 35:16 36:7 39:11

terminate 27:21

terminated 14:17

test 33:9

testified 5:3

testimony 10:23

theater 30:11,16

thing 10:20 19:22 30:25

things 7:24 20:15 30:3,4 31:4 38:8

thinking 22:1 38:22

thought 13:13 14:8 23:8 30:22 31:18 33:2,25 38:11

thoughts 12:24 18:21,24 22:12, 15 23:10,19 30:1

thousands 24:12

threatened 12:23

time 6:7,18 11:8 13:6,9 16:13 18:1 19:4 26:17 29:7

30:3,10 38:16,17 39:17 40:1

**times** 5:21

**timing** 36:12

**title** 9:11

**today** 7:25

**today's** 7:14

**Todd** 5:1,9,10 34:17,18

**told** 36:17,18

**topic** 17:16

**topics** 7:16 37:10

**totally** 16:9 33:4

**treated** 19:11,24

**trick** 38:21

**trip** 21:2

**troubling** 37:14, 20,23 38:3,5

**true** 23:21

**trust** 34:3

**truth** 6:9

**turn** 17:12

**Twitter** 10:17 11:1

**type** 9:13 25:4,9 33:18

**U**

**uh-huh** 6:11

**ultimately** 14:16

**unapologeticall y** 27:20

**uncomfortable** 12:17

**understand** 6:21 7:14

**understanding** 11:18

**understood**

12:21

**Union** 26:23

**universities** 29:5,10,11

**university** 9:12 12:20 14:13 15:20 17:4,11 24:25 25:8 26:23 29:1 32:5 34:1 35:16 36:7 37:24 39:11,14

**urging** 16:15

**UT** 10:19 36:24 37:1

**UTK** 18:14

**V**

**variety** 22:16

**vice** 9:15

**view** 33:23

**viewpoint** 14:21 15:5 20:5 21:19 22:4 25:19

**viewpoints** 15:22 22:12

**views** 12:18

**violent** 22:4 24:17

**voting** 7:20

**W**

**wake** 18:11

**wanted** 17:3,6

**weak** 8:16

**website** 10:19 36:24

**whatsoever** 27:24 30:21 36:20

**Whitworth** 9:9, 10 14:19 28:4,10

**wife** 19:8 20:13 36:3

**wished** 20:6,23 21:12

**wishing** 20:4,18, 20,22 21:4

**word** 11:12 14:21 15:5 18:20 21:11 29:8 39:9

**wording** 31:24

**words** 13:5 16:21 17:12,13 18:2 20:17,22 21:11 23:15,17,19 31:3, 6,7 32:2 37:19

**work** 34:4

**world** 18:13,19 19:7,22 20:11 23:17,25 31:25 32:16

**write** 19:5 21:17 24:21 27:19 34:8, 17

**written** 17:13 21:3 34:3

**wrong** 32:17 33:21

**wrote** 18:1 19:21 28:23 30:18 32:6 34:11

**Y**

**year** 22:2 23:11 25:2,11,16,17,18

**years** 5:21 15:25 26:15

**yell** 30:11

**yelled** 30:15

**yelling** 30:16

**young** 24:22

**youth** 12:16