# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | | |
|---|---|---|
| TAMAR SHIRINIAN | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:25-cv-528 |
| | ) | |
| v. | ) | Judge Crytzer |
| | ) | Magistrate Judge McCook |
| DONDE PLOWMAN, | ) | |
| in her individual capacity | ) | |
| and in her official capacity | ) | JURY DEMAND |
| for prospective injunctive relief only, | ) | |
| RANDY BOYD, | ) | |
| RYAN STINNETT, | ) | |
| CYNTHIA MOORE, | ) | |
| JOHN C. COMPTON, | ) | |
| CHRIS TODD, | ) | |
| TIMOTHY BURCHETT, | ) | |
| JOHN DOE #1, | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## PROPOSED SECOND AMENDED COMPLAINT

## FACTUAL INTRODUCTION

1.      On September 10, 2025, an American right-wing political activist, Charlie Kirk, was tragically shot and killed. Mr. Kirk was a co-founder of Turning Point USA ("TPUSA"), a conservative organization designed to advocate for conservative politics and values.

2.      In the following weeks, national news covered the story of his life, death, and messages, including a September 11, 2025, New York Times article entitled, "Conservative Christians are Mourning Charlie Kirk as a Martyr." See Deposition of University of Tennessee, Knoxville ("UTK") Chancellor Donde Plowman, attached as Exhibit A, at 26-32.

3. On the night of September 12, 2025, while at home with her husband and children, Dr. Tamar Shirinian scrolled through her private Facebook page.

4. Plaintiff's private Facebook profile did not indicate that she worked in or even lived in the State of Tennessee.

5. While scrolling, Dr. Shirinian saw a friend's private post about the messages of the deceased political activist Charlie Kirk being inconsistent with the messages of Jesus.

6. Dr. Shirinian, agreeing with her friend's private Facebook post, responded with a comment: The world was a better place without Charlie Kirk.

7. Dr. Shirinian's speech commented on a public, political figure. Plowman Dep. at 65.

8. Mr. Kirk, a staunch First Amendment advocate, has been labeled a champion to a conservative America by U.S. Senator Marsha Blackburn.

9. Plaintiff expressed a negative political viewpoint about a prominent conservative public figure in the context of a national political moment

10. Dr. Shirinian's speech was part of national political discourse. Many other Americans held her same viewpoint, while many others did not.

11. Neither the post nor Dr. Shirinian's comment advocated or endorsed violence.

12. On the afternoon of September 14, 2025, right-wing, conservative political activist Robby Starbuck "doxed" Plaintiff and published the post and comment to his hundreds of thousands of conservative followers on X in an effort get Dr. Shirinian fired from her job, along with Dr. Shirinian's professor profile from University of Tennessee, Knoxville ("UTK") website.

13. Doxing is the malicious act of researching and publicly releasing someone's private information in an aim to intimidate, humiliate, bully, or harass them.

14. Starbuck provided his hundreds of thousands of X followers the email address of UT's Vice President of Marketing and the X account of University of Tennessee System ("UT") President Randy Boyd (@randyboyd), urging them to contact UT leadership and demand action.

15. For clarification, the University of Tennessee System ("UT") is the statewide higher-education institution, with the University of Tennessee, Knoxville ("UTK") as its flagship campus. In this pleading, Defendants who work for either UT or UTK will be referred to as "UT/UTK Defendants" and, when addressing both UT and UTK, they will be referred to as "UT/UTK."

16. That evening, many of Starbuck's followers contacted UT/UTK demanding that Dr. Shirinian be terminated.

17. This amplification, in addition to later amplifications by UT/UTK administrators, transformed a private Facebook comment into a public controversy driven entirely by third-party reaction.

18. Individuals who work as Tennessee state legislators and federal legislators also demanded that UT/UTK terminate Dr. Shirinian, some publicly and others through non-public communications directed at influencing a specific employment decision.

19. Individuals who dedicate their time to working as Tennessee State legislators are part-time legislators, and most have other jobs.

20. The General Assembly convenes in the State Capitol in Nashville on the second Tuesday in January of each odd numbered year. Legislative work usually runs from January through April or May.

Case 3:25-cv-00528-KAC-JEM    Document 58-1    Filed 03/27/26    Page 3 of 42
PageID #: 2309

21. Before acting, UTK Chancellor Plowman did not even try to contact or speak with Dr. Shirinian, did not reach out to Dr. Shirinian's Department Chair, and did not reach out to any students in Dr. Shirinian's classes. Plowman Dep. at 48-49.

22. Before acting, Chancellor Plowman did not contact any of the UTK faculty or staff that worked with Dr. Shirinian and did not speak with the Dean of Dr. Shirinian's college. *Id.* at 60-61.

23. Internal UT/UTK tracking reflected that an overwhelming majority of incoming communications demanded Plaintiff's termination.

24. Sworn testimony and internal communications show that UT/UTK Defendants focused on public image, donor reaction, and political fallout—not on any contemporaneous evidence of disruption.

25. At the time the decision was made, UT/UTK Defendants had identified no disrupted class, no student complaint tied to Plaintiff's teaching, no safety threat, no operational impairment, and had conducted no contemporaneous safety assessment, threat evaluation, or disruption analysis of any kind.

26. On the evening of September 14, 2025, after seeing the legislators demands and the viral public response, UT/UTK Defendants decided to remove Plaintiff from teaching, place her on administrative leave, and initiate a path toward termination without conducting any contemporaneous safety assessment, threat evaluation, or evidence-based analysis of workplace disruption.

27. The decision was made within hours of the external political and donor pressure described above, and without any intervening investigation or fact-finding.

4

28. UT/UTK Defendants were aware that other UTK-affiliated speakers, including professors and students, had recently engaged in similar or more extreme speech without discipline.

29. UT/UTK Defendants were also aware or became aware that UT/UTK had previously treated comparable or more extreme speech as protected under the First Amendment.

30. To justify discipline that could not lawfully be imposed, UT/UTK Defendants published statements they knew were false or acted with reckless disregard for their falsity despite having access to the initial post and Plaintiff's exact response/comment: that Plaintiff was both *advocating* violence and murder and *endorsing* violence and murder.

31. Under the ordinary meaning of those terms, Plaintiff's speech did not support, promote, or express approval of violence or murder.

32. UT/UTK Defendants, via social media and email, sent these false statements to hundreds of thousands of their social media followers, foreseeably and actually injuring Plaintiff in her profession, as well as her reputation.

33. Chancellor Plowman testified that she punished Dr. Shirinian because of her concern that Dr. Shirinian's comment had gone viral. Plowman Dep. at 67.

34. Chancellor Plowman testified that she acted against Dr. Shirinian because her instructors have a responsibility for modeling respectful interaction around multiple viewpoints and that Dr. Shirinian's private Facebook comment was not respectful. Plowman Dep. at 74.

35. Chancellor Plowman admitted under oath that it did and does not matter to her if Dr. Shirinian made her comment on behalf of the university. Plowman Dep. at 78-79.

36. Chancellor Plowman did not follow legal advice provided to her as to the constitutionality of her actions when she fired Plaintiff.

5

37. UT Board of Trustees written policy specifically allows for speech that some find immoral if the speech is not made on behalf of the university.

38. Chancellor Plowman admitted under oath that she made the decision to terminate Dr. Shirinian because when a public university loses the public's trust, they "lose everything." Plowman Dep. at 158.

39. Private text messages between UT President Randy Boyd and UTK Chancellor Donde Plowman—show that external political, donor, and the public pressure substantially motivated the discipline on Plaintiff. *See* private messages attached as Exhibit B.

40. These private messages confirm Chancellor Plowman's admission that the actions were taken in response to political and public pressure—which is not a lawful justification:

**And it wasn't just politicians.**
**It was alumni, parents, and so many others.**

**We did the right thing.**

*See* Exhibit B.

41. UT/UTK Defendants punished Plaintiff not only because of the viewpoint expressed, as they knowingly permitted similar or more extreme speech expressing different viewpoints, but because the private post and comment, without Dr. Shirinian's consent, had gone viral. Plowman Dep. at 53-57, 67.

42. Each day UT/UTK Defendants continue to enforce their decision, Plaintiff is excluded from her profession, her academic career is further damaged, and her constitutional rights are violated. These are ongoing injuries that cannot be remedied after the fact.

6

43.     If permitted to stand, UT/UTK Defendants' conduct would signal that public universities may punish protected speech whenever sufficient political or donor pressure is applied, nullifying core First Amendment protections for public employees.

44.     If permitted to stand, UT/UTK Defendants' conduct would signal to legislators who swear to uphold the Constitution that they have no need to seek legal advice before illegally acting on constitutional issues.

45.     If permitted to stand, UT/UTK Defendants' conduct would signal that freedoms, be it the First Amendment, Second Amendment, or any Amendment, can be bought or trampled on if the mob is loud enough.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343.

47.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

48.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District and because the UTK campus, Plaintiff's employment, and the relevant decisionmakers are in this District.

## PARTIES

49.     Plaintiff Tamar Shirinian, Ph.D., was a tenure-track anthropology professor at UTK. She was on track to receive tenure in 2026.

7

50. Defendant Donde Plowman is Chancellor of UTK. She is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief only.

51. Defendant Randy Boyd is President of the University of Tennessee System and is sued in his individual capacity.

52. Defendant Ryan Stinnett is General Counsel for the University of Tennessee and is sued in his individual capacity.

53. Defendant Cynthia Moore is Secretary and Special Counsel to the UT Board of Trustees and is sued in her individual capacity.

54. Defendant John C. Compton is Chair of the UT Board of Trustees and is sued in his individual capacity.

55. Defendants Plowman, Boyd, Stinnett, Moore and Compton are occasionally referred to in this Complaint as the "UT/UTK Defendants."

56. Defendant Chris Todd owns and operates Envirogreen, Inc., a landscaping and erosion prevention company. He lives in Tennessee and is a member of the Tennessee House of Representatives. His actions in this matter do not involve any legislative act, including voting, committee work, investigation, or information-gathering related to legislation. He is sued in his individual capacity.

57. Defendant Tim Burchett is a member of the United States House of Representatives and is sued in his individual capacity for non-legislative conduct, including personal pressure, encouragement, and participation in efforts to cause Plaintiff's termination. His actions in this case did not involve any legislative act or communication integral to the legislative process.

8

58. Defendant John Doe #1 is a currently unidentified UT supporter who threatened to not give over ten million dollars ($10,000,000.00) if Dr. Shirinian remained at UTK. His name was redacted in UT/UTK documents.

## FACTS

### A. Plaintiff's protected private speech

59. On September 12, 2025, a Facebook friend of Plaintiff made a post on a private Facebook page about Charlie Kirk:

> I've unfriended four people since Kirk's assassination. I get it, they're mourning him because of his message but the content of his message was full of hate, genocide apologia and bigotry yet they're treating him like the next best thing since Jesus. So my secular sensibilities find that to be blasphemous and a lil delulu. I guess we "grew" apart.

60. Plaintiff responded with a private Facebook comment in support of her friend's private Facebook post:

> The world is better off without him in it. Even those who are claim to be sad for his wife and kids… like, his kids are better off living in a world without a disgusting psychopath like him and his wife, well she's a sick fuck for marrying him so I don't care about her feelings.

61. Chancellor Plowman recognized that Dr. Shirinian's comment could be read to mean that Dr. Shirinian agrees with her friend that Kirk's messages were full of hate, genocide apologia and bigotry. Plowman Dep. at 69.

62. Plaintiff's Facebook profile did not identify her as a UTK professor or purport to speak on behalf of UT or UTK.

63. Plaintiff's comment was made while she was off duty, at home, on her personal account, and not pursuant to any official duty.

9

64. Plaintiff's comment did not advocate or endorse violence, incite imminent lawless action, or solicit criminal conduct.

65. Plaintiff's comment did not constitute a true threat, incitement, or advocacy for violence.

66. Plaintiff's comment addressed an important matter of public concern that was being discussed throughout the country.

67. UT/UTK Defendants did not identify any disruption caused by Plaintiff's speech itself, as opposed to reactions to that speech by third parties.

68. Plaintiff's comment was political in nature, as Mr. Kirk was an important political figure with strong ties to President Trump and other powerful members of the GOP.

69. Plaintiff expressed a viewpoint about a prominent political figure and public controversy surrounding him.

70. Chancellor Plowman testified under oath that this private Facebook post was about Mr. Kirk's politics, and that professors' political views must be protected under the First Amendment, even if people might find them to be reprehensible, such as a UTK professor donating to the KKK. Plowman Dep. at 68, 74-75.

**B.      Political outrage, donor pressure, and demands for discipline**

71. On September 14, 2025, conservative social-media activist Robby Starbuck doxed Plaintiff and demanded that UT/UTK act.

72. Mr. Starbuck encouraged followers to contact UT leadership.

73. UT/UTK officials quickly began receiving a large volume of politically charged messages demanding discipline.

74. By the evening of September 14, 2025, elected officials, donors, UT/UTK parents, and politically connected actors were pressuring UT/UTK to terminate Plaintiff.

75. UT's government relations employees became actively engaged in communications regarding Plaintiff's employment status and served as intermediaries between legislative offices and UT/UTK decisionmakers.

76. UT's government relations department, UT's communications department, and decisionmakers began to actively track and analyze these communications.

77. At 6:19 p.m. on September 14, 2025, a private X account, "CA Escapee @TurtleSocks3035" forwarded Mr. Starbuck's post to United States Representative Tim Burchett.

78. Two minutes later, at 6:21 p.m. on September 14, 2025, Defendant Burchett publicly responded "On it" to a message directing his attention to Plaintiff and calling for action.

79. In context, Mr. Burchett's statement signaled an intent to intervene with executive decisionmakers to the effect that he was "working on" getting Dr. Shirinian fired.

80. Timothy Burchett is Knoxville's local U.S. Representative. He has strong connections to Knoxville, was a close friend of Mr. Kirk, and has significant influence with regards to UT/UTK.

81. Representative Burchett talked with Mr. Kirk about various Republican strategies and political issues.

82. Less than an hour later, at 7:05 p.m. on September 14, 2025, in a follow up with CA Escapee @TurtleSocks3035, U.S. Representative Burchett posted on X that he had "already delivered the message."

83. Within hours of Defendant Burchett's public statements indicating that he had delivered the message after working on it, University decisionmakers acted in a manner consistent

11

with that directive, removing Plaintiff from teaching and initiating termination proceedings without investigation.

84. Burchett's public statements indicating action, combined with UT's established practice of routing legislative communications through government-relations personnel and the immediate adverse action that followed, plausibly support that Burchett or his agents communicated with UT decisionmakers through non-public channels to advocate for Plaintiff's termination.

85. Such communications are further supported by UT's documented practice of routing legislative concerns through government-relations personnel directly connected to decisionmakers.

86. Defendant Burchett's conduct did not involve voting, debate, committee work, or any formal legislative act.

87. Defendant Burchett's efforts were specifically designed to influence executive action against Dr. Shirinian.

88. At 7:54 p.m., United States Senator Marsha Blackburn, on the social media platform X, copied Robby Starbuck's post, and publicly called for Dr. Shirinian to be "fired immediately."

89. At approximately 8:54 p.m. on September 14, 2025, Chris Todd, without knowing or caring if Dr. Shirinian made her comments in her capacity as a citizen (and not a professor), had a private email sent to President Boyd. *See* Todd Letter attached as Exhibit C, and Todd Deposition, attached as Exhibit D, at 11-12, 29.

90. The private email specifically noted that he was the Chair of Tennessee's Agriculture and Natural Resources Committee and called for Plaintiff's termination because of her speech.

91. As a result of the letter, combined with his position of power in the Tennessee State legislature, Todd expected his actions would result in Dr. Shirinian being terminated.

92. Todd holds significant influence over UTK and UT/UTK officials.

93. Todd wrote in his email that he did not like Dr. Shirinian's viewpoint.

94. Todd expected his email to influence executive action.

95. Todd's communication was not part of debate, voting, committee work, or any other legislative act.

96. Todd's communication was a direct effort to cause executive-branch and university officials to punish a public employee for protected speech.

97. Other elected officials or their staff likewise communicated pressure to UT leadership and were a substantial factor in the adverse action taken against Plaintiff.

98. Both Burchett and Todd functioned as a conduit through which political and donor pressure was transmitted to UT/UTK decisionmakers, resulting in the adverse action against Plaintiff.

99. Defendants Burchett and Todd were independent actors, acting outside the scope of their official duties, but using their official elected positions to exert pressure via direct communications to coerce UT/UTK to a specific employment decision regarding Dr. Shirinian in violation of her protected speech.

100. Plaintiff does not challenge any legislative act, voting activity, or internal legislative deliberation. Rather, Plaintiff challenges non-legislative conduct, including external

communications, coordination with UT/UTK officials, and efforts to influence a specific employment decision.

101. Defendant Todd and Defendant Burchett's conduct was directed at a specific executive employment decision and did not involve the formulation of policy, legislation, or any general legislative function.

102. Communications directed at influencing a specific employment decision by executive officials, outside any legislative process, are not protected by legislative immunity and fall outside the scope of any legitimate legislative function.

103. These Defendants and other legislators expressed disagreement with Plaintiff's viewpoint and used their offices to exert coercive pressure, not to legislate.

104. UT/UTK decisionmakers were actively tracking, discussing, and responding to these legislative communications contemporaneously with the decision to discipline Plaintiff.

105. These communications were received by and relayed among UT/UTK decisionmakers, including senior administrators and communications officials involved in the disciplinary decision, and were considered contemporaneously with the decision to impose adverse action, including individuals with authority to recommend, approve, ratify, or implement disciplinary action against Plaintiff. Some of these individuals had authority to intervene, halt, or reverse the adverse action but knowingly chose not to do so despite awareness of the constitutional violations described herein.

106. Numerous UT/UTK donors also communicated displeasure with Plaintiff's speech and threatened consequences if UTK did not act, which UT/UTK Defendants understood as a threat to institutional funding.

107. One donor, Defendant John Doe #1, threatened to not give over $10 million dollars ($10,000,000.00) to UT unless Plaintiff was terminated. *See* email from John Doe #1, attached as Exhibit E.

108. The September 15, 2025, email addressing President Boyd reads:

Dear President Boyd,

I cannot believe what I just read about Dr. Tamar Shirinian's comment on the death of Charlie Kirk. I can only hope this is not true.

**My Family Trust is set to leave a sizeable estate ($10 M plus)** to UT's Engineering department.

**If Dr. Tamar Shirinian's comments are true, I find it difficult to understand why UT would hire this person. Any UT employee with a hateful point of view does not deserve to be employed at UT. This is not the UT I know *and definitely not the UT I support.***

(emphasis added).

109. Defendant John Doe #1's message was clear: Fire Dr. Shirinian or he would not give over ten million dollars ($10,000,000.00).

110. Public universities rely on donors for funding.

111. Over 70,000 individuals donated to UT/UTK last year.

112. A ten-million-dollar gift to a public university is considered a major gift.

113. A ten-million-dollar gift to a public university often gets significant publicity.

114. Significant gifts or endowments given to major universities often lead to other major gifts or endowments.

115. UT/UTK would consider not receiving a ten-million-dollar gift a significant loss.

116. Defendant John Doe #1 used coercive economic pressure—conditioning a substantial donation on Plaintiff's termination—to override independent decision-making and induce unconstitutional action.

117. Defendant John Doe #1, like Defendants Todd and Burchett, each knew that Dr. Shirinian had an existing employment relationship with UT/UTK.

118. Defendant John Doe #1, like Defendants Todd and Burchett, each intended to cause a breach in Dr. Shirinian's employment relationship with UT/UTK.

119. Defendant John Doe #1 intended to cause a breach in Dr. Shirinian's employment relationship with UTK via improper means: threatening to withhold funds from UT/UTK if Dr. Shirinian was not terminated.

120. Defendants Todd and Burchett intended to cause a breach in Dr. Shirinian's employment relationship with UTK via improper means: coercion via behind the scenes demands to terminate Dr. Shirinian because of her speech and viewpoint.

121. Based on the temporal proximity, public statements, and UT/UTK's established practice of communicating with legislative offices through intermediaries, these communications occurred through non-public channels, including staff, agents, or government-relations personnel acting on UT/UTK Defendants' behalf.

C. **Without even attempting to talk to plaintiff first, UT/UTK Defendants helped draft, publish, or ratify knowingly false statements accusing her of advocating for and endorsing violence and murder**

122. At approximately 7:54 a.m. on September 15, 2025, targeting Dr. Shirinian's private Facebook comment, Defendant Boyd publicly posted on his social media account regarding Plaintiff that "[c]elebrating or advocating violence and murder is reprehensible and has no place at the University of Tennessee" and that UTK was investigating and would take decisive action.

123. In doing so, Defendant Boyd was referencing Dr. Shirinian and publicly stating she celebrates and advocates for violence and murder.

124.    Upon information and belief, Defendant Stinnett either helped draft, ratified, or approved of Defendants Boyd's statement.

125.    Defendant Boyd republished the statement on multiple other social media accounts.

126.    UT/UTK followed suit by posting Boyd's statement on its official social media accounts.

127.    The statement was also disseminated to tens, if not hundreds of thousands of people, via UT/UTK official email accounts.

128.    That published statement was reasonably understood to refer to Plaintiff and to assert as a matter of fact that Plaintiff had celebrated or advocated violence and murder.

129.    Published statements, as they relate to Dr. Shirinian celebrating or advocating for violence and murder, were false.

130.    Plaintiff's Facebook comment did not celebrate violence and murder.

131.    Plaintiff's Facebook comment did not advocate violence and murder.

132.    Defendant Stinnett, Defendant Moore, members of the UT Board of Trustees, and others participated in drafting, reviewing, approving, ratifying, or authorizing statements about Dr. Shirinian "advocating violence." *See* September 15, 2025, email from President Randy Boyd attached as Exhibit F (previously marked as Exhibit 109 to Compton Dep.)

133.    At approximately 12:01 p.m. on September 15, 2025, an official UTK social-media account published the statement that "[Dr. Shirinian's] actions endorsing violence and murder do not represent the university or our values," and announced that Plaintiff had been removed from the classroom, placed on administrative leave, and that the termination proceedings had begun.

134.    Chancellor Plowman also published a statement that Dr. Shirinian endorsed violence and murder.

135. This statement, like President Boyd's statement, was published numerous times on various UT/UTK social media and email accounts.

136. Defendants' statements (attached as collective Exhibit G) were not framed as subjective opinion or rhetorical commentary, but as factual assertions about what Plaintiff said and meant. The statements conveyed that Plaintiff had expressed approval of violence—a claim directly contradicted by the text itself.

137. UT/UTK Defendants did not even reach out to talk to Dr. Shirinian before publishing these statements.

138. Defendant Stinnett, Defendant Moore, members of the UT Board of Trustees, and others participated in drafting, reviewing, approving, ratifying, or authorizing statements about Dr. Shirinian "endorsing violence and murder."

139. Such accusations are widely understood in academia to foreclose employment opportunities.

140. The official statements of UT/UTK with regards to Dr. Shirinian were reasonably understood to assert as a matter of fact that Plaintiff had endorsed violence and murder.

141. Defendants' multiple false statements amplified public outrage and were used to justify the adverse action against Plaintiff. Defendants relied on the resulting backlash as evidence of disruption, despite having identified no disruption caused by Plaintiff's speech itself.

142. At approximately 12:59 p.m. on September 15, 2025, Chancellor Plowman sent Plaintiff a letter placing her on administrative leave and initiating expedited termination proceedings.

143. Three minutes later, at 1:02 p.m., President Boyd forwarded Chancellor Plowman's letter, via email, to UT's Vice President of Government Relations, Advocacy and Economic

18

Development, UT's Vice President for Communications and Marketing, and UT's General Counsel.

144. Three minutes after that, at 1:05 p.m., UT's Vice President of Government Relations and Advocacy forwarded President Boyd's email and Chancellor Plowman's email to Dr. Shirinian to the following people:

- Mackensie Burt McKernan, UT's Assistant Vice President for Federal Relations
- Josh Warren, UT's Executive Director of Partnerships and Regulatory Affairs
- Tim Sigler, UT's Assistant Vice President of Government Relations and Advocacy
- Annie Fishel, UT's Executive Director of Policy and Advocacy

145. UT's Vice President of Government Relations, Advocacy and Economic Development also forwarded the email to Defendant Stinnett, specifically noting "Ryan copied for AC privilege and counsel."

146. At 1:14 p.m. Chancellor Plowman published an X post with the factual claim that she had initiated proceedings against Dr. Shirinian for endorsing violence and murder. This factual claim was false and made purposefully, maliciously, and recklessly.

147. Within that very hour, based on UT/UTK Defendants' false statements, social media sources and numerous newspapers throughout America published articles claiming that Plaintiff had been terminated for a social media post endorsing violence and murder.

148. In an article published at 1:38 p.m. on September 15, 2025, Knoxville's own WBIR published an article with a headline that "UT looks to terminate assistant professor for social media post 'endorsing violence and murder.'" See https://www.wbir.com/article/news/local/downtown-

ut/ut-employee-charlie-kirk-investigation/51-2b6e9ad8-d0f8-4114-899d-dfccfd4db044 (accessed March 24, 2026).

149.   The article acknowledges U.S. Representative Burchett's "On it" X post and Representative Burchett saying that UTK responded "appropriately." It also quoted Charles Noble, the President of the UTK Faculty Senate inferring that Dr. Shirinian's speech constituted "hate speech," and cited Tennessee Governor Bill Lee's 12:57 p.m. X post for thanking President Boyd and Chancellor Plowman for "taking decisive action to terminate" Dr. Shirinian.

150.   Political and donor pressure was communicated directly to UT/UTK decisionmakers and was a substantial and motivating factor in the decision to impose and maintain adverse action against Plaintiff

151.   Political pressure, donor demands, and public backlash were not merely part of the surrounding circumstances—they were a but-for and substantial motivating cause of their decisions regarding Plaintiff.

152.   These pressures were received, discussed, and acted upon contemporaneously by the same officials who approved, ratified, or implemented the adverse action, and no independent, evidence-based justification intervened between that pressure and Defendants' decision.

153.   No independent, intervening, or evidence-based justification separated the political and donor pressure from Defendants' decision; rather, the adverse action followed directly and immediately from that pressure.

154.   UT/UTK employees praised Charlie Kirk on social media.

155.   UT/UTK has never punished any UT/UTK employee for their social media posts praising Mr. Kirk.

**D.     Decisionmakers rapidly moved to discipline Dr. Shirinian**

156.    By either the evening of Sunday, September 14, 2025, or the morning of Monday, September 15, 2025, senior UT/UTK leaders, including but not limited to UT/UTK named Defendants, based on pressure from UT/UTK donors, alumni, political leaders and other UT/UTK stakeholders who demanded Dr. Shirinian's termination, decided that Plaintiff would be removed. *See* Compton Dep. 34, 44, 77–80, 174–75 (Deposition of John Compton attached as <u>Exhibit H</u>); Boyd Dep. 88–89, 115–16, 122–23, 144, 171, 175, 240 (Deposition of John Compton attached as <u>Exhibit I</u>); Plowman Dep. 18–23, 48–49, 57–68, 72–73, 78–79, 105–07, 108–10, 121–23, 157–62, 240, 250–55, 265.

157.    The decision to terminate Plaintiff was not based on any concern for safety or operational disruption.  *See* Compton Dep. at 174-75; *see* Boyd Dep. at 88-89, 115-16, 122-23, 171, 175; *see* Plowman Dep. at 18-23, 48-49, 57-68, 78-79, 108-110, 157-62, 250-55.

158.    UT/UTK Defendants conducted no safety assessment.

159.    UT/UTK Defendants did not identify any disrupted class, student complaint, or operational impairment before imposing discipline, nor did they conduct any contemporaneous assessment of risk.

160.    At the time of the decision, UT/UTK Defendants possessed no contemporaneous evidence—documentary or testimonial—showing that Plaintiff's speech had disrupted any classroom, interfered with UT/UTK operations, or created any safety risk.

161.    Defendants' failure to conduct any contemporaneous investigation, threat assessment, or disruption analysis before imposing discipline confirms that their actions were not

21

based on legitimate governmental interests, but instead on viewpoint and external pressure, rendering their conduct constitutionally invalid.

162. UT/UTK Defendants' own conduct confirms that their decision was driven by listener reaction rather than any potential workplace disruption.

163. UT/UTK Defendants tracked public outrage, donor threats, political pressure, and media "temperature," while identifying no disrupted class, no operational impairment, and no safety risk attributable to Plaintiff. That is not disruption—it is backlash.

164. UT/UTK Defendants did not act based on disruption—they acted first, then constructed a justification through false characterizations of Plaintiff's speech.

165. Punishing speech because of anticipated or actual third-party reaction constitutes an impermissible heckler's veto as a matter of clearly established law.

**E. Plaintiff was removed and subjected to an ad hoc process**

166. Defendants Plowman and Stinnett devised and implemented an expedited termination process for Dr. Shirinian that was not grounded in any written, faculty-facing policy.

167. Plowman and Stinnett created the ad hoc to impose discipline on Plaintiff without the procedural protections that were required under UT Board of Trustees policy and as written in the UT Employee Handbook.

168. This ad hoc process bypassed established procedures—including departmental review, faculty review, and Provost-level review.

169. The ad hoc process concentrated decision-making authority in a single administrator without neutrality despite no written policy allowed them to do so.

22

170. The ad hoc process took responsibility from the Provost that had been specifically granted to him via a written UT Board of Trustee policy.

171. Defendants Plowman and Stinnett structured this process to minimize internal review and bypass the procedural safeguards that ordinarily apply to faculty discipline, including multi-level academic and administrative review. *See* Plowman Dep. at 98-100.

172. The process concentrated decision-making authority in a manner that eliminated neutral review and reduced the likelihood that constitutional deficiencies would be identified or corrected before adverse action was imposed.

173. According to publicly available state legislative materials, in March of 2026, the Tennessee legislature passed a bill to streamline university termination process.

174. The bill eradicates steps currently required by UT policy in the termination of a faculty member and gives unilateral power to both the Chief Academic Officer (the Provost) or the Chief Executive Officer (the Chancellor).

175. This further demonstrates that such authority did not previously exist in the form exercised against Plaintiff.

176. Plaintiff provided a written response to Chancellor Plowman on September 22, 2025, denying that she had endorsed violence and asking that she be restored to teaching and scholarship.

177. Plaintiff thereafter awaited a decision, seeking restoration of her teaching and academic duties.

178. UT/UTK Defendants nonetheless maintained the adverse action.

23

179.    For months, Plaintiff was kept in professional limbo: paid, but removed from teaching and academic duties, blocked from the meaningful incidents of her appointment, and left without a constitutionally adequate final process.

180.    UT/UTK Defendants' conduct interrupted Plaintiff's teaching, scholarship, grant opportunities, publication opportunities, conference participation, academic mobility, and tenure trajectory.

181.    These harms are ongoing and not fully compensable by monetary damages.

182.    In January of 2026, Plaintiff filed a Motion for a Preliminary Injunction.

183.    Defendants in this matter requested a 90-day extension of time to file a response.

184.    Defendants in this matter were granted an extension of just over one month.

185.    While the Preliminary Injunction was outstanding, Defendants changed the status quo and terminated Plaintiff.

186.    UT/UTK Defendants' decision to terminate Plaintiff while a motion for preliminary injunction was pending confirms that Defendants sought to alter the status quo to evade judicial review, further supporting the need for immediate injunctive relief.

## F.    Defendants had notice that their actions were unconstitutional and selectively enforced

187.    Chancellor Plowman punished Dr. Shirinian based on her alleged used of incendiary language and lack of civility.

188.    However, in the days immediately after Mr. Kirk's assassination, UT/UTK senior officials were made aware of numerous third-party complaints about similar Charlie Kirk-related social-media speech by professors other than Dr. Shirinian, as well as similar Charlie Kirk-related posts by UTK students.

189. One complainant asserted that another UTK professor had crossed an ethical line and that action should be taken against the professor by suggesting Kirk's children should draw lessons from their father's murder.

190. Another complainant cited a different professor's Charlie Kirk-related post, claimed that it justified violence, and demanded discipline on the ground that the professor could not be seen as a rational or unbiased teacher.

191. Yet another complained about UTK students posting vile social media that celebrated and mocked Charlie Kirk's death.

192. Defendant Plowman did not punish these other UTK professors.

193. Defendant Plowman did not punish these other UTK students.

194. In March of 2025, Defendant Plowman was aware that UTK allowed Mr. Kirk's organization, Turning Point USA, to host a rally on campus at UTK. Plowman Dep. at 19.

195. While Defendant Plowman labeled the rally as "peaceful," she was aware that a UTK professor had complained about actual disruption due to heckling transgender and black male UTK students. Plowman Dep. at 19-21.

196. Defendant Plowman was made aware that the pro-Charlie Kirk/TPUSA rally was disrupting classes during midterm examinations. Plowman Dep. at 21.

197. Despite the request of a UTK professor to have UTK investigate, Chancellor Plowman did not know if any follow up had taken place. Plowman Dep. at 22.

198. Defendants were aware of another incident in which UTK Professor Glenn Reynolds publicly posted "Run 'em down" on Twitter in reference to protesters—speech more directly suggestive of violence than Plaintiff's—and UT treated that speech as protected and did not initiate termination proceedings.

25

199. While at a previous position, Chancellor Plowman previously chose not suspend or terminate a professor after she learned that the professor flipped off Turning Point USA students at a campus event. Plowman Dep. at 158-59.

200. Some UT/UTK comparators involved speech more directly tied to violence and disruption yet resulted in no discipline, demonstrating viewpoint-based enforcement.

201. UT/UTK Defendants were repeatedly informed of the First Amendment and due-process defects in their conduct through counsel correspondence, faculty criticism, campus activity, media coverage, and internal communications.

202. UT/UTK Defendants and other UT official nevertheless continued and ratified the adverse action.

## G. Reckless participation by each individual UT/UTK Defendant

203. Defendant Plowman implemented the suspension and termination process, approved or ratified the public messaging, and continues to maintain Plaintiff's exclusion from teaching and academic duties.

204. Plowman admits acting against written UT Board of Trustee Policy that mandates that the free exchange of ideas even if people might find them offensive, unwise, immoral, radical or wrongheaded, as well as First Amendment analysis of UT's Law School Dean recognizing that speech objectively more shocking that could truly be interpreted by some to incite violence is protected. Plowman Dep. at 61, 64-65.

205. Plowman recognizes UT policy about institutional neutrality but admits to not being neutral about Dr. Shirinian's Facebook comment. Plowman Dep. at 82-85.

206. While Plowman explained that lawyers can advise her on risk and as to how *they* understand the law, she admits that, with regards to First Amendment legal questions, at the end of the day, made the decisions, not the lawyers. Plowman Dep. at 86.

207. Defendant Boyd personally adopted, approved, and published false written public statements accusing Plaintiff of advocating violence and murder and personally supported the disciplinary action.

208. Defendant Compton, as Board Chair, received notice of the constitutional issues, participated in communications about the matter, approved or ratified messaging, and deliberately chose not to intervene despite authority and duty to demand constitutional compliance.

209. Defendant Compton, whose Board of Trustees has the power to overturn decisions of the President and Chancellor, admitted to not seeking any legal advice on the Shirinian matter.

210. Defendant Stinnett acted as an operational participant in drafting false public statements, facilitating ad hoc process, routing communications, ratifying, and enabling the continuation of unconstitutional adverse actions.

211. Defendant Moore participated in drafting, approving, routing, facilitating, or ratifying the unconstitutional conduct at issue.

212. Defendant Stinnett used attorney/client privilege to shield public relations or business-related discovery.

213. Upon information and belief, Defendant Stinnett told university officials to copy him on all emails.

214. Upon information and belief, Defendant Stinnett told university officials to copy him on all emails as means to shield public relations advice and non-legal advice.

Case 3:25-cv-00528-KAC-JEM    Document 58-1    Filed 03/27/26    Page 27 of 42
PageID #: 2333

215. Defendant Moore used attorney/client privilege to shield public relations or business related discovery.

216. Defendant Todd personally demanded Plaintiff's termination through non-legislative channels and thereby encouraged, pressured, and set in motion retaliatory action against Plaintiff.

217. Defendant Burchett, acting outside any legitimate legislative function, personally encouraged, pressured, and/or participated in efforts to cause Plaintiff's termination and to bring the weight of political office to bear on UT/UTK decisionmakers.

218. Each individual UT/UTK Defendant acted intentionally, knowingly, recklessly, or with deliberate indifference to Plaintiff's clearly established rights.

219. Defendants' actions were not based on misunderstanding or incomplete information, but on a deliberate decision to act in response to political and donor pressure despite the absence of any lawful basis to discipline Plaintiff.

220. Defendants with supervisory authority had actual knowledge of the constitutional violations and possessed the authority to prevent, halt, or reverse the adverse action, and knowingly acquiesced in, approved, or ratified the unconstitutional conduct.

221. UT/UTK Defendants' conduct was not merely negligent or mistaken, but reckless and undertaken with knowledge that Plaintiff's speech was protected under clearly established legal principles.

222. At the time of UT/UTK Defendants' conduct, it was clearly established that public employers may not impose adverse action based on protected speech on matters of public concern, may not punish speech because of third-party hostility or backlash, and may not rely on knowingly

28

false factual characterizations of speech to justify discipline. No reasonable official in UT/UTK Defendants' positions could have believed that their conduct was lawful.

223. At no point did any Defendant identify a lawful basis for discipline independent of Plaintiff's viewpoint or the reaction it generated, and no such basis existed.

224. No reasonable official in Defendants' positions could have believed that punishing off-duty, private political speech based on public backlash, absent any evidence of disruption, complied with the First Amendment, and no Defendant has identified any authority suggesting otherwise.

225. The prohibition on viewpoint discrimination and the heckler's veto was clearly established long before the events at issue here.

226. No reasonable official could believe that punishing a public employee for off-duty political speech, in response to political pressure and public backlash, without any evidence of disruption, was lawful.

227. Defendant Plowman admitted under oath that, on September 14th or 15th, 2025, she and Defendant Stinnett believed that they were going to be sued as a result of their actions.

228. All three layers of institutional power, the UT Board of Trustees, the President and the Chancellor, with the Board of Trustees having the ultimate authority either purposefully 1) failed to seek or follow legal advice, or, 2) ignored multiple UT policies. *See* Compton Dep. at 26-34, 38, 44, 75-80, 87-88, 97, 124, 141, 152, 161-67, 172-75; *see* Boyd Dep. at 85-89, 138-39, 142-44, 163-67; *see* Plowman dep. at 55-73, 78-79, 86-87, 254-55.

**CLAIMS FOR RELIEF**

**COUNT I: First Amendment Viewpoint Discrimination — 42 U.S.C. § 1983:**

**Against Plowman in her official capacity for prospective relief and against Plowman, Boyd, Stinnett, Moore, and Compton in their individual capacities**

229. Plaintiff incorporates by reference the preceding paragraphs.

230. Plaintiff engaged in protected speech.

231. As admitted to under oath by Chancellor Plowman, Plaintiff would not have been disciplined but for the viewpoint she expressed.

232. Defendants Plowman, Boyd, Stinnett, and Moore, who are all state actors, each targeted the viewpoint Plaintiff expressed.

233. Defendant Compton recklessly failed to even ask for a legal opinion and ratified others targeting Plaintiff's viewpoint.

234. Defendants Plowman, Boyd, Stinnett, Moore and Compton, each knew that Plaintiff did not make her Facebook comment as a representative of UT or UTK in any way, or were reckless in not researching facts.

235. Governmental actions were taken by Defendants Plowman because of that viewpoint, as she both suspended and later terminated Plaintiff's employment.

236. No UT/UTK Defendant can identify a compelling interest, and any asserted interest is not narrowly tailored.

237. Defendants did not act based on workplace disruption or operational concerns, but instead in direct response to disagreement with Plaintiff's viewpoint coupled with third-party hostility to that viewpoint. Chancellor Plowman admits to on multiple occasions and the text messages between the Chancellor and President Boyd confirm it.

30

238. Accordingly, this case does not present a close balancing question under Pickering, and Defendants' conduct is unconstitutional per se.

239. Defendants acted before conducting any evidence-based assessment of disruption.

240. Because Defendants acted in response to disagreement with Plaintiff's viewpoint and in response to third-party hostility to that viewpoint, their conduct is per se unconstitutional and not subject to justification under any balancing framework.

241. Viewpoint-based discrimination is an egregious form of content discrimination that is presumptively unconstitutional and cannot be justified by generalized concerns about controversy, public reaction, or institutional reputation.

242. Defendants did not impose comparable discipline on similarly situated speakers whose speech was more politically favored, generated less political pressure, or both.

243. Defendants' enforcement was selective and viewpoint-based, not content-neutral.

244. Defendants' own communications and sworn testimony show that they focused not on operational disruption, but on how Plaintiff's speech was perceived by donors, politicians, and the public, and how to respond to that perception.

245. Because Defendants engaged in viewpoint discrimination, their actions are subject to strict scrutiny, which they cannot satisfy.

246. Defendants cannot identify any compelling interest, and even if they could, their actions were not narrowly tailored but instead driven by external political and donor pressure.

247. If truly worried about the safety of Dr. Shirinian, UT/UTK could have resorted to less drastic measures.

248. Defendants' conduct violated the First Amendment and well-established Supreme Court and Sixth Circuit precedent.

31

249. The ongoing exclusion of Plaintiff from her profession and the chilling effect on protected speech constitute irreparable harm as a matter of law.

250. Defendants suffer no cognizable harm from being required to comply with the Constitution.

251. Injunctive relief would restore—not alter—the status quo by returning Plaintiff to her position prior to Defendants' unconstitutional actions.

252. Injunctive relief would restore the last uncontested status quo that existed before Defendants' unconstitutional conduct—not create a new one.

253. The law is clear: the First Amendment does not permit a public university to suppress speech to appease those who threaten disruption. The proper response is to control the crowd---not to silence the speaker. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("[A] function of free speech under our system of government is to invite dispute."); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992); *Gregory v. Chicago*, 394 U.S. 111, 118 (1969); *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc).

## COUNT II: Procedural Due Process — 42 U.S.C. § 1983:

**Against Plowman in her official capacity for prospective relief and against Plowman and Stinnett, in their individual capacities**

254. Plaintiff incorporates by reference the preceding paragraphs.

255. Plaintiff possessed protected property and liberty interests in her tenure-track appointment, continued employment, teaching duties, tenure trajectory, and professional standing—liberty interests under the stigma-plus doctrine.

256. Plaintiff was blacklisted from employment nationally because of how Defendants characterized her speech.

257. Defendants deprived Plaintiff of these interests without providing constitutionally adequate process, including notice of specific charges supported by evidence, a meaningful opportunity to respond prior to deprivation, and a hearing before a neutral decisionmaker.

258. No pre-deprivation hearing consistent with due process was provided, and any post-deprivation procedures were inadequate to cure these deficiencies because they were ad hoc, lacked neutrality, and were not grounded in established, faculty-facing policy, and effectively foreclosed Plaintiff from future employment in her profession.

259. No exigent circumstances justified bypassing pre-deprivation process, and Defendants identified no immediate risk requiring summary action.

260. Defendants publicly stigmatized Plaintiff by falsely accusing her of advocating and endorsing violence and murder and coupled that stigma with concrete alterations of her employment status, including removal from teaching, initiation of termination proceedings, and ultimate termination. This combination of reputational harm and tangible employment consequences constitutes a "stigma-plus" deprivation of liberty under clearly established law.

261. Because Defendants acted without any exigent circumstances or demonstrated risk, pre-deprivation process was constitutionally required and feasible.

262. Defendants' public accusations imposed a stigma that effectively foreclosed Plaintiff from employment in her profession, satisfying the stigma 'plus' requirement.

263. Defendants' conduct violated the Fourteenth Amendment.

### COUNT III: Declaratory and Injunctive Relief:

**Against Plowman in her official capacity only**

264. Plaintiff incorporates by reference the preceding paragraphs.

265. Plaintiff has filed an internal appeal of her termination.

33

266. Plaintiff remains subject to ongoing and prospective constitutional injury unless Defendant Plowman is ordered to rescind the adverse action, restore Plaintiff's teaching and academic duties, restore her tenure timeline, and refrain from continuing or renewing discipline based on protected speech absent constitutionally adequate justification.

267. A live controversy exists between the parties.

268. Plaintiff is entitled to declaratory and injunctive relief.

## COUNT IV: Defamation:

### Against Defendants Boyd, Plowman, Stinnett, and Moore

269. Plaintiff incorporates by reference the preceding paragraphs.

270. Defendants Boyd, Plowman, Stinnett and Moore each had access to Plaintiff's full Facebook post and comment prior to publication and either reviewed them or deliberately avoided doing so before accusing Plaintiff of advocating or endorsing violence and murder, or ratifying such publications.

271. Defendant Plowman admitted that Plaintiff's comment could simply be viewed as agreeing with the initial post but chose not to even speak with Plaintiff before acting.

272. Defendants Boyd and Plowman published false statements of fact, including statements that Plaintiff had advocated, or endorsed violence and murder.

273. The terms "advocate" and "endorse" have objective meanings requiring affirmative support or approval, which Plaintiff's speech did not express.

274. Whether Plaintiff's speech advocated or endorsed violence can be determined by comparing her actual words to the ordinary meaning of those terms, requiring no subjective interpretation and rendering Defendants' statements provably false.

275. No reasonable reader of Plaintiff's actual words could conclude that she advocated or endorsed violence under any accepted definition or in context.

276. Defendants' statements were defamatory because they exposed Plaintiff to public hatred, contempt, ridicule, disgrace, and injury in her profession.

277. Defendants published those statements intentionally, negligently, recklessly, and/or with actual malice.

278. Defendants' statements were published widely to third parties, including through official University social media accounts and widely viewed public platforms, reaching hundreds of thousands if not millions of individuals and being further republished by others.

279. Defendants failed to undertake any reasonable analysis of Plaintiff's actual words before accusing her of advocating or endorsing violence and murder.

280. Whether Plaintiff's speech advocated or endorsed violence is a factual determination that can be objectively assessed based on the words used and their context

281. In context, Defendants' statements would be understood by a reasonable reader as asserting an objectively verifiable fact about Plaintiff's speech, not as protected opinion or hyperbole.

282. Defendants Stinnett, Moore, Compton, and Plowman either authored, materially assisted in drafting, approved, authorized, ratified, or caused publication of the defamatory statements.

283. Defendants either knew the statements were false or deliberately avoided confirming their truth, including by failing to properly examine Plaintiff's actual words before making public accusations.

284. Defendants knew the actual words used by Dr. Shirinian contradicted their characterization.

285. Whether Plaintiff's speech "advocated violence" is a verifiable factual question capable of objective determination based on the actual words used.

286. As a direct and proximate result, Plaintiff suffered reputational injury, emotional distress, humiliation, damage to professional standing, damage to future earning capacity, and other compensable harm.

### COUNT V: Defamation Per Se:

### Against Defendants Boyd, Plowman, Stinnett, and Moore

287. Plaintiff incorporates by reference the preceding paragraphs.

288. Defendants Boyd, Plowman, Stinnett and Moore each falsely accused Plaintiff of advocating, endorsing, supporting, or celebrating violence and murder.

289. Defendants' statements that Plaintiff advocated violence and murder is an assertion of fact—not opinion—because it conveys a verifiable and objectively false characterization of Plaintiff's actual words.

290. Defendants' statements that Plaintiff endorsed violence and murder is an assertion of fact—not opinion—because it conveys a verifiable and objectively false characterization of Plaintiff's actual words.

291. Defendants knew the statements were false or acted with reckless disregard for their truth, including by failing to review the actual speech or deliberately mischaracterizing it.

292. Those false accusations directly impugned Plaintiff in her profession as a university professor and charged her with conduct incompatible with the duties, ethics, and trust required of an educator.

293. Those accusations also tended to subject Plaintiff to public contempt and to deter others from associating with or employing her in her profession.

294. The statements were defamatory because they exposed Plaintiff to public hatred, contempt, ridicule, disgrace, and injury in her profession.

295. Defendants published those statements intentionally, negligently, recklessly, and/or with actual malice.

296. Defendants' statements were published widely to third parties, including through official University social media accounts and widely viewed public platforms, reaching hundreds of thousands if not millions of individuals and being further republished by others.

297. The statements therefore constitute defamation per se under Tennessee law.

298. Plaintiff is entitled to presumed damages and all other damages permitted by law, in addition to special and actual damages to the extent proven.

## COUNT VI: False Light Invasion of Privacy:

### Against Defendants Boyd, Plowman, Stinnett, and Moore

299. Plaintiff incorporates by reference the preceding paragraphs.

300. Defendants gave widespread publicity to matters concerning Plaintiff that placed her before the public in a false light.

301. Specifically, Defendants Boyd, Plowman, Stinnett and Moore each portrayed Plaintiff as a person who advocates, endorses, supports, or celebrates violence and murder.

302. That portrayal was false.

303. That false light would be highly offensive to a reasonable person.

304. Defendants knew of the falsity of that portrayal or acted in reckless disregard as to its falsity and the false light in which Plaintiff would be placed.

305.     Plaintiff suffered severe reputational, professional, and emotional harm as a result.

## COUNT VII: Tortious Interference with Business Relationship (Tennessee Law):

### Against Defendants Todd, Burchett and John Doe #1

306.     Defendants Todd, Burchett, and John Doe #1 each employed improper means, including coercion and/or threats of economic harm, in violation of clearly established constitutional rights.

307.     Defendants Todd and Burchett acted outside their roles as legislators and targeted an individual's specific contractual relationship.

308.     The conduct of Defendants Tood and Burchett does not constitute protected political advocacy but rather coercive interference with a specific contractual relationship through improper means.

309.     Defendants Todd and Burchett used coercive economic pressure and political pressure intended to induce unconstitutional action, including leveraging their official position to exert outside lawful channels.

310.     Inducing a public institution to violate clearly established constitutional rights constitutes independently wrongful conduct and improper means under Tennessee law.

311.     Plaintiff maintained an ongoing and legally protected business relationship with UT and/or UTK including her tenure-track faculty appointment, compensation, research opportunities, and continued employment expectations.

312.     Defendant John Doe #1, threatened to withhold over $10 million dollars ($10,000,000.00) if Plaintiff was not terminated. *See* email from John Doe #1, attached as Exhibit E.

313. Defendants John Doe #1 Todd, and Burchett, each knew that Plaintiff had an existing business relationship with UTK.

314. Each of these Defendants intended to cause a breach in Dr. Shirinian's employment with UTK.

315. Defendant John Doe #1 intended to cause a breach in Dr. Shirinian's business relationship with UTK via improper means: by his threat to withhold over ten million dollars ($10,000,000.00) from UT/UTK if Dr. Shirinian was not terminated because of her protected speech and viewpoint.

316. Defendants Todd and Burchett intended to cause a breach in Dr. Shirinian's business relationship with UTK via improper means: acting outside of legitimate legislative function, though behind the scenes demands that UT/UTK terminate Dr. Shirinian because of her protected speech and viewpoint.

317. These actions were undertaken for an improper purpose—namely, to punish Plaintiff for her viewpoint—and through improper means, including political and financial coercion and pressure directed at public officials to violate clearly established constitutional rights.

318. Defendants John Doe #1, Todd, and Burchett actions were a substantial factor in causing Defendants Boyd, Plowman, and others to impose adverse action against Plaintiff.

319. Such conduct constitutes independently wrongful conduct, including conduct that is illegal, tortious, or in violation of established public policy under Tennessee law.

320. As a direct and proximate result, Plaintiff suffered loss of employment, reputational injury, emotional distress, and economic damages.

## COUNT IX: Inducement or Procurement of Breach of Contract,

## T.C.A. section 47-50-101:

### Against Defendants Todd, Burchett and John Doe #1

321. It is unlawful for any person, by persuasion, to induce the breach or violation or failure to perform any contract. In every case where a breach or violation of a contract is so procured, the injured party may bring suit for the breach and treble (triple) damages.

322. At all relevant times, Plaintiff maintained a valid and enforceable contractual relationship with the UT and/or UTK, including but not limited to her employment, associated rights, and protection arising from UT policies, practices, and governing procedures.

323. Defendants Todd, Burchett, and John Doe #1, each knew of the existence of such a contract.

324. Defendants Todd, Burchett, and John Doe #1, each acted maliciously through persuasion to induce the breach that occurred.

325. Defendants' inducement was accomplished through improper means, including coercion, threats of economic harm, and pressure to violate clearly established constitutional rights.

326. Such conduct is not privileged and falls outside any lawful justification for interference.

327. As a direct and proximate result of the breach, Plaintiff suffered loss of employment, reputational injury, emotional distress, and economic damages

328. Defendants Todd, Burchett, and John Doe #1, each were proximate causes to the breach and damages resulted from the breach.

## <u>REQUEST FOR RELIEF</u>

Based on the Motion for Preliminary Injunction already before this Court, the undisputed facts, and the clear violation of viewpoint discrimination and heckler's veto, Plaintiff respectfully requests that this Court enforce these settled constitutional principles and grant the relief requested. In toto, Plaintiff respectfully requests that the Court:

A. Declare that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments;

B. Provide expedited consideration of her request for preliminary injunctive relief given the ongoing nature of the constitutional violation, and declaratory relief that Defendants' conduct constituted viewpoint discrimination and an impermissible heckler's veto;

C. Enter preliminary and permanent injunctive relief against Defendant Plowman in her official capacity rescinding the administrative leave and all related adverse restrictions, relieving Plaintiff of the need to continue with her appeal, restoring Plaintiff to teaching and academic duties, restoring her tenure-review timeline, and prohibiting renewed discipline based on protected speech absent constitutionally sufficient grounds;

D. Award compensatory damages against the individual Defendants;

E. Award presumed, general, special, and consequential damages on the Tennessee tort claims as permitted by law;

F. Award punitive damages against the individual Defendants to the fullest extent permitted by law;

G. Award attorney's fees and expenses under 42 U.S.C. § 1988 and other applicable law;

H. Tax costs to Defendants; and

I. Grant such other and further relief as the Court deems just and proper.

J. Provide a trial by jury.

41

## CONCLUSION

Faced with direct, behind the scenes, coercive pressure from legislators, credible eight-figure donor threats, and an escalating public-relations crisis, UT and UTK officials admitted under oath that their central concern was not safety or disruption—but that a doxed, private Facebook comment had gone viral and made the University's "brand" look bad. As Chancellor Plowman's sworn testimony explained, when a public university loses public trust, it "loses everything."

Private text messages between the UT President Randy Boyd and Chancellor Plowman confirm what the sworn testimony already establishes: the decision to terminate Dr. Shirinian was driven by politicians, donors, alumni, parents, and "so many others"—not by any constitutionally permissible basis.

The record shows that Defendants did not rely on, ignored, or purposely failed to seek legal guidance before acting. Instead, UT's own lawyers—functioning mainly in a public-relations and business capacity—helped their clients craft after-the-fact justifications, including false public statements that Dr. Shirinian advocated for ad endorsed violence and murder.

The law does not permit such conduct.

Respectfully Submitted,

/s/ Robert C. Bigelow, Esq.
Robert C. Bigelow, Esq. #022022
Bigelow Legal, PLLC
4235 Hillsboro Pike, Suite 301
Nashville, TN 37215
(615) 829-8986
rbigelow@bigelowlegal.com

42